**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| DIAMONDHEAD CASINO CORPORATION, | Case No. 15-11647 (LSS) |
| Alleged Debtor. | **Ref. No.  4** |

**OBJECTION TO MOTION OF THE ALLEGED DEBTOR, DIAMONDHEAD
CASINO CORPORATION, TO DISMISS THE INVOLUNTARY BANKRUPTCY
PETITION OR, IN THE ALTERNATIVE, TO CONVERT THE CASE TO CHAPTER 11**

Petitioning Creditors F. Richard Stark (**"Stark"**), Arnold Sussman (**"Sussman"**), Alan D. Cohen (**"Cohen"**), Robert F. Skaff (**"Skaff"**), Jr., David J. Towner (**"Towner"**) and DDM Holdings, LLC, as successor in interest to College Health & Investment, L.P.'s March 25, 2010 Promissory Note (**"DDM"**) (collectively, the **"Petitioning Creditors"**), by and through their undersigned counsel, hereby respectfully submit this Objection (the **"Objection"**) to the Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11 (the **"Motion"**).  In support of their Objection, the Petitioning Creditors respectfully represent as follows:

**PRELIMINARY STATEMENT**

Alleged Debtor is an insolvent corporation that has been mismanaged for over a decade, and according to its own recent public filing with the SEC: (i) "has incurred losses over the past several years, has no operations and generates no operating revenues"; (ii) "[d]uring the six months ended June 30, 2015 and 2014 the Company incurred net losses applicable to common shareholders"; (iii) it has had no operations since it ended its gambling cruise ship operations in 2000; (iv) it has concentrated its efforts—**for fifteen years without success**—on the development of its Diamondhead, Mississippi property, which is dependent upon the Company

obtaining the necessary capital to do so; (v) "certain conditions raise substantial doubt about the Company's ability to continue as a going concern"; and (vi) it expects continued losses for the foreseeable future.

Alleged Debtor has solicited and received significant investment from the Petitioning Creditors over the years, and as described below, the promissory notes provided to the Petitioning Creditors in exchange for their monetary investments are long past their maturity dates and are in default. Rather than working with the Petitioning Creditors to pay down the notes, at every turn, Alleged Debtor attempts to dodge its responsibilities. When faced with demands for immediate payment of the notes and a corresponding Delaware Superior Court lawsuit for payment, Alleged Debtor responded by attempting to convert the principal and interest due under the notes into worthless common stock in a failed attempt to moot the lawsuit. The Superior Court denied the motion to dismiss and held that because Alleged Debtor materially breached the promissory note it could not enforce a conversion provision thereunder. *See* Memorandum Opinion (the **"Memorandum Opinion"**) attached hereto as **Exhibit A**. The Superior Court saw right through Alleged Debtor's scheme:

> This is a case of casino receiving $150,000, executing a note for that amount, paying nothing on the principal, defaulting and then asserting that they have complied with the terms of the note by converting it to their common stock that has little or no value. If the Court was to find their argument had merit it would truly be declaring that they had hit the "Jackpot". Unfortunately for them, the Court will not play with their dice and finds the [Debtor's] position is not supported by any reasonable reading of the terms of the note and their Motion will be denied.

The promissory notes that are the foundation of the debt owed to the Petitioning Creditors are all virtually identical to the promissory note analyzed by the Superior Court. The only differences are the amounts and the various maturity dates (all of which have expired), which are

set forth below.  Again, rather than addressing its financial woes head on, Alleged Debtor resorts to a red herring attack on the Petitioning Creditors' motives.  The proxy contest, which concluded at the annual meeting of the stockholders on June 8, 2015, is a side show.  The Petitioning Creditors are not attempting to "pressure the Company to put Petitioners' nominees on the Board."  Indeed, a wife of one of the Petitioning Creditors refused to sit on the board despite being approached to do so in exchange for support in further entrenching management.

At bottom, the Petitioning Creditors are valid creditors of the Alleged Debtor who are merely trying to obtain payment on their long overdue notes and ensure that the value of the Alleged Debtor's assets is maximized for all parties-in-interest.  The Alleged Debtor has been mismanaged for years at the expense of Petitioning Creditors, primarily for the benefit of its insiders with no viable development plan to repay Petitioning Creditors or provide a return to equity.  Shareholder value is being eroded because of Alleged Debtor's mismanagement and, as set forth in the motion for the appointment of a trustee to be filed on September 18, 2015, Petitioning Creditors simply want the Company to be managed by an independent fiduciary capable of deciding how to maximize value for all stakeholders, whether that be through an orderly sale of the Company's assets or some other means.

## BACKGROUND

1.      On August 6, 2015, Stark, Sussman and Cohen (the **"Original Petitioning Creditors"**) commenced this bankruptcy case by filing an involuntary petition (the **"Petition"**) against Diamondhead Casino Corporation (the **"Alleged Debtor"** or **"Diamondhead"** or the **"Company"**).

2.      Skaff, Towner and DDM ("the **"Joining Creditors"**) each filed a joinder to this action on September 11, 2015 (Skaff), September 15, 2015 (Towner), and September 17, 2015 (DDM), respectively (collectively, the **"Joinders"**).

3.      The Company owns approximately 404.5 acres of unimproved land in Diamondhead, Mississippi on which it has planned for over **fifteen years** to construct a casino resort and hotel and associated amenities (the **"Property"**).  According to Alleged Debtor's most recent Quarterly Report filed with the SEC on August 14, 2015:

> The Company has incurred losses over the past several years, has no operations and generates no operating revenues.  During the six months ended June 30, 2015 and 2014 the Company incurred net losses applicable to common shareholders, exclusive of the recording of change in the fair value of derivatives, of $926,076 and $662,597, respectively.
>
> The Company has had no operations since it ended its gambling cruise ship operations in 2000.  Since that time, the Company has concentrated its efforts on the development of its Diamondhead, Mississippi property.  That development is dependent upon the Company obtaining the necessary capital, through either equity and/or debt financing, unilaterally or in conjunction with one or more partners, to master plan, design, obtain permits for, construct, open, and operate a casino resort.
>
> In the recent past, in order to raise capital to continue to pay on-going costs and expenses, the Company has borrowed funds and offered, through Private Placements, convertible instruments more fully described in Notes 5 and 6 to these condensed consolidated financial statements.

*See* Diamondhead Casino Corporation Form 10-Q (Aug. 14, 2015), at 5 (the **"Form 10-Q"**).  A true and correct copy of the Form 10-Q is attached hereto as **Exhibit B**.

