**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DIAMONDHEAD CASINO CORPORATION,<br><br>Alleged Debtor. | Chapter 7<br><br>Case No. 15-11647 (LSS)<br><br>**Objection Deadline: TBD**<br>**Hearing Date: TBD** |

**EMERGENCY MOTION OF PETITIONING CREDITORS FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF (I) AN INTERIM CHAPTER 7 TRUSTEE, OR (II) ALTERNATIVELY, A CHAPTER 11 TRUSTEE SHOULD THE INVOLUNTARY BANKRUPTCY CASE BE CONVERTED**

Petitioning Creditors F. Richard Stark (**"Stark"**), Arnold Sussman (**"Sussman"**), Alan D. Cohen (**"Cohen"**), Robert F. Skaff, Jr. (**"Skaff"**), David J. Towner (**"Towner"**) and DDM Holdings, LLC, as successor in interest to College Health & Investment, L.P.'s March 25, 2010 Promissory Note with Debtor (**"DDM"**) (collectively, the "**Petitioning Creditors**[1]"), by and through their undersigned counsel, hereby move the Court (the **"Trustee Motion"**) for the entry of an order pursuant to sections 105, 303(f), 303(g) and 1104 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"): (i) appointing an interim chapter 7 trustee in the bankruptcy case of Diamondhead Casino Corporation (the "**Alleged Debtor**" or the "**Company**"), (ii) alternatively, appointing a chapter 11 trustee should the case be converted to a case under chapter 11 of the Bankruptcy Code, and (iii) granting certain related relief. In support of their Trustee Motion, the Petitioning Creditors respectfully represent as follows:

[1] All capitalized terms not otherwise defined herein shall have the meanings provided in the *Objection to Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11* (the **"Objection"**) [Docket No. 10] filed on September 17, 2015.

## PRELIMINARY STATEMENT

The Company has lost almost all of the money that has been invested with it to date. As set forth in its Quarterly Report filed last month, the Company has raised in excess of $35 million of additional paid in capital since its inception, but has an accumulated deficit in excess of $34.5 million. *See* Objection, Exhibit B at 3. Entrenched insiders of the Company have grossly mismanaged its affairs for years and have breached their fiduciary duties by, among other things, refusing to pay Notes when due, while continuing to pay themselves at the expense of all creditors and shareholders. The Petitioning Creditors believe that the appointment of an interim chapter 7 trustee is necessary to preserve property of the estate and to prevent further diminution in value. Alternatively, in the event that the Court grants in part the relief requested in the *Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition, or in the Alternative, to Convert the Case to Chapter 11* (the **"Motion"**) and converts this case to one under Chapter 11, the appointment of a chapter 11 trustee is in the best interests of all parties-in-interest. The Company is admittedly insolvent, admittedly is in default of the Notes, has not been operational for fifteen years and has failed to develop its primary asset — 404.5 acres of unimproved land in Diamondhead, Mississippi on which it has planned to construct a casino resort and hotel and associated amenities (the **"Property"**). Despite raising millions of dollars in capital for that express purposed from investors, including from the Petitioning Creditors, the Company has regressed. Entrenched management has been wasting the Company's resources and has been breaching their fiduciary duties by engaging in self-interested transactions and misleading investors as to the Company's true state of affairs.

As a result of entrenched management's failure to manage the Company properly and their self-dealing transactions, the Company has been deregistered by the SEC and cannot raise additional capital to pay its debts as the come due—all while management simply protects their own investments to the detriment of the Company's stakeholders. During management's twenty years at the helm, it has failed to garner any meaningful results for the Company's stakeholders. Accordingly, the Court should appoint an interim chapter 7 trustee to preserve property of the estate and to prevent further losses.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein are Sections 105, 303(g), 1104(a) and (b) of the Bankruptcy Code.

## BACKGROUND

2. As set forth more fully in the Petitioning Creditors' Objection filed on September 17, 2015 and incorporated herein by reference, the Company is insolvent and has not been operating for fifteen years, despite raising capital primarily for the benefit of insiders on several occasions. The Property remains undeveloped and the Company has squandered opportunities to successfully develop the site or sell it for a profit.

3. According to the Company's most recent Quarterly Report filed with the SEC on August 14, 2015, the Company has incurred losses over the past several years, is not operational and generates no operating revenues. *See* Objection, Exhibit B at 5. "The Company has had no operations since it ended its gambling cruise ship operations in 2000." *Id.* Current management "expects continued losses for the foreseeable future." *Id.* The Company also admitted in last

month's Quarterly Report that it "is in default of the repayment terms of the [N]otes."[2] *Id*. at 9, 17.