4.      The Company concedes that it "has incurred continued losses over the past several years and certain conditions raise substantial doubt about the Company's ability to continue as a going concern." *See* Form 10-Q, at 16.   The Company "has incurred a loss

applicable to common shareholders of $3,377,375 and $1,414,526 for the years ending December 31, 2014 and 2013, respectively, *and expects continued losses for the foreseeable future*." (*Id.*) (emphasis added).

5.      In or about March, 2010, Alleged Debtor began soliciting an investment in convertible promissory notes. Each of the Petitioning Creditors invested in Alleged Debtor in exchange for an executed promissory note.

6.      In 2010, Stark, Cohen, Sussman, and College Health & Investment, L.P. (**"CHI"**), invested money with Alleged Debtor in exchange for twelve percent (12%) promissory notes, each with a maturity date two years later. CHI invested $150,000.00 and received a promissory note (the **"CHI Note"**) from Alleged Debtor in return that matured on March 25, 2012, which erroneously listed CHI as "College Health & Investment, Ltd." Stark, Cohen and Sussman each invested $50,000.00 and received promissory notes (the **"Stark Note,"** "**Cohen Note"** and **"Sussman Note,"** respectively, and together with the CHI Note, the **"12% Notes"**) from Alleged Debtor in return.

7.      In November 2010 and June 2011, Skaff invested money with Alleged Debtor in exchange for nine percent (9%) promissory notes. Towner also invested money with the Alleged Debtor in June 2011 in exchange for a nine percent (9%) promissory note. Skaff invested $37,500.00 in November 2010 and $25,000.00 in June 2011, and received nine percent (9%) promissory notes (the **"Skaff Notes"**) from the Alleged Debtor in return. Towner invested $25,000.00 in June 2011 and received a nine percent (9%) promissory note (the **"Towner Note,"** together with the Skaff Notes, the **"9% Notes,"** and together with the 12% Notes, the **"Notes"**) from the Alleged Debtor in return. The Skaff Notes matured in November 2012 and June 2013, respectively. The Towner Note matured in June 2013.

8.      Pursuant to the terms of the 12% Notes, Alleged Debtor was required to pay the principal amount of such notes to the applicable noteholders by maturity dates plus interest owed.  Interest accrued at a rate of twelve percent annually and was due semi-annually.  Alleged Debtor failed to repay the 12% Notes by the maturity dates, and has made no interest payments for years.

9.      Pursuant to the terms of the 9% Notes, Alleged Debtor was required to pay the principal amount of such notes to the applicable noteholders by the maturity dates plus interest owed.  Interest accrued at nine percent annually and was due semi-annually.  Alleged Debtor failed to repay the 9% Notes by the maturity dates, and has made no interest payments for years.

10.      The Notes define an "Event of Default" as a failure to pay the principal balance or interest when the Notes are due and when such failure continues for sixty (60) days after the Maturity Date.  The Notes also provide for remedies upon the occurrence of a default, including that Petitioning Creditors "may at any time at [their] option, (a) declare the entire unpaid balance of [the Notes], together with all interest accrued hereon, due and payable, and thereupon, the same shall be accelerated and so due and payable."  (Notes at § 3.2.)

11.      On September 22, 2014, CHI first demanded payment of the principal amount of the CHI Note and the interest from June 30, 2012 at twelve percent annually.  At the time, the property owned by Alleged Debtor was unencumbered.  On October 14, 2014, Alleged Debtor responded that it did not have the funds to pay the CHI Note.

12.      On January 15, 2015, CHI filed a lawsuit in the Superior Court of the State of Delaware (the **"Superior Court"**).  Seven days later, on January 22, 2015, Alleged Debtor acknowledged the debt and notified CHI that it would exercise a purported right under Section 2.1 of the Notes to convert the unpaid principal interest into common stock of Alleged Debtor.

See **Exhibit C**.

13.    On February 11, 2015, Alleged Debtor moved to dismiss the Superior Court action contending that it had tendered the relief requested by CHI and therefore rendering the action moot.

14.    After briefing and oral argument, on July 2, 2015, the Superior Court issued the Memorandum Opinion denying Alleged Debtor's motion to dismiss and holding that Alleged Debtor materially breached the CHI Note by failing to pay the principal to CHI by the Maturity Date, and failed to pay interest after June 30, 2012.

15.    The Superior Court further held that because Alleged Debtor materially breached the CHI Note it could not enforce the conversion provision of the CHI Note.  The Superior Court aptly described Alleged Debtor's conduct towards one of its noteholders:

> This is a case of casino receiving $150,000, executing a note for that amount, paying nothing on the principal, defaulting and then asserting that they have complied with the terms of the note by converting it to their common stock that has little or no value.  If the Court was to find their argument had merit it would truly be declaring that they had hit the "Jackpot".  Unfortunately for them, the Court will not play with their dice and finds the [Alleged Debtor's] position is not supported by any reasonable reading of the terms of the note and their Motion will be denied.

16.    On several occasions after the Stark Note matured, Stark verbally demanded that Alleged Debtor pay the principal and outstanding interest due and owing under the Stark Note.  Stark's demand was ignored.

17.    On several occasions after the Cohen Note matured, Cohen verbally demanded that the Alleged Debtor pay the principal and outstanding interest due and owing under the Cohen Note.  Cohen's recent demand occurred in July of this year.  Cohen's demand was ignored.

18.    Sussman and his wife, Soraya Sussman, each demanded repayment of the Sussman Note—by e-mail and verbally.  Alleged Debtor's President, Deborah Vitale, responded to Ms. Sussman that Alleged Debtor did not have the money to pay the Sussman Note.  Ms. Vitale also stated that Vitale was confident that she would receive a return of her money, but that none of the other stakeholders would get their money back.

19.    On June 19, 2015, Skaff made a written demand on Alleged Debtor for immediate payment of the Skaff Notes.  On June 26, 2015, Alleged Debtor acknowledged the debt and responded by attempting to convert the debt to common stock, just like its failed attempt with CHI.  As held by the Superior Court on July 2, 2015, however, the conversion right no longer exists because the Notes are in default and have been breached by the Alleged Debtor.

20.    In or around September 1, 2015, Towner made written demand on Alleged Debtor for the immediate payment of the Towner Note.  Towner's demand was ignored.

21.    At the request of the Alleged Debtor's directors, CHI assigned the CHI Note, including its cause of action against the Company, to DDM.

**THE AVOIDABLE LIEN**

22.    On September 24, 2014, the Company perfected a $5 million lien on the Property—its only viable asset (the **"Avoidable Lien"**).  The Avoidable Lien includes an insider executive lien on the Property in favor of the executives of Diamondhead.  The Company's current President and Director, Deborah Vitale, is the primary beneficiary of the approximately $2 million "executives lien", which was for purported past consideration.  As disclosed in the Company's public filings, Vitale is the primary beneficiary of the Avoidable Lien.