4. For several years the Company was not making its SEC required filings and was deregistered for a period of time. During the time that the Company operated outside the public domain, the Company nevertheless spent millions of dollars compensating insiders through questionable cash payments and securing additional alleged obligations with insider liens. Recently, the Company sought to double the authorized shares of its common stock to provide insiders with access to yet more cash, while diluting existing shareholders, on the heels of several years of private placements, which included the Notes, and at a time when the Company no longer was filing public disclosures.

**MANAGEMENT'S SELF-DEALING AND**
**MISREPRESNTATIONS TO INVESTORS**

5. While Petitioning Creditors have yet to take discovery in this matter, the following items have been gleaned from public filings and from direct communications with the Company that they believe support the appointment of a trustee. Once a chapter 7 or chapter 11 trustee is appointed, further investigation may reveal other questionable transactions.

**(a) The Avoidable Lien**

6. When the Company was soliciting investments from the Petitioning Creditors and others, it touted that the Property was unencumbered and a valuable tract of land situated between Interstate 10 and the Bay of St. Louis. Immediately after obtaining substantial investments in the Company, on September 24, 2014, the Company recorded a $5 million lien

[2] In addition to being in default on the Petitioning Creditors' Notes, the Company admits that it is in default under all of the convertible notes issued in 2010 and that it is in default on the repayment terms of a $1 million line of credit *See* Objection, Exhibit B at 9, 12.

(the **"Avoidable Lien"**) on the Property, primarily for the benefit of insiders. *See*, Objection, Exhibit B, at 13. The Lien includes an "executive lien" for approximately $2 million in favor of the Company's President, Deborah Vitale (**"Vitale"**) and other insider Gregory Harrison (**"Harrison"**), for purported past consideration.[3] *Id*. The Avoidable Lien was hidden from the stockholders and Petitioning Creditors and they did not become aware of it until a month after is recording, and only after a noteholder sent several written demands for payment of the CHI Note, including a demand just two days before the recording of the lien on September 24, 2014. *See* **Exhibit 1**, attached hereto. Vitale delayed responding to the demand purportedly due to "a major computer problem." *Id*.

7. Approximately $3 million dollars of the Avoidable Lien was provided to the Company's banker/broker Henley & Company (**"Henley"**), who was tasked with selling the Company's securities via a series of private placement transactions. Less than $2 million of the $3 million was funded and upon information and belief was paid primarily to insiders. In exchange for Henley's involvement with the Company, it required that Ted Arneault (**"Arneault"**) be Chairman of the Board of Directors, which resulted in Arneault receiving hundreds of thousands of dollars in compensation. Arneault and Henley wanted to sell the Company to another gaming company, El Dorado Gaming (**"El Dorado"**) — an entity in which, upon information and belief, Arneault and Henley have substantial interests — or alternatively to enter into a joint venture with El Dorado.

8. Of the proceeds received by the Company discussed above, $736,915 of the $1,850,000, or almost 40% of the proceeds was paid to insiders as follows:

---

[3] Vitale also is the lien agent for the lien pursuant to which she is the primary beneficiary. *See* Objection, Exhibit B at 16.

- $100,000 - Payment to Vitale for past due office rents;
- $568,905 - Payroll paid to Arneault and Vitale and related taxes; and
- $ 68,010 - Office rents paid to Vitale.

In fact, only arguably about $232,458 of the $1,850,000, or 12.5% of the proceeds seem to have been used directly for the development of a casino resort on Alleged Debtor's Property. *See* Objection, Exhibit B at 18.

9. When soliciting investments, the Company touted to potential investors, including the Petitioning Creditors, that the Property was unencumbered and worth millions of dollars because of its potential as a casino and entertainment site. At the time, however, the insiders knew that the board already had approved the Avoidable Lien, failed to mention it to investors and waited to record the Avoidable Lien until after it had received the cash from investors. Additionally, the Avoidable Lien was recorded twenty days after the Company's securities were deregistered with the SEC because the Company failed to make required SEC filings. This deregistration allowed the Company to record the Avoidable Lien without disclosing it publicly.

**(b) Payments for Vitale's Townhouse**

10. In addition to the Avoidable Lien for the benefit of insiders, while allegedly not having any cash to pay the Petitioning Creditors' overdue Notes, the Company has been able to find cash to pay rent to Vitale for over three and a half years to maintain her townhouse in Alexandria, Virginia – or as she will likely describe, the Company's "headquarters". Clearly, Vitale is using the funds she is raising from investors to fund personal expenses while not paying legitimate creditors' Notes. It is not clear to the Petitioning Creditors why the Company – that has not been operating for 15 years - needs a "headquarters." Rent expense associated with this insider lease amounted to $34,287 and $37,050 for the six months ended June 30, 2015 and 2014, respectively. *See* Objection, Exhibit B at 12. Vitale received direct cash payments

totaling $27,207 for rents in the first six months of 2015. *Id*. Vitale also received direct cash payments of $100,000 of the $168,665 total for accumulated rents for the period from September 1, 2011 through March 31, 2014 and an additional $13,602 for base rents due April 1, 2014 through June 30, 2014, which were approved only after the Company ceased reporting with the SEC. *Id*.