**ARGUMENT**

**A.    The Petition Should <u>Not</u> be Dismissed Because there are Important Bankruptcy Purposes that Can Only be Accomplished by this Court.**

23.    The Original Petitioning Creditors' primary goals in commencing these cases on August 6, 2015 (the **"Petition Date"**) were to: (i) obtain payment on their long overdue Notes; (ii) maximize the value of the Alleged Debtor's assets for the benefit of all parties-in-interest; (iii) preserve, for the benefit of all parties-in-interest, one or more large potential avoidable transfers – the Avoidable Lien; (iv) have an independent fiduciary analyze and assume or reject any executory contracts; and (v) to seek the appointment of an independent Chapter 7 trustee to investigate and pursue breach of fiduciary duty and other claims against the Alleged Debtor's officers and directors.  All of these are valid reasons for commencing an involuntary bankruptcy case. *See In re AMC Investors, LLC*, 406 B.R. 478, 488-89 (Bankr. D. Del. 2009) (bankruptcy court would not abstain from hearing involuntary Chapter 7 case where creditor had filed petition in order to seek appointment of Chapter 7 trustee to investigate and pursue breach of fiduciary duty claims against debtors' officers and directors); *In re Key Auto Liquidation Center, Inc.*, 372 B.R. 74, 78 (Bankr. N.D. Fla. 2007) (petitioning creditors had reason to believe that the Alleged Debtor was making preferential transfers, which can be avoided only under the Bankruptcy Code, and filed the involuntary petition to ensure that they got their fair share of the Alleged Debtor's assets).

24.    As set forth above, the Avoidable Lien, a large improper transfer, was made last September that likely will result in a very valuable preference action should this bankruptcy case be allowed to continue.  The recipients of this potentially avoidable transfer include the Alleged Debtor's insiders.  Any further delay in initiating these cases would have placed the Avoidable Lien outside of the applicable preference recovery period.  Consequently, the value of the

Alleged Debtor's bankruptcy estate would have diminished had the Involuntary Petition not been filed. Moreover, since the Alleged Debtor is an insolvent, non-operating company that merely holds a single parcel of land, it is not clear how a bankruptcy petition is harmful. The only entities that may be harmed by entering an order for relief in this case are the officers and directors of the Alleged Debtor. While these individuals may desire to avoid the threat of lawsuits pursued by a chapter 7 trustee, those interests are not relevant in a decision to abstain under section 305(a)(1). *See In re AMC Investors, LLC*, 406 B.R. at 489.

**B.    Petitioning Creditors are Eligible Petitioners and Bankruptcy Relief is Appropriate.**

25.    Section 303 of the Bankruptcy Code governs involuntary petitions. Section 303(b) states, in relevant part:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title —
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such non-contingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

11 U.S.C. § 303(b)(1).

**1.    Original Petitioning Creditors' Claims are Not Subject to a *Bona Fide* Dispute.**

26.    The Original Petitioning Creditors' claims are not subject to a *bona fide* dispute. A *bona fide* dispute exists "if there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Assoc. v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65, 66-67 (3d Cir. 1989); *In re AMC Investors, LLC*, 406 B.R. at 483. Under this standard, the bankruptcy court must determine

whether there is an objective basis for either a factual or a legal dispute as to the validity of debt. *In re AMC Investors, LLC,* 406 B.R. at 484.

27.     First, Diamondhead has conceded that the Original Petitioning Creditors are owed $150,000 plus interest pursuant to their Notes, an amount well in excess of the minimum amount of $15,325 required to file an involuntary petition. *See* Motion at page 5; *In re Mylotte, David and Fitzpatrick*, 2007 WL 2033812, at *7 (Bankr. E.D. Pa. July 12, 2007) (finding that petitioning creditor met its burden by showing that a sufficient portion of its claim was not subject to a bona fide dispute).

28.     Claims for amounts due on demand notes constitute claims that are not contingent or subject to *bona fide* dispute.  The Notes that form the basis of all the Petitioning Creditors unpaid loans to the Alleged Debtor are attached hereto as **<u>Exhibit D.</u>**  All a petitioning creditor is required to provide is evidence of an alleged unpaid loan for standing to file an involuntary petition. *In re VitaminSpice*, 472 B.R. 282, 291 (Bankr. E.D. Pa. 2012)(recognizing that loan documents introduced by petitioning creditors were sufficient to establish prima facie validity of claims); *In re Taub*, 439 B.R. 261, 274–75 (Bankr. E.D.N.Y. 2010)(finding that petitioning creditor lacked standing where she had presented no evidence of the underlying agreement supporting her claim); *In re Rimell*, 111 B.R. 250, 253 (Bankr. E.D. Mo. 1990) *aff'd by* 946 F.2d 1363 (8th Cir. 1991) (evaluating underlying agreements to determine whether claim was subject to a bona fide dispute).

29.     As stated by the Third Circuit, "[u]nder common law, to constitute a loan there must be (i) a contract, whereby (ii) one party transfers a defined quantity of money goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." *Boston Univ. v. Mehta (In re Mehta)*, 310 F.3d 308, 313 (3d Cir. 2002).  Put another

way, to establish the *prima facie* validity of a claim, the Petitioning Creditors must only establish the existence of a contract obligating the Alleged Debtor to repay the amount borrowed – the Notes.  The Petitioning Creditors claims consist of obligations imposed on the Alleged Debtor set forth in the Notes, which are *prima facie* valid and not contingent as to liability or the subject of a *bona fide* dispute as to liability or amount.

30.     The Alleged Debtor does not contest the fact that the Notes are due and owing. Their primary complaint is that the Original Petitioning Creditors did not demand payment before filing the involuntary petition.  However, as set forth above, the Original Petitioning Creditors verbally demanded repayment of their Notes but were ignored.  It should be noted that the Notes do not require any specific form of demand, so a verbal demand is sufficient, and there is no cure period.  Therefore, the involuntary petition itself can serve as the demand under the Notes. *See Int'l City Bank & Trust Co. v. Morgan Walton Props., Inc.*, 675 F.2d 666, 668 (5th Cir. 1982)  ("Neither is it significant that plaintiff failed to make formal demand prior to commencing this suit. Because the filing of the lawsuit constitutes a demand, a formal demand was not necessary.  Moreover, in both notes defendants waived 'presentment for payment, demand, protest, and notice of protest and non-payment.'  This provision is binding.  The purpose of demand prior to suit, to give the maker of the note opportunity to pay and avoid litigation expenses, is of no practical consequence where, as here, the maker chooses to defend the action.  Even if a demand were required before suit, a formal demand merely permits the maker to set up certain defenses as to costs and damages and does not preclude recovery on the notes.") (citations omitted); *Nat'l Credit Union Admin. Bd. v. Regine*, 795 F. Supp. 59, 62-63 (D.R.I. 1992) ("There is no dispute that the defendants stopped making payments on the four promissory notes by May 1989.  Under the terms of these notes, the holder may demand

repayment of the entire amounts owed.  The parties dispute whether Fairlawn declared all the notes to be due after the NCUAB became Fairlawn's conservator in November 1989.  In any event, the filing of this lawsuit in December 1989 amounts to such a declaration.") (citations omitted).