**(c) The Misuse of ESOP Shares to Further Entrench Management**

11. Since taking control of the management of the Company, Vitale has significantly increased the authorized and issued shares of the Company's common stock thereby substantially diluting the stockholders. Management also intentionally misled Petitioning Creditors in connection with the viability of the Company's now-defunct employee stock ownership plan (the **"ESOP"**). In 1994, when the Company operated cruise line gaming and had employees, the Company established the ESOP. Despite not having any employees (other than Vitale and Harrison) for many years, Vitale, as the trustee of the ESOP, continues to vote over 4 million ESOP shares to entrench herself and her cronies.

12. Certain of the Petitioning Creditors were told years ago by directors of the Company that the ESOP was being terminated and was defunct. In fact, Vitale demanded and was awarded stock options from the Company **because the ESOP was terminated**. Upon information and belief, Vitale threatened that because the ESOP was defunct; she was losing her voting power and as a result would leave the Company without additional stock ownership. Accordingly, she asked another director to make a motion to award her stock options, which the board approved. The board awarded Vitale the option to purchase 2 million shares of common stock at a strike price of 19 cents per share.

13. On August 28, 2013, while attempting to raise additional money for the Company, director Harrison disclosed to at least one stockholder that the Company is a non-reporting company and that:

> [The] ESOP is dead!! I have the Board minutes[.] [W]e voted and DAV abstained [.] [I]t is that simple. [The] ESOP is dead.

Petitioning Creditors and other stakeholders relied on Harrison's disclosures about the ESOP no longer being viable for a determination of the market cap of the company and whether or not (and how much) to invest in the Company.

14. Harrison again confirmed to stockholders just last year that the ESOP was cancelled, but when the Company was compelled to hold an annual meeting for the first time in over seven years, Vitale made sure to vote the ESOP shares to assure that she remained on the board and as President. *See* Chancery Court Order, dated Mar. 24, 2015, attached hereto as **Exhibit 2**. The ESOP shares were the difference maker in the election.

15. The Company's most recent public filing with the SEC corroborates that the ESOP is defunct and that the Company faces significant monetary penalties from the Department of Labor and Internal Revenue Service. The Company discloses that it is delinquent in filing "those documents and forms required to be filed in connection with its [ESOP] for the years ended December 31, 2010, 2011, 2012 and 2013." The Company further disclosed:

> The Company did not have the funds to pay professionals to audit its ESOP and/or prepare and file required documents and forms when due. Although these required filings normally do not result in any tax due to an agency of the government, **the Company could be subject to significant penalties for failure to file these forms when due.** Penalties are assessed by both the Department of Labor and the Internal Revenue Service on a per diem basis from the original due dates for the required informational filings until the filings are actually made. The Company has accrued $42,605 and $28,417 in penalties for the six months ended June 30, 2015 and 2014, respectively, based on the current delinquent filings. In addition, the Company expects that cumulative penalties for all

> delinquent ESOP filings could total $185,208 through June 30, 2015. The Company intends to bring its ESOP-required filings current and when current, will attempt to enroll in a voluntary compliance program with the Department of Labor and the Internal Revenue Service with respect to any penalties or fines incurred. However, there can be no assurance the Company will be able to enroll in any such program or obtain a reduction of the fines and penalties that may be due.

*See* Objection, Exhibit B at 13 (emphasis added).

**THE DEREGISTRATION OF THE COMPANY'S SECURITIES AND THE FIRST ANNUAL STOCKHOLDERS' MEETING IN OVER SEVEN YEARS**

16. The Alleged Debtor has failed to follow corporate formalities for many years, including failing to hold annual stockholders' meetings as required by Delaware law for over seven years. Significantly, the Company unilaterally ceased reporting to the SEC in 2011 and thus left its stakeholders in the dark about management's activities and the Company's status. Rather than remedying the problem with the SEC by updating its public filings and addressing the SEC's letters and concerns, Vitale avoided contact with the SEC in late 2013 while attempting to raise money. During this time, Vitale informed certain Petitioning Creditors, including Skaff, that the SEC issue was a minor, administrative issue that would be easy to correct. Prior to a hearing with the SEC in connection with a proceeding it initiated in mid-June 2014, Vitale stated to Skaff that she was confident the SEC would let the Company off the hook. She never disclosed that de-registration could result from the SEC proceeding.