31.    Even if the Court finds they did not properly make demand – which they did - this argument places form over substance and will only serve to benefit the insiders who received substantial preferential transfers within a year of the bankruptcy filing.  If the Court were to dismiss the petition based upon this argument, all the Original Petitioning Creditors would need to do is send a demand upon dismissal and immediately refile the involuntary. Of course, the insiders would prefer this to place certain preferential transfers – the Avoidable Lien - made to themselves outside of the one year window provided for in section 547(b) of the bankruptcy Code.  Such a ruling would be a monumental waste of judicial resources and prejudicial to all of the creditors and shareholders of the Alleged Debtor.

32.    In a desperate effort to avoid bankruptcy, the Alleged Debtor further claims that because there is a pending action by a noteholder to compel payment on an identical Note pending in the Superior Court, the claims of the Original Petitioning Creditors are somehow subject to *bona fide* dispute. *See College Health & Investment, L.P. v. Diamond Head Casino Corporation*, C.A. No. N15C-01-119 WCC (Del. Super. July 2, 2015) (the **"Superior Court Action"**).  However, the mere existence of litigation relating to a petitioning creditor's claim is insufficient to rebut its *prima facie* validity as a claim not subject to any *bona fide* dispute thus denying creditor standing to join in filing involuntary petition. *See In re VitaminSpice*, 472 B.R. at 293; *In re Red Rock Rig 101, Ltd.*, 2008 WL 2052732, at *2 (10th Cir. BAP 2008) ("The mere existence of pending litigation is insufficient to establish the existence of a bona fide dispute.").

33.    The Superior Court Action is proof that the Alleged Debtor is not paying its debts as they come due.  In the *College Health* case, the Plaintiff sued in Superior Court to compel payment on the same form of Note held by the Original Petitioning Creditors.  The Alleged Debtor filed a Motion to Dismiss for mootness which was denied by the Superior Court.

34.    In the Superior Court Action, the Alleged Debtor admitted that it did not have the funds to pay the Note. *See* Memorandum Opinion at 3.  The basis for the Motion to Dismiss was the Alleged Debtor's assertion that it tendered the relief requested by the plaintiff by converting the Note into common stock – after default and well after the maturity date.  In dismissing the same argument the Alleged Debtor is trying make here, that the Notes are subject to a *bona fide* dispute presumably because they can be paid in stock, the Superior Court stated that "[i]f the Court was to find their argument had merit it would truly be declaring that they had hit the "Jackpot".  Unfortunately for them, the Court will not play with their dice and finds the defendant's position is not supported by any reasonable reading of the terms of the note and their Motion will be denied." *See* Memorandum Opinion at 5.

35.    In denying the Motion to Dismiss, the Court held that there is no question that the Alleged Debtor has defaulted on the note and that the right to convert the note to common stock ceased when the maturity date of the note passed. *See* Memorandum Opinion at 8.  Thus, there can be no dispute that the Notes are due and owing and not subject to a *bona fide* dispute[1].

---

[1]    Any argument that because the Memorandum Opinion may be subject to appeal somehow makes the Notes subject to *bona fide* dispute has been rejected by this and other courts.  *See, e.g., In re AMC Investors, LLC*, 406 B.R. at 484-486 (claim based upon unstayed state court judgment against purported debtors, which was not entered by default, was not subject to any "bona fide dispute," for purposes of determining whether judgment creditor was eligible to commence involuntary Chapter 7 case, though debtors had filed a still-pending appeal from attorney fee component of state court's damages award).

36.     Furthermore, a final judgment is not needed to commence an involuntary bankruptcy proceeding and the Petitioning Creditors can file based upon the unpaid Notes. *In re AMC Investors, LLC*, 406 B.R. at 485 (the Code does not make the existence of a bona fide dispute depend on whether a claim has been reduced to judgment. It permits creditors who have not reduced their claims to judgment to file involuntary petitions); *In re Wishgard, LLC*, 2013 WL 1774707, *6 (Bankr. W.D. Pa. April 25, 2013) (a petitioning creditor is not required to obtain a judgment prior to filing an involuntary petition).

37.     Additionally, so long as only a portion of the claim is undisputed, it is settled law that the undisputed portion of the claim is sufficient to create a debt under section 303(b)(1) of the Bankruptcy Code.  Prior to 2005, the law was clear that an undisputed portion of a claim was sufficient to support an involuntary petition so long as the undisputed portion was greater than the statutory minimum. *See In re Focus Media, Inc.*, 378 F.3d 916, 926 (9th Cir. 2004) (noting the "widely accepted proposition regarding involuntary bankruptcy petitions:  If at least a portion of the debt that is the subject of the petition is undisputed, the undisputed portion is sufficient to create a debt under section 303(b)(1) not subject to bona fide dispute"); *IBM Credit Corp. v. Compuhouse Sys.*, 179 B.R. 474, 479 (W.D. Pa. 1995), *aff'd,* 85 F.3d 612 (3d Cir 1996) (same); *In re F.R.P. Indus., Inc.*, 73 B.R. 309, 321 (Bankr. M.D. Fla. 1987) (finding that even though a portion of a claim was subject to bona fide dispute, the undisputed part was greater than the statutory floor and was sufficient to support an involuntary petition); *In re Byrd*, 357 F.3d 433, 440 (4th Cir. 2004) ("Even if Byrd had demonstrated a bona fide dispute with regard to any portion of Platinum's claim that was for finance charges, Platinum still might have had an undisputed claim for principal in excess of § 303(b)(2)'s $11,625 threshold").