17. In June 2014, Skaff spoke to the SEC and was told that the Company "committed the ultimate sin" by raising money and not filing its required disclosures with the SEC. Based on that conversation, it became clear that the SEC proceedings were much more serious than Vitale disclosed. On September 4, 2014, the Company's securities were deregistered with the SEC because management failed to cause the Company to make required SEC filings.

18. Once the stock was deregistered, the Board solicited stockholders (including Petitioning Creditors) for new investments for the stated purpose of raising money to reregister the securities. Despite substantial stockholder investment, the Company failed to re-register its securities with the SEC in a timely fashion. It was only after lawsuits were filed in the Delaware Court of Chancery (the **"Chancery Court"**) in early 2015 seeking: (i) to compel an annual meeting; (ii) breach of fiduciary duty in connection with disclosure violations; and (iii) the improper use of the corporate machinery to disenfranchise stockholders, that the Company made a filing seeking to re-register its securities.

19. Upon information and belief, the Company intentionally delayed the process to seek re-registration. On February 21, 2015, Vitale told Skaff that she would "never" file the requisite paperwork prior to an annual stockholders' meeting—presumably because it would disclose how poorly the Company was being managed.

20. In order to avoid scrutiny on the timing and notice of the meeting, and to avoid a legitimate proxy contest, Vitale falsely told another stockholder, Elliot Lepler (**"Lepler"**), that the Company could only hold an annual meeting if ordered by the Court. This prompted Lepler to quickly file an action seeking a meeting and stipulating to a judgment setting a meeting for March 25 (the **"March Meeting"**) without any notice to the first filed plaintiff.

21. In response, a complaint was filed against the Company's directors for breach of fiduciary duties and sought the issuance of a temporary restraining order enjoining the March Meeting so that stockholders could conduct a proxy contest.[4] Ultimately, when faced with the

[4] Additional details about the directors' and management's tactics to avoid an orderly annual meeting and a proxy context, as well as their breaches of fiduciary duties are set forth in the Chancery Court briefs and supporting affidavits filed in support of the requested application for a temporary restraining order compiled and attached hereto as **Exhibits 3 and 4.**

likelihood of an injunction and only hours before oral argument, the Company mooted the requested injunction by voluntarily postponing the March Meeting. The Company changed course and moved forward with re-registration and contended that the imminent re-registration process and the coincidental arrival of the Company's financials from its auditors were two of the reasons it voluntarily postponed the March Meeting.

22. The Chancery Court then entered an Order, *inter alia*, scheduling an annual meeting for June 8, 2015 (the **"Annual Meeting"**), requiring that the Company provide stocklist information and draft proxy materials to the plaintiff, and correcting a disclosure made by the Company. *See* Exhibit 2.

23. Leading up to the Annual Meeting the management threatened stockholders (including certain of the Petitioning Creditors) that voting for a competing slate would destroy any chances to sell the Company. A potential sale transaction, however, was not disclosed in the Company's then-operative Proxy Statement. Harrison also threatened that the Board needed to double the authorized shares of common stock so that the Company could be sold. This also was not disclosed in the Proxy Statement. Harrison contacted Stockholders, including certain Petitioning Creditors, and represented (upon information and belief, falsely) that a "deal" to acquire the Company was imminent and that failure to vote with management and increase the authorized shares at the annual meeting would "kill" the deal. Conspicuously absent from the Proxy Statement is any reference to such a transaction.

24. Similarly, the Company has been telling the Petitioning Creditors for years that the Company is on the verge of selling and that a sale would result in a lucrative price for the stockholders. The Petitioning Creditors were "sold" on the safety of the Notes because of the purported value of the unencumbered Property. The Petitioning Creditors also were told that the

Company would pay them on the Notes with either stock or cash, whichever was more valuable at the relevant time.

25. Following the Company's postponement of the March Meeting but prior to the Annual Meeting, the Board expanded its size from five directors to eight directors. Upon information and belief, management filled vacant board seats with stockholders with significant voting power in order to win the election.

26. Prior to the Annual Meeting, Harrison told Sussman and other stockholders that the Company was going to be sold and that all investors would "get rich" because the Company was valued at $12.00 per share. Upon information and belief, this was done to persuade stockholders to vote for entrenched management's slate of nominees.