38.    The 2005 amendments did not change these "widely accepted proposition[s]." Those amendments changed the language of section 303(b)(1) from "holder of a claim … that is not contingent or the subject of a bona fide dispute" to "holder of a claim … that is not contingent or the subject of a bona fide dispute as to liability or amount."  But as noted by the Court in *In re Demirco Holdings, Inc.*, the addition of the words "as to liability or amount" did not change the well-settled law regarding the meaning of a *bona fide* dispute:

> The legislative history from 1984 shows a Congressional intent that the addition of the "bona fide dispute" phrase to the statute originally was intended to cover disputes as to both liability and amount.  *See* 130 Cong. Rec. S7618 (daily ed. June 19, 1984) (remarks of Sen. Baucus).  The addition of the words "as to liability and amount" in the 2005 amendments is compatible with that original intent and no legislative history was found to suggest otherwise.  Prior to the BAPCPA, some courts faced with "bona fide dispute" questions focused principally on liability issues.  *See, e.g., In re Seko Investments, Inc.*, 156 F.3d 1005, 1008 (9th Cir. 1998), *cert denied* 526 U.S. 1066, 119 S. Ct. 1458 (1999). Thus, the amendment appears to clarify the prior legislative intent.  With a dearth of committee comments and legislative history available to interpret BAPCPA, this Court cannot presume that Congress added the phrase "as to liability and amount" with the intent that the claims of involuntary petitioners must now be fully liquidated either by agreement or judgment so that no dispute exists as to any portion of such claims.  Without clear legislative intent, this Court cannot presume such a change in the law and declines to do so.

*In re Demirco Holdings, Inc.*, 2006 WL 1663237, at *3 (Bankr. C.D. Ill. June 9, 2006).

39.    Simply stated, the undisputed facts demonstrate that no *bona fide* dispute exists here.  From the findings in the Superior Court Action, it is clear that the Alleged Debtor is not contesting liability on the Notes, only how that liability should be paid – in stock or in cash.  The Superior Court held that the Notes are in default and <u>must</u> be paid in cash.   The amount due under the Notes from all Petitioning Creditors is in excess of $337,500.00, plus interest, an amount well north of the statutory amount required to commence an involuntary bankruptcy case.

40.     In any event, as set forth above and in correspondence with certain of the Petitioning Creditors, the Alleged Debtor has admitted to liability on more than one occasion. *See* Exhibit C; *see also In re Knight*, 380 B.R. 67, 74 (Bankr. M.D. Fla. 2007) (where a debtor conceded that he owed a debt to the creditor, the court held that "his disagreement as to the amount owed does not constitute a *bona fide* dispute").  In light of the Alleged Debtor's own admissions, it strains credulity for the Alleged Debtor to appear before this Court and argue that there is a *bona fide* dispute sufficient to require this Court to dismiss the petition.  Instead, the Alleged Debtor's Motion reflects an inexplicable and entrenched intent to avoid their undisputed obligations and avoid having an independent fiduciary investigate their self-dealing actions.  In short, as a matter of law, there is no *bona fide* dispute.

41.     Finally, as set forth above and in Exhibit C, the Alleged Debtor offered but failed to pay certain of the Notes in full with stock. *In re Key Auto Liquidation Center, Inc.*, 372 B.R. at 77  (offers to pay claims in full reassures the Court that they are not subject to bona fide dispute); *In re Faberge Rest. of Florida, Inc.*, 222 B.R. 385, 388 (Bankr. S.D. Fla. 1997) (stating that payment of a debt post-petition is an admission of liability).  The failed offers to pay in full on the Notes with stock undercuts any argument that the Notes are subject to *bona fide* dispute.

**2.      Joinder of Additional Petition Creditors Cures any Default.**

42.     Even if the Court were to conclude that the Original Petitioning Creditors' claims are subject to *bona fide* dispute, the joinder of additional petitioning creditors cures any deficiencies related to the original petition.  Section 303(c) of the Bankruptcy Code provides that after the filing of the petition but before the case is dismissed or an order for relief is entered, creditors may join the petition with the same effect as if they were petitioning creditors. *See* 11 U.S.C. §303(c); *In re FKF Madison Park Group Owner, LLC*, 435 B.R. 906, 909 (Bankr. D. Del.

2010) (creditors holding noncontingent unsecured claims against putative Chapter 7 debtor had right, prior to entry of order dismissing petition, to join in support of involuntary petition, and had to be regarded as original petitioning creditors, notwithstanding the original petitioning creditors' alleged bad faith); *In re The S & Q Shack, LLC*, 2009 WL 6499128, at *2 (Bankr. N.D. Ga. Apr. 17, 2009) ("[S]ection 303(c) explicitly permits additional creditors to join in a petition.").   Where the original involuntary petition is defective because one or more of the petitioning creditors' claims is disqualified, the "defect" may be cured as of right by having additional creditors join in the petition. *Efron v. Guiterrez*, 226 B.R. 305, 313 (D.P.R. 1998), *citing In re Crown Sportswear, Inc.*, 575 F.2d 991, 993 (1st Cir. 1978).

43.    As the Court noted in *IBM Credit Corp. v. Compuhouse Sys., Inc.*, 179 B.R. 474 (W.D. Pa. 1995), "[J]oinder is a matter of right . . . The straightforward language of the statute permits any number of qualifying petitioners to sign onto the petition and be treated as if they had signed the petition before it was filed." *Id.* at 477. *See also, In re Kidwell*, 158 B.R. 203, 210-211 (Bankr. E.D. Cal. 1993) ("The Congress placed no restrictions on joinder in section 303(c). . . . Joinder is a matter of right.").   So long as they (i) were not original parties to the petition and (ii) filed their joinders before the case is dismissed or relief is ordered, joining petitioning creditors are treated as if they joined the petition *ab initio*. *Rimell v. Mark Twain Bank*, 946 F.2d 1363 (8th Cir. 1991); *see also, In re Braten*, 86 B.R. 340 (Bankr. S.D.N.Y. 1988) (joining creditor's status relates back to the commencement of the involuntary case).   Once a bankruptcy court determines that a sufficient number of petitioning creditors exists, the proceeding may go forward "regardless of the correctness of the original petition." *In re Claren, Inc.*, 1992 WL 346779, at *2 (E.D. Pa. Nov. 13, 1992) (citations omitted).

44.     Moreover, the fact that one petitioning creditor seeks out others to join in the filing of an involuntary petition does not give rise to a finding of bad faith on the part of the petitioning creditor. *See In re Key Auto Liquidation Center, Inc.*, 372 B.R. at 80; *In re Reveley*, 148 B.R. 398, 410 (Bankr. S.D.N.Y. 1992); *U.S. Fid. & Guar. Co. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1012 (N.D.N.Y. 1986) (stating, "it would be idealistic for this court to believe that three creditors would voluntarily travel to the bankruptcy court and meet on its doorstep with an identical purpose, to commence an involuntary bankruptcy proceeding against an alleged debtor").