27. Following the Annual Meeting, Vitale called Sussman's wife to persuade her and Sussman to reconsider their vote against the doubling of the Company's authorized shares. The Motion is inaccurate when it states that Sussman "has pressured the Company … to put [Stark's] nominees on the Board of Directors." To the contrary, Vitale contacted Sussman's wife and offered her a Board seat if she renounced the opposition nominees and supported an increase in the Company's authorized shares.

**THE DELAWARE SUPERIOR COURT REFUSES TO "PLAY WITH THE COMPANY'S DICE" AND PERMIT THE COMPANY TO HIT THE "JACKPOT" IN CONNECTION WITH THE COMPANY'S REFUSAL TO REPAY THE NOTES**

28. The Superior Court found that the CHI Note is due and not convertible into stock because the Company materially breached the CHI Note. The Superior Court aptly described the Company's conduct:

> This is a case of casino receiving $150,000, executing a note for that amount, paying nothing on the principal, defaulting and then asserting that they have complied with the terms of the note by converting it to their common stock that has little or no value. If

> the Court was to find their argument had merit it would truly be declaring that they had hit the "Jackpot". Unfortunately for them, the Court will not play with their dice and finds the [Company's] position is not supported by any reasonable reading of the terms of the note and their Motion will be denied.

*See* Objection, Exhibit A, at 5-6.

The non-financial terms of the Notes are identical to the CHI Note with non-material differences in the maturity dates.

29. The Company has either ignored Petitioning Creditors when payment has been demanded, threatened Petitioning Creditors with lawsuits or has improperly attempted to convert debt into worthless equity. Until recently, several of the Petitioning Creditors did not challenge the misconduct of the board or the defaults of their Notes because (i) they were promised significant upside, which has gone undelivered for years, and (ii) Vitale intimidated them. Vitale is quick to inform stakeholders that she is a long-time trial lawyer and successfully has sued others when they have challenged for control of the Company.

30. Sussman, for example, has been an investor in the Company for seventeen years, and although he wanted his Note repaid long ago, he did not immediately demand payment because he was misled by management that the Company would be sold or would enter into lucrative joint ventures with other gaming companies. When Sussman was solicited to invest money in exchange for the Sussman Note, he also was misled to believe that the Property was and would remain debt free.

31. Sussman ultimately made it known to the Company his wishes for repayment on his Note in cash, which was long in default, but he was informed that the Company had no money for repayment. When the Company realized it was facing unrest from the noteholders, it took the unsupportable position that the Notes would be paid via worthless common stock – a position soundly rejected by the Superior Court.

## RELIEF REQUESTED

32. By this Motion, Petitioning Creditors request entry of an order pursuant to section 303(g) of the Bankruptcy Code appointing an interim chapter 7 trustee in the involuntary case.

33. Alternatively, to the extent the Court grants in part the Motion, thereby converting this case to one under chapter 11 of the Bankruptcy Code, Petitioning Creditors request entry of an order pursuant to sections 105 and 1104(a) and (b) of the Bankruptcy Code appointing a chapter 11 trustee in the involuntary case of the Alleged Debtor.

## ARGUMENT

### I. The Alleged Debtor is a Proper Debtor under Section 303(b) of the Bankruptcy Code

34. As a threshold matter, "so as to avoid appointing an interim trustee in a case that will soon be dismissed," the Court must determine whether there is a reasonable likelihood that the Alleged Debtor will eventually be found to be a proper involuntary debtor under section 303 of the Bankruptcy Code and that an order for relief will enter. *In re The Ctr. For Mgmt. & Tech., Inc.*, 2007 WL 3197221, at *3 (Bankr. D. Md. Oct. 26, 2007) (citing *In re Prof'l Accountants Referral Svcs., Inc.*, 142 B.R. 424, 429 (Bankr. D. Colo. 1992)). This test is readily satisfied here. Under section 303(b)(1) of the Bankruptcy Code, an involuntary petition may be commenced "by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount … if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims." 11 U.S.C. § 303(b)(1).

35. As described above, and set forth more fully in the Petitioning Creditor's Objection, the Petitioning Creditors hold claims against the Alleged Debtor in an unsecured amount exceeding $337,500.00, plus interest. These obligations are not subject to *bona fide* dispute within the meaning of the Bankruptcy Code, and there are no "substantial" legal or factual questions regarding the Alleged Debtor's liability to the Petitioning Creditor, or the amount of their claims. *See, e.g.*, *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989). In addition, the Company's public filings admit that the Company is not paying any of the its debts as they become due and is insolvent.[5] *See* Objection, Exhibit B at 17. Thus, the Alleged Debtor is a proper involuntary debtor under section 303(b) of the Bankruptcy Code.