45.     Consequently, the authorities are uniform and clear that the Joining Creditors are to be treated, for all intents and purposes, as Petitioning Creditors who commenced these cases on the Petition Date.  To the extent that the original Involuntary Petition is proven to be defective, the Joinders must be permitted to correct these defects with retroactive effect. Or, as stated slightly differently by Collier on Bankruptcy, "even if creditors are later joined as petitioning creditors, perhaps to correct the original filing, the date of the filing by the initial petitioning creditor or creditors should still govern." 2 COLLIER ON BANKRUPTCY ¶ 303.14[11] (16th ed. rev. 2010).  If the Court were to find that the Original Petitioning Creditors' claims are subject to *bona fide* dispute for any reason, the Joinders should be used to cure any defaults. Finally, the Petition Date should remain unchanged to allow a chapter 7 trustee or other independent fiduciary to investigate and pursue any preferential transfers to insiders – including the Avoidable Lien - and to maximize value for all parties-in-interest.

**3.     The Debtor is Not Paying Debts as They Come Due.**

46.     Section 303(h)(1) of the Bankruptcy Code requires that where a petition is timely controverted, "the court shall order relief against the debtor in an involuntary case ... [only if] the

debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h).

47.    Although there is no exact formula for determining when a debtor is "generally not paying its debts," courts will "compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the non-payment and the nature of the debtors' conduct of its financial affairs." *See In re Mylotte*, 2007 WL 2033812, at *5.  The courts have a great deal of flexibility, but it seems reasonable to consider both the amount of the debt not being paid and the number of creditors not being paid in determining the answer. *See In re All Media Properties, Inc.*, 5 B.R. 126, 142 (Bankr. S.D. Tex. 1980) *aff'd* 646 F.2d 193 (5th Cir. 1981) (the Court states that generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operations).

48.    The Company has conceded that it is not paying its debts as they come due.  All one has to do is review the Company's public filings.  The Company "has incurred continued losses over the past several years and certain conditions raise substantial doubt about the Company's ability to continue as a going concern." See Form 10-Q, at 16.  The Company "has incurred a loss applicable to common shareholders of $3,377,375 and $1,414,526 for the years ending December 31, 2014 and 2013, respectively, and expects continued losses for the foreseeable future."  (Id.) (emphasis added).

49.    Furthermore, it is clear that none of the Notes are being paid and several creditors have joined the involuntary petition.  The only other debt the Petitioning Creditors are aware of is the Avoidable Lien which the Petitioning Creditors believe constitutes a preferential or fraudulent transfer that should be investigated and pursued by a chapter 7 trustee or other independent fiduciary.

50.    The Alleged Debtor's non-payment of their substantial undisputed debts to the Petitioning Creditors is long standing and habitual.  In short, the fact that the Alleged Debtor has refused to and can't pay their debts to any of the Petitioning Creditors shows that they are not paying their debts as they come due.

**C.    This Court Should Not Abstain.**

51.    As a general matter, abstention is only warranted if "the interests of creditors and the debtor would better be served by dismissal of the case or suspension of all proceedings in the case." 11 U.S.C. § 305.  Courts that have construed section 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under section 305(a)(1) only in the situation where the court finds that both creditors and the debtor would be better served by a dismissal. *In re AMC Investors, LLC*, 406 B.R. at 487-488.  Granting an abstention motion pursuant to section 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief. *See In re Northshore Mainland Service, Inc.,* Case No. 15-11402 (KJC), Memorandum Opinion, Docket # 503 at *16 (Bankr. D.Del. Septemebr 15, 2015); *In re AMC Investors, LLC,* 406 B.R. at 488; *see also In re Square at Falling Run, LLC*, 472 B.R. 337, 346 (Bankr. N.D. W. Va. 2012) (same).  Courts have recognized that   section 305(a)(1) "was designed to be utilized where, for example, a few

21

recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors." *In re Northshore Mainland Service, Inc.,* at *16, *citing In re Stillwater Asset Backed Offshore Fund Ltd.,* 485 B.R. 498, 509 (Bankr. S.D.N.Y. 2013).  The movant (in this case the Alleged Debtor) bears the burden to demonstrate that the interests of the debtor and creditors would benefit from dismissal. *In re AMC Investors, LLC*, 406 B.R. at 488.

52.    In determining whether dismissal under 11 U.S.C. § 305(a) is appropriate, courts can look to the facts of the individual case and consider factors such as: (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.  *See In re R & A Bus. Assoc., Inc.*, 1999 Bankr. LEXIS 543, at *53 (Bankr. E.D. Pa. Mar. 8, 1999).  A determination of whether dismissal under 11 U.S.C. § 305(a) is appropriate rests with the discretion of the bankruptcy court, to be exercised based on the totality of the particular circumstances of each case.

53.    The totality of the circumstances does not support abstention here.  With regard to the economy and efficiency of administration, this Court is extremely capable of economically administering debtor estates, especially ones with no current operations or employees.  The only

tasks to be completed by a chapter 7 trustee at this point would be to: (i) maximize the value of the Property through a full, fair and open sale process; (ii) analyze and assume or reject any executory contracts; and (iii) investigate and pursue any claims held by the estate.

54.    Other than the Superior Court Action discussed above, the Petitioning Creditors are unaware of any pending proceeding in a state court or any other forum available to protect the interests of both the Alleged Debtor and the Petitioning Creditors.  Additionally, as set forth above, some of the reasons for the filing of the involuntary was to preserve the ability of the Alleged Debtor's estate to pursue the Avoidable Lien and analyze and assume or reject any executory contracts, something that can only be accomplished under federal bankruptcy proceedings.

55.    While a receivership action commenced under state law could possibly serve as an alternative for the distribution of the Alleged Debtor's assets, a state court proceeding does not have the same ability to pursue preference actions or assume or reject executory contracts, some of the primary purposes for commencing this case.  Furthermore, the Alleged Debtor and the creditors have not been able to work out a less expensive out-of-court arrangement which better serves all interests in this case.  The Alleged Debtor's insiders are entrenched and have refused pay what is due on the Notes, all while continuing to pay themselves and run the company primarily for their own benefit at the expense of all creditors and shareholders.  Given the long history between the parties, the Petitioning Creditors do not see any ability to reach an agreement with existing management to work on an out-of-court arrangement at this point in time.