**II. The Court Should Appoint an Interim Chapter 7 Trustee for Alleged Debtor**

**A. The Conduct of Insiders of the Company Demands the Appointment of an Interim Chapter 7 Trustee**

36. Although section 303(f) generally permits a debtor in an involuntary chapter 7 proceeding to continue to operate its business and "use, acquire or dispose of property as if an involuntary case concerning the debtor had not been commenced," 11 U.S.C. § 303(f), this is not an absolute right. Rather, the appointment of an interim trustee is necessary to preserve the debtor's estate and to prevent further diminution in value of the estate. *In re The Ctr. For Mgmt.*

---

[5] According to the Company's recent Quarterly Report:

> As of June 30, 2015, the Company had $163,223 of operating cash on hand and current accounts payable and accrued expenses totaling $3,503,765. In addition, a Line of Credit in the amount of $1,000,000 obtained in October 2008 was payable in November 2012. Also, Convertible Notes issued via two Private Placements offered in 2010 totaling $962,500 in aggregate at June 30, 2015, had become payable beginning in March 2012 and extending at various dates through June 2013. As of the date of the filing of this report, none of the aforementioned debt obligations have been satisfied and the Company is in default of the repayment terms of the notes.

Objection, Exhibit B at 17.

*& Tech., Inc.*, 2007 WL 3197221, at *6. Indeed, if it is shown that a debtor "may attempt to abscond with assets, dispose of them at less than their fair market value, or dismantle his business, all to the detriment of [its] creditors," the appointment of an interim trustee is both necessary and appropriate. *In re DiLorenzo*, 161 B.R. 752, 754 (Bankr. S.D.N.Y. 1993).

37. Accordingly, to provide protection to creditors, section 303(g) of the Bankruptcy Code provides:

> At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor….

11 U.S.C. § 303(g). In essence, this section provides the Court authority to appoint an interim trustee during the period between the date of commencement of an involuntary case and the date of any order for relief therein—a period commonly referred to as the "gap" period. *See, e.g., In re James Plaza Joint Venture*, 62 B.R. 959 (Bankr. S.D. Tex. 1986) (appointing an interim trustee in an involuntary chapter 7 petition under the section 303(g) standard); *In re Tradex Swiss AG*, 2007 WL 4374438 (Bankr. D. Mass. Dec. 12, 2007) (same).

38. For the reasons discussed in detail above and in the Objection, which are incorporated herein by reference, the appointment of an interim chapter 7 trustee over the Alleged Debtor is necessary and appropriate. In particular, insiders and management of the Company have, among other things: (i) grossly mismanaged the Company by refusing to pay what was due on the Notes, while continuing to enrich themselves and run the Company primarily for their own benefit; (ii) repeatedly acted contrary to the interests of its creditors and shareholders; (iii) misled investors about the status of the Company to raise additional funds; and

(iv) used ESOP shares to entrench existing management. Accordingly, cause exists for the appointment of an interim chapter 7 trustee under section 303(g) of the Bankruptcy Code.

**B. Any Bond Required of the Petitioning Creditors Should be *Di Minimis* or Waived**

39. Bankruptcy Rule 2001(b) imposes a bond requirement on any appointment of an interim trustee under section 303(g) of the Bankruptcy Code, the purpose of which is to "indemnify the debtor for costs, attorney's fees, expenses, and damages allowable under § 303(i) of the Code." Fed. R. Bankr. P. 2001(b). While the Petitioning Creditors acknowledge that the "bond requirement is mandatory rather than discretionary," *see*, *In re The Ctr. For Mgmt. & Tech., Inc.*, 2007 WL 3197221, at *7, the requisite should be *di minimis* or waived. Although the Alleged Debtor has requested attorney's fees in connection with the Motion, the Objection explains why the Alleged Debtor is not entitled to receive any fees or expenses. Furthermore, the Petitioning Creditors already have loaned hundreds of thousands of dollars to the Alleged Debtor that is due and owing. To the extent the Court was to find fees and expenses are appropriate (which they are not), any amounts can be set-off against their ultimate recovery on the Notes, and the Notes can serve as the bond. Therefore, any bond should be *di minimis* or waived because the Alleged Debtor is fully secured in any ultimate award of fees and expenses.

**III. If the Case is Converted, then the Court Should Appoint a Chapter 11 Trustee**

**A. Appointment of a Trustee is Required Under Section 1104(a)(1) of the Bankruptcy Code**

40. The Bankruptcy Code requires the Court to remove a debtor's management and appoint a chapter 11 trustee "for cause" where there is "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management …." 11 U.S.C. § 1104(a)(1); *see also In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998). The Bankruptcy Code's list of wrongs constituting fraud is not exclusive; other factors that mandate

appointment of a trustee for cause include "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence." *In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999), *aff'd in part, vacated in part,* 254 B.R. 509 (D. Conn. 2000). Once a party has proven "cause," appointment of a chapter 11 trustee is mandatory. *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.),* 385 F.3d 313, 318 (3d Cir. 2004).