56.    There is no out-of-court restructuring that had the support of a significant percentage of the debtor's creditors and there has not been any non-federal insolvency

proceeding commenced to date so there is no concern here that the Court is starting afresh with the federal bankruptcy process.  Finally, the purpose for which bankruptcy jurisdiction has been sought has been clearly articulated above and for the purposes of brevity will not be repeated here.

57.    In sum, it has become clear that the Alleged Debtor's conduct has been and continues to be egregious, and as such this bankruptcy case may be the only way for the Petitioning Creditors to: (i) seek the appointment of an independent Chapter 7 trustee to investigate and pursue breach of fiduciary duty, preferential transfer and other claims against the Alleged Debtor's officers and directors; (ii) maximize the value of the Alleged Debtor's assets through a fair and open sale process; (iii) analyze and assume or reject any executory contracts that may exist; and (iv) finally provide a long overdue payment on the Notes.  Indeed, without these bankruptcy cases, the Alleged Debtor is likely to continue to refuse to pay on the Notes, continue to place liens the property for the benefit of insiders and refuse to prosecute any causes of action it might have against its officers and directors.  Upon entry of an order for relief, however, a chapter 7 Trustee will have the authority to sell the Property to pay creditors, assume or reject executory contracts and investigate and pursue any legitimate claims against the Alleged Debtor's officers and directors.

58.    This case is like *In re B.D. Int'l Discount Corp*., 13 B.R. 635, 640 (Bankr. S.D.N.Y. 1981) *aff'd* 701 F.2d 1071 (2d Cir. 1983), in which the court held that where there was the "specter of fraudulent activities" mandating bankruptcy investigation and administration, the best interests of the petitioning creditor and the other creditors would not be served by abstention.  The court held that under the jurisdiction of the bankruptcy court a trustee can be appointed to conduct a thorough investigation into the debtor's financial affairs, and to collect

and reduce to money the property of the estate. *Id.* The Court went on to hold that a chapter 7 Trustee, with his comprehensive discovery powers, and his broad avoiding powers can provide a remedy for the creditors that is not available in a non-bankruptcy proceeding. *Id.*  As in that case, the bankruptcy court proceeding and a Chapter 7 Trustee who will be able to investigate and pursue any legitimate claims against the officers and directors of the Alleged Debtor for, among other things, self-dealing and fraud, may be the only way to ensure that the interests of the Petitioning Creditors and all other creditors are properly represented.

**D.    No Attorneys' Fees or Costs Should be Awarded to the Alleged Debtor**

59.    Even if the Court were to dismiss the petitions -- and it should not -- this is not the type of case where fees and costs are warranted.  Section 303(i)(1) provides that a court may grant costs or attorneys' fees against a petitioning creditor upon dismissal of a petition.  The Court should not exercise its discretion to do so here.  The Petitioning Creditors are noteholders that are owed in excess of $337,500.00, plus interest, by the Alleged Debtor.  It is clear that the Alleged Debtor has made no effort to pay the Notes in cash while the insiders have placed liens on the property to pay themselves for alleged for purported past consideration.  Given the abundance of case law holding that unpaid notes are a proper basis for filing an involuntary petition and the Alleged Debtor's continued refusal to pay noteholders, the Original Petitioning Creditors were -- and are -- warranted in believing that filing these involuntary petitions was a reasonable and proper course of action.

60.    An award of fees under section 303(i)(2) is also not warranted because the Alleged Debtor has not met their burden of proving bad faith. *See, In the Matter of ELSUB Corporation*, 66 B.R. 172, 188 (Bankr. D. N.J. 1986) (it is presumed that good faith has been exercised in filing of involuntary petition in bankruptcy, and burden of showing bad faith rests

on alleged debtor or upon any other interested party); *Lubow Machine Co. v. Bayshore Wire Products (In re Bayshore Wire Products Corp.)*, 209 F.3d 100, 105 (2d Cir. 2000) ("there is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith").  The Bankruptcy Code does not define "bad faith" for purposes of awarding punitive damages under section 303(i).  Courts wrestling with this term have used somewhat vague definitions.  One line of cases holds that bad faith exists when a petition is "ill advised or motivated by spite, malice or a desire to embarrass the debtor." *See Camelot, Inc. v. Hayden*, 30 B.R. 409, 411 (E.D. Tenn. 1983).  A second line of authority looks to whether the creditor's actions were an improper use of the Bankruptcy Code as "a substitute for customary collection procedures." *See In re Advance Press & Litho, Inc.*, 46 B.R. 700, 703 (D. Colo. 1984). The tests for determining bad faith for section 303(i)(2) center on "improper use," "improper purpose," and "reasonable person" tests. *See In re Grossinger*, 268 B.R. 386, 389 (Bankr. S.D.N.Y. 2001), *citing In re Bayshore Wire Products Corp.*, 209 F.3d at 105-06.

61.     Without any supporting facts, the Alleged Debtor alleges that the Original Petitioning Creditors demonstrated bad faith in commencing this action because the Alleged Debtor would not place their "nominees on its Board of Directors."  Nothing could be further from the truth.  The factual background and reasons for the proxy contest, which concluded at the annual meeting of stockholders on June 8, 2015, are more fully set forth in the *Emergency Motion of Petitioning Creditors for Entry of an Order Directing the Appointment of (i) an Interim Chapter 7 Trustee, or (ii) Alternatively, a Chapter 11 Trustee Should the Involuntary Bankruptcy Case be Converted* (the **"Trustee Motion"**) to be filed on September 18, 2015, and which shall be incorporated herein by reference as if fully set forth herein.  The Petitioning Creditors are not attempting to "pressure the Company to put Petitioners' nominees on the

Board."   Indeed, a wife of one of the Petitioning Creditors refused to sit on the board despite being approached to do so in exchange for support.

62.     The Alleged Debtor's trumped up allegations are unsubstantiated and cannot support a finding of bad faith.   The Petitioning Creditors are all creditors holding valid and enforceable unpaid Notes issued by the Alleged Debtor, who is admittedly insolvent and not paying its debts as they come due.   The Alleged Debtor has not alleged any improper purpose other than their self-serving and unsupported assertions.   Nor have they shown that a "reasonable person" would not have filed the involuntary petition.   As such, there has been no showing of "bad faith" that would support awarding the Alleged Debtor costs, attorneys' fees and punitive damages in this case.