**i) The Fraud and Dishonesty of the Company's Insiders Mandate Appointment of a Chapter 11 Trustee**

41. There should be no question that the Company's management is guilty of fraud and dishonesty. Courts have regularly found that diversion of funds and misuse of corporate assets constitutes fraud or dishonesty. *See, e.g., In re PRS Ins. Grp., Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001) (citing *In re Bibo, Inc.*, 76 F.3d 256, 257-58 (9th Cir. 1996) (appointment of a trustee was mandated where management had siphoned funds from the debtor through kickbacks); *In re Sharon Steel Corp.,* 871 F.2d 1217, 1228 (3d Cir. 1989) (systematic syphoning of debtor's assets to other companies under shareholder's common control constituted cause for appointment of trustee)). Moreover, existing management has misled stakeholders about the Company's state of affairs and squandered opportunities to maximize the value of the estate. Appointment of a chapter 11 trustee is particularly warranted where a debtor's principals complete transactions that deprive third parties of contractual rights, and seek to shield their actions through "secrecy and lack of candor …." *In re Ridgemour Meyer Props., LLC,* 413 B.R. 101, 111 (Bankr. S.D.N.Y. 2008).

42. In this case, the Alleged Debtor's principals and management have entrenched themselves, refusing to pay what is due on the Notes, all while continuing to pay themselves and run the Company primarily for their own benefit at the expense of all creditors and shareholders. Further, the conduct of the Company's management, in addition to evidencing a desire to take corporate assets for their own benefit, demonstrates a willingness and ability to take any action necessary to shield their actions from creditors, including, without limitation, threatening Petitioning Creditors with lawsuits if they challenged management and materially misleading investors to raise additional funds. This sort of dishonesty, and the material misrepresentations the Alleged Debtor and its management have made to the Petitioning Creditors to date, prove their inability to serve as fiduciaries of the estate. The appointment of a trustee here is thus mandatory. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007) ("Dishonesty provides a reason to appoint a chapter 11 trustee under § 1104(a)(1)."); *Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

43. Further, the history of self-dealing by the Alleged Debtor's insiders mandates appointment of a trustee because they cannot be trusted to act as an honest broker. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"); *In re William H. Vaughan & Co., Inc.*, 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984) (holding that appointment of a trustee was necessary because the debtor could not be trusted to scrutinize dealings between debtor and debtor's president). The Company's Insiders have demonstrated that their only interest is diverting as much value to the Company's

principals and insiders as possible, an interest that is diametrically opposed to that of the Alleged Debtor's creditors in this case. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d at 472-73 (holding that acrimony among creditors, "when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor," may constitute cause for appointment of a trustee).

44. Courts have found "cause" to appoint a chapter 11 trustee under much less flagrant circumstances. For example, in *Euro-American Lodging*, a bankruptcy court appointed a trustee due to the debtor's "padding the creditors list," failing to pay taxes prepetition, and operating without necessary licensing. *Euro-American Lodging Corp.*, 365 B.R. at 426-27. The Petitioning Creditors have not yet had the opportunity to conduct discovery regarding the Alleged Debtor's activities, but the fraud it does know about set forth herein warrants the appointment of a trustee in this case far exceeds the "cause" found in *Euro-American Lodging*. In short, existing management has used the Company's assets to improperly enrich themselves while leaving the Petitioning Creditors with empty promises. If cause existed for the appointment of a trustee in *Euro-American Lodging*, then it certainly exists in this case.

45. In sum, insiders of the Alleged Debtor for years have been engaged in a series of self-dealing transactions designed to siphon off funds solely for certain insiders' benefit, all at the expense of the Company's creditors. This conduct falls plainly within section 1104(a)(1)'s definition of "cause."

**ii) The Company's Gross Mismanagement of Corporate Assets Further Warrants Appointment of a Chapter 11 Trustee.**

46. The diversion of corporate funds for the personal benefit of insiders, resulting in the deterioration of assets necessary to the value of the Alleged Debtor's estate, further evidences "gross mismanagement," and mandates appointment of a chapter 11 trustee. *E.g. In re PRS Ins.*

*Grp., Inc.*, 274 B.R. at 387 (citing *Intercat, Inc.*, 247 B.R. 911, 923 (Bankr. S.D. Ga. 2000)). In the absence of a debtor's ability to explain a legitimate reason for the diversion or transfer of assets to corporate insiders, gross mismanagement exists to appoint a chapter 11 trustee. *Id*.