63.     Moreover, although the absence of any specific factual allegations alleging that the Involuntary Petition was filed in bad faith makes it impossible to fully and fairly respond to such an allegation, several general principles of law counsel against the bad faith filing doctrine even applying to this case.   First is the well-established principle that "there is a presumption in favor of good faith filings, and the burden is on the debtor to show by a preponderance of the evidence that the filing is in bad faith. 2 *Collier on Bankruptcy* ¶ 303.16 (16th ed. rev. 2010); *In re Square at Falling Run, LLC*, 472 B.R. at 344 ("A filing is presumed to be in good faith, and the existence of bad faith must be proven by the debtor by a preponderance of the evidence."). In this case, no facts have been asserted to rebut this good faith presumption and the Alleged Debtor has not met their burden of showing the involuntary case was filed in bad faith.   Second, and perhaps more importantly, are the facts showing that this case is distinct from the typical bad-faith filing case in a very important way: the number of Original Petitioning Creditors who filed the Involuntary Petition.

64.     The bad faith filing doctrine is typically invoked when a single creditor files an involuntary petition knowing that three or more creditors are required to have an effective involuntary petition, with an eye toward later seeking additional joining creditors after the would-be debtor files a list of creditors with the court as required by Bankruptcy Rule 1003(b). In creating a doctrine, the courts recognized that "[t]he ability to force a debtor into bankruptcy in the hands of a single creditor is a very dangerous weapon." *In re Dino's, Inc.*, 183 B.R. 779, 783 (Bankr. M.D. Fla. 2012) (emphasis added).  To guard against this hazard, the courts created the bad faith filing doctrine. Indeed, most courts that embrace the bad faith filing doctrine speak of it as only applying to an involuntary case filed by a single creditor. *See, e.g., Basin Elec. Power Coop. v. Midwest Processing Co.*, 769 F.2d 483, 486 (8th Cir. 1985) ("While an involuntary petition may be cured after filing when **a single creditor** filed in good faith believing the debtor has fewer than twelve creditors, **a single creditor** may not file an involuntary petition knowing the debtor has twelve or more creditors.") (emphasis added); *In re Mylotte,* 2007 WL 2033812, at *8. ("[T]he vast majority of courts, along with various bankruptcy commentators, have concluded that a bankruptcy court may dismiss a defective involuntary petition filed by a single creditor in bad faith, even if additional creditors seek to join in the petition, and even if their joinder would meet the three petitioning creditor requirement.") (collecting cases) (emphasis added). *In re Atlas Mach. & Iron Works*, 190 B.R. 796, 802 (Bankr. E.D. Va. 1995) (noting "this Court adopted the rule that a single creditor who filed an involuntary petition with knowledge that a debtor has twelve or more creditors acts in bad faith."). When the bad faith filing doctrine has been raised tried in cases with three or more initial petitioning creditors, the courts generally have not found a bad faith filing. *See, e.g., In re LaRoche*, 131 B.R. 253, 255 (D.R.I. 1991).

28

65.     The motivating concern behind the bad faith filing doctrine is lessened, if not completely eliminated, when, as here, three or more creditors are responsible for the original involuntary petitions and others have joined the involuntary petitions.   Indeed, these cases present unique facts; the case was filed to allow, among other thing, for the assumption or rejection of any executory contracts and review of avoidable transfers for the benefit of the Alleged Debtor's creditors. *In re Key Auto Liquidation Center, Inc.*, 372 B.R. at 77 (bad faith does not exist when a petitioning creditor's primary motivation in filing the petition is to "protect itself against other creditors' obtaining a disproportionate share of [the alleged debtor's] assets.").

66.     In summation, the Alleged Debtor has not pled that the Original Petitioning Creditors filed the Involuntary Petition in bad faith, nor have they pled any facts that would support such an allegation.

**E.      If the Case is Converted to a Case Under Chapter 11, a Chapter 11 Trustee Should be Appointed.**

67.     For the reasons set forth herein and more fully in the Trustee Motion, if an order for relief is entered and the case is converted to a case under Chapter 11, a Chapter 11 trustee must be appointed by the Court.

## CONCLUSION

68.     The Petitioning Creditors are eligible to file the involuntary petition in the above captioned case against the Alleged Debtor because they hold claims in excess of $337,500.00, plus interest, that are not contingent or subject to a *bona fide* dispute as to liability or amount, and the Alleged Debtor is not generally paying its debts as they come due.   Contrary to the allegations of the Alleged Debtor, this Court is the only appropriate venue able to provide the relief needed, as the chapter 7 Trustee will be able to pursue claims on behalf of the estate that

the Alleged Debtor is unwilling or unable to pursue, and thus preserve, protect and maximize the value of the Alleged Debtor's estate for the benefit of its creditors.  In addition, the Alleged Debtor has not demonstrated any ill-will, malice or improper purpose in filing the petition. Therefore, the Alleged Debtor's Motion to dismiss should be denied and an Order for Relief should be entered by the Court.

Dated: September 17, 2015　　　　　　　　**CHIPMAN BROWN CICERO & COLE, LLP**
　　　Wilmington, Delaware


　　　　　　　　　　　　　　　　　　　　　/s/ *William E. Chipman, Jr.*
　　　　　　　　　　　　　　　　　　William E. Chipman, Jr. (No. 3818)
　　　　　　　　　　　　　　　　　　Joseph B. Cicero (No. 4388)
　　　　　　　　　　　　　　　　　　Mark D. Olivere (No. 4291)
　　　　　　　　　　　　　　　　　　1007 North Orange Street, Suite 1110
　　　　　　　　　　　　　　　　　　Wilmington, Delaware  19801
　　　　　　　　　　　　　　　　　　Telephone:　　(302) 295-0191
　　　　　　　　　　　　　　　　　　Facsimile:　　(302) 295-0199
　　　　　　　　　　　　　　　　　　Email:　　　　chipman@chipmanbrown.com
　　　　　　　　　　　　　　　　　　　　　　　　cicero@chipmanbrown.com
　　　　　　　　　　　　　　　　　　　　　　　　olivere@chipmanbrown.com

　　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　John H. Genovese
　　　　　　　　　　　　　　　　　　Paul J. Battista
　　　　　　　　　　　　　　　　　　**GENOVESE JOBLOVE & BATTISTA P.A.**
　　　　　　　　　　　　　　　　　　100 Southeast Third Street, 44th Floor
　　　　　　　　　　　　　　　　　　Miami, Florida 33131
　　　　　　　　　　　　　　　　　　Telephone:　　(305) 349-2300
　　　　　　　　　　　　　　　　　　Facsimile:　　(305) 349-2310
　　　　　　　　　　　　　　　　　　Email:　　　　jgenovese@gjb-law.com
　　　　　　　　　　　　　　　　　　　　　　　　pbattista@gjb-law.com

　　　　　　　　　　　　　　　　　　*Counsel to the Petitioning Creditors*