47. In the present case, the gross mismanagement the Alleged Debtor has evidenced warrants appointment of a chapter 11 trustee. Had the Company not diverted funds to insiders, such funds would have been used to pay down the Notes, preserving value for the Company's unsecured creditors. This is not merely a case of the Company's management making bad business decisions; management has misled investors at every opportunity to obtain money which is being used to benefit only the insiders. Stated more succinctly, management is using the Company's assets as their personal piggy bank at the expense of the Petitioning Creditors. It is also a case of the Company and its management utterly disregarding what is best for the business and creditors. Such gross mismanagement independently provides cause for the appointment of a chapter 11 trustee.

**B. Appointment of a Trustee is in the Best Interests of Creditors Under Section 1104(a)(2)**

48. Furthermore, appointment of a trustee is also appropriate here under section 1104(a)(2) of the Bankruptcy Code because it would be in the best interests of the Company's creditors. In determining whether a trustee should be appointed "in the interests of creditors" under section 1104(a)(2), courts "look to the practical realities and necessities." *Euro-American*, 365 B.R. at 427. Among the factors courts consider are "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced

against the cost of the appointment." *Id.* (citations omitted). Each of these four considerations warrant the appointment of a trustee here.

49. First, the Alleged Debtor's prepetition conduct has entirely eroded whatever trustworthiness it can claim to have. Second, existing management's self-dealing transactions, including the Avoidable Lien and payments for Vitale's townhouse, to name a few have, eroded all confidence in management. Third, existing management's past performance record is horrendous in failing - **for fifteen years without success** – to develop the Property and **losing $34 million to date**. Thus, the first two factors—the Alleged Debtor's lack of trustworthiness and its past and present performance—weigh in favor of appointing a trustee.

50. Furthermore, the Company does not have the confidence of its creditor body. As described in greater detail above and in the Objection, the level of mistrust between the management and insiders of the Company and the Petitioning Creditors is very high due to prepetition fraud and misconduct perpetrated by the Company's insiders and management. Put simply, the Petitioning Creditors do not believe that the Company, under this management team, can effectively reorganize itself. Appointment of a chapter 11 trustee is the only remedy that will ensure that the debtor is managed honestly and for the benefit of all of its stakeholders and relieve any suspicions of self-dealing and fraud. *See Marvel Entm't*, 140 F.3d at 474; 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][d][ii] (16th ed. Rev. 2014).

51. Finally, there are substantial benefits to appointing an independent trustee here. The Company owns property that, if managed properly, may provide a meaningful recovery to the all stakeholders. A fair and efficient sale process free from the stain of self-dealing will maximize value for all parties-in-interest. *See In re BLX Grp., Inc.*, 419 B.R. 457, 472 (Bankr. D. Mont. 2009) (concluding that appointment of a chapter 11 trustee to manage a sale process

was in the best interests of creditors because it would "eliminate the insider circumstances and conflicts of interest" and would allow for a "professionally managed sale process"). Moreover, the costs to appointing a trustee here are minimal. The Company is a holding company with no operations. The Company merely owns an undeveloped parcel of land. Thus, there is no reason to believe that a trustee will have a steep learning curve in getting up to speed.

## CONCLUSION

For the reasons set forth above, existing management of the Alleged Debtor should not remain in control of the Company. The appointment of an interim trustee is necessary to preserve the value of the Alleged Debtor's estate and to prevent further diminution in value. Moreover, existing management's history and propensity for fraud, dishonesty, and gross mismanagement plainly constitutes "cause" under the Bankruptcy Code, mandating the appointment of a chapter 11 trustee if the Court decides to convert the case to one under Chapter 11. For the foregoing reasons, the Petitioning Creditors request that the Court place the Company and its estate under the control of an interim chapter 7 trustee, or chapter 11 trustee, as applicable.

Dated: September 18, 2015
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Joseph B. Cicero*
William E. Chipman, Jr. (No. 3818)
Joseph B. Cicero (No. 4388)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Facsimile: (302) 295-0199
Email: chipman@chipmanbrown.com
cicero@chipmanbrown.com
olivere@chipmanbrown.com

-and-

John H. Genovese
Paul J. Battista
**GENOVESE JOBLOVE & BATTISTA P.A.**
100 Southeast Third Street, 44th Floor
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310
Email: jgenovese@gjb-law.com
pbattista@gjb-law.com

*Counsel to Richard Stark, Arnold Sussman, Alan D. Cohen, Robert F. Skaff, Jr., David J. Towner, and DDM Holdings, LLC*