# EXHIBIT 3

## OPENING BRIEF IN SUPPORT OF MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND SUPPORTING DOCUMENTATION

EFiled: Mar 14 2015 02:10PM EDT
Transaction ID 56920699
Case No. 10793-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

COLLEGE HEALTH & INVESTMENT, L.P., a Delaware Limited Partnership,

Plaintiff,

v.

EDSON R. ARNEAULT, DEBORAH A. VITALE, GREGORY A. HARRISON, MARTIN BLOUNT and BENJAMIN J. HARRELL,

Defendants.

C. A. No.

## OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED PROCEEDINGS

Dated: March 14, 2015

CHIPMAN BROWN CICERO & COLE, LLP
Joseph B. Cicero (No. 4388)
Paul D. Brown (No. 3903)
Stephanie S. Habelow (No. 5184)
The Nemours Building
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
Telephone: (302) 295-0191

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

PRELIMINARY STATEMENT ...........................................................1

NATURE AND STAGE OF THE PROCEEDINGS ................................4

FACTUAL BACKGROUND...............................................................5

    A.    The Parties ..............................................................................5

    B.    The Company Has Not Held An Annual Meeting
           In Over Seven Years..................................................................7

    C.    The SEC Orders the Deregistration of the Company's
           Securities ................................................................................7

    D.    CHI Requests Information From Diamondhead,
           Which it Ignores ......................................................................8

    E.    Behind CHI's Back, Diamondhead Agrees to a Watered
           Down Stipulated Judgment to Hold an Annual Meeting ..................9

    F.    The Defendants Finalize A Proxy Statement on
           February 23—The Day Lepler Files His Complaint...........................11

    G.    Defendants Time The Meeting To Ensure That
           Stockholders Desiring To Oppose Management Will
           Not Effectively Be Able To Solicit And Obtain Proxies ...................12

    H.    The Proxy Statement Contains Misleading and Confusing
           Statements ..............................................................................15

    I.    Subsequent To The Mailing Of The Proxy Statement,
           Harrison Makes Further Misrepresentations To
           Stockholders In An Effort To Chill Voting...................................16

    J.    A Competing Slate is Nominated For Election to the Board..............19

ARGUMENT ..................................................................................20

I.    THE APPLICABLE TRO STANDARD ...........................................20

II.   PLAINTIFF HAS A COLORABLE CLAIM
      THAT NOTICING THE MEETING ON A
      SENSELESSLY RUSHED BASIS IS AN
      INEQUITABLE MANIPULATION OF CORPORATE
      MACHINERY ....................................................................22

      A.    Permitting The Meeting To Proceed On
            March 25, 2015 Would Validate Defendants'
            Ploy To Disenfranchise Stockholders ......................................22

            1.    The Proxy Statement is incomplete because
                  it fails to adequately describe the consequences
                  of a failure to oppose the Charter Amendment ..............23

            2.    The Proxy Statement misrepresents that
                  stockholder proposals must be submitted in
                  advance of the Meeting, even though the
                  Company has no advance notice bylaw..........................24

            3.    After the Proxy Statement is mailed, Defendants
                  continue to make misrepresentations to
                  stockholders in order to dissuade them from
                  supporting the Competing Slate ....................................28

      B.    Defendants' Response to the First 211 Action Was For
            The Primary Purpose of Disenfranchising Stockholders..........31

            1.    The Company prompts the bogus Second 211
                  Action and surreptitiously obtains a stipulated
                  order scheduling a rushed meeting ................................31

            2.    The Meeting must be enjoined because it is
                  inequitable in intent and/or effect....................................34

III.    DIAMONDHEAD AND ITS STOCKHOLDERS WILL
        SUFFER IRREPARABLE HARM IN THE ABSENCE
        OF A TRO AND THE BALANCE OF THE
        EQUITIES TIPS DECIDEDLY IN PLAINTIFF'S FAVOR ............35

IV.    PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS
       SHOULD BE GRANTED ................................................................37

CONCLUSION ........................................................................................38

# TABLE OF AUTHORITIES

**Cases**                                                                                                                         **Page**

*ACE Ltd v. Capital Re Corp.*,
    747 A.2d 95 (Del. Ch. 1999) ..................................................................20, 21

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
    650 A.2d 1270 (Del. 1994)..................................................................23

*Banet v. Fonds de Regulation et de Controle Café Cacao*,
    2008 WL 4951054 (Del. Ch. Nov. 12, 2008)...............................37

*Blasius Industries, Inc. v. Atlas Corp.*,
    564 A.2d 651 (Del. Ch. 1988) ...............................................31, 32

*Box v. Box*,
    697 A.2d 395 (Del. 1997)..................................................................38

*Cnty. of York Emps. Ret. Plan v. Merrill Lynch & Co., Inc.*,
    2008 WL 4824053 (Del. Ch. Oct. 28, 2008)...............................37

*Giammargo v. Snapple Beverage Corp.*,
    1994 WL 672698 (Del. Ch. Nov. 15, 1994)................................38

*Gilmartin v. Adobe Res. Corp.*,
    1992 WL 71510 (Del. Ch. Apr. 6, 1992).....................................23

*Goggin v. Vermillion, Inc.*,
    2011 WL 2347704 (Del. Ch. June 3, 2011) ..........................26, 27

*In re Anderson, Clayton S'holders' Litig.*,
    519 A.2d 669 (Del. Ch. 1986) ......................................................22

*In re MONY Grp., Inc. S'holder Litig.*,
    853 A.2d 661 (Del. Ch. 2004) ......................................................32

*Jana Master Fund, Ltd. v. CNET Networks, Inc.*,
    954 A.2d 335 (Del. Ch. 2008) ......................................................30

*Lerman v. Diagnostic Data, Inc.*,
    421 A.2d 906 (Del. Ch. 1980) ................................................................27, 34

*Levitt Corp. v. Office Depot, Inc.*,
    2008 WL 1724244 (Del. Ch. Apr. 14, 2008)................................................26

*Linton v. Everett*,
    1997 WL 441189 (Del. Ch. Jul. 31, 1997) ..................................................27

*Louisiana Municipal Police Employees' Retirement System v. Crawford*,
    918 A.2d 1172 (Del. Ch. 2007) ....................................................................36

*Mesa Petroleum Co. v. Unocal Corp.*,
    1985 WL 44692 (Del. Ch. Apr. 22, 1985)...................................................28

*MM Companies, Inc. v. Liquid Audio, Inc.*,
    813 A.2d 1118 (Del. 2003)............................................................................31

*ODS Technologies, L.P. v. Marshall*,
    832 A.2d 1254 (Del. Ch. 2003) ...............................................................22, 36

*Raymond Revocable Trust v. MAT Five LLC*,
    2008 WL 2673341 (Del. Ch. June 26, 2008) ...............................................37

*Schnell v. Chris-Craft Indus., Inc.*,
    285 A.2d 437 (Del. 1971)........................................................................27, 34

*Sherwood v. Ngon*,
    2011 WL 6355209 (Del. Ch. Dec. 20, 2011) .........................................35, 36

*Stahl v. Apple Bancorp, Inc.*,
    579 A.2d 1115 (Del. Ch. 1990) ....................................................................34

*State of Wis. Inv. Bd. V. Peerless Sys. Corp.*,
    2000 WL 1805376 (Del. Ch. Dec. 4, 2000) ................................................32

*Stirling Inv. Holdings, Inc. v. Glenoit Universal, Ltd.*,
    1997 WL 74659 (Del. Ch. Feb. 12, 1997)...................................................20

*Zirn v. VLI Corp.*,
        681 A.2d 1050 (Del. 1996) ............................................................................24


**Publications**

R. Franklin Balotti & Jesse A. Finkelstein,
        *The Delaware Law of Corporations & Business Organizations*,
        (2010 Supp.) ............................................................................................32


**Rules and Statutes**

17 CFR 240.14a-8(e)(2) ............................................................................................25

8 *Del. C.* § 222(a) ....................................................................................................26

## PRELIMINARY STATEMENT

College Health & Investment, L.P., a stockholder of Diamondhead Casino Corporation, brings this action to postpose briefly—for four weeks—Diamondhead's annual stockholders' meeting, currently scheduled to occur on March 25, 2015. Plaintiff requests this brief postponement to allow stockholders of Diamondhead an opportunity: (i) to receive full and accurate information about the Company and (ii) to evaluate the competing slate of director nominees that has been submitted to the Company (the "Competing Slate"). Plaintiff and the stockholders of Diamondhead have not been afforded an opportunity to exercise their franchise and to evaluate new director nominees in *over seven years*. The Company currently is on the precipice as a result of (i) the failure of its leadership, which, among other things, resulted in the Company's securities being deregistered in September 2014 and/or (ii) Defendants' orchestration of a scheme to deregister securities in order to avoid SEC and stockholder scrutiny. The apparent purpose for the scheme, includes, but is not limited to, the circumvention of quorum requirements to reelect themselves and to dilute the stockholders.

Stockholders should not be forced to vote on the future of the Company under these circumstances. There can be no legitimate basis for Defendants to object to a four-week postponement of an annual meeting more than seven years overdue. The only reason Defendants refuse to postpone the meeting is that they

want to (i) avoid any challenge to their board seats and entrench themselves even longer and (ii) cram through an amendment to the Charter that doubles the Company's authorized shares of common stock from 50,000,000 shares to 100,000,000 shares ("Proposal 2") so that Defendants can issue it at will to themselves or their supporters, thus diluting the remaining stockholders and further entrenching themselves.

Defendants have breached their fiduciary duties of disclosure, loyalty and care by disseminating knowingly false and misleading statements and failing to disclose material information to stockholders. This requires corrective disclosures and a brief injunction of the annual meeting. Defendants disseminated false and misleading statements about, among other things, (i) an advance notice requirement to submit stockholder proposals, (ii) that the pending election is uncontested (and cannot be contested), and (iii) that a vote in favor of Proposal 2 is necessary for the Company's future. In addition, Defendants failed to disclose in their proxy statement (i) that there is an imminent deal to sell the Company and (ii) that Defendants need excess shares on their books to prompt such sale. In communications to a targeted group of stockholders, which were not disclosed in the proxy statement, Defendants threatened that voting for anyone but Defendants would kill the potential (yet undisclosed) deal to sell the Company, and that additional shares of stock are needed to move forward. The Company's

stockholders were not informed about this material information in the proxy statement.

Defendants also breached their fiduciary duties of loyalty and care by manipulating the meeting process to ensure the Company's stockholders would be unable to mobilize and challenge Defendants' directorships. In order to remedy Defendants' breaches, an order enjoining the annual meeting and requiring corrective disclosures in advance of the meeting is necessary.

In addition to making corrective disclosures and postponing the annual meeting, Defendants should be ordered to disclose the Competing Slate in their supplemental proxy materials and to provide the stockholders with the option to vote for such slate on the Company's proxy card.

In light of the fiduciary breaches, including the purposeful manipulation of the upcoming annual meeting to avoid real stockholder democracy, this action seeks an injunction postponing the annual stockholders meeting until Defendants make full and accurate corrective disclosures in their proxy materials and so that all stockholders can have sufficient time to give careful thought to the Competing Slate and more generally as to how they should exercise their vote at the meeting.

Absent the requested injunction, Plaintiff and its fellow Diamondhead stockholders will be harmed irreparably because they will be forced to make a decision at the annual meeting that will determine the fate of Diamondhead

without the benefit of full information concerning the Defendants' misconduct in seeking to enrich themselves at the expense of the Company's stockholders and without a full opportunity to consider the Competing Slate. Thus, Plaintiff brings this action to ensure that stockholders have sufficient time to consider full and accurate information about the Company, its management, its directors and the Competing Slate.

## NATURE AND STAGE OF THE PROCEEDINGS

On February 13, 2015, Plaintiff College Health & Investment, L.P. ("CHI") commenced an action in this Court against Diamondhead Casino Corporation ("Diamondhead" or the "Company") to compel an annual stockholders' meeting pursuant to 8 *Del. C.* § 211(c) (the "First 211 Action"). (C.A. No. 10663-CB, Dkt. No. 1).

On February 23, 2015, unbeknownst to CHI, a different stockholder of the Company filed an action to compel an annual stockholders' meeting (the "Second 211 Action"). (C.A. No. 10700-CB, Dkt. No. 1). CHI discovered that counsel for the Company—the same as in the First 211 Action—and counsel for the plaintiff in the Second 211 Action, Elliot Lepler, Trustee of the Lepler Family Trust ("Lepler"), stipulated to an order of judgment less than two days later, in substantially the same form as the one offered to CHI and to which CHI refused to stipulate in the First 211 Action. (C.A. No. 10700-CB, Dkt. No. 3). Before CHI

4

discovered the existence of the Second 211 Action, the Court entered the Order of Judgment (the "Judgment").  (C.A. No. 10700-CB, Dkt. No. 4).

After discovering the Second 211 Action and the Judgment, on February 27, 2015, CHI filed a motion to intervene in the Second 211 Action and to vacate the Judgment (the "Motion to Intervene").  (C.A. No. 10700-CB, Dkt. No. 6).  On March 2, 2015, Diamondhead filed an opposition to the motion to vacate.  (C.A. No. 10700-CB, Dkt. No. 7).  On March 9, 2015, Lepler filed a response to the Motion to Intervene.  (C.A. No. 10700-CB, Dkt. No. 10).

Due to the Defendants' inequitable conduct and breaches of fiduciary duties described herein, CHI has filed this action and seeks an order temporarily restraining Defendants from holding the Company's annual meeting scheduled for March 25, 2015 (the "Meeting").

This is CHI's opening brief in support of its motion for a temporary restraining order and for expedited proceedings.

## FACTUAL BACKGROUND

### A.   The Parties

Plaintiff CHI is a Delaware limited partnership, with its principal place of business in Miami, Florida.   CHI beneficially owns 1,659,868 shares of Diamondhead common stock.  CHI also owns in excess of 500,000 shares of the Company's common stock, which are registered under the name College Health &

Investment, Ltd. CHI has been a stockholder of the Company since approximately 2005.

Defendant Edson R. Arneault ("Arneault") has been a director of Diamondhead and Chairman of the Company's Board of Directors (the "Board") since March 31, 2014. Arneault was appointed by the Board to fill a vacancy.

Defendant Deborah A. Vitale ("Vitale") has served as President, Chief Executive Officer and Treasurer of the Company since February 1998 and served as Chairman of the Board from March 1995 through March 31, 2014. Vitale also currently serves as Secretary of the Company, a position she previously held from November 1994 until July 2002. Vitale has been a director of the Company since December 1992.

Defendant Gregory A. Harrison ("Harrison") was elected a director of the Company on February 20, 1998. Harrison was appointed Vice President of the Company on July 18, 2002 and was appointed Secretary of the Company on July 25, 2002.

Martin C. Blount ("Blount") has been a director of the Company since June 9, 2010. Blount was appointed by the Board to fill a vacancy.

Benjamin J. Harrell ("Harrell") was elected a director of the Company on July 18, 2002.

### B.    The Company Has Not Held An Annual Meeting In Over Seven Years

The Company's last annual stockholders' meeting was held on October 1, 2007. At the meeting, Harrell, Harrison, Vitale, Carl D. Stevens, H. Steven Norton and Frank E. Williams, Jr. were elected as directors. Defendants (other than Arneault) have been directors of the Company for at least five years and, Vitale, for over twenty years. (Compl. ¶ 19.)

### C.    The SEC Orders the Deregistration of the Company's Securities

On September 4, 2014, the Company's securities were deregistered, because Defendants failed to cause the Company to make required SEC filings. In particular, no periodic reports had been filed since the period ended June 30, 2011. (Compl. ¶ 20.)

Defendants subsequently solicited stockholders, including CHI, for new investments for the stated purpose of raising money to reregister the Company's securities. Despite substantial stockholder investment, the Company failed to reregister its securities with the SEC. (*Id.* ¶ 21.)

During the course of the Company's solicitation of additional investment into the Company, the Company's investment banker, James Devlin, assured CHI that a stockholder meeting was being arranged to occur no later than January 2015. When CHI heard nothing more from the Company or its agents regarding the purportedly scheduled annual meeting, on or about January 22, CHI demanded that

the Company hold an annual meeting.  Diamondhead ignored that demand, and, on February 13, 2015, CHI commenced the First 211 Action.  (Compl. ¶ 22.)

On February 16, 2015, counsel for the Company sent an email to counsel for CHI stating that the Company was amenable to holding an annual meeting on March 25, 2015, and attaching a proposed stipulation of judgment.  (*Id.* ¶ 23.)

### D.    CHI Requests Information From Diamondhead, Which it Ignores

On February 18, 2015, counsel for CHI called counsel for the Company and informed him that CHI likely could resolve the First 211 Action by stipulated order, but that any such stipulated order would need to include additional provisions, including the record date for the determination of stockholders entitled to vote, and the form of notice of the meeting as permitted by Section 211(c).  In order to properly complete that negotiation, counsel for CHI requested a copy of the Company's Bylaws, which the Company previously had refused to provide to CHI.  (*Id.* ¶24.)

On February 19, 2015, counsel for CHI followed up with Diamondhead's counsel and asked in writing whether the Company would provide the Bylaws, and if not, informed the Company that CHI would need to propound and serve a targeted document request.  Counsel for CHI also asked whether the Company could come to an agreement on an expedited schedule and would produce its stock list materials without the need for a formal demand pursuant to 8 *Del. C.* § 220.

(*Id.* ¶25.)   When counsel for the Company failed to respond to the February 19 email, CHI propounded and served a document request for the Company's Bylaws. (*Id.* ¶26.)

On February 23, 2015, CHI made a demand on the Company pursuant to 8 *Del. C.* § 220 for the Company's stock list and related documents.   The demand was delivered to the Company on February 24, 2015.  (*Id.*¶ 27.)

### E.   Behind CHI's Back, Diamondhead Agrees to a Watered Down Stipulated Judgment to Hold an Annual Meeting

Unbeknownst to CHI, on February 23, a different stockholder of the Company filed the Second 211 Action.   CHI discovered that counsel for the Company—the same as in the First 211 Action—and counsel for Lepler stipulated to an order of judgment less than two days later, in substantially the same form as the one to which CHI refused to stipulate in the First 211 Action. Before CHI discovered the existence of the Second 211 Action, the Court entered the Judgment. (Compl. ¶ 28.)

Upon information and belief, Vitale prompted Lepler to file the Second 211 Action and to quickly agree to the Judgment so that Defendants could avoid having the Court approve the form of the notice, as requested by CHI.  This was important to Defendants because holding a meeting ordered pursuant to 8 *Del. C.* § 211(c) could obviate the need for a quorum in compliance with 8 *Del. C.* § 216 and, upon information and belief, Defendants had planned to include agenda items other than

the election of directors and to take advantage of the relaxed quorum requirements of 8 *Del. C.* § 211(c) at the meeting.  It was not a coincidence that the second Section 211 Action was commenced on the heels of the First 211 Action in connection with a company that has failed to hold a meeting in over seven years. Only after CHI refused to agree to the Company's proposed stipulated order of judgment was the Second 211 Action filed.  Upon information and belief, other stockholders were approached by Defendants to file an action to compel an annual meeting and offered payment of legal fees to do so, but they refused to participate. (Compl. ¶ 29.)

Lepler agreed to the Judgment in less than two days without even taking into consideration his own requested relief requiring the Company to schedule an annual meeting within 60 days and to "provide notice of its annual meeting and deliver proxy materials to its shareholders at least 30 days prior to the annual meeting."  The Judgment does not provide any relief regarding the notice and delivery of proxy materials, and the March 25, 2015 meeting date guarantees that notice and proxy materials would not be delivered thirty days prior to the annual meeting, as the date of the meeting listed in the Judgment is merely twenty-eight days from the date of the entry of the Judgment. (*Id.* at ¶30.)

On March 1, 2015, CHI disclosed in legal papers filed with this Court that it intended to support a competing slate of directors at the annual meeting, as

10

highlighted by its demand for the Company's stock list materials.  Accordingly,

Defendants were incentivized to cram down a meeting in order to thwart any

challenge to their directorships.  (Compl. ¶ 31.)

### F.    The Defendants Finalize A Proxy Statement on February 23—The Day Lepler Files His Complaint

On February 23, 2015—the same day that Lepler filed the Second 211

Action—Defendants finalized a notice of meeting and proxy statement

(collectively, the "Proxy Statement") in connection with the Meeting.  (Compl. ¶

32.)  Despite being dated for February 23, Defendants did not disseminate the

Proxy Statement until four days later and after the Court entered the Judgment.

(*Id.* ¶33.)

After discovering the Second 211 Action and the Judgment, on March 1,

2015, CHI filed the Motion to Intervene.  On the evening of March 1, 2015,

Diamondhead sent CHI the Company's stocklist dated as of December 29, 2014, a

copy of a list of ESOP participants, and a copy of its Bylaws.  Diamondhead also

sent CHI a copy of the Proxy Statement that supposedly was prepared at least six

days before and mailed out two days before.  (*Id.* ¶34.)

On March 3, 2015, the Company produced a stocklist dated as of the record

date, February 17, 2015 (the "Stocklist").  Also on March 3, CHI requested that

missing stocklist materials, including the CEDE Breakdown, be provided to CHI,

which the Company provided.  CHI did not receive the list of Non-Objecting Beneficial Owners (the "NOBO" list) until March 6, 2015.  (Compl. ¶35.)

On March 2, 2015, Diamondhead filed an opposition to the Motion to Intervene and levied irrelevant attacks on the General Partner of CHI.  On March 9, 2015, Lepler filed a response to the Motion to Intervene.  (*Id.* ¶36.)  Lepler confirmed that the Defendants prompted the lawsuit by stating that the Company told him that it could not hold an annual meeting unless ordered by the Court.  (*Id.* ¶37.)

### G.    Defendants Time The Meeting To Ensure That Stockholders Desiring To Oppose Management Will Not Effectively Be Able To Solicit And Obtain Proxies

When CHI finally received the Stocklist, it learned for the first time that roughly seventy percent of Diamonhead's shares of capital stock are held in "street name."  Specifically, as of February 17, 2015—the record date for the Meeting— the Company had issued, outstanding and entitled to vote 40,509,046 shares of stock, 27,029,627 of which are held by 55 different nominees (brokerage houses and banks whose clients are beneficial holders of Diamondhead's voting stock). (Compl. ¶38.)  Of course, the legal owner of these shares is, in turn, the Depository Trust Company ("DTC"), which holds through its nominee, Cede & Co ("Cede"). (*Id.* ¶39.)

While Diamondhead is no longer an SEC reporting company, having had its

securities deregistered on September 4, 2014 (*see* Transmittal Affidavit of Stephanie S. Habelow, hereinafter, "Habelow Aff.", Ex. A), it continues to be capitalized like a public company.  As alleged herein, Defendants took advantage of that fact when they manipulated Diamondhead's corporate machinery in an attempt to cram down the Meeting on CHI (who filed the First 211 Action to force the Company to hold an election for the first time in over 7 years) and other similarly situated stockholders who, to Defendants' knowledge, intended to support a dissident slate to run against current management.

Knowing that Diamondhead no longer had to comply with federal securities laws and proxy rules that would have given stockholders ample notice of the Meeting and the Company's proxy materials,[1] Defendants caused Diamondhead to mail its Proxy Statement dated February 23, 2015 on February 27, 2015 for a meeting to be held on March 25, 2015.  Counsel for CHI was not provided a copy of the Proxy Statement until March 1, 2015.

This timing allowed Defendants to leverage the fact that a majority of Diamonhead's issued and outstanding stock is in street name, which, of necessity, foists onto stockholders the burden of attempting to discern the identities of beneficial owners from whom to solicit votes and of obtaining legal proxies from

---

[1] For example, Diamondhead would have had to file a preliminary proxy statement on Form PRE 14A.  That alone would have given stockholders notice of the upcoming election and given them time to mobilize their own proxy contest or consent solicitation.

DTC. This takes a significant amount of time. Defendants knew that and, indeed, relied on that when they rushed to cram down the Meeting on CHI and other stockholders who expressed an interest in exercising their franchise in favor of non-management directors.

The nearly insurmountable timing obstacle confronting CHI and like-minded stockholders is apparent. Once Diamondhead sent its Proxy Statement to various securities intermediaries, those intermediaries needed to send the Proxy Statement to their clients (*i.e.*, the beneficial holders) along with Voting Instruction Forms ("VIFs") by which the beneficial holders could direct the intermediaries to obtain for them legal proxies from DTC through its nominee, Cede.

CHI did not receive a VIF with respect to the shares that it owns beneficially until on or about March 11, 2015. Once the beneficial holders receive their legal proxies, which takes approximately 5-7 days after instructions are sent by the intermediary to DTC, there is the reality that Diamondhead's stockholder base is widely dispersed and many stockholders interested in voting will not be able to attend the Meeting on such short notice. That, in turn, necessitates the process of re-proxying the legal proxies from DTC to an agent or attorney-in-fact who can attend the Meeting in person.

By Defendants' conduct alleged herein, they have deliberately sought to disenfranchise stockholders who would oppose current management.

14

Alternatively, even if Defendants' motives regarding the timing and process of the Meeting were not illicit, which they were, Defendants' conduct is nevertheless inequitable in effect, thus warranting the relief sought in this Complaint.

## H.    The Proxy Statement Contains Misleading and Confusing Statements

The Proxy Statement contains an omission regarding the actions commenced against the Company to compel an annual meeting. It also contains a confusing statement regarding quorum requirements. The Proxy Statement also contains the following disclosure regarding stockholder proposals:

> **STOCKHOLDER PROPOSALS**
> If a stockholder intends to present a proposal for action at the next Annual Meeting and wishes to have such proposal considered for inclusion in the Company's proxy materials, the proposal must be submitted, in writing, and received by the Secretary of the Company at the Company's office located at 1013 Princess Street, Alexandria, Virginia, 22314, not less than 120 calendar days before the date of the Company's Proxy Statement released to shareholders in connection with the previous year's Annual Meeting.

*See* Habelow Aff., Ex. B at 11. This language confusingly references proposals for Diamondhead's "next" annual meeting, and states that they must be received 120 days before the date of the proxy statement for the "previous" year's annual meeting. This creates the impression that (i) the Company has an advance notice bylaw, which it does not, and (ii) that the advance notice requirement applies to the current Meeting. If the disclosure were intended to refer clearly to a future

meeting (*i.e.*, Diamondhead's 2016 annual meeting, then it would have stated that the 120 day advance notice period was triggered off of the February 23, 2014 date of this year's Proxy Statement.

Compliance with this purported advance notice requirement (which does not exist) is an impossibility because the Company has not had an annual meeting in over seven years.

Nevertheless, as alleged below, Harrison falsely told stockholders that the 120-day advance notice period applied to director nominations for this year's Meeting scheduled for March 25, 2015. That, coupled with the confusing nature of the "Stockholder Proposal" disclosure in the Proxy Statement, demonstrates that Diamondhead's intent was to discourage stockholders from supporting any non-management directors.

## I.    Subsequent To The Mailing Of The Proxy Statement, Harrison Makes Further Misrepresentations To Stockholders In An Effort To Chill Voting

Orally and in writing, Harrison made statements (and, upon information and belief, continues to make statements) to stockholders in an effort to dissuade them from voting against the Company's proposals in the Proxy Statements and in favor of any non-management slate of directors.

In an email blast to stockholders of the Company, Harrison made blatantly false statements about the Delaware law governing elections of directors. The

16

entirety of his email is as follows:

I think some of you will find this very interesting as a minimum & maybe frustrating too?:

Plurality voting in the election of directors is the default standard in most state corporate statutes, including Delaware's, as well as under the Model Act. In short, plurality voting means that a director is elected to office by virtue of having received the most votes in his or her election. **In uncontested elections, a single vote "for" a director theoretically would be sufficient to secure his or her election. As a result, while withholding authority to vote for the election of a director may be an effective way to communicate dissatisfaction or stockholder unrest, no amount of withheld voters can defeat a director under the plurality standard.** Under majority voting, however, a director would be required to receive a majority of votes cast in his or her election to be elected to a board, and the failure of a nominee to receive majority support would necessitate some subsequent action by the board. Accordingly, the rationale most frequently given behind the push for majority voting is to make boards of directors more "accountable" to stockholders.

*Diamondhead annual mtg. involves an uncontested election per se as no other slate of Directors was provided to the Co. in the prescribed time period for Notice.*
This does not mean that the Company cannot add additional Directors to the Board of Directors after the Annual Meeting is closed. We have sufficient empty chairs to do so.

NOTE WELL THAT THE Diamondhead PROXY CARD CONTAINS NO MECHANISM TO VOTE "AGAINST" A DIRECTOR. ONE COULD SAY THAT THE Diamondhead ANNUAL MTG ELECTION PROCESS WILL DEVOLVE INTO A POPULARITY

17

> CONTEST. I PREDICT THAT BENNY HARRELL
> WILL BE THE WINNER!! AS HE WAS IN OTHER
> ELECTIONS.......MARDI GRA KING!!!

*See* Affidavit of Robert F. Skaff, Jr. (hereinafter "Skaff Aff."), Ex. A (emphasis

added in italics).

In a subsequent voicemail to one of the non-management nominees, Robert

Skaff, which dovetails with Harrison's email falsely claiming that the impending

election is uncontested and cannot be contested, he compounds his misstatements

and his efforts to discourage a competing slate from running by (i) reiterating the

falsehood that the election is uncontested and cannot be contested due to a 120-day

advanced notice requirement, and (ii) falsely stating that, in any event, nominations

cannot be made from the floor of the Meeting. *See* Skaff Aff. at ¶7); *see also*

Habelow Aff., Ex. F.

Harrison's false statements are contrary to the Charter and Bylaws, which

were provided to CHI's counsel by counsel for Diamondhead. Habelow Aff., Ex.

D & Ex. E. Nowhere in those governing documents are there any provisions

requiring advance notice of stockholder proposals for election of directors or any

other business at an annual meeting. Similarly absent from the Company's organic

documents are any provisions regulating nominations of directors and/or setting

director qualifications.

**J.      A Competing Slate is Nominated For Election to the Board**

On March 9, 2015, stockholder Dr. F. Richard Stark nominated Robert Skaff, Steven Gersten and Robert Sturges as direct candidates for the meeting.  On or about March 10, 2015, Harrison threatened stockholders that voting for the competing slate would destroy any chances to sell the Company.  A potential sale transaction, however, was not disclosed in the Proxy Statement.  Harrison further threatened that Defendants needed Proposal 2 to be approved in order to sell the Company.  This likewise is not disclosed in the Proxy Statement.

Harrison's efforts to silence any dissent to current management or opposition to the incumbent directors' reelection did not stop with his misrepresentations regarding the vote for directors.  In another attempt to stymie voting, he also told stockholders that the vote on Proposal 2 was locked up.  Skaff Aff. at ¶5.

On March 10, 2015, counsel for CHI informed counsel for the Company that the Proxy Statement was defective and requested the Company's position as to the acceptance of the Competing Slate as director nominees.  The Company did not respond.

Shockingly, on March 12, 2015, CHI learned that one or more of the Defendants, including Harrison, have been contacting stockholders, and representing (upon information and belief, falsely) that a "deal" to acquire Diamondhead is imminent and that failure to vote with management at the Meeting

will kill the deal. Conspicuously absent from Proposal 1 in the Proxy Statement (election of directors) is any reference to such a pending transaction that hinges on re-electing the Defendants.  This representation to stockholders, which clearly is material, is either true and a disclosure omitted from the Proxy Statement, or, alternatively, is a false representation designed to discourage stockholders from supporting any nominees other than the Defendants.  Either way, it has a negative impact on the stockholder franchise.

## ARGUMENT

## I.    THE APPLICABLE TRO STANDARD

In order to prevail on a motion for issuance of a temporary restraining order, plaintiff must demonstrate that (i) plaintiff has a colorable claim on the merits, (ii) plaintiff will suffer irreparable harm if relief is not granted, and (iii) the balance of hardships favors plaintiff.  *See ACE Ltd v. Capital Re Corp.*, 747 A.2d 95, 102 (Del. Ch. 1999); *Stirling Inv. Holdings, Inc. v. Glenoit Universal, Ltd.*, 1997 WL 74659, at 2 (Del. Ch. Feb. 12, 1997).  Application of this standard generally requires this Court to concentrate:

> on whether the absence of a TRO will permit imminent, irreparable injury to occur to the applicant and whether that possibility of injury outweighs the injury that the TRO itself might inflict on the defendants.  In a case where this balance tilts in favor of the applicant and where a responsible consideration of the merits cannot be had, this court will issue a TRO even though that applicant has only raised claims that "are colorable,

20

> litigable, or . . . raise questions that deserve serious
> attention."

*ACE Ltd.*, 747 A.2d at 102 (quoting *Cottle v. Carr*, 1988 WL 10415, at \*2-3 (Del.
Ch. Feb. 9, 1988)).

Plaintiff meets and exceeds this burden, particularly in light of the
immediacy and magnitude of the harm about to befall the Company's stockholders,
who have been misinformed regarding material facts bearing directly on their
decision to vote for the Company's proposals due to the confusing and misleading
Proxy Statement and due to Defendants' subsequent attempts to interfere with the
stockholder franchise by spreading misinformation about the upcoming election of
directors.  Moreover, a majority of the voting power of the Company is controlled
by stockholders who are beneficial owners holding shares of the Company's
capital stock in "street name."  They will be denied the opportunity to cast fully
informed and meaningful votes at the Meeting due to insufficient time for (i) the
solicitation of proxies in support of the Competing Slate, (ii) the transmittal of
voting instructions from those beneficial owners to their securities intermediaries
such as brokers and banks, (iii) the intermediaries to, in turn, obtain proxies from
the record holder (*i.e.*, Cede as the nominee for DTC) and transmit them back to
the beneficial owners.

## II. PLAINTIFF HAS A COLORABLE CLAIM THAT NOTICING THE MEETING ON A SENSELESSLY RUSHED BASIS IS AN INEQUITABLE MANIPULATION OF CORPORATE MACHINERY

### A. Permitting The Meeting To Proceed On March 25, 2015 Would Validate Defendants' Ploy To Disenfranchise Stockholders

When directors communicate with stockholders to request action such as voting at an annual meeting, they are required to disclose to stockholders all material information that is reasonably available. *ODS Technologies, L.P. v. Marshall*, 832 A.2d 1254, 1259 (Del. Ch. 2003). The test for whether a misrepresented or omitted fact is material is as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 1259-60 (finding reasonable likelihood of success on claim for breach of duty of disclosure regarding proposed bylaw amendments) (quoting *Arnold v. Society for Sav. Bancorp.*, 650 A.2d 1270, 1277 (Del. 1994)). *See also In re Anderson, Clayton S'holders' Litig.*, 519 A.2d 669, 675 (Del. Ch. 1986) (finding

22

reasonable probability of success on claim that proxy supplement was materially misleading); *Gilmartin v. Adobe Res. Corp.*, 1992 WL 71510 (Del. Ch. Apr. 6, 1992) (finding reasonable probability of success on proxy disclosure claims). Here, the confusing and misleading language in the Proxy Statement, as well as Defendants' subsequent and patently false representations to stockholders about the purported inability to elect a competing slate, easily satisfies this standard.

> 1. **The Proxy Statement is incomplete because it fails to adequately describe the consequences of a failure to oppose the Charter Amendment**

The Proxy Statement states that funds from a sale of debentures are in escrow and that those funds will not be released unless Proposal 2 is approved, which is represented to be a requirement under the applicable Private Placement Memorandum ("PPM"). To frighten stockholders into voting for Proposal 2, Defendants caused the Proxy Statement to include bolded language warning stockholders that failure to "approve this proposed **Amendment** would have a material adverse impact on the Company." Habelow Aff, Ex. B at 8. What is missing is an explanation of the material adverse effect that is predicted. Also missing is an explanation that, under the PPM, failure to approve the Charter Amendment simply means that investors would be refunded. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994) (holding that directors making partial disclosures "had an obligation to provide the stockholders with an

23

accurate, full and fair characterization" of the subject of the partial disclosures); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("directors are under a fiduciary obligation to avoid misleading partial disclosures.").

2. **The Proxy Statement misrepresents that stockholder proposals must be submitted in advance of the Meeting, even though the Company has no advance notice bylaw**

As discussed in Section H above, the Proxy Statement contains language implying that Diamondhead has an advance notice bylaw or other requirement, when it does not.    This language confusingly references proposals for Diamondhead's "next" annual meeting, and states that they must be received 120 days before the date of the proxy statement for the "previous" year's annual meeting.  This creates the impression that (i) the Company has an advance notice bylaw, which it does not, and (ii) that the advance notice requirement applies to the current Meeting.    If the disclosure were intended to refer clearly to a future meeting (*i.e.*, Diamondhead's 2016 annual meeting), it would have stated that the 120-day advance notice period was triggered off of the February 23, 2015 date of this year's Proxy Statement.

The stockholder proposal language in the Proxy Statement is reminiscent of a stockholder proposal section in Diamondhead's proxy statement for its last annual meeting of stockholders in 2007.  *See* Habelow Aff. at Ex. C at 14.  The 120-day advance notice required under that provision, however, was predicated on

24

a stockholder seeking access to the Company's proxy statement for a proposal in reliance on Rule 14a-8 under the Securities and Exchange Act of 1934.

Any current reliance by Diamondhead on such a provision is flawed for at least five reasons. <u>First</u>, the Company's securities are deregistered and the federal proxy rules no longer apply. <u>Second</u>, the letter nominating the Competing Slate on March 10, 2015 did not request access to the Company's proxy materials. <u>Third</u>, if the federal proxy rules did apply, then Diamondhead neglected to reference the portion of the applicable rule that governs when the company failed to hold an annual meeting the previous year.

> The deadline is calculated in the following manner if the proposal is submitted for a regularly scheduled annual meeting. The proposal must be received at the company's principal executive offices not less than 120 calendar days before the date of the company's proxy statement released to shareholders in connection with the previous year's annual meeting. *However, if the company did not hold an annual meeting the previous year, or if the date of this year's annual meeting has been changed by more than 30 days from the date of the previous year's meeting, then the deadline is a reasonable time before the company begins to print and send its proxy materials.*

17 CFR 240.14a-8(e)(2) (emphasis added).    Here, of course, Diamondhead stockholders had no means of knowing when the Company would commence printing and sending its proxy materials and the Meeting was scheduled hastily and on an unreasonably compressed schedule in response to the First 211 Action.

25

Fourth, because the federal proxy rules governing advance notice are inapplicable and because the Company's Charter and Bylaws contain no advance notice provisions or other restrictions or procedures regarding director nominations or qualifications, there is no legal impediment to the nomination of the Competing Slate. An analysis on this point can commence with an observation about what the General Corporation Law does not say. Section 222(a) of the DGCL imposes no requirement for advance notice of stockholder proposals to be considered at an annual meeting. *See* 8 *Del. C.* § 222(a). Indeed, this Court has recognized that there is no requirement for a stockholder to give advance notice of an intention to nominate directors, unless a corporation has duly imposed such a requirement. *Goggin v. Vermillion, Inc.*, 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011) ("Delaware law *does not require that shareholders provide advance notice of proposals or of director nominations* to be raised at an annual meeting, 'unless the corporation has duly imposed such a requirement.'") (emphasis added). *See also Levitt Corp. v. Office Depot, Inc.*, 2008 WL 1724244, at *4 (Del. Ch. Apr. 14, 2008) ("Under Delaware law, no advance notice of a stockholder's intent to nominate directors at an annual meeting need be given, unless the corporation has duly imposed such a requirement."). Obviously, the place for such a requirement

is in the bylaws or certificate of incorporation.    Diamondhead's Charter and

Bylaws are silent on the issue.[2]

Fifth, if Defendants are purporting to enforce a 120-day notice requirement

in connection with this year's annual meeting, which, as discussed below, they are,

it is *per se* invalid for one of two reasons.  The Proxy Statement is dated February

23, 2015 and was mailed on February 27, 2015.  There was no prior year's proxy

statement from which to calculate the running of the notice period.  If, on the other

hand, Defendants are contending that the nomination of the Competing Slate was

required to have been made 120 days in advance of the date of this year's Proxy

Statement, no stockholder could have complied.  *See Schnell v. Chris-Craft Indus.,*

*Inc.*, 285 A.2d 437, 439 (Del. 1971) (reversing Court of Chancery and holding that

it was inequitable for board to advance scheduled annual meeting by one month at

an isolated location after learning of plaintiff's plan to wage a proxy contest to

elect new directors); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906 (Del. Ch.

1980) (invalidating board's setting of annual meeting date only 63 days after board

meeting at which date was set when board had, five months earlier, adopted bylaw

requiring 70 days' notice of information relating to proposed director nominees in

advance of annual meeting); *Linton v. Everett*, 1997 WL 441189, at *10 (Del. Ch.

---

[2] Even when corporations have advance notice bylaws, which Diamondhead does
not, "they will be struck down" if they "unduly restrict the stockholder franchise or
are applied inequitably." *Goggin*, 2011 WL 2347704, at *4

Jul. 31, 1997) (30 days' notice of annual meeting was inequitable where (i) certificate of incorporation required notice of director nomination within 10 days of notice of annual meeting if notice of meeting was mailed within 31 days of meeting itself, and (ii) board's past practice was to give stockholders 1 year's notice of procedure for taking action at annual meeting); *Mesa Petroleum Co. v. Unocal Corp.*, 1985 WL 44692, at *5-6 (Del. Ch. Apr. 22, 1985) (issuing interpretation of new bylaw within 30 days of annual meeting was inequitable where bylaw required 30 days' notice of proposed action at annual meeting but board's interpretation effectively required 90 days' notice, effectively thwarting defendants' ability to solicit proxies for proposed action at next annual meeting).

>   **3.    After the Proxy Statement is mailed, Defendants continue to make misrepresentations to stockholders in order to dissuade them from supporting the Competing Slate**

Once the Proxy Statement was mailed, the Defendants unleashed a barrage of phone and email solicitations to dissuade stockholders from supporting the Competing Slate by either (i) falsely telling them that they are not entitled to vote for the Competing Slate because the election is uncontested and cannot be contested, or (ii) engaging in scare tactics to designed to suggest that voting against the incumbents would harm the Company.

Orally and in writing, Harrison has and is communicating with stockholders in an effort to dissuade them from voting against the Company's proposals in the

Proxy Statement and in favor of any non-management slate of directors.

In an email blast to stockholders of the Company, quoted in its entirety at Section I above, Harrison made blatantly false statements about the Delaware law governing elections of directors. Critically, the email states falsely that "DHCC annual mtg. involves an uncontested election per se as no other slate of Directors was provided to the Co. in the prescribed time period for Notice." *See* Skaff Aff. at Ex. A. In a subsequent voicemail to one of the members of the Competing Slate, Robert Skaff, which dovetails with Harrison's email falsely claiming that the impending election is uncontested and cannot be contested, he compounds his misstatements and his efforts to discourage a dissident slate from running by (i) reiterating the falsehood that the election is uncontested and cannot be contested due to a 120-day advanced notice requirement, and (ii) falsely stating that, in any event, nominations cannot be made from the floor of the Meeting.

A transcript of the voicemail is attached hereto (Habelow Aff., Ex. F), but it simply must be heard to be appreciated. (Skaff Aff. at ¶7, https://www.dropbox.com/s/gvqwe38r00xgr51/03-10-15_VoiceMail.mp3?dl=0).

Harrison's false statements are contrary to the Charter and Bylaws, which were provided to CHI's counsel by counsel for Diamondhead. Nowhere in those governing documents are there any provisions requiring advance notice of stockholder proposals for election of directors or any other business at an annual

meeting. Similarly absent from the Company's organic documents are any provisions regulating nominations of directors and/or setting director qualifications. Delaware courts have long recognized that the "right of shareholders to participate in the voting process includes the right to nominate an opposing slate." *Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 345 (Del. Ch. 2008). Where, as here, Diamondhead has not duly imposed any advance notice, nomination or qualification requirements regarding the stockholders' right to nominate and vote for directors of their choosing in its governing documents, Defendants' conduct in thwarting the franchise is inexcusable.

Harrison's efforts to silence any dissent to current management or opposition to the incumbent directors' reelection did not stop with his misrepresentations regarding the vote for directors. To stymie voting, he also told stockholders that the vote on Company's proposal to amend the Charter was locked up. Skaff Aff. at ¶5.

Shockingly, on the evening of March 12, 2015, CHI learned that one or more of the Defendants have been contacting substantial stockholders and representing that a "deal" to acquire Diamondhead is imminent and that failure to vote with management at the Meeting will kill the deal. Skaff Aff. at ¶9. Conspicuously absent from Proposal 1 in the Proxy Statement (election of

directors) is any reference to such a pending transaction that hinges on re-electing the management slate. Logic dictates that this representation to stockholders, which clearly is material, is either true and a disclosure omitted from the Proxy Statement, or, alternatively, is a false representation designed to discourage stockholders from supporting any nominees other than the management slate. Either way, it has a negative impact on the stockholder franchise.

### B. Defendants' Response to the First 211 Action Was For The Primary Purpose Of Disenfranchising Stockholders

#### 1. The Company prompts the bogus Second 211 Action and surreptitiously obtains a stipulated order scheduling a rushed meeting

One of the most fundamental tenets of corporate governance is the relationship between a corporation's stockholders and its board of directors, and the allocation of power between the two. *MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1126 (Del. 2003). Stockholders derive their power from the right to vote on particular matters, while the board of directors has the power to manage the corporation, thereby creating "a separation of control and ownership." *Id.* Thus, "the stockholder franchise has been characterized as the 'ideological underpinning' upon which the legitimacy of the directors' managerial power rests." *Id.* (quoting *Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988)). In *Blasius*, the Court of Chancery held that the business judgment rule does not apply to actions taken by the board for the purpose of interfering with a

stockholder vote, even if those acts are taken in good faith. *See Blasius* 564 A.2d at 659-60. *See also* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations*, 4.21 at 4-207 (2010 Supp.). Where a board is found to have taken certain action with the principal purpose of preventing stockholders from electing a majority of new directors, the board will be required to show a "compelling justification" for taking such action. *See In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 674 (Del. Ch. 2004). However, as previously stated, "even where the Court finds that the action taken by the board was made in good faith, it may still constitute a violation of the duty of loyalty" under the *Blasius* standard. *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *8 (Del. Ch. Dec. 4, 2000). Specifically, *Blasius* will apply where not only board purposefully acts "to interfere with or impede exercise of the shareholder franchise" but also where stockholders "are not given a 'full and fair opportunity to vote.'" *Id.* (quoting *Stroud v. Grace*, 606 A.2d 75, 92 (Del. 1992).

As described above, after the First 211 Action was filed by CHI, Defendants approached different stockholders looking for a shill to file another action under Section 211 so that Diamondhead could obtain a stipulated order in the form that CHI rejected in its negotiations with Company's counsel. As stated by counsel for Lepler (the plaintiff in the Second 211 Action), Lepler was prompted by the Company to serve as a plaintiff for this purpose because he allegedly wanted a

meeting, was not told about the First 211 Action, and was incorrectly told that an order was needed before the annual meeting could happen. CHI has since learned that Vitale prompted Lepler to file the Second 211 Action. That was done, and Diamondhead obtained a stipulated order setting the meeting date.

Now armed with this stipulated order for an annual meeting on short notice, which Diamondhead hid from CHI and which counsel for CHI discovered only by happenstance, Defendants were ideally situated to take full advantage of the fact that stockholders like CHI would have insufficient time to mount a meaningful proxy contest to unseat the long-entrenched incumbent directors.

Holding the Meeting on the current schedule was orchestrated by Defendants and there is only one plausible purpose: to obstruct a meaningful challenge to the Company's currently seated directors. Here, the Court's analysis of whether Defendants' conduct fits within the first prong of the *Blasius* analysis—whether the corporate action was taken for the primary purpose of impeding the franchise—should be further informed by the Defendants' conduct in calling and emailing stockholders and spreading untruths in an effort to convince them to withhold support from the Competing Slate. As to the second prong of the *Blasius* analysis, there is no justification for the orchestration of the Second 211 Action and the rushed timetable for the Meeting, much less a compelling one. Diamondhead has not held a meeting in over seven years and nothing requires

33

Defendants to attempt to force one on the *present schedule*.  If such exigent circumstances exist, stockholders were entitled to hear about them in the Proxy Statement but there are no such disclosures.  By negative implication, then, there is no need for Defendants to have caused Diamondhead to steamroll any opposition to the incumbent directors with a rushed annual meeting.

2.    **The Meeting must be enjoined because it is inequitable in intent and/or effect**

Even if Defendants' conduct did not run afoul of the teachings of *Blasius*, an injunction is nevertheless warranted.  It is a well-established principle that "inequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971). There is no requirement, however, that the inequitable conduct stem from "an evil or selfish motive." *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1121-22 (Del. Ch. 1990). *See also Lerman v. Diagnostic Data, Inc.*, 421 A2d 906 (Del. Ch. 1980) (invalidating bylaw amendment due to its "terminal effect" on an insurgent stockholder's slate of proposed director nominees, regardless of whether the bylaw was "designedly inequitable or not").

Defendants' scheme to entrench themselves in office and prevent the nomination of any new directors through their surreptitious manipulation of the scheduling of the Meeting fits neatly within the framework of *Schnell* and its progeny.  Providing stockholders with significantly less than 30 days' notice of the

34

Meeting and intentionally misleading them to believe that the Company's Bylaws requires 120 days' notice for stockholder proposals in an attempt to obstruct stockholders from supporting any non-management director nominees is patently inequitable. Assuming for the sake of argument that the purported advance notice requirement was duly adopted by Defendants, its application here would have a "terminal effect" on any stockholder proposals such as for the nomination of directors (as in *Lerman*). For that reason, it would need to be stricken.

## III. DIAMONDHEAD AND ITS STOCKHOLDERS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO AND THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN PLAINTIFF'S FAVOR

The stockholders will be irreparably harmed in the absence of an injunction because Defendants' disclosure violations misrepresent material facts, omit material facts and confusingly create the impression that the Competing Slate cannot stand for election and that the vote is locked up in favor of management supporters in any event. The presence of such an uninformed (and, in certain instances, misinformed) electorate constitutes irreparable harm.

In *Sherwood v. Ngon*, 2011 WL 6355209 (Del. Ch. Dec. 20, 2011), this Court held that an injunction is the appropriate remedy to allow stockholders time to consider corrective disclosures and to solicit proxies for a competing slate of directors:

> The threat of an uninformed stockholder vote constitutes irreparable harm. "[I]t is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected." According to Plaintiffs, the Annual Meeting will result in an uninformed shareholder vote if ChinaCast's shareholders are not given time to consider corrective disclosures and Plaintiffs' competing slate of nominees. …
>
> I find Plaintiffs' argument convincing and conclude for those same reasons that Plaintiffs have satisfied their burden to show the existence of irreparable harm.

*Id.* at *9 (internal citations omitted). *See also Louisiana Municipal Police Employees' Retirement System v. Crawford*, 918 A.2d 1172, 1192 (Del. Ch. 2007) ("Shareholders would suffer irreparable harm [if they] were … forced to vote without knowledge of … material facts."); *ODS Techs.*, 832 A.2d at 1262 ("The threat of an uninformed stockholder vote constitutes irreparable harm.").

Moreover, there is no harm to the Company on account of a reasonable postponement of the Meeting to facilitate an informed electorate and a meaningful vote. The Company has expressed no interest in a meeting for over seven years and it sought to rush the pending meeting only to preempt Plaintiff's attempt to obtain a real meeting. Thus, in sharp contrast to Plaintiff and other Diamondhead stockholders, who will suffer appreciably in the absence of a TRO, the Company will suffer no harm from a reasonable postponement of the Meeting.

Due to Defendants' successful ploy to manipulate the timing of the

Meeting, the equities tip even further in favor of Plaintiff because it and other stockholders deserve ample time to consider all material information.

Plaintiff is entitled to an injunction postponing the Meeting until Defendants correct the numerous material disclosure problems alleged in the Complaint and as detailed herein.

## IV.    PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS SHOULD BE GRANTED

For the same reasons described above, Plaintiff's motion for expedited proceedings should be granted so that Plaintiff can obtain timely relief on this emergency application.  A motion for expedited proceedings should be granted with sufficient demonstration of a "colorable claim" and a "possibility of threatened irreparable injury." *Banet v. Fonds de Regulation et de Controle Café Cacao,* 2008 WL 4951054, at *1 (Del. Ch. Nov. 12, 2008) (citation omitted). Courts routinely depart from the timing envisioned by the Court of Chancery's rules and grant motions to expedite when a Plaintiff has met this "minimal threshold." *Cnty. of York Emps. Ret. Plan v. Merrill Lynch & Co., Inc.,* 2008 WL 4824053, at *7-8 (Del. Ch. Oct. 28, 2008); *see also Raymond Revocable Trust v. MAT Five LLC,* 2008 WL 2673341, at *2, 6 (Del. Ch. June 26, 2008) (granting preliminary injunction hearing, motion to expedite proceedings and motion for expedited discovery).

Indeed, where emergency injunctive relief is sought, this Court traditionally

has acted with a particular consideration for plaintiffs and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994); *see also Box v. Box*, 697 A.2d 395, 398-99 (Del. 1997) ("Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties," and the Court of Chancery in particular is "renowned" for its "expedited decision[-]making."). As explained above, Plaintiffs have established a colorable breach of fiduciary duty claim and shown the possibility of threatened irreparable injury absent relief. The motion to expedite should therefore be granted.

## CONCLUSION

For all the foregoing reasons, this Court should grant Plaintiff's Motion for Issuance of a Temporary Restraining Order and Plaintiff's Motion for Expedited Proceedings.

Dated: March 14, 2015        **CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Joseph B. Cicero*
Joseph B. Cicero (No. 4388)
Paul D. Brown (No. 3903)
Stephanie S. Habelow (No. 5184)
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
Telephone: (302) 295-0191

*Attorneys for Plaintiff*

38

EFiled: Mar 14 2015 02:10PM EDT
Transaction ID 56920699
Case No. 10793-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

COLLEGE HEALTH & INVESTMENT,
L.P., a Delaware Limited Partnership,

        Plaintiff,

        v.

EDSON R. ARNEAULT, DEBORAH A.
VITALE, GREGORY A. HARRISON,
MARTIN BLOUNT and BENJAMIN J.
HARRELL,

        Defendants.

C. A. No.

## TRANSMITTAL AFFIDAVIT OF STEPHANIE S. HABELOW IN SUPPORT OF OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED PROCEEDINGS

STATE OF DELAWARE     )
                     ) s.s.
COUNTY OF NEW CASTLE  )

I, Stephanie S. Habelow, do hereby aver, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

    1.    True and correct copies of the following exhibits are attached to the Opening Brief in Support of Plaintiff's Motions for a Temporary Restraining Order and for Expedited Proceedings:

| Exhibit | Description |
|---|---|
| A | Order Making Findings and Revoking Registration of Securities Pursuant to Section 12(j) of the Securities Exchange Act of 1934 as to Diamondhead Casino Corporation (SEC Release No. 72977, September 14, 2014) |
| B | Notice of Annual Meeting of Stockholders To Be Held On March 25, 2015 & Proxy Statement, Diamondhead Casino Corporation |
| C | Notice of Annual Meeting of Stockholders To Be Held On October 1, 2007 & Proxy Statement, Diamondhead Casino Corporation |
| D | Certificate of Incorporation of Europa Cruises Corporation |
| E | Bylaws of Europa Cruises Corporation (February 28, 2015) |
| F | Unofficial transcription of voicemail of G. Harrison to R. Skaff, March 10, 2015 |

Stephanie S. Habelow (No. 5184)
Chipman Brown Cicero & Cole, LLP
The Nemours Building
1007 N. Orange Street, Suite 1110
Wilmington, DE 19801

Sworn and subscribed before me this 14th day of March, 2015.

Notary Public

My commission expires: 7·18·16

EFiled:  Mar 14 2015 02:10PM EDT
Transaction ID 56920699
Case No. 10793-

# Exhibit A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 72977 / September 4, 2014

**ADMINISTRATIVE PROCEEDING**
File No. 3-15934

| | |
|---|---|
| **In the Matter of**<br><br>**AISystems, Inc.**<br>   **(a/k/a Airline Intelligence Systems, Inc.),**<br>**Baeta Corp.,**<br>**China Jianye Fuel, Inc.,**<br>**Cordex Pharma, Inc.,**<br>**Diamondhead Casino Corporation,**<br>**Emerald Dairy, Inc., and**<br>**Kentucky Energy, Inc.,**<br><br>        **Respondents.** | **ORDER MAKING FINDINGS AND REVOKING REGISTRATION OF SECURITIES PURSUANT TO SECTION 12(j) OF THE SECURITIES EXCHANGE ACT OF 1934 AS TO DIAMONDHEAD CASINO CORPORATION** |

## I.

The Securities and Exchange Commission ("Commission") deems it necessary and appropriate for the protection of investors to accept the Offer of Settlement submitted by Diamondhead Casino Corporation ("DHCC" or "Respondent") pursuant to Rule 240(a) of the Rules of Practice of the Commission, 17 C.F.R. § 201.240(a), for the purpose of settlement of these proceedings initiated against Respondent on June 18, 2014, pursuant to Section 12(j) of the Securities Exchange Act of 1934 ("Exchange Act").

## II.

Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Making Findings and Revoking Registration of Securities Pursuant to Section 12(j) of the Securities Exchange Act of 1934 as to Diamondhead Casino Corporation  ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds that[1]:

      1.     DHCC (CIK No. 844887) is a Delaware corporation located in Alexandria, Virginia with a class of securities registered with the Commission under Exchange Act Section 12(g). As of June 16, 2014, the common stock of DHCC (symbol DHCC) was quoted on OTC Link (formerly "Pink Sheets") operated by OTC Markets Inc., had eleven market makers, and was eligible for the "piggyback" exception of Exchange Act Rule 15c2-11(f)(3).

      2.     DHCC has failed to comply with Exchange Act Section 13(a) and Rules 13a-1 and 13a-13 thereunder because it has not filed any periodic reports with the Commission since the period ended June 30, 2011.

### IV.

     In view of the foregoing, the Commission deems it necessary and appropriate for the protection of investors to impose the sanction specified in Respondent's Offer.

     Accordingly, it is hereby ORDERED that:

     Pursuant to Section 12(j) of the Exchange Act, the registration of each class of Respondent's securities registered pursuant to Exchange Act Section 12 be, and hereby is, revoked.

     For the Commission, by its Secretary, pursuant to delegated authority.

Jill M. Peterson
Assistant Secretary

---

[1]The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

Exhibit B

# DIAMONDHEAD CASINO CORPORATION

1013 Princess Street
Alexandria, Virginia 22314

Dear Stockholder:

It is my honor and pleasure, as the new Chairman of the Board of Diamondhead Casino Corporation, to personally invite you to attend the Annual Meeting of Stockholders of Diamondhead Casino Corporation.

The accompanying Notice of Annual Meeting and Proxy Statement describe the business to be conducted at the Annual Meeting. There will also be a brief report on the current status of our Company and we will be available to answer shareholder questions.

Whether or not you plan to attend the meeting in person, it is important that your shares be represented and voted. Your vote is particularly important this year because of the significance of the matters to be voted upon and because of the number of votes required for passage of certain proposals.

On behalf of the Board of Directors of Diamondhead Casino Corporation, I thank you for your interest in the Company and sincerely hope that you will be able to attend our Annual Meeting. I look forward to meeting those of you who can attend.

For the Board of Directors,

Edson R. "Ted" Arneault
Chairman of the Board

February 23, 2015

# DIAMONDHEAD CASINO CORPORATION

1013 Princess Street
Alexandria, Virginia 22314

### NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD ON MARCH 25, 2015

TO THE STOCKHOLDERS OF DIAMONDHEAD CASINO CORPORATION:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (the "Meeting") of Diamondhead Casino Corporation, a Delaware Corporation (the "Company"), will be held on Wednesday, March 25, 2015, at the Hilton Hotel, 1767 King Street, Alexandria, Virginia 22314, at 11:00 a.m., local time, for the following purposes:

(1)  To elect five Directors to hold office until the next annual meeting of stockholders and until their successors have been duly elected and qualified.

(2)  To approve an amendment to the Company's Certificate of Incorporation, as amended to date, to increase the number of authorized shares of common stock of the Company from 50,000,000 to 100,000,000 shares of common stock.

(3)  To ratify the selection of Friedman LLP as the Company's independent registered public accounting firm.

(4)  To transact such other business as may properly come before the Meeting and any adjournment or postponements thereof.

The Board of Directors has fixed the close of business on February 17, 2015 as the Record Date for the determination of stockholders entitled to notice of and to vote at the Meeting or any adjournments thereof. **Whether or not you plan to attend the annual meeting, please sign and date the enclosed proxy and promptly return it in the pre-addressed envelope provided for that purpose. You may also vote your proxy by telephone or on the Internet by following the instructions on your proxy card.**

A complete list of stockholders entitled to vote at the Meeting shall be open to the examination of any stockholder, for any purpose germane to the Meeting, during ordinary business hours at least ten days prior to the Meeting at the principal place of business of the corporation at 1013 Princess Street, Alexandria, Virginia 22314. The list shall also be produced and kept at the time and place of the Meeting during the whole time thereof and may be inspected by any stockholder who is present.

By Order of the Board of Directors
Deborah A. Vitale, President, Chief Executive
Officer, Treasurer and Secretary

February 23, 2015

# DIAMONDHEAD CASINO CORPORATION

## PROXY STATEMENT

This Proxy Statement is furnished with the solicitation of proxies on behalf of the Board of Directors (the "Board") of Diamondhead Casino Corporation (the "Company"), a Delaware corporation, to be voted at the Annual Meeting of Stockholders to be held on Wednesday, March 25, 2015, at the Hilton Hotel, 1767 King Street, Alexandria, Virginia 22314 at 11:00 a.m. local time, and at any adjournments or postponements thereof.

All expenses incurred in connection with this solicitation of proxies will be borne by the Company. Solicitations may be undertaken by mail, telephone, electronic means and personal contact by directors, officers, and employees of the Company without additional compensation. The Company will reimburse brokers, fiduciaries and custodians for reasonable costs incurred in forwarding proxy materials to beneficial owners of Voting Stock held in their names.

With respect to the election of Directors to hold office until the next annual meeting of stockholders and until their successors have been duly elected and qualified, stockholders may vote in favor of all nominees or withhold their vote as to one or more nominees, or all nominees. With respect to any other proposal to be voted upon, stockholders may vote in favor of the proposal, may vote against the proposal, or may abstain from voting. Abstentions and broker non-votes will have the same effect as a vote against the proposal.

You may vote in one of four ways:

1) You can vote by signing and returning the enclosed proxy card. If you do, the individuals named on the card will vote your shares in the way you indicate.

2) You can vote by telephone by following the instructions on your proxy card.

3) You can vote using the Internet by following the instructions on your proxy card.

4) You can cast your vote at the Annual Meeting.   *However, if you plan to cast your vote at the Annual Meeting, please send written notice to the Secretary of the Company at 1013 Princess Street, Alexandria, Virginia 22314, so that your name can be put on a list held at the registration desk at the entrance to the meeting. In addition, if you hold your shares through a broker or bank and you wish to vote at the Annual Meeting, you __must__ obtain a legal proxy from that broker or bank authorizing you to vote at the Annual Meeting. We will be unable to accept a vote from you at the Annual Meeting without that authorization. If you are a registered holder and wish to vote at the Annual Meeting, you must provide proper identification as the stockholder of record at the registration desk, but no additional authorization will be required in order to cast your vote with respect to those shares you hold as a registered holder.*

A proxy when executed and not revoked will be voted and, if it contains any specifications, it will be voted in accordance therewith. If no choice is specified, stock covered by the proxy will be voted for the election to the Board of Directors of each of the nominees of the Board, to amend the Company's Certificate of Incorporation, as amended to date, to increase the number of authorized shares of common stock of the Company from 50,000,000 shares of common stock to 100,000,000 shares of common stock, for the proposal to ratify the appointment of Friedman LLP as the Company's independent registered public accounting firm, and in the discretion of the proxy holder, upon such other matters as may properly come before the Meeting and any adjournments or postponements thereof.

Under our Bylaws, the holders of a majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at the Annual Meetings of stockholders. However, we may be required to determine the extent to which a quorum is present for purposes of the Annual Meeting pursuant to Section 211(c) of the General Corporation Law of the State of Delaware, which provides, in part, that the shares of stock represented at such Meeting, either in person or by proxy, and entitled to vote thereat, shall constitute a quorum for the purpose of such meeting, notwithstanding any provision of the Certificate of Incorporation or Bylaws to the contrary.

Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. Approval of the proposed amendment to our Certificate of Incorporation, as amended to date, requires the affirmative vote of the holders of a majority of the outstanding stock of each class entitled to vote thereon as a class. Approval of the ratification of the selection of Friedman LLP as the Company's independent registered public accounting firm requires the affirmative vote of the holders of a majority of the shares entitled to vote and represented at the Annual Meeting.

This Proxy Statement and the accompanying proxy were first sent or given to stockholders on or about February 23, 2015.

At the close of business on February 17, 2015, the Record Date for determining the stockholders entitled to vote at the Annual Meeting, there were issued and outstanding and entitled to vote a total of 40,509,946 shares of the Company's voting stock. The voting stock consisted of 38,683,946 shares of common stock, par value $.001 per share (the "Common Stock"), 926,000 shares of the Company's Series S Preferred Stock (the "S Preferred Stock") and 900,000 shares of the Company's Series S-NR Preferred Stock (the "S-NR Preferred Stock"). The S Preferred Stock and the S-NR Preferred Stock are collectively referred to herein as the "Preferred Stock". The Common Stock and Preferred Stock (collectively referred to as the "Voting Stock") vote as a single class, and each share of voting Stock is entitled to one vote per share. Votes cast by proxy or in person at the Meeting will be tabulated by the Inspector of Elections appointed for the Meeting.

## PROPOSAL 1
## ELECTION OF DIRECTORS

The Board of Directors consists of five directors whose terms continue until the next annual meeting of stockholders or until his or her successor is duly elected and qualified. The Board has nominated the following five persons for election at the Meeting. Unless otherwise indicated in this proxy statement, the business address of each nominee is the executive office of the Company. Certain information concerning the nominees is set forth below.

Each nominee is, at present, available for election, but if any nominee should become unavailable, the persons voting the accompanying proxy may, at their direction, vote for a substitute.

**Nominees**

| Name | Age | Title |
|------|-----|-------|
| Edson R. "Ted" Arneault | 67 | Chairman of the Board of Diamondhead Casino Corporation, President, Chief Executive Officer of Casino World, Inc. |
| Martin Blount | 52 | Director |
| Benjamin J. Harrell | 61 | Director |
| Gregory A. Harrison | 70 | Director, Vice-President |
| Deborah A. Vitale | 64 | Director, President, Chief Executive Officer, Secretary & Treasurer |

**Edson R. "Ted" Arneault** was elected a Director of the Company and Chairman of the Board of Directors of the Company on March 31, 2014. On the same date, the Board of Directors of Casino World, Inc., a wholly-owned subsidiary of the Company, which is expected to develop and operate the Diamondhead casino, named Mr. Arneault to the Board of Directors of Casino World, Inc. and elected Mr. Arneault to the position of President and CEO of Casino World, Inc. From 1992 through 2008, Mr. Arneault served as Chairman, President and Chief Executive Officer of MTR Gaming Group (NASDAQ: MNTG), a publicly-traded company. Mr. Arneault has significant experience in the gaming industry and, though not currently licensed, has previously held gaming licenses in Pennsylvania, West Virginia, Ohio, and Nevada. Since 2009, Mr. Arneault has served as President of New ERA Consulting, which provides marketing, government relations, capital formation, financing, and human resources consulting services to various companies. Since 2009, Mr. Arneault has also served as a principle and co-CEO of Braneault Enterprises, LLC, which advises political, commercial and entrepreneurial enterprises in all facets of marketing management. Since 2001, Mr. Arneault has served as a co-host of "Black and Gold Sunday," a sports program on KDKA radio. Since 1981, Mr. Arneault has served as President of Century Energy Management Co., Inc. and its predecessors, an oil and gas operating company founded in 1980, which has drilled and operated numerous gas wells. Mr. Arneault is also a member of the American Institute of Certified Public Accountants and was previously licensed as a CPA in Michigan, Ohio, and Louisiana. Mr. Arneault has worked as a tax partner with Seidman and Seidman (BDO Seidman) and as a tax consultant for Arthur

4

Andersen & Company. Mr. Arneault was a Distinguished Military Graduate and served as a Captain in the United States Air Force from 1969 to 1972 and on active duty in the Middle East, Africa and Asia.

**Martin C. Blount** was elected a Director of the Company on June 9, 2010. Since approximately 1986, Mr. Blount has been a stock broker and registered investment banker. Since approximately April of 2013, Mr. Blount has also served as a licensed structured settlement agent for Galaher Settlements & Insurance Services, Inc. Mr. Blount also represents professional athletes and is a certified Major League Baseball agent. Mr. Blount is a graduate of West Virginia Wesleyan College and holds a B.A. degree in Sociology.

**Benjamin J. Harrell** was elected a Director of the Company on July 18, 2002. Mr. Harrell was the founder and served as President and CEO of Pete Fountain Productions, Inc. from 1979 until it was acquired in 1999 by Production Group International, Inc. ("PGI"), a global event communications company, which was subsequently acquired by TBA Global Events, LLC in 2005. Mr. Harrell managed the acquiring company's business in the New Orleans area. He currently serves as Head of U.S. Operations of Kuoni Destination Management, Inc., a global event and travel company which specializes in event solutions, corporate meetings, incentive programs and sporting events. He also served as Vice President of Pete Fountain Entertainment, LLC, which until March 2003 operated one of the largest jazz clubs in New Orleans. Since 1975, Mr. Harrell has served as personal manager for the internationally noted jazz artist, Pete Fountain. Mr. Harrell handled all aspects of Mr. Fountain's career, including promotion, concerts, personal appearances and commercial endorsements. From 1985 through 2003, Mr. Harrell served as President of Cresent Sound & Light, Inc, a professional sound, lighting, video and staging company for the convention and entertainment industry. Mr. Harrell served as a Director of the New Orleans Metropolitan Convention and Visitors Bureau from 1997 through 1999. On January 15, 2004, Mr. Harrell was elected to the Board of Directors of Mississippi Gaming Corporation, a wholly owned subsidiary of the Company.

**Gregory A. Harrison, Ph.D., P.E.** was elected a Director of the Company on February 20, 1998. Dr. Harrison was appointed Vice-President of the Company on July 18, 2002 and was appointed Secretary of the Company on July 25, 2002. Dr. Harrison is a consulting forensic engineer with forty-nine years of diversified fire protection/safety/project engineering experience with NASA, DOD, NBS, NRC, ARAMCO, and Tenera, L.P. Dr. Harrison is licensed in six states and, effective August 27, 2004, became a Professional Engineer licensed to practice in the state of Mississippi. Dr. Harrison has qualified as an expert witness in various courts in ten states. Dr. Harrison is a partner of Master Jin Kim of Champion Martial Arts, Inc., in the development of an internet martial arts school. Dr. Harrison received a B.S. degree in Fire Protection Engineering from the University of Maryland, an M.S. degree in Civil Engineering from the University of Maryland, an M.S. degree in Engineering Administration from George Washington University and a Ph.D. in Safety Engineering from Kennedy-Western University. Dr. Harrison has held a top secret security clearance with the U.S. Department of Energy, the U.S. Nuclear Regulatory Commission, and the Department of Defense. Dr. Harrison has served on the Board of Directors of Data Measurement Corporation and was an Advisory Board member of United Bank and First Patriot National Bank.

**Deborah A. Vitale** has served as President, Chief Executive Officer and Treasurer of the Company since February 1998 and served as Chairman of the Board of the Company from March 1995 through March 31, 2014. Ms. Vitale served as Secretary of the Company from November 1994 until July 2002 and currently serves as Secretary. As President and CEO, Ms. Vitale was responsible for all phases of the day-to-day operations of four casino ships sailing out of three Florida ports into international waters and for the management and supervision of hundreds of ship-based and land-based employees. She has been a Director of the Company since December 1992. On February 14, 1997, Ms. Vitale was appointed Chairman of the Board of Directors of Casino World, Inc. and Chairman of the Board of Directors of Mississippi Gaming Corporation, each a subsidiary of the Company. On September 2, 1997, Ms. Vitale was appointed President of Casino World, Inc. and Mississippi Gaming Corporation. On March 31, 2014, Ms. Vitale stepped down as Chairman of the Board of the Company and as President and CEO of Casino World, Inc. Ms. Vitale is a trial attorney by background with over thirty years of experience handling complex civil litigation. Ms. Vitale is licensed to practice law in Washington, D.C., Maryland, and Virginia.

**THE BOARD UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE FOR THE NOMINEES LISTED ABOVE.**

### PROPOSAL 2

**AMENDMENT TO OUR CERTIFICATE OF INCORPORATION, AS AMENDED TO DATE, TO INCREASE THE NUMBER OF AUTHORIZED SHARES OF COMMON STOCK FROM FIFTY MILLION TO ONE HUNDRED MILLION SHARES**

Our Board of Directors has adopted a Resolution and is seeking stockholder approval of a Resolution to authorize our Board of Directors to amend Article IV of our Certificate of Incorporation, as amended to date, to increase the number of shares of common stock that we are authorized to issue from 50,000,000 to 100,000,000 (the "Proposed Amendment"). The Board of Directors has declared the advisability of the amendment proposed and directed that the amendment proposed be considered at the 2015 Annual Meeting of stockholders. The full text of the Proposed Amendment adopted by the Board of Directors appears below.

Under our original Certificate of Incorporation, filed on November 15, 1988, the Company was authorized, under Article IV, to issue 50,000,000 shares of common stock, $0.001 par value. On September 4, 1992, the Company filed Articles of Amendment to the Articles of Incorporation of our Company, deleting Article IV in its entirety and replacing it with a new Article IV. The revised Article IV gave the Company the authority to issue 55,000,000 shares of stock, consisting of 50,000,000 shares of common stock, $0.001 par value and 5,000,000 shares of preferred stock, par value $0.01. The Amendments were approved at an Annual Meeting of Shareholders in 1992.

At February 17, 2015, the Company had issued 39,052,472 shares of Common Stock, which included 2,386,370 unallocated Employee Stock Ownership Plan shares and 368,526 Treasury shares. Our Board of Directors has reserved the following approximate number of shares of Common Stock for future issuance: 4,501,500 shares of Common Stock for issuance upon

6

exercise of outstanding Options, 1,975,000 shares of Common Stock for issuance upon exercise of outstanding Warrants, 1,925,000 shares of Common Stock for issuance upon the conversion of outstanding Promissory Notes, and 260,000 shares of Common Stock for issuance upon the conversion of our outstanding Series S-PIK Junior, Non-Voting, Convertible, Non-Redeemable Preferred Stock. Therefore, at February 17, 2015, only approximately 2,286,028 shares of our Common Stock remained unreserved and available for future issuance. As indicated hereafter, the Company does not currently have sufficient shares of Common Stock for the conversion of Debentures issued or to be issued in connection with a Private Placement dated February 14, 2014, as amended, and described below.

**Primary Reason for the Proposed Amendment**

Pursuant to a Private Placement Memorandum dated February 14, 2014 (the "Memorandum"), the Company offered up to an aggregate of $3,000,000 of its securities to accredited or institutional investors in three tranches as follows:

(a) $1,000,000 of First Tranche Collateralized Convertible Senior Debentures convertible into an aggregate of 3,333,333 shares of Common Stock of the Company at a conversion price of $.30 per share (the "First Tranche Debentures");

(b) $1,000,000 of Second Tranche Collateralized Convertible Senior Debentures, convertible into an aggregate of 2,222,222 shares of Common Stock of the Company at a conversion price of $.45 per share (the "Second Tranche Debentures"); and

(c) $1,000,000 of Third Tranche Collateralized Convertible Senior Debentures, convertible into either 1,818,182 shares of Common Stock or 1,333,333 shares of Common Stock of the Company, at a conversion price of $.55 or $.75 per share depending upon certain conditions described in the Memorandum (the "Third Tranche Debentures").

Subsequently, on December 4, 2014, the Company extended Offers to Amend to the Investors in the above Private Placement dated February 14, 2014. The Company offered to amend, upon certain terms and conditions, the conversion terms of the First Tranche Debentures, which were issued on March 31, 2014 ("Amendment I"). The Company separately offered to amend, upon certain terms and conditions, the terms for issuance and conversion of the Second and Third Tranche Debentures, as well as the period of time within which to perform the Third Tranche Closing Obligations, as amended ("Amendment II").

The Company raised aggregate gross proceeds of $1 million from the sale of the First Tranche Debentures which may be converted into a minimum of 3,166,667 shares of Common Stock and a maximum of 3,333,333 shares of Common Stock. The Company raised aggregate gross proceeds of $850,000 from the sale of the Second Tranche Debentures which may be converted into 1,888,889 shares of Common Stock. A total of $850,000 is being held in Escrow for the purchase of the Third Tranche Debentures. The Escrow Agent will release the $850,000 to the Company and the Company will issue the Third Tranche Debentures to the Investors, assuming all of the conditions for issuance of the Third Tranche Debentures have been met by the Company on or before *June 30, 2015*. In the event the Third Tranche Debentures are issued, they may be converted into a minimum of 1,133,333 shares of Common Stock and a maximum

7

of 1,545,455 shares of Common Stock. Thus, in the event all of the above-described Debentures were converted into Common Stock, they could be converted into a minimum of 6,188,889 and a maximum of 6,767,677 shares of Common Stock.

In order to meet the conditions for issuance of the Third Tranche Debentures, in addition to satisfying certain other obligations, pursuant to the Private Placement, as amended, the Company must have held an Annual Meeting of Stockholders in accordance with applicable state and/or federal law, to obtain stockholder approval to increase the number of authorized shares of Common Stock from fifty million to one hundred million shares or obtained such approval by written consent of its stockholders pursuant to Section 228 of the Delaware General Corporation Law. **Thus, the approval of this proposal is one of the requirements the Company must meet in order to obtain the $850,000 held in Escrow for the purchase of the Third Tranche Debentures, pursuant to the terms of the Private Placement, as amended. The failure of the shareholders to approve this proposed Amendment would have a material adverse impact on the Company.**

**The Proposed Amendment**

The first paragraph of Article IV of the Certificate of Incorporation, as amended to date, shall be amended as follows.

The first paragraph of Article IV will be deleted. It currently reads, in full, as follows:

> 1) <u>Shares Authorized.</u>  The aggregate number of shares of stock which this corporation shall have authority to issue shall be fifty-five million (55,000,000) shares of which fifty million (50,000,000) shall be of Common Stock (each with a par value of one cent ($.001), and five million (5,000,000) shares of Preferred Stock (each with a par value of one cent ($.01)).

The following paragraph will be substituted in place of the above-deleted paragraph:

> 1) <u>Shares Authorized</u>. The corporation shall have authority to issue One Hundred Million (100,000,000) shares of Common Stock, par value $0.001 per share (the "Common Stock") and Five Million (5,000,000) shares of Preferred Stock, par value $0.01 per share (the "Preferred Stock").

If this proposal is approved, the additional shares or our Common Stock so authorized may be issued from time to time upon authorization from our Board, without further stockholder approval and for such consideration as our Board may determine to be adequate, or without consideration in the case of a stock dividend or stock split. The additional shares would have rights identical to the rights of our current holders of Common Stock. The *authorization* of additional shares of our Common Stock pursuant to this proposal will have no dilutive effect upon the proportionate ownership and voting power of our current stockholders. However, the actual *issuance* of additional Common Stock in the future would dilute each existing stockholder's proportionate ownership and voting power, including the issuance of those shares of Common Stock which may be issued in connection with the conversion of the Debentures referred to above in connection with the Private Placement dated February 14, 2014, as amended.

Our Board believes it is in the best interest of the Company and its shareholders to increase the number of authorized shares of our Common Stock, not only for the purposes described above relating to the Private Placement dated February 14, 2014, as amended, but also so as to have additional authorized, but unissued and unreserved, shares available for issuance to meet other proper corporate purposes.

If this proposal is approved, then the Amendment will become effective when we file a Certificate of Amendment and/or a Restated and Amended Certificate of Incorporation with the Secretary of State of the State of Delaware, which we expect would occur shortly after shareholder approval of the Amendment. If the Amendment is not approved by our shareholders, then the proposed Amendment will not be implemented.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" PROPOSAL 2.**

## PROPOSAL 3

### RATIFICATION OF THE SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors has selected Friedman LLP as the Company's independent registered auditors to audit the Company's financial statements for the fiscal years ending December 31, 2013 and December 31, 2014. Friedman LLP has previously served as the Company's independent auditors. The Board of Directors is requesting that the stockholders ratify the selection of Friedman LLP as the Company's independent auditors. Even if the appointment is ratified, the Board of Directors, in its discretion, may direct the appointment of a different independent auditor at any time during the year if the Board determines that such a change would be in the Company's and its stockholders' best interest.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" PROPOSAL 3.**

### SECURITIES AND EXCHANGE COMMISSION REVOCATION OF STOCK REGISTRATION

As described below, the Company was not in compliance with its reporting requirements under Section 13(a) of the Securities Exchange Act of 1934 and, as a result, its stock registration was revoked under said Act effective September 4, 2014. The Company did not file any financial statements, Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q or other periodic reports with the Securities and Exchange Commission, which it was required to file, after it filed its Form 10-Q for the period ended June 30, 2011. The Company did not file the foregoing because it did not have sufficient funds to retain accountants, outside auditors, and/or outside attorneys to prepare, review and file the documents and/or financial statements required to have been filed

during certain periods in which it was obligated to file the foregoing with the Securities and Exchange Commission (the "SEC").

On June 18, 2014, the SEC issued an Order of Suspension of Trading with respect to the Company's securities. The Order stated, among other things, that "[t]he Commission was of the opinion that the public interest and the protection of investors require[d] a suspension of trading" and the Commission ordered, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the Company's securities be suspended from June 18, 2014 through July 1, 2014. On June 18, 2014, the SEC also issued an Order Instituting Administrative Proceedings ("OIP") and Notice of Hearing Pursuant to Section 12(j) of the Securities Exchange Act of 1934, alleging that the Company was delinquent in its periodic filings with the SEC, having not filed any periodic reports since it filed its Form 10-Q for the period ended June 30, 2011 and, therefore, that the Company had failed to comply with Securities Exchange Act Section 13(a) and Rules 13a-1 and 13a-13 thereunder.

On June 27, 2014, the Company filed an Answer to the OIP in which it admitted that it had not filed certain periodic reports since it filed its Form 10-Q for the period ended June 30, 2011. On July 29, 2014, the Company attended a prehearing conference at which it requested an in-person hearing. On August 11, 2014, the SEC issued an Initial Decision on Default and Order for Motion for Summary Disposition as to Diamondhead Casino Corporation. The SEC found that there were no issues of material fact that required an in-person hearing, granted the Division leave to file a motion for summary disposition, and set a briefing schedule for the parties to file their briefs.

The Board of Directors of the Company determined that defending the Company against the OIP would likely have resulted in extensive, time-consuming and expensive litigation. Moreover, the Company believed that litigation would not have resulted in a favorable outcome inasmuch as the Company had not, in fact, met its reporting requirements. Accordingly, the Board of Directors determined that litigation would have constituted a waste of the Company's scarce resources and capital.

On August 29, 2014, the Company made an Offer of Settlement in which it admitted that it had failed to comply with Exchange Act Section 13(a) and Rules 13a-1 and 13a-13 thereunder because it had not filed any periodic reports with the SEC since the quarterly period ended June 30, 2011. The Company consented to the entry of an Order, pursuant to Section 12(j) of the Exchange Act, revoking the registration of the Company's securities registered pursuant to Section 12 of the Exchange Act. On September 4, 2014, the SEC entered an Order Making Findings and Revoking Registration of Securities Pursuant to Section 12(j) of the Securities Exchange Act of 1934 as to Diamondhead Casino Corporation, pursuant to the Offer of Settlement. Thus, effective September 4, 2014, the registration of each class of the Company's securities registered pursuant to Section 12 of the Exchange Act was revoked and the Company's Common Stock no longer trades on any exchange or other public market.

## RE-REGISTRATION OF THE COMPANY'S COMMON STOCK

After the Issuer's registration was revoked, the Board of Directors voted to take those steps required to re-register the Company's Common Stock under the Exchange Act. There can be no assurance that the Company's stock will be successfully re-registered.

## OTHER MATTERS

Management of the Company does not know of any other matters that may properly come before the Annual Meeting.  If any other matters properly come before the Meeting, it is intended that the shares of Voting Stock represented in the accompanying proxy will be voted with respect thereto in accordance with the judgment of the persons voting them.

## STOCKHOLDER PROPOSALS

If a stockholder intends to present a proposal for action at the next Annual Meeting and wishes to have such proposal considered for inclusion in the Company's proxy materials, the proposal must be submitted, in writing, and received by the Secretary of the Company at the Company's office located at 1013 Princess Street, Alexandria, Virginia, 22314, not less than 120 calendar days before the date of the Company's Proxy Statement released to shareholders in connection with the previous year's Annual Meeting.

By Order of the Board of Directors
Deborah A. Vitale, President, Chief Executive
Officer, Treasurer and Secretary

February 23, 2015

Exhibit C

DEF 14A 1 g09090def14a.htm DIAMONDHEAD CASINO CORPORATION

Table of Contents

# SCHEDULE 14A INFORMATION

## INFORMATION REQUIRED IN PROXY STATEMENT

### Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934

Filed by the Registrant ☑

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to 240.14a-12

## DIAMONDHEAD CASINO CORPORATION

(Name of Registrant as Specified in Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.
☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

DIAMONDHEAD CASINO CORPORATION

(2)  Form, Schedule or Registration No:

(3)  Filing Party:

(4)  Date Filed:

3/13/2015

DIAMONDHEAD CASINO CORPORATION

## TABLE OF CONTENTS

NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
DIAMONDHEAD CASINO CORPORATION
I. ELECTION OF DIRECTORS
BENEFICIAL OWNERSHIP CHART
MEETINGS AND COMMITTEES OF THE BOARD OF DIRECTORS
SUMMARY COMPENSATION TABLE
SUMMARY OF OUTSANDING EQUITY AWARDS AT FISCAL YEAR END
CERTAIN TRANSACTIONS
II. RATIFICATION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
III. OTHER MATTERS
STOCKHOLDER PROPOSALS

Table of Contents

## DIAMONDHEAD CASINO CORPORATION
1301 Seminole Boulevard, Suite 142
Largo, Florida 33770

### NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD ON OCTOBER 1, 2007

TO THE STOCKHOLDERS OF DIAMONDHEAD CASINO CORPORATION:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (the "Meeting") of Diamondhead Casino Corporation, a Delaware Corporation (the "Company"), will be held on Monday, October 1, 2007, at the Hilton Hotel, 1767 King Street, Alexandria, Virginia 22314, at 11:00 a.m., local time, for the following purposes:

(1) To elect six Directors to hold office until the next annual meeting of stockholders and until their successors have been duly elected and qualified.

(2) To ratify the appointment of Friedman LLP as the Company's independent registered public accounting firm.

(3) To transact such other business as may properly come before the Meeting and any adjournment or postponements thereof.

The Board of Directors has fixed the close of business on August 15, 2007 as the Record Date for the determination of stockholders entitled to notice of and to vote at the Meeting or any adjournments thereof.

**WHETHER OR NOT YOU EXPECT TO ATTEND THE MEETING, PLEASE COMPLETE, SIGN AND DATE YOUR PROXY AND MAIL IT IN THE ENCLOSED ENVELOPE. IF YOU ATTEND THE MEETING, YOU MAY, IF YOU WISH, REVOKE YOUR PROXY AND VOTE YOUR SHARES IN PERSON.**

The annual report to stockholders of Diamondhead Casino Corporation for the year ended December 31, 2006 is enclosed. A complete list of stockholders entitled to vote at the Meeting shall be open to the examination of any stockholder, for any purpose germane to the Meeting. during ordinary business hours at least ten days prior to the Meeting at the principal place of business of the corporation at 1301 Seminole Boulevard, Suite 142, Largo, Florida 33770. The list shall also be produced and kept at the time and place of the Meeting during the whole time thereof and may be inspected by any stockholder who is present.

By Order of the Board of Directors
Deborah A. Vitale, Chairman of the Board,
President, Chief Executive Officer, and Treasurer

August 17, 2007

Table of Contents

## DIAMONDHEAD CASINO CORPORATION

---

### PROXY STATEMENT

---

This Proxy Statement is furnished with the solicitation of proxies on behalf the Board of Directors (the "Board") of Diamondhead Casino Corporation (the "Company"), a Delaware corporation, to be voted at the Annual Meeting of Stockholders to be held on Monday, October 1, 2007, at the Hilton Hotel, 1767 King Street, Alexandria, Virginia 22314 at 11:00 a.m. local time, and at any adjournments or postponements thereof.

All expenses incurred in connection with this solicitation of proxies will be borne by the Company. Solicitations may be undertaken by mail, telephone, electronic means and personal contact by directors, officers, and employees of the Company without additional compensation. The Company will reimburse brokers, fiduciaries and custodians for reasonable costs incurred in forwarding proxy materials to beneficial owners of Common Stock held in their names.

Stockholders executing proxies may revoke them at any time prior to exercise by written notice to the Secretary of the Company, by subsequently executing another proxy, or by attending the Meeting and voting in person. With respect to the election of Directors to hold office until the next annual meeting of stockholders and until their successors have been duly elected and qualified, stockholders may vote in favor of all nominees or withhold their vote as to all nominees. With respect to any other proposal to be voted upon, stockholders may vote in favor of the proposal, may vote against the proposal, or may abstain from voting. Stockholders should specify their choices on the enclosed form of proxy. A proxy when executed and not revoked will be voted and, if it contains any specifications, it will be voted in accordance therewith. If no choice is specified, stock covered by the proxy will be voted for the election to the Board of Directors of each of the nominees of the Board; for the proposal to ratify the appointment of Friedman LLP as the Company's independent registered public accounting firm; and, in the discretion of the proxy holder, upon such other matters as may properly come before the Meeting and any adjournments or postponements thereof.

This Proxy Statement, the accompanying proxy, and the Company's Annual Report to stockholders for the year ended December 31, 2006 (the "Annual Report"), were first sent or given to stockholders on or about August 17, 2007. **COPIES OF THE ANNUAL REPORT ON FORM 10-KSB, NOT INCLUDING EXHIBITS, WILL BE FURNISHED WITHOUT CHARGE TO ANY STOCKHOLDER UPON WRITTEN REQUEST TO THE COMPANY AT ITS EXECUTIVE OFFICE: DIAMONDHEAD CASINO CORPORATION, ATTENTION: INVESTOR RELATIONS, 1301 SEMINOLE BOULEVARD, SUITE 142, LARGO, FLORIDA 33770. EXHIBITS TO THE ANNUAL REPORT ON FORM 10-KSB MAY BE FURNISHED TO STOCKHOLDERS UPON THE PAYMENT OF AN AMOUNT EQUAL TO THE REASONABLE EXPENSES INCURRED IN FURNISHING SUCH EHIBITS.**

A complete list of stockholders entitled to vote at the Meeting shall be open to the examination of any stockholder, for any purpose germane to the Meeting, during ordinary business hours, at least ten days prior to the Meeting at the principal place of business of the corporation at 1301 Seminole Boulevard, Suite 142, Largo, Florida 33770. The list shall also be produced and kept at the time and place of the Meeting during the whole time thereof and may be inspected by any stockholder who is present.

1

---

DIAMONDHEAD CASINO CORPORATION

3/13/2015

Table of Contents

At the close of business on August 15, 2007, the Record Date for determining the stockholders entitled to vote at the Annual Meeting, there were issued and outstanding and entitled to vote a total of 36,412,746 shares of the Company's common stock, par value $.001 per share (the "Common Stock"), 926,000 shares of the company's series "S" preferred stock (the "S Preferred Stock") and 900,000 shares of the Company's series "S-NR" preferred stock (the "S-NR Preferred Stock"). The S Preferred Stock and the S-NR Preferred Stock are collectively referred to as the "Preferred Stock". The Common Stock and Preferred Stock (collectively referred to as the "Voting Stock") vote as a single class, and each share of voting Stock is entitled to one vote per share. A majority of the shares of Voting Stock represented at the Meeting, either in person or by proxy, and entitled to vote thereat, shall constitute a quorum for purposes of the Meeting. Votes cast by proxy or in person at the Meeting will be tabulated by the judge of elections appointed for the Meeting.

## I. ELECTION OF DIRECTORS

The Board consists of six directors whose terms continue until the next annual meeting of stockholders or until his or her successor is duly elected and qualified. The Board has nominated the following six persons for election at the Meeting. Unless otherwise indicated in this proxy statement, the business address of each nominee is the executive office of the Company. Certain information concerning the nominees is set forth below.

Each nominee is, at present, available for election, but if any nominee should become unavailable, the persons voting the accompanying proxy may, at their direction, vote for a substitute. The election of each director requires the vote of holders of a plurality of the outstanding Voting Stock, counted as a single class, present and voting at the Meeting. **THE BOARD RECOMMENDS THAT STOCKHOLDERS VOTE FOR THE NOMINEES LISTED BELOW.**

| Name | Age | Title |
|------|-----|-------|
| Deborah A. Vitale | 57 | Chairman of the Board, President, Chief Executive Officer, and Treasurer |
| Gregory A. Harrison | 63 | Director, Vice-President, Secretary |
| Frank E. Williams, Jr. | 72 | Director |
| Benjamin J. Harrell | 54 | Director |
| Carl D. Stevens | 60 | Director |
| H. Steve Norton | 73 | Director |

2

3/13/2015                                   DIAMONDHEAD CASINO CORPORATION

Table of Contents

## BENEFICIAL OWNERSHIP CHART

The following table sets forth, to the Company's knowledge, as of July 20, 2007, based on filings with the Securities and Exchange Commission, the beneficial ownership of the outstanding Voting Stock held by (i) each person or entity beneficially owning more than 5% of the shares of any class of Voting Stock, (ii) each director, nominee, and certain executive officers, individually, and (iii) all directors and executive officers as a group.

| Name and Address of Beneficial Owner | Amount & Nature of Beneficial Ownership | Title of Class | % of Class | % Voting (1) |
|---|---|---|---|---|
| Europa Cruises Corporation Employee Stock Ownership Plan Trust (2) 1301 Seminole Boulevard, Suite 142 Largo, Florida 33770 | 3,022,770 | Common | 7.60% | 7.27% |
| Deborah A. Vitale (2) (3) Chairman, President, CEO, and Treasurer Chairman, President, and Treasurer of Casino World, Inc. and Mississippi Gaming Corp. 1013 Princess Street Alexandria, Virginia 22314 | 5,580,944 | Common | 14.04% | 13.42% |
| Gregory Harrison (4) Director, Secretary, and Vice President 16209 Kimberly Grove Gaithersburg, Maryland 20878 | 1,444,948 | Common | 3.64% | 3.48% |
| Benjamin J. Harrell (5) Director 237 N. Peters Street, Fourth Floor New Orleans, Louisiana 70130 | 650,000 | Common | 1.64% | 1.56% |
| Frank E. Williams, Jr. (6) Director 2789b Hartland Road Falls Church, Virginia 22043 | 447,150 | Common | 1.12% | 1.08% |
| Carl D. Stevens (7) Director 1753 Highway 42 South Forsyth, Georgia 31029 | 602,324 | Common | 1.52% | 1.45% |
| H. Steven Norton (8) Director 700 Rozier Street Alton, Illinois 62002 | 250,000 | Common | .63% | .60% |
| Serco International Limited (9) P.O. Box 15, A-9010 Klagenfurt, Austria | 1,251,833 900,000 926,000 | Common S-NR Preferred S- Preferred | 3.15% 100.00% 100.00% | 7.40% |

3

DIAMONDHEAD CASINO CORPORATION

Table of Contents

| Name and Address of Beneficial Owner | Amount & Nature of Beneficial Ownership | Title of Class | % of Class | % Voting (1) |
|---|---|---|---|---|
| Austroinvest International Limited (9) | 1,251,833 | Common | 3.15% | 7.40% |
| P.O. Box 15, A-9010 | 900,000 | S-NR Preferred | 100.00% | |
| Klagenfurt, Austria | 926,000 | S- Preferred | 100.00% | |
| | | | | |
| Ernst G. Walter (9) | 1,251,833 | Common | 3.15% | 7.40% |
| 14700 Gulf Blvd., Apt.401 | 900,000 | S-NR Preferred | 100.00% | |
| Madeira Beach, Florida 33708 | 926,000 | S- Preferred | 100.00% | |
| | | | | |
| All Directors and Executive Officers as a Group (6 persons) | 9,033,002 | | 22.73% | 21.73% |

**NOTES TO BENEFICIAL OWNERSHIP CHART:**

(1)  Common Stock, Series S-NR Preferred Stock and Series S Preferred Stock have been combined for the purpose of calculating voting percentages. Unless otherwise noted below, all references to options are to currently exercisable options or options exercisable with 60 days of August 15, 2007.

(2)  The Europa Cruises Corporation Employee Stock Ownership Plan ("ESOP") was established on August 18, 1994. The Trustee of the ESOP is Deborah A. Vitale, President, CEO, and Chairman of the Board. As of December 31, 2006, 1,977,270 ESOP shares had been released and allocated to participants in the ESOP. The participants in the ESOP are entitled to direct the Trustee as to the manner in which the Company's allocated shares are voted. The remaining 3,022,730 unallocated shares are voted by the Trustee. The Trustee is required to vote the unallocated ESOP shares in the best interests of the ESOP beneficiaries.

(3)  Includes 3,022,730 unallocated common shares of the ESOP Trust; 767,000 shares of Common Stock owned directly by Ms. Vitale; options to purchase 1,450,000 shares of Common Stock; and 341,214 shares of Common Stock, which represent shares of stock held in Ms. Vitale's fully vested ESOP participant account.

(4)  Includes 807,951 shares of Common Stock owned directly by Mr. Harrison; 70,000 shares of Common Stock owned by the Harry and Marie Harrison Trust of which Mr. Harrison is a Co-Trustee; options to purchase 425,000 shares of Common Stock; and 141,997 shares of Common Stock held in Mr. Harrison's partially vested ESOP participant account

(5)  Includes 400,000 shares of Common Stock owned directly by Mr. Harrell and options to purchase 250,000 shares of Common Stock.

(6)  Includes 143,500 shares of Common Stock owned directly by Mr. Williams; 53,650 shares of Common Stock owned by the Williams Family Limited Partnership of which Mr. Williams is President of the General Partner, the Williams Family Corporation; and options to purchase 250,000 shares of Common Stock.

(7)  Includes 502,324 shares of Common Stock owned directly by Mr. Stevens and options to purchase 100,000 shares of Common Stock.

4

Table of Contents

(8)  Includes 75,000 shares of Common Stock owned directly by Mr. Norton and options to purchase 175,000 shares of Common Stock.

(9)  Serco International Limited (f/k/a Serco International Financial Advisory Services, Ltd.) and Austroinvest International Limited are affiliated entities. The Company understands that Dr. Ernst Walter is the sole director of each company. The total beneficial ownership of securities of the Company held by the foregoing and Dr. Walter includes: 1,251,831 shares of Common Stock owned by Serco International Limited; 900,000 shares of Series S-NR Preferred Stock owned by Serco International Limited; and 926,000 shares of Series S Preferred Stock owned by Austroinvest International Limited.

(10) Casino World, Inc. and Mississippi Gaming Corporation are wholly-owned subsidiaries of the Company.

## NOMINEES

**DEBORAH A. VITALE** has served as President, Chief Executive Officer and Treasurer of the Company since February 1998 and has served as Chairman of the Board of the Company since March 1995. As President and CEO, Ms. Vitale was responsible for all phases of the day-to-day operations of four casino ships sailing out of three Florida ports into international waters and for the management and supervision of hundreds of both ship-based and land-based employees. Ms. Vitale served as Secretary of the Company from November 1994 until July 2002. She has been a Director of the Company since December 1992. On February 14, 1997, Ms. Vitale was appointed Chairman of the Board of Directors of Casino World, Inc. and Chairman of the Board of Directors of Mississippi Gaming Corporation, each a subsidiary of the Company. On September 2, 1997, Ms. Vitale was appointed President of Casino World, Inc. and Mississippi Gaming Corporation. Ms. Vitale is a trial attorney with over twenty years of experience handling complex civil litigation. Ms. Vitale is licensed to practice law in Maryland, Virginia and Washington, D.C.

**GREGORY A. HARRISON, Ph.D., P.E.**, was elected a Director of the Company on February 20, 1998. Dr. Harrison was appointed Vice-President of the Company on July 18, 2002 and was appointed Secretary of the Company on July 25, 2002. Dr. Harrison is a consulting forensic engineer with forty years of diversified fire protection/safety/project engineering experience with NASA, DOD, NBS, NRC, ARAMCO, and Tenera, L.P. Effective August 27, 2004, Dr. Harrison became a Professional Engineer licensed to practice in the state of Mississippi. Dr. Harrison has qualified as an expert witness in various courts in ten states. Dr. Harrison is a partner of Master Jin Kim of Champion Martial Arts, Inc., in the development of an internet martial arts school. Dr. Harrison received a B.S. degree in Fire Protection Engineering from the University of Maryland in 1966, an M.S. degree in Civil Engineering from the University of Maryland in 1970, an M.S. degree in Engineering Administration from George Washington University in 1979 and a Ph.D. in Safety Engineering from Kennedy-Western University in 1994. Dr. Harrison has held a top secret security clearance with the U.S. Department of Energy, the U.S. Nuclear Regulatory Commission, and the Department of Defense. Dr. Harrison has served on the Board of Directors of Data Measurement Corporation and was an Advisory Board member of United Bank and First Patriot National Bank.

**FRANK E. WILLIAMS, JR.** was elected a Director of the Company on July 3, 2002. Since 1969, Mr. Williams has served as Chairman of the Board of Williams Enterprises of Georgia, Inc., a holding company controlling six subsidiaries active in various facets of the steel industry. Since 1995, Mr.

5

Table of Contents

Williams has also served as Chairman, CEO, and a fifty percent owner of Bosworth Steel Erectors, Inc. of Dallas, Texas, an erector of steel products in the southwestern United States and as Chairman and a major shareholder of Wilfab, Inc., a structural steel fabricator located in Cherokee County, Georgia. Mr. Williams is the Managing Partner and principal owner of Structural Concrete Products, LLC of Richmond, Virginia, a manufacturer of pre-stressed concrete building systems for customers in the mid-Atlantic region and of Industrial Alloy Fabricators, LLC of Richmond, Virginia, a fabricator of alloy plate products for the energy and chemical industries. Mr. Williams founded Williams Industries, Inc., a public company (OTCBB: WMSI), which owns five subsidiaries active in the steel industry including Williams Bridge Company, one of the largest fabricators of steel plate for bridge structures in the mid-Atlantic region. He served as Chairman of the Board of Williams Industries, Inc. through 1994 and currently is a Director of that Company. Mr. Williams is currently Chairman of the Board of Directors of Kaiser Group Holdings, Inc., a public company (NYSE: KGH). Mr. Williams is a former Chairman and a current Director of Capital Bank, N.A. Mr. Williams has been appointed by bankruptcy courts as an official representative serving in a pro bono capacity on behalf of investors and debt holders in public companies in bankruptcy. Mr. Williams holds a Bachelor of Civil Engineering degree from the Georgia Institute of Technology.

**BENJAMIN J. HARRELL** was elected a Director of the Company on July 18, 2002. Mr. Harrell was the founder and served as President and CEO of Pete Fountain Productions, Inc. from 1979 until it was acquired in 1999 by Production Group International, Inc. ("PGI"), a global event communications company, and subsequently acquired from "PGI" by TBA Global Events, LLC in 2005. Mr. Harrell currently manages the acquiring company's business in the New Orleans area. Mr. Harrell also currently serves as Vice President of Pete Fountain Entertainment, LLC, which until March 2003, operated one of the largest jazz clubs in New Orleans. Since 1975, Mr. Harrell has served as personal manager for the internationally noted jazz artist, Pete Fountain. Mr. Harrell handles all aspects of Mr. Fountain's career, including promotion, concerts, personal appearances and commercial endorsements. From 1985 through 2003, Mr. Harrell served as President of Cresent Sound & Light, Inc, a professional sound, lighting, video and staging company for the convention and entertainment industry. Mr. Harrell served as a Director of the New Orleans Metropolitan Convention and Visitors Bureau from 1997 through 1999. On January 15, 2004, Mr. Harrell was elected to the Board of Directors of Mississippi Gaming Corporation, a wholly-owned subsidiary of the Company.

**H. STEVEN NORTON** was elected a Director of the Company on August 6, 2002. Since 1998, Mr. Norton has served as President and CEO of Norton Management, Inc., a consulting company in Alton, Illinois and Las Vegas, Nevada. Mr. Norton also currently serves as a Director of Centaur, Inc., a privately held company which owns a casino in Central City, Colorado and owns Hossier Park, an Indiana race track, located in Anderson, Indiana. Mr. Norton is also a Director of Colorado Casino Resorts, Inc. in Cripple Creek, Colorado and North East Resorts, Inc., a privately held company pursuing gaming in the state of Massachusetts. Mr. Norton is also a major creditor and has provided consulting services to Onnam Entertainment, Inc., a privately held Las Vegas based company, with contracts to develop and operate Native American casinos in various U.S. locations. Prior to Hurricane Katrina, Onnam received permission from the Mississippi Gaming Commission to develop a casino site in Biloxi, Mississippi. The casino, if constructed, would compete with any casino resort subsequently developed by the Company.

From 1993 to 1998, Mr. Norton served as President and Chief Operating Officer of Argosy Gaming Corporation, a public company and operator of riverboat casinos. Mr. Norton also previously served as President and Chief Operating Officer of the Sands Hotel & Casino in Las Vegas, Nevada; as President and Chief Executive Officer of the Gold River Gambling Hall & Resort in Laughlin, Nevada; as

6

Table of Contents

Executive Vice-President of Resorts International, Inc. and Resorts International Casino Hotel in Atlantic City, New Jersey; and as Vice-President, Treasurer and Comptroller of Paradise Island, Ltd/Paradise Island Casino.

Mr. Norton has also previously served as a founder and a Director of the American Gaming Association; as a founder, a Director and Vice-Chairman of the New Jersey Casino Association; as Chairman of the Indiana Gaming Association; as a Director and Vice-President of the Missouri Gaming Association; as a Director of the Illinois River Boat Association and as Chairman of the Casino Commission of the American Hotel Association. Mr. Norton has also served on the Board of Directors and Executive Committee of the American Hotel Association; as Chairman of the Board and President of the New Jersey Hotel Motel Association; as Director and Vice-President of the Bahamas Hotel Association; as Chairman of the Bahamas Hotel Employers Association; as Director and Treasurer of the Bahamas Employers Confederation; as a Board Member of the Nevada Hotel Motel Association; as Chairman of the Atlantic City Convention & Visitors Bureau; as Chairman of the Nassau Paradise Island Promotion Board; and as a member of the Advisory Board of the Governors Office of Travel and Tourism in New Jersey.

**CARL D. STEVENS** was elected a Director of the Company on January 10, 2006. Mr. Stevens spent 26 years with the IBM Corporation in various sales and management positions, including Branch Manager, Atlanta, Georgia. Mr. Stevens was responsible for the southeast United States and served as Program Director for Public Sector Sales for the United States. In 1997, Mr. Stevens became President and CEO of ITC Corporation which was headquartered in Herndon, Virginia. ITC, a NASDAQ listed company, was a publisher and distributor of multimedia training materials with worldwide sales. In 1999, Mr. Stevens was named Division President of InfoCast Corporation Inc., which was headquartered in Toronto, Canada. Mr. Stevens headed the Company's efforts in the e-Learning and Virtual Contact Center divisions. In June of 2001, Mr. Stevens was named CEO and President of Cogient Corporation, a medical software development and services provider headquartered in Toronto, Canada. Mr. Stevens resigned as CEO of Cogient Corporation in January of 2005 to return to the U.S. to actively manage his investments. Mr. Stevens attended Indiana University where he majored in business administration. Mr. Stevens is a veteran of the United States Air Force.

**KEY PERSONELL**

**ROBERT ZIMMERMAN** was appointed Chief Financial Officer of the Company on July 27, 1998. From May of 1994 until joining the Company, Mr. Zimmerman served as Controller for the North and Central American operations of Casinos Austria International, Ltd. From 1980 through 1993, Mr. Zimmerman served as Vice President of Finance for the Industrial Controls subsidiary of Emerson Electric Company (NYSE: EMR). Prior to 1980, Mr. Zimmerman was employed with the public accounting firm of Fiddler and Co. for seven years.

## MEETINGS AND COMMITTEES OF THE BOARD OF DIRECTORS

The Board of Directors held twelve meetings during 2006 and all directors attended at least 75% of the meetings. The Board has determined that Frank E. Williams, Jr., Carl D. Stevens, Benjamin J. Harrell, and H. Steven Norton are independent Directors as defined under the general independence standards of the NASD's listing standards.

The Board of Directors has formed both a standing Audit Committee and a Compensation Committee. The Board has not formed a Nominating Committee.

7

DIAMONDHEAD CASINO CORPORATION

Table of Contents

## THE AUDIT COMMITTEE

The Audit Committee is composed of three Directors: Frank E. Williams, Jr. (Chairman), Benjamin J. Harrell, and Gregory A. Harrison (ex-officio member). Both Mr. Williams and Mr. Harrell meet the independence standards as defined by Rule 4200(a) (15) of the NASD listing standards. Mr. Harrison, who serves only in an ex-officio capacity, by virtue of his status as a compensated Officer of the Company, is not independent. The Board of Directors has also determined that Frank E. Williams, Jr. is an Audit Committee Financial expert as that term is defined in the rules issued pursuant to the Sarbanes-Oxley Act of 2002.

The Audit Committee has no written charter and convenes at the regularly scheduled meetings of the Board of Directors. Management of the Company has primary responsibility for the financial statements and reporting process, including systems of internal control. The Company's independent registered public accounting firm is responsible for performing an independent audit of the Company's consolidated financial statements in accordance with generally accepted auditing standards and issuing a report thereon.

## REPORT OF THE AUDIT COMMITTEE

The Audit Committee has reviewed and discussed the audited financial statements with management; has discussed with the independent auditors the matters required to be discussed by Statement on Auditing Standards (SAS) No. 61, as may be modified or supplemented; has reviewed the written disclosures and the letter from Friedman LLP, the independent registered public accounting firm, required by Independence Standards Board Standards Board Standard No. 1, as may be modified or supplemented; has discussed with the firm their independence; and based on the foregoing review and discussions, has recommended to the Board of Directors that the audited financial statements be included in the Annual Report on Form 10-KSB for the year ended December 31, 2006, for filing with the Securities and Exchange Commission.

Frank E. Williams, Jr.                Benjamin J. Harrell        Gregory A. Harrison
(Chairman)

## THE COMPENSATION COMMITTEE

The Compensation Committee is composed of three Directors: Benjamin J. Harrell (Chairman), Carl D. Stevens, and Gregory A. Harrison (ex-officio member). Both Mr. Harrell and Mr. Stevens have been determined to be independent Directors by the Board of Directors based on the general independence standards adopted by the Board. Mr. Harrison, who serves only in an ex-officio capacity, by virtue of his status as a compensated Officer of the Company, is not independent.

The Committee has no written charter and convenes at regularly scheduled meetings of the Board of Directors. The Committee discharges the Board's responsibility related to compensation of Officers and employees of the Company. In addition, the Committee recommends to the Board, awards of options to purchase shares of Company common stock.

8

DIAMONDHEAD CASINO CORPORATION

Table of Contents

## REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

The Compensation Committee of Diamondhead Casino Corporation recommended to the Board of Directors of the Company that Deborah A. Vitale receive a bonus and increased salary in recognition of her significant and material contributions to the Company. The bonus was for $450,000 to reflect Ms. Vitale's significant contributions to the Company arising from her negotiation and settlement of significant tax liabilities with the Florida Department of Revenue arising from two separate tax audits of the Company's former operating subsidiaries. As a result of Ms. Vitale's efforts, the Company ultimately paid approximately $917,000 of a $7.4 million assessment with the Florida Department of Revenue and ultimately paid $1.6 million in settlement of a second tax assessment of approximately $3.2 million. As a result of Ms. Vitale's efforts, the State of Florida did not foreclose on the Company's assets, the Company was not forced into bankruptcy, and the Company was able to remain in operation so as to sell its vessels and leases, pay its lenders, including First Union National Bank of Florida in full, and avoid the loss of its Mississippi property which was pledged as collateral for its bank loans. The bonus was also awarded in recognition of Ms. Vitale's efforts in settling various EEOC related complaints and lawsuits as well as settlement of certain Department of Labor matters.

The Compensation Committee also recommended that Ms. Vitale's salary be increased from $125,000 per annum, where it has been since she became President in February of 1998, to $300,000 per annum. The pay increase was recommended to reflect her myriad corporate roles and responsibilities more accurately and to fairly compensate her based upon industry peer review. The Compensation Committee also noted that Ms. Vitale manages the company's business without the benefit of administrative staff normally associated with the management of a publicly-traded company at significant savings to the Company.

Benjamin J. Harrell (Chairman)        Carl D. Stevens        Gregory A. Harrison

## NO NOMINATING COMMITTEE

The Board of Directors has not formed a Nominating Committee, however, the Board acts as a group in considering nominations. The Board considers and reviews, from time to time, the appropriate size and composition of the Board and anticipates future vacancies and needs of the Board. In evaluating possible nominees, the Board considers, among other things, the background, experience, education and knowledge of a candidate, his familiarity with the gaming industry and related industries, his experience with publicly-traded entities, and his integrity and judgment. The Board considers the potential contribution a candidate will bring to the backgrounds, experience, and skills of the existing Board of Directors. The Board also considers a candidate's ability to devote sufficient time and effort to his duties as a Director. After evaluation and review of candidates who meet the Board's criteria, the Board considers its then-current needs and selects the nominees that best suit those needs.

The Board will consider candidates recommended by stockholders, provided the names of such nominees, accompanied by relevant biographical information, are properly submitted in writing to the Secretary of the Company in accordance with the manner described in Section III below: "Stockholder Proposals." The nominees will be submitted to the Board of Directors and receive the same consideration as those nominees identified by members of the Board of Directors.

9

## CODE OF ETHICS

The Company adopted a Code of Ethics in 2004 that applies to the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the Code was attached as an exhibit to the 2004 Annual Report. A copy of the Code of Ethics will be made available to any shareholder, free of charge, upon written request to the Company.

## SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

The Company's Directors and Officers are required, pursuant to Section 16(a) of the Securities and Exchange Act of 1934, to file statements of beneficial ownership and changes in beneficial ownership of common stock of the Company with the Securities and Exchange Commission and to furnish copies of such statements to the Company. Based solely upon its review of Forms 3, 4 and 5 and any amendments thereto furnished to the Company pursuant to Section 16 of the Securities Exchange Act of 1934, as amended, all purchases and sales of stock and all required forms were filed timely by reporting persons during 2006 except as follows:

Carl D. Stevens was elected as a Director of the Company on January 10, 2006 and should have filed a Form 3 by January 20, 2006, but did not file that form until January 27, 2006.

On April 25, 2006, Frank E. Williams, Jr. reported one transaction reflecting the Company's award of an option to purchase 100,000 shares of common stock on April 13, 2006, which should have been reported by April 17, 2006. On May 25, 2006, Mr. Williams reported one transaction for the sale of 4,000 shares of common stock on May 22, 2006, which should have been reported by May 24, 2006. On June 12, 2006, Mr. Williams reported one transaction for the sale of 1,500 shares of common stock on June 7, 2006, which should have been reported by June 9, 2006. On October 3, 2006, Mr. Williams reported one transaction for the sale of 7,625 shares of common stock on September 28, 2006, which should have been reported by October 2, 2006.

## EXECUTIVE COMPENSATION

The following table provides information concerning the compensation of named executive officers of the Company and its wholly-owned subsidiaries. No other person serving as an executive officer of the Company on December 31, 2006, received cash compensation in excess of $100,000 during any of the last two fiscal years.

### SUMMARY COMPENSATION TABLE

| Name and Occupation | Year | Salary | Bonus | Stock Awards | Option Awards (2) | Non Equity Incentive Plan Compensation | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Deborah A. Vitale | 2006 | $300,000 | $450,000 | None | $190,515 | None | None | (3) | $940,515 |
| President | 2005 | $133,654(1) | None | None | $437,171 | None | None | (3) | $570,825 |

(1)  In 2005, Ms. Vitale received $125,000 of her annual salary and the remainder was paid to her in 2006.

10

Table of Contents

(2) On February 10, 2005, Ms. Vitale was awarded an option to purchase 75,000 shares of common stock exercisable at $.80 per share. On October 24, 2005, an option to purchase 450,000 shares of common stock, exercisable at $.50 per share, expired. On October 27, 2005, Ms. Vitale was awarded an option to purchase 450,000 shares of common stock exercisable at $1.25 per share. On April 13, 2006, Ms. Vitale was awarded an option to purchase 100,000 shares of common stock exercisable at $2.70 per share. Reference is hereby made to Note 3, "Summary of Significant Accounting Policies — Stock Based Compensation" in the attached 2006 Financial Statements, for a determination of the variables used in computing the value of option awards.

(3) The Europa Cruises Corporation Employee Stock Ownership Plan ("the Plan") is a defined contribution pension plan funded with common stock of the Company of which Ms. Vitale is a participant. As of December 31, 2005, Ms. Vitale was fully vested in 314,700 shares of common stock allocated to her account in the Plan. As of December 31, 2006, Ms. Vitale was fully vested in 341,214 shares of common stock allocated to her account in the Plan.

The following table provides a summary of the outstanding equity awards at December 31, 2006 for the named executive officer.

## SUMMARY OF OUTSANDING EQUITY AWARDS AT FISCAL YEAR END

### Option Awards

| Name | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable | Equity Incentive Plan Awards Number of Securities Underlying Unexpired Unexercised Options | Option Exercise Price | Option Expiration Date |
|---|---|---|---|---|---|
| Deborah A. Vitale | 750,000 | None | None | $ .30 | 3/11/08 |
| | 75,000 | None | None | .75 | 7/23/08 |
| | 75,000 | None | None | .80 | 2/10/10 |
| | 450,000 | None | None | 1.25 | 10/27/10 |
| | 100,000 | None | None | 2.70 | 4/13/11 |

### Stock Awards

| Name | Number of Shares or Units Of Stock That Have Not Vested | Market Value of Shares or Units Of Stock That Have Not Vested | Equity Incentive Plan Awards Number of Unearned Shares, Units or Other Rights That Have Not Vested | Equity Incentive Plan Awards Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested |
|---|---|---|---|---|
| Deborah A. Vitale | None | None | None | None |

11

3/13/2015                                DIAMONDHEAD CASINO CORPORATION

Table of Contents

## DIRECTORS' COMPENSATION

The current members of the Board of Directors are not paid fees for their services as a Director. Directors are reimbursed for certain approved expenses incurred in connection with Company business and for certain approved expenses incurred in connection with attendance at non-telephonic Board meetings and non-telephonic committee meetings. Directors are, from time to time, awarded non-qualified options to purchase common stock of the Company. The table below summarizes compensation of Directors for 2006, exclusive of the named executive officer, whose compensation has been summarized in the tables above.

| Name | Fees Earned Or Paid in Cash | Stock Awards | (1) (2) Option Awards | Non-Equity Incentive Plan Compensation | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|------|------|------|------|------|------|------|
| Gregory A. Harrison | None | None | $190,515 | None | None | None | $190,515 |
| Frank E. Williams, Jr. | None | None | $190,515 | None | None | None | $190,515 |
| Benjamin J. Harrell | $2,500 | None | $190,515 | None | None | None | $193,015 |
| H. Steven Norton | None | None | $190,515 | None | None | None | $190,515 |
| Carl D. Stevens | None | None | $190,515 | None | None | None | $190,515 |

(1)  On April 13, 2006, each Director was awarded an option to purchase 100,000 shares of common stock at an exercise price of $2.70 per share. The option is immediately exercisable and expires five years from the date of grant.

(2)  Reference is hereby made to Note 3, "Summary of Significant Accounting Policies – Stock Based Compensation" in the attached 2006 Financial Statements, for a determination of the variables used in computing the value of option awards.

## CERTAIN TRANSACTIONS

On August 18, 1994, the Company established the Europa Cruises Corporation Employee Stock Ownership Plan (the "ESOP"). The ESOP, which is a qualified retirement plan under the provisions of Section 401(a) of the Internal Revenue Code and an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Internal Revenue Code, was established primarily to invest in stock of the Company. All employees as of December 31, 1994, and subsequent new employees having completed 1,000 hours of service, are eligible to participate in the ESOP. The Company also established a trust called the Europa Cruises Corporation Employee Stock Ownership Plan Trust Agreement, to serve as the funding vehicle for the ESOP. Deborah A. Vitale, CEO, President and Treasurer of the Company, is the sole Trustee of the Trust. As of December 31, 2006, 1,977,270 shares of Common Stock had been released and allocated to participants in the ESOP. Unallocated shares are voted by the Trustee. The Trustee is required to vote the unallocated ESOP shares in the best interests of the ESOP beneficiaries.

On August 21, 1994, the Company loaned $4,275,000 to the ESOP in exchange for a ten-year promissory note bearing interest at eight percent per annum. On August 24, 1994, the ESOP purchased 2,880,000 shares of the Company's Common Stock with the proceeds of the loan. On August 25, 1994 the Company loaned an additional $3,180,000 to the ESOP in exchange for a ten year promissory note bearing interest at eight percent per annum. On August 26, 1994, the ESOP purchased an additional 2,120,000 shares of the Company's Common Stock with the proceeds of the loan. The shares of Common Stock were pledged to the Company as security for the loans. The promissory notes will be repaid with

12

DIAMONDHEAD CASINO CORPORATION

Table of Contents

the proceeds of annual contributions made by the Company to the ESOP. In April of 1995, the Company agreed to extend the maturity of the loans to twenty years. Effective for the Plan year beginning January 1, 2001, the Company amended the plan and related loans for the purpose of limiting excise tax liability for plan contributions in excess of IRS Code 415 limitations. To accomplish this, the Company agreed to extend the maturity of the loans to fifty years.

## II. RATIFICATION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Friedman LLP has served as the Company's independent registered public accounting firm since the audit of the 2000 financial statements. The Audit Committee has selected Friedman LLP to audit the Company's financial statements for the year ending December 31, 2007 and is asking the stockholders to ratify the appointment. Members of the firm of Friedman LLP are not expected to be present at the Annual Meeting of Stockholders and, accordingly, will not be available to make a statement or respond to questions.

In the event stockholders fail to ratify the appointment, the Audit Committee may reconsider this appointment. Even if the appointment is ratified, the Audit Committee, in its discretion, may direct the appointment of a different independent accounting firm at any time during 2007 if the Audit Committee determines that such a change would be in the best interest of the Company and its stockholders.

The Audit Committee approved all services provided by Friedman LLP for the years ended December 31, 2006 and 2005. The following fees were paid to Friedman LLP for services in 2006 and 2005:

|  | 2006 | 2005 |
|---|---|---|
| Audit Fees | $57,603 | $50,529 |
| Audit-Related Fees | 7,745 | 7,745 |
| Tax Fees | 0 | 0 |
| All Other Fees | 0 | 1,500 |
| Total Fees Paid to Friedman LLP | $65,348 | $59,774 |

Audit fees are comprised of fees for professional services rendered in conjunction with the audit of the Company's annual financial statements, review of the Company's annual report filed with the Securities and Exchange Commission on Form 10KSB, and review of the information contained in the Company's quarterly filings with the Securities and Exchange Commission on Form 10QSB.

Audit-related fees are comprised of the fees for professional services rendered in connection with the audit of the Company's Employee Stock Ownership Plan.

All other fees are comprised of fees for professional services rendered in conjunction with the review of the Company's answers to the Securities and Exchange Commission's queries in their review of the Company's filings.

**THE BOARD OF DIRECTORS AND THE AUDIT COMMITTEE UNANIMOUSLY RECOMMEND A VOTE FOR THE RATIFICATION OF THE APPOINTMENT OF FRIEDMAN LLP AS THE COMPANY'S INDEPENDENT AUDITOR.**

13

Table of Contents

## III. OTHER MATTERS

Management of the Company does not know of any matters that may properly come before this meeting other that those referred to in the accompanying Notice of Annual Meeting of Stockholders. If any other matters properly come before the Meeting, it is intended that the shares of Voting Stock represented by the proxy will be voted with respect thereto in accordance with the judgment of the persons voting them.

## STOCKHOLDER PROPOSALS

If a stockholder intends to present a proposal for action at the 2008 Annual Meeting and wishes to have such proposal considered for inclusion in the Company's proxy materials in reliance on Rule 14a-8 under the Securities and Exchange Act of 1934, the proposal must be submitted in writing and received by the Secretary of the Company at the Company's principal executive offices at 1301 Seminole Boulevard, Suite 142, Largo, Florida 33770, not less than 120 calendar days before the date of the Company's Proxy Statement released to shareholders in connection with the previous year's annual meeting. All such proposals must meet the rules and requirements of the Securities and Exchange Commission relating to stockholder proposals. No stockholder proposals were received with respect to the Meeting scheduled for October 1, 2007.

By Order of the Board of Directors
Deborah A. Vitale
Chairman of the Board
President and Chief Executive Officer

August 17, 2007

14

DIAMONDHEAD CASINO CORPORATION

Table of Contents

---

 **VOTE BY INTERNET OR TELEPHONE** 
QUICK ★★★ EASY ★★★ IMMEDIATE

## DIAMONDHEAD CASINO CORPORATION

*Voting by telephone or Internet is quick, easy and immediate.* As a stockholder of Diamondhead Casino Corporation, you have the option of voting your shares electronically through the Internet or on the telephone, eliminating the need to return the proxy card. Your electronic vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed, dated and returned the proxy card. Votes submitted electronically over the Internet or by telephone must be received by 7:00 p.m., Eastern Time, on September 30, 2007.

*Vote Your Proxy on the Internet:*
**Go to www.continentalstock.com.**
Have your proxy card available when you access the above website. Follow the prompts to vote your shares.

*Vote Your Proxy by Phone:*
**Call 1 (866) 894-0537.**
Use any touch-tone telephone to vote your proxy. Have your proxy card available when you call. Follow the voting instructions to vote your shares.

### PLEASE DO NOT RETURN THE PROXY CARD IF YOU ARE
### VOTING ELECTRONICALLY OR BY PHONE

*Vote Your Proxy by mail:*
Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.

- - - - - - - - - - - - - - ▼ FOLD AND DETACH HERE AND READ THE REVERSE SIDE ▼ - - - - - - - - - - - - - -

### PROXY

Please mark your votes like this ☒

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED HEREIN. IF NO DIRECTION IS GIVEN, THIS PROXY WILL BE VOTED IN ACCORDANCE WITH THE RECOMMENDATIONS OF THE COMPANY'S BOARD OF DIRECTORS "FOR" ALL NOMINEES IN ITEM 1 AND "FOR" ITEM 2.**

1. ELECTION OF DIRECTORS

|  | FOR all Nominees listed to the left | WITHHOLD AUTHORITY to vote for all nominees listed to the left |
|---|---|---|
| NOMINEES: (01) DEBORAH A. VITALE<br>(02) BENJAMIN J. HARRELL<br>(03) GREGORY A. HARRISON<br>(04) CARL D. STEVENS<br>(05) FRANK E. WILLIAMS, JR.<br>(06) H. STEVEN NORTON | ☐ | ☐ |

(Instruction: To withhold authority to vote for any individual nominee, strike a line through that nominee's name in the list above)

2. TO RATIFY THE APPOINTMENT OF FRIEDMAN LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

| FOR | AGAINST | ABSTAIN |
|---|---|---|
| ☐ | ☐ | ☐ |

COMPANY ID:

PROXY NUMBER:

3/13/2015

DIAMONDHEAD CASINO CORPORATION

**ACCOUNT NUMBER:**

Signature _____   Signature _____   Date _____ , 2007.

Note: Please sign exactly as name appears below. When shares of Voting Stock are held by joint tenants, both should sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such. If a corporation, please sign in full corporate name by President or other authorized officer. If a partnership, please sign in partnership name by authorized person.

3/13/2015

DIAMONDHEAD CASINO CORPORATION

**Table of Contents**

▼ FOLD AND DETACH HERE AND READ THE REVERSE SIDE ▼

PROXY

## THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned, revoking any previous proxies or consents, hereby appoints as his or her proxies, Deborah A. Vitale and Gregory A. Harrison, or either of them, with full power of substitution and revocation, to vote all shares of Common Stock or S Preferred Stock or S-NR Preferred Stock (collectively, the "Voting Stock") of the undersigned in Diamondhead Casino Corporation with all of the powers that the undersigned would have if personally present at the Annual Meeting of stockholders of Diamondhead Casino Corporation, to be held on October 1, 2007 at the Hilton Hotel, 1767 King Street, Alexandria, Virginia 22314 at 11:00 a.m. local time, and at any and all adjournments or postponements thereof, and upon the matters described in the accompanying Proxy Statement and upon any other business that may properly come before the Meeting or any adjournment or postponement thereof. Said proxies are directed to vote or refrain from voting as indicated and, otherwise, in their discretion.

(Continued, and to be marked, dated and signed, on the other side)

&#8203;

3/13/2015                                                   DIAMONDHEAD CASINO CORPORATION

Table of Contents

 **VOTE BY INTERNET OR TELEPHONE** 
QUICK ★★★ EASY ★★★ IMMEDIATE

# DIAMONDHEAD CASINO CORPORATION

*Voting by telephone or Internet is quick, easy and immediate.* As a stockholder of Diamondhead Casino Corporation, you have the option of voting your shares electronically through the Internet or on the telephone, eliminating the need to return the proxy card. Your electronic vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed, dated and returned the proxy card. Votes submitted electronically over the Internet or by telephone must be received by 7:00 p.m., Eastern Time, on September 27, 2007.

**_Vote Your Proxy on the Internet:_**
**Go to www.continentalstock.com.**
Have your proxy card available when you access the above website. Follow the prompts to vote your shares.

**_Vote Your Proxy by Phone:_**
**Call 1 (866) 894-0537.**
Use any touch-tone telephone to vote your proxy. Have your proxy card available when you call. Follow the voting instructions to vote your shares.

## PLEASE DO NOT RETURN THE PROXY CARD IF YOU ARE VOTING ELECTRONICALLY OR BY PHONE

**_Vote Your Proxy by mail:_**
Mark, sign, and date your proxy card, then detach it, and return it in the postage-paid envelope provided.

▼ FOLD AND DETACH HERE AND READ THE REVERSE SIDE ▼

-----------------------------------------------------------------------------------

## PROXY

Please mark your votes like this ☒

THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED HEREIN. IF NO DIRECTION IS GIVEN, THIS PROXY WILL BE VOTED IN ACCORDANCE WITH THE RECOMMENDATIONS OF THE COMPANY'S BOARD OF DIRECTORS "FOR" ALL NOMINEES IN ITEM 1 AND "FOR" ITEM 2.

**1. ELECTION OF DIRECTORS**

| | FOR all Nominees listed to the left | WITHHOLD AUTHORITY to vote for all nominees listed to the left |
|---|---|---|
| NOMINEES: (01) DEBORAH A. VITALE (02) BENJAMIN J. HARRELL (03) GREGORY A. HARRISON (04) CARL D. STEVENS (05) FRANK E. WILLIAMS, JR. (06) H. STEVEN NORTON | ☐ | ☐ |

(Instruction: To withhold authority to vote for any individual nominee, strike a line through that nominee's name in the list above)

**2. TO RATIFY THE APPOINTMENT OF FRIEDMAN LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

| FOR | AGAINST | ABSTAIN |
|---|---|---|
| ☐ | ☐ | ☐ |

**COMPANY ID:**

**PROXY NUMBER:**

3/13/2015

DIAMONDHEAD CASINO CORPORATION

**ACCOUNT NUMBER:**

Signature _____    Signature _____    Date _____, 2007.

Note: Please sign exactly as name appears below. When shares of Voting Stock are held by joint tenants, both should sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such. If a corporation, please sign in full corporate name by President or other authorized officer. If a partnership, please sign in partnership name by authorized person

　DIAMONDHEAD CASINO CORPORATION

Table of Contents

▼ FOLD AND DETACH HERE AND READ THE REVERSE SIDE ▼

PROXY

### THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned, revoking any previous proxies or consents, hereby appoints his or her Trustee of the Employee Stock Ownership Trust Agreement, Deborah A. Vitale, with full power of substitution and revocation, to vote all shares of Common Stock of the undersigned in Diamondhead Casino Corporation allocated to his or her Employee Stock Ownership Plan account with all of the powers that the undersigned would have if personally present at the Annual Meeting of stockholders of Diamondhead Casino Corporation, to be held on Monday, October 1, 2007, at the Hilton Hotel, 1767 King Street, Alexandria, Virginia 22314 at 11:00 a.m. local time, and at any and all adjournments or postponements thereof, and upon the matters described in the accompanying Proxy Statement and upon any other business that may properly come before the Meeting or any adjournment or postponement thereof. Said proxy is directed to vote or refrain from voting as indicated and, otherwise, in her discretion.

**(Continued, and to be marked, dated and signed, on the other side)**

Exhibit D

DATE SUBMITTED ___11/15/88___   _8803200133_

FILED BY: Corporation Service Company        FILE DATE ___11/15/88___

_____        TIME ___9:00AM___

_____LYNNE_____

_____        FILER'S NO. _____00014_____

NAME OF COMPANY EUROPA CRUISES CORPORATION

Name reserved by: David Silberstein @ Hornsby & Whisenhunt
1110 Brickell Ave., Penthouse, Miami FL 33131
(our client)        FILE NUMBER 21783-24

TYPE OF DOCUMENT Certificate of Incorporation        SECTION NO. 102

CLOSED & INVOICED

NOV 19 1988

CHANGES NAME_____

CHANGES AGENT/OFFICE_____

STOCK $ 50,000,000 Com at $.001    Received

    TO $_____    NOV 15 1988

_____Franchise Tax $_____

                Filing Fee Division of Corporation 15

            Receiving and Indexing $___25___

        NO. _2_ Certified Copies $___20___

        NO._____ PAGES (If prepared
        by the Division of Corp.)$_____

OTHER IX - VIII _____        $ _____

OTHER_____        $ _____

                TOTAL        $ _____

                                1933661-62

8803200133

# CERTIFICATE OF INCORPORATION

## OF

## EUROPA CRUISES CORPORATION

FILED

NOV 15 1988  9am

### ARTICLE I

The name of this corporation is Europa Cruises Corporation.

### ARTICLE II

The address of the corporation's registered office in Delaware is Corporation Service Company, 1013 Centre Road, in the City of Wilmington, County of New Castle. The name of the corporation's registered agent at such address is Corporation Service Company.

### ARTICLE III

The purpose for which the corporation is organized is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

### ARTICLE IV

The corporation shall have authority to issue Fifty Million (50,000,000) shares of Common Stock, par value $.001 per share (the "Common Stock").

The designations and the preferences, limitations and relative rights of the Common Stock of the corporation are as follows:

A.   Provisions Relating to the Common Stock.

1.   Except as otherwise required by law all rights to vote and all voting power shall be vested exclusively in the holders of the Common Stock.

2.   The holders of the Common Stock shall be entitled to receive when, as and if declared by the Board of Directors, out of funds legally available therefor, dividends payable in cash, stock or otherwise.

3.   Upon any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, the remaining net assets of the corporation shall be distributed pro rata to the holders of the Common Stock in accordance with their respective rights and interests.

B.   <u>General Provisions</u>

1.   Cumulative voting by any stockholder is hereby expressly denied.

2.   No stockholder of this corporation shall have, by reason of holding shares of any class or series of stock of this corporation, any preemptive or preferential rights to purchase or subscribe for any other shares of any class or series of this corporation now or hereafter to be authorized, or any other equity securities, or any notes, debentures, warrants, bonds, or other securities convertible into or carrying options or warrants to purchase shares of any class, now or hereafter to be authorized, whether or not the issuance of any such shares or equity securities, or such notes, debentures, bonds or other securities, would adversely affect the dividend or voting rights of such stockholder.

## ARTICLE V

The corporation shall have perpetual existence.

## ARTICLE VI

The number of directors of this corporation shall not be less than three (3) nor more than ten (10), the exact number to be fixed from time to time in the manner provided in the bylaws of the corporation.

## ARTICLE VII

The name and address of the Incorporator is Leslie J. Croland, Esq., 1110 Brickell Avenue, Penthouse, Miami, Florida 33131.

## ARTICLE VIII

A director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended after approval of this article to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director

2

of the corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

Any repeal or modification of the foregoing paragraph by the stockholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification.

### ARTICLE IX

The Board of Directors is authorized to make, alter or repeal the Bylaws of the corporation.  Election of directors need not be by written ballot.

### ARTICLE X

The corporation reserves the right to amend, alter, or repeal any provision contained in this certificate of incorporation, and any other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted in the manner now or hereinafter provided herein or by statute, and all rights, preferences and privileges of any nature whatsoever conferred upon the stockholders of the corporation by and pursuant to this certificate of incorporation in its present form are granted subject to the provisions of this Article X.

IN WITNESS WHEREOF, I, the undersigned, being the Incorporator hereinabove named for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this Certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and, accordingly, I have hereunto set my hand this _9th_ day of November, 1988.

EUROPA CRUISES CORPORATION

Leslie J. Croland, Incorporator

STATE OF FLORIDA    )
                    ) SS:
COUNTY OF DADE      )

BEFORE ME, a notary public, authorized to take acknowledgments in the State and County set forth above, personally appeared Leslie J. Croland, Incorporator, known to me and known by me to be the person who executed the foregoing Certificate of Incorporation on

3

behalf of Europa Cruises Corporation and he acknowledged before me that he executed said Certificate of Incorporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, in the State and County aforesaid.

_____
Notary Public, State of Florida at
Large

My Commission Expires:

4

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:30 PM 09/04/1992
922S2S398 - 2178324

**ARTICLES OF AMENDMENT
TO
ARTICLES OF INCORPORATION
OF
EUROPA CRUISES CORPORATION**

EUROPA CRUISES CORPORATION, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), in order to amend its Articles of Incorporation, does hereby submit these Articles of Amendment of its Articles of Incorporation and in connection therewith does hereby state as follows:

1.    The name of the Corporation is Europa Cruises Corporation. The original Articles of Incorporation of the Corporation were filed with the Department of State of the State of Delaware on November 15, 1988.

2.    The Amendment to the Corporation's Articles of Incorporation as adopted by the shareholders of the Corporation and as effected hereby is as follows:

Article IV of the Articles of Incorporation of the Company shall be deleted in its entirety, and in its place and stead shall be substituted the following:

**ARTICLE IV**

(1). Shares Authorized. The aggregate number of shares of stock which this corporation shall have authority to issue shall be fifty-five million (55,000,000) shares of which fifty million (50,000,000) shall be of Common Stock (each with a par value of one cent ($.001), and five million (5,000,000) shares of Preferred Stock (each with a par value of one cent ($.01)).

A.    Preferred Stock.   Shares of Preferred Stock may be issued from time to time by one or more series, each such series to have such distinctive designation or title as may be fixed by the Board of Directors prior to the issuance of any shares thereof. Except as limited elsewhere in this Article IV, the rights, preferences and privileges of the shares thereof shall be determined by the Board of Directors who shall have the power to decide on the following terms:

(a) whether the shares of preferred stock shall be participating;

(b) the dividend rate or rates, if any, on the shares of preferred stock and the relation which dividends of preferred stock shall bear to the dividends payable on any other class or classes or of any other series of any class or classes of capital stock of the corporation;

(c) the terms and conditions upon which and the periods in respect to which any such dividends shall be payable;

(d) whether and upon what conditions and any dividends of preferred stock shall be cumulative and, if cumulative, the date or dates from which dividends shall accumulate;

A-1

(e) whether the shares shall be limited in dividends, if any, or whether they shall participate in dividends over and above the dividend rate, if any, provided for the shares;

(f) whether any such dividends shall be payable in cash, in shares of such series, in shares of any other class or classes or of any other series of any class or classes of capital stock of the corporation, or in other property, or in more than one of the foregoing;

(g) whether the shares of preferred stock shall be redeemable or callable, the limitations and restrictions with respect to such redemption or call, the time or time of redemption, and the price or prices (which may be greater than par value) at which and the manner in which shares shall be redeemable or callable, including the manner of selecting shares for redemption if less than all shares are to be redeemed or called;

(h) whether the shares of preferred stock shall be subject to the operation of a purchase, retirement or sinking fund, and, if so, whether and upon what conditions the purchase, retirement or sinking fund shall be cumulative or non-cumulative and the extent to which and the manner in which the fund shall be applied to the purchase or redemption of the shares for retirement or to other corporate purposes and the terms and provisions relative to the operation thereof;

(i) the terms on which preferred stock shall be convertible into or exchangeable for shares of any other class or classes or of any other series of any class or classes of capital stock of the corporation, and the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of such conversion or exchange;

(j) the extent to which holders of preferred stock shall be entitled to vote generally with respect to matters relating to the corporation and the matters on which the holders of preferred stock shall be entitled to vote as a class;

(k) the preferences in respect to the assets of the corporation upon liquidation or winding upon the corporation including the amount (which may be greater than par value) payable to holders of preferred stock before any amount is payable to holders of common stock; and

(l) any other preferences, privileges and powers, and relative, participating, optional or other special rights and qualifications of or limitations or restrictions which the Board of Directors may deem advisable, provided they are not inconsistent with the provisions of these Articles of Incorporation.

Notwithstanding anything herein to the contrary, each share of preferred stock shall stand on a parity with each other share of preferred stock upon the voluntary or involuntary liquidation, dissolution or distribution of assets, or winding up of the corporation.

No dividend shall be paid, declared or set apart for payment on any preferred stock in respect of any period unless accumulated dividends shall be or shall have been paid, or declared and set apart for payment, pro rata, on all shares of outstanding preferred stock.

A-2

B.   Common Stock.

(a) Whenever cash dividends upon the preferred stock at the time outstanding, to the extent of the preference to which such stock is entitled, shall have been paid in full for all past dividend periods or declared and set apart for payment, such dividends, payable in cash, stock or otherwise, as may be determined by the Board of Directors, may be declared by the Board of Directors, and paid from time to time to the holders of common stock out of the remaining net profit or surplus of the corporation.

(b) In the event of any liquidation, dissolution or winding up of the affairs of the corporation, whether voluntary or involuntary, all assets and funds of the corporation remaining after the payment to the holders of the preferred stock of the full amounts to which they shall be entitled, as provided by the Board of Directors in the resolution or resolutions by which it authorizes the issuance of such stock, shall be divided and distributed among the holders of the common stock according to their respective shares.

(c) Except as may be otherwise required by law or by these Articles of Incorporation, each holder of Common Stock shall have one vote of each share of such stock held by him on all matters voted upon by the shareholders.

C.   Preemptive Rights.  No holder of shares of this corporation of any class, now or hereafter authorized, shall have any preferential or preemptive right to subscribe for, purchase or receive (i) any shares of stock of this corporation of any class, now or hereafter authorized; (ii) any options or warrants for such shares; (iii) any rights to subscribe to or purchase such shares; or (iv) any securities which may at any time or from time to time be issued, sold or offered for sale by this corporation.

A new Article X shall be added as follows:

## ARTICLE X

No person or entity may become the beneficial owner of 5% or more of the Company's shares of capital stock of every series and class unless such person or entity agrees to provide personal background and financial information to gaming authorities, consent to a background investigation, and respond to questions from gaming authorities. The Company may repurchase or redeem shares, at fair market value, held by any person or entity whose status as a shareholder, in the opinion of the Company's Board of Directors, jeopardizes the approval, continued existence, or renewal by any gaming regulatory authority, of a contract to manage gaming operations, or any other tribal, federal or state license or franchise held by the Company or any of its subsidiaries.  These restrictions will be contained in a legend on each certificate evidencing shares of capital stock.

The current Article X shall be renumbered Article XI.

2.    The above Amendments were approved by the Board of Directors and recommended to the Corporation's shareholders on August 21, 1992.

A-3

3.    The Amendments were approved by the holders of a majority of the Corporation's outstanding shares of common stock, which is the only group of the Corporation's shareholders entitled to vote on the Amendments, at the Corporation's Annual Meeting of Shareholders held August 21, 1992. The number of votes in favor of the Amendments were sufficient for approval.

IN WITNESS WHEREOF, the foregoing instrument has been duly executed and delivered by the Corporation by its undersigned officers this 27 day of August, 1992.

ATTEST:

EUROPA CRUISES CORPORATION

By: _____
   Charles S. Liberis, President

_____
              Secretary

ACKNOWLEDGEMENT

STATE OF FLORIDA          )
                          )  ss
COUNTY OF ESCAMBIA        )

BEFORE ME, the undersigned authority, on this 27 day of August, 1992, personally appeared Sharon E. Petty and Charles S. Liberis, to me known to be the persons who executed the foregoing Articles of Amendment of Articles of Incorporation, who acknowledged to me that the same were executed freely and voluntarily, with full knowledge and understanding of and for the uses and purposes therein expressed.

WITNESS my hand and official seal the date first above written.

_____
Notary Public

My commission expires:

JUDY Y. WAGNER
MY COMMISSION # CC 01000 EXPIRES
June 7, 1994

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 11:09 AM 11/22/2002*
*020723322 - 2178324*

# EUROPA CRUISES CORPORATION

## CERTIFICATE OF AMENDMENT OF
## CERTIFICATE OF INCORPORATION

- **First**:        That the Board of Directors of Europa Cruises Corporation, via unanimous written consent dated September 11, 2002, duly adopted a resolution setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for the consideration thereof.  The resolution setting forth the proposed amendment is as follows:

  **FURTHER RESOLVED**, that the Articles of Incorporation shall be amended so as to change the name of the Company from "Europa Cruises Corporation" to "Diamondhead Casino Corporation" subject to approval of the shareholders in accordance with the Company's Bylaws.

- **Second**:        That, thereafter,  pursuant to resolution of the Board of Directors, the Annual Meeting of shareholders was duly called and held on November 4, 2002, upon notice in accordance with section 222 of the General Corporation Law of the State of Delaware, at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

- **Third**:        That said amendment was adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

- **Fourth**:        That the capital of said corporation shall not be reduced under or by reason of aid amendment.

By: _____
  Deborah A. Vitale, President
  Authorized Officer

Exhibit E

BYLAWS

OF

EUROPA CRUISES CORPORATION

(A DELAWARE CORPORATION)

INDEX

| | | Page Number |
|---|---|---|
| ARTICLE ONE – OFFICES | | 1 |
| 1. | Registered Office | 1 |
| 2. | Other Offices | 1 |
| | | |
| ARTICLE TWO – MEETINGS OF STOCKHOLDERS | | 1 |
| 1. | Place | 1 |
| 2. | Time of Annual Meeting | 1 |
| 3. | Call of Special Meeting | 1 |
| 4. | Notice | 1 |
| 5. | Business of Special Meetings | 2 |
| 6. | Quorum | 2 |
| 7. | Required Vote | 2 |
| 8. | Voting of Shares | 2 |
| 9. | Proxies | 3 |
| 10. | Stockholder List | 3 |
| 11. | Action Without Meeting | 3 |
| 12. | Closing of Transfer Books and Fixing Record Date | 3 |
| | | |
| ARTICLE THREE – DIRECTORS | | 4 |
| 1. | Number, Election and Term | 4 |
| 2. | Vacancies | 4 |
| 3. | Powers | 5 |
| 4. | Place of Meeting | 5 |
| 5. | Annual Meeting | 5 |
| 6. | Regular Meetings | 5 |
| 7. | Special Meetings and Notice | 5 |
| 8. | Quorum and Required Vote | 5 |
| 9. | Action Without Meeting | 6 |
| 10. | Telephone Meetings | 6 |
| 11. | Committees | 6 |
| 12. | Compensation of Directors | 7 |
| 13. | Chairman of the Board | 7 |
| 14. | Vice Chairman of the Board | 7 |
| | | |
| ARTICLE FOUR – OFFICERS | | 8 |
| 1. | Positions | 8 |
| 2. | Election of Specified Officers by Board | 8 |
| 3. | Election or Appointment of Other Officers | 8 |
| 4. | Salaries | 8 |
| 5. | Term | 8 |
| 6. | President | 8 |
| 7. | Vice Presidents | 9 |
| 8. | Secretary | 9 |
| 9. | Treasurer | 9 |

(i)

<u>INDEX</u>
(cont'd.)

|  |  | Page<br>Number |
|---|---|---|
| ARTICLE FIVE - CERTIFICATE FOR SHARES | | 9 |
| 1. | Issue of Certificates | 9 |
| 2. | Legends for Preferences and Restrictions on Transfer | 10 |
| 3. | Facsimile Signatures | 10 |
| 4. | Lost Certificates | 11 |
| 5. | Transfer of Shares | 11 |
| 6. | Registered Stockholders | 11 |
| ARTICLE SIX - GENERAL PROVISIONS | | 11 |
| 1. | Dividends | 11 |
| 2. | Reserves | 11 |
| 3. | Checks | 12 |
| 4. | Fiscal Year | 12 |
| 5. | Seal | 12 |
| ARTICLE SEVEN - INDEMNIFICATION | | 12 |
| 1. | Indemnification | 12 |
| 2. | Continuation of Indemnity | 13 |
| 3. | Advancement and Repayment of Expenses | 13 |
| 4. | Authorization | 13 |
| 5. | Notification and Defense of Claim | 14 |
| 6. | Nonexclusivity | 15 |
| 7. | Indemnification of Other Expenses | 15 |
| 8. | Length of Effectiveness | 15 |
| ARTICLE EIGHT - AMENDMENT OF BYLAWS | | 15 |

EUROPA CRUISES CORPORATION

## BYLAWS

### ARTICLE ONE

#### OFFICES

Section 1.    Registered Office. The registered office shall be located in the City of Wilmington, County of New Castle, State of Delaware.

Section 2.    Other Offices. The corporation may also have offices at such other places, either within or without the State of Delaware, as the board of directors may from time to time determine or as the business of the corporation may require.

### ARTICLE TWO

#### MEETINGS OF STOCKHOLDERS

Section 1.    Place.    All annual meetings of stockholders shall be held at the offices of the corporation in the City of Pensacola, State of Florida, or at such other place, within or without the State of Delaware, as may be designated by the board of directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.    Special meetings of stockholders may be held at such place, within or without the State of Florida, and at such time as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.    Time of Annual Meeting.    Annual meetings of stockholders shall be held on the date and at the time fixed, from time to time, by the Board of Directors, provided, that there shall be an annual meeting held every calendar year at which the stockholders shall elect a board of directors and transact such other business as may properly be brought before the meeting.

Section 3.    Call of Special Meeting. Special meetings of the stockholders may be called by the president, the board of directors or the holders of not less than a majority of all shares entitled to vote at the meeting.

Section 4.    Notice. Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the day of the meeting, either personally or by mail, by or at the direction of the president, the secretary, or the officer or person calling the meeting, to each stockholder of

record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the stockholders at his address as it appears on the stock transfer books of the corporation, with postage thereon prepaid. If a meeting is adjourned to another time and/or place, and if an announcement of the adjourned time and/or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting unless the directors, after adjournment, fix a new record date for the adjourned meeting. Notice need not be given to any stockholder who submits a written waiver of notice by him before or after the time stated therein. Attendance of a person at a meeting of stockholders shall constitute a waiver of notice of such meeting, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice.

Section 5.   <u>Business of Special Meetings</u>.   Business transacted at any special meeting shall be confined to the purposes stated in the notice thereof.

Section 6.   <u>Quorum</u>.   The holders of a majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at meetings of stockholders except as otherwise provided in the certificate of incorporation. If, however, a quorum shall not be present or represented at any meeting of the stockholders, the stockholders present in person or represented by proxy shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified and called. The stockholders present at a duly organized meeting may continue to transact business notwithstanding the withdrawal of some stockholders prior to adjournment, but in no event shall a quorum consist of the holders of less than one-third (1/3) of the shares entitled to vote and thus represented at such meeting.

Section 7.   <u>Required Vote</u>.   The vote of the holders of a majority of the shares entitled to vote and represented at a meeting at which a quorum is present shall be the act of the stockholders' meeting, unless the vote of a greater number is required by law or the certificate of incorporation.

Section 8.   <u>Voting of Shares</u>.   Each outstanding share, regardless of class, shall be entitled to vote on each matter submitted to a vote at a meeting of stockholders, except to the extent that the voting rights of the shares of any class are

2

limited or denied by the corporation's certificate of incorporation or the Delaware General Corporation Act.

Section 9.     Proxies.  A stockholder may vote in person or by proxy executed in writing by the stockholder or by his duly authorized attorney-in-fact.  No proxy shall be valid after three (3) years from the date of its execution unless otherwise provided in the proxy.  Each proxy shall be revocable unless expressly provided therein to be irrevocable, and unless otherwise made irrevocable by law.

Section 10.     Stockholder List.  The officer or agent having charge of the corporation's stock transfer book shall make, at least ten (10) days before each meeting of stockholders, a complete list of the stockholders entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of, and the number and class and series, if any, of shares held by each.  Such list, for a period of ten (10) days prior to such meeting, shall be subject to inspection by any stockholder at any time during the usual business hours at the place where the meeting is to be held.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any stockholder during the whole time of the meeting.  The original stock transfer books shall be prima facie evidence as to who are the stockholders entitled to examine such list or transfer book or to vote at any such meeting of stockholders.

Section 11.     Action Without Meeting.  Any action required by the statutes to be taken at a meeting of stockholders, or any action which may be taken at a meeting of the stockholders, may be taken without a meeting or notice if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of stockholders, taken at such a meeting.

Section 12.     Closing of Transfer Books and Fixing Record Books.  For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend, or in order to make a determination of stockholders for any other proper purposes, the board of directors may provide that the stock transfer books shall be closed for a stated period not to exceed, in any case, sixty (60) days.  If the stock transfer books shall be closed for the purpose of determining stockholders entitled to notice of or to vote at a meeting of stockholders, such books shall be closed for at least ten (10) days immediately preceding such meeting.  In lieu of closing the stock transfer

3

books, the board of directors may fix in advance a date as the
record date for any such determination of stockholders, such date
in any case to be not more than sixty (60) days, and, in case of
a meeting of stockholders, not less than ten (10) days, prior to
the date on which the particular action requiring such
determination of stockholders is to be taken. If the stock
transfer books are not closed and no record date is fixed for the
determination of stockholders entitled to notice of or to vote at
a meeting of stockholders, or stockholders entitled to receive
payment or a dividend, the date of which the notice of the meeting
is mailed or the date on which the resolutions of the board of
directors declaring such dividend is adopted, as the case may be,
shall be the record date for such determination of stockholders.
When a determination of stockholders entitled to vote at any
meeting of stockholders has been made as provided in this section,
such determination shall apply to any adjournment thereof, except
where the board of directors fixes a new record date or the
determination has been made through the closing of stock transfer
books and the stated period of closing has expired.

## ARTICLE THREE

### DIRECTORS

Section 1.    Number, Election and Term.    The number of
directors of the corporation shall not be less than three (3) nor
more than ten (10), and within that minimum and maximum shall be
such number as shall be from time to time specified by resolution
of the board of directors; provided, however, no director's term
shall be shortened by reason of a resolution reducing the number
of directors. The directors shall be elected at the annual meeting
of the stockholders, except as provided in Section 2 of this
Article, and each director elected shall hold office for the term
for which he is elected and until his successor is elected and
qualified.    Directors need not be residents of the State of
Delaware or stockholders of the corporation.  Any director may be
removed at any time, with or without cause, at a special meeting
of the stockholders called for that purpose.

Section 2.    Vacancies.  A director may resign at any time
by giving written notice to the board of directors or the chair-
man of the board.  Such resignation shall take effect at the date
of receipt of such notice or at any later time specified therein;
and, unless otherwise specified therein, the acceptance of such
resignation shall not be necessary to make it effective.    Any
vacancy occurring in the board of directors may be filled by the
affirmative vote of a majority of the remaining directors though
less than a quorum of the board of directors, or may be filled by
an election at an annual or special meeting of the stockholders
called for that purpose.  A director elected to fill a vacancy
shall be elected for the unexpired term of his predecessor in

4

office, or until the next election of one or more directors by stockholders if the vacancy is caused by an increase in the number of directors.

Section 3.    Powers.    The business and affairs of the corporation shall be managed by its board of directors which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the certificate of incorporation or by these bylaws directed or required to be exercised and done by the stockholders.

Section 4.    Place of Meetings.    Meetings of the board of directors, regular or special, may be held either within or without the State of Delaware.

Section 5.    Annual Meeting.    The first meeting of each newly elected board of directors shall be held, without call or notice, immediately following each annual meeting of stockholders.

Section 6.    Regular Meetings.    Regular meetings of the board of directors may also be held without notice at such time and at such place as shall from time to time be determined by the board of directors.

Section 7.    Special Meetings and Notice.    Special meetings of the board of directors may be called by the president and shall be called by the secretary on the written request of two (2) directors.    Written notice of special meetings of the board of directors shall be given to each director at least twenty-four (24) hours before the meeting.    Except as required by statute, neither the business to be transacted at, nor the purpose of, any regular or special meeting of the board of directors need be specified in the notice or waiver of such meeting.    Notices to directors shall be in writing and delivered personally or mailed to the directors or stockholders at their addresses appearing on the books of the corporation.    Notice by mail shall be deemed to be given at the time when same shall be received.    Notice to directors may also be given by telegram, and shall be deemed delivered when same shall be deposited at a telegraph office for transmission and all appropriate fees therefor have been paid.    Whenever any notice is required to be given to any director, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.    Attendance of a director at a meeting shall constitute a waiver of notice of such meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 8.    Quorum and Required Vote.    A majority of directors shall constitute a quorum for the transaction of business and the act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board

5

of directors, unless a greater number is required by the certificate of incorporation. If a quorum shall not be present at any meeting of the board of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. At such adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting as originally notified and called.

Section 9. <u>Action Without Meeting</u>. Any action required or permitted to be taken at a meeting of the board of directors or committee thereof may be taken without a meeting if a consent in writing, setting forth the action taken, is signed by all of the members of the board of directors or the committee, as the case may be, and such consent shall have the same force and effect as a unanimous vote at a meeting.

Section 10. <u>Telephone Meetings</u>. Directors and committee members may participate in and hold a meeting by means of conference telephone or similar communication equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground the meeting is not lawfully called or convened.

Section 11. <u>Committees</u>. The board of directors may, by resolution passed by a majority of the whole board, designate one or more other committees, each committee to consist of one or more of the directors of the corporation. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

Any such committee, to the extent provided in the resolution of the board of directors, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the certificate of incorporation, (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the board of directors as provided in Section 151(a) fix any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the corporation or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the corporation) adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all

or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, or amending the bylaws of the corporation; and, unless the resolution or the certificate of incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock or to adopt a certificate of ownership and merger. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors. Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

Section 12.   Compensation of Directors.   The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director. No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 13.   Chairman of the Board.   The board of directors may, in its discretion, choose a chairman of the board who shall preside at meetings of the stockholders and of the directors and shall be an ex officio member of all standing committees. The chairman of the board shall have such other powers and shall perform such other duties as shall be designated by the board of directors.   The chairman of the board shall be a member of the board of directors but no other officers of the corporation need be a director.   The chairman of the board shall serve until his successor is chosen and qualified, but he may be removed at any time by the affirmative vote of a majority of the board of directors.

Section 14.   Vice Chairman of the Board.   The board of directors may, at its discretion, choose a vice chairman of the board who shall preside at meetings of the stockholders and directors in the absence of the chairman of the board. The vice chairman of the board shall have such other powers and shall perform such other duties as shall be designated by the board of directors.   The vice chairman of the board shall serve until his successor is chosen and qualified, but he may be removed at any time by the affirmative vote of a majority of the board of directors.

7

## ARTICLE FOUR

### OFFICERS

Section 1.    Positions.  The officers of the corporation shall be chosen by the board of directors and shall be a president, a vice-president, a secretary and a treasurer.  The board of directors may also choose additional vice-presidents, and one or more assistant secretaries and assistant treasurers.  Any number of offices may be held by the same person, unless the certificate of incorporation or these bylaws otherwise provide.

Section 2.    Election of Specified Officers by Board.  The board of directors at its first meeting after each annual meeting of stockholders shall elect a President, one or more Vice Presidents, a Secretary and a Treasurer.

Section 3.    Election or Appointment of Other Officers.  Such other officers and assistant officers and agents as may be deemed necessary may be elected or appointed by the board of directors, or, unless otherwise specified herein, appointed by the president of the corporation.  The board of directors shall be advised of appointments by the president at or before the next scheduled Board meeting.

Section 4.    Salaries.  The salaries of all officers of the corporation to be elected by the board of directors pursuant to Article Four, Section 2 hereof shall be fixed from time to time by the board of directors or pursuant to its discretion.  The salaries of all other elected or appointed officers of the corporation shall be fixed from time to time by the president of the corporation or pursuant to his direction.

Section 5.    Term.  The officers of the corporation shall hold office until their successors are chosen and qualify.  Any officer or agent elected or appointed by the board of directors or the president of the corporation may be removed, with or without cause, by the board of directors whenever in its judgment the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Any officers or agents appointed by the president of the corporation pursuant to Section 3 of this Article Four may also be removed from such officer positions by the president, with or without cause.  Any vacancy occurring in any office of the corporation by death, resignation, removal or otherwise shall be filled by the board of directors, or, in the case of an officer appointed by the president of the corporation, by the president or the board of directors.

Section 6.    President.  The president shall be the chief executive officer of the corporation, shall have general and active management of the business of the corporation and shall see that

8

all orders and resolutions of the board of directors are carried into effect. In the absence of the chairman of the board or in the event the board of directors shall not have designated a chairman of the board, the president shall preside at meetings of the stockholders and the board of directors.

Section 7.    Vice Presidents. The vice presidents in the order of their seniority, unless otherwise determined by the board of directors, shall, in the absence or disability of the president, perform the duties and exercise the powers of the president. They shall perform such other duties and have such other powers as the board of directors shall prescribe or as the president may from time to time delegate.

Section 8.    Secretary. The secretary shall attend all meetings of the board of directors and all meetings of the stockholders and record all the proceedings of the meetings of the corporation of the board of directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. He or she shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors, and shall perform such other duties as may be prescribed by the board of directors or president, under whose supervision he or she shall be. He or she shall keep in safe custody the seal of the corporation and, when authorized by the board of directors, affix the same to any instrument requiring it.

Section 9.    Treasurer. The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all monies and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the board of directors. He or she shall disburse the funds of the corporation as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the president and the board of directors at its regular meetings or when the board of directors so requires an account of all his or her transactions as treasurer and of the financial condition of the corporation.

## ARTICLE FIVE

### CERTIFICATES OF SHARES

Section 1.    Issue of Certificates. The corporation shall deliver certificates representing all shares to which stockholders are entitled; and such certificates shall be signed by the president or a vice president, and the secretary or an assistant secretary of the corporation, and may be sealed with the seal of the corporation or a facsimile thereof. No certificate shall be issued for any share until the consideration therefor has been

fully paid. Each certificate representing shares shall state upon the face thereof, the name of the corporation, that the corporation is organized under the laws of the State of Delaware, and name of the person to whom issued, the number and class and the designation of the series, if any, which such certificate represents, and the par value of each share represented by such certificate.

Section 2.    Legends for Preferences and Restrictions on Transfer.  Every certificate representing shares issued by the corporation shall set forth or fairly summarize upon the face or back of the certificate, or shall state that the corporation will furnish to any stockholder upon request and without charge a full statement of:

(a)  The designation, preferences, limitation and relative rights of the shares of each class or series authorized to be issued.

(b)  The variations in the relative rights and preferences between the shares of each such series, if the corporation is authorized to issue any preferred or special class in series and so far as the same have been fixed and determined.

(c)  The authority of the board of directors to fix and determine the relative rights and preferences of subsequent series.

Every certificate representing shares which are restricted as to the sale, disposition, or the transfer of such shares shall also state that such shares are restricted as to transfer and shall set forth or fairly summarize upon the certificate, or shall state the corporation will furnish to any stockholder upon request and without charge, a full statement of, such restrictions.  If the corporation issues any shares which are not registered under the Securities Act of 1933, as amended, and registered or qualified under the applicable state securities laws, the transfer of any such shares shall be restricted substantially in accordance with the following legend:

"THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY APPLICABLE STATE LAW.  THEY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR PLEDGED WITHOUT (1) REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND ANY APPLICABLE STATE LAW, OR (2) AN OPINION (SATISFACTORY TO THE CORPORATION) OF COUNSEL (SATISFACTORY TO THE CORPORATION) THAT REGISTRATION IS NOT REQUIRED."

Section 3.    Facsimile Signatures.  The signatures of the president or vice president and the secretary or assistant secretary upon a certificate may be facsimiles, if the certificate is manually signed by a transfer agent, or registered by a registrar,

other than the corporation itself or an employee of the corporation. In case any officer who has signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such officer before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer at the date of the issuance.

Section 4.     Lost Certificates.  The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost or destroyed.  When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost or destroyed.

Section 5.     Transfer of Shares.  Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 6.     Registered Stockholders.  The corporation shall be entitled to recognize the exclusive rights of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

## ARTICLE SIX

### GENERAL PROVISIONS

Section 1.     Dividends.  The board of directors may from time to time declare, and the corporation may pay, dividends on its outstanding shares in cash, property, or its own shares pursuant to law and subject to the provisions of the corporation's certificate of incorporation.

Section 2.     Reserves.  The board of directors may by resolution create a reserve or reserves out of earned surplus for

11

any proper purpose or purposes, and may abolish any such reserve in the same manner.

Section 3.     Checks.  All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the board of directors may from time to time designate.

Section 4. December  Fiscal Year.  The fiscal year of the corporation shall end on ~~May~~ 31 of each year unless otherwise fixed by resolution of the board of directors.

Section 5.     Seal.  The corporate seal shall have inscribed thereon the name and state of incorporation of the corporation. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

## ARTICLE SEVEN

### INDEMNIFICATION

Section 1.     Indemnification.  The corporation hereby agrees to hold harmless and indemnify any of its officers, directors, employees or agents from and against and to reimburse such person for, any and all judgments, fines, liabilities, amounts paid in settlement and expenses, including attorneys' fees, incurred directly or indirectly as a result of or in connection with any threatened, pending or completed action, suit or proceeding whether or not such action, suit or proceeding is by or in the right of the corporation to procure a judgment in its favor, including an action, suit or proceeding by or in the right of any other corporation of any type or kind, domestic or foreign, or any partnership, joint venture, trust, employee benefit plan or other enterprise for which such person served in any capacity at the request of the corporation to which such person is, was or at any time becomes a party, or is threatened to be made a party, or as result of or in connection with any appeal therein, by reason of the fact that such person is, was or at any time becomes a director or officer of the corporation or is or was at any time serving or at any time serves such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise in any capacity, whether arising out of any breach of such person's fiduciary duty as a director or officer of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise under any state or federal law or otherwise; provided, however, that (i) indemnification shall be paid pursuant to this Article Seven if and only if such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful; and (ii) no indemnification shall be payable pursuant to

12

this Article Seven if a court having jurisdiction in the matter shall determine that such indemnification is not lawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had reasonable cause to believe that this conduct was unlawful. No indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnify for such expenses which the Court of Chancery or such other court shall deem proper.

Section 2.     Continuation of Indemnity. All agreements and obligations of the corporation contained herein shall continue during the period such person shall serve as a director or officer of the corporation and shall continue thereafter so long as such person shall be subject to any possible claim or threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person was a director or officer of the corporation or served at the request of the corporation in any capacity for any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

Section 3.     Advancement and Repayment of Expenses. Expenses incurred by an officer or director in defending any threatened or pending action, suit or proceeding, whether civil, criminal, administrative or investigative, shall be paid by the corporation in advance of the final disposition thereof, other than those expenses for which such director or officer is not entitled to indemnification pursuant to the proviso to, or the last sentence of, Section 1 of this Article Seven. The corporation shall make such payments upon receipt of (i) a written request made by such person for payment of such expenses, (ii) an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the corporation as authorized herein and (iii) evidence satisfactory to the corporation as to the amount of such expenses.

Section 4.     Authorization. Any indemnification under this Article Seven (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he has met the applicable standard of conduct set forth in Section 1 of this

13

Article Seven. Such determination shall be made (i) by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (ii) if such a quorum is not obtainable, or, even if obtainable, a quorum of disinterested directors so directs, by a written opinion of independent legal counsel, or (iii) by the stockholders of the corporation.

Section 5.    Notification and Defense of Claim. Promptly after receipt by a person seeking indemnification pursuant to this Article Seven of notice of the commencement of any action, suit or proceeding, such person will, if a claim in respect thereof is to be made against the corporation under this Article Seven, notify the corporation of the commencement thereof; but the omission so to notify the corporation will not relieve it from any liability which it may have to such person otherwise than under this Article Seven. With respect to any such action, suit or proceeding as to which such person notifies the corporation of the commencement thereof.

A.    The corporation will be entitled to participate therein at its own expense; and,

B.    Except as otherwise provided below, to the extent that it may wish, the corporation jointly with any other indemnifying party similarly notified will be entitled to assume the defense thereof, with counsel satisfactory to the person to be indemnified. After notice from the corporation to the person to be indemnified of its election so to assume the defense thereof, the corporation will not be liable to such person under this Article Seven for any legal or other expenses subsequently incurred by such person in connection with the defense thereof other than reasonable costs of investigation or as otherwise provided below. The person to be indemnified shall have the right to employ his or her own counsel in such action, suit or proceeding but the fees and expenses of such counsel incurred after notice from the corporation of its assumption of the defense thereof shall be at the expense of such person unless (i) the employment of counsel by such person has been authorized by the corporation in connection with the defense of such action, (ii) such person shall have reasonably concluded that there may be a conflict of interest between the corporation and such person in the conduct of the defense of such action, or (iii) the corporation shall not in fact have employed counsel to assume the defense of such action, in each of which cases the fees and expenses of counsel for such person shall be borne by the corporation (it being understood, however, that the corporation shall not be liable for the expenses of more than one counsel for such person in connection with any action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances). The corporation shall not be entitled to assume the defense of any action, suit or proceeding brought by or on behalf of the corporation or as to

14

which such person shall have made the conclusion provided for in (ii) above.

C.    Anything in this Section to the contrary notwithstanding, the corporation shall not be liable to indemnify any person seeking indemnification under this Article Seven for any amounts paid in settlement of any action or claim effected without its written consent.  The corporation shall not settle any action or claim in any manner which would impose any penalty or limitation on the person to be indemnified without such person's written consent.    Neither the corporation nor any such person will unreasonably withhold their consent to any proposed settlement.

Section 6.    Nonexclusivity.    The  indemnification  and advancement of expenses provided by, or granted pursuant to this Article Seven shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the General Corporation Law of the State of Delaware, the corporation's Certificate of Incorporation, Bylaws, as now in effect or as hereafter amended, any agreement, any vote of stockholders or directors, any applicable law, or otherwise.

Section 7.    Indemnification of Other Expenses.    In the event any person seeking indemnification hereunder is required to bring any action to enforce rights or to collect monies due under this Article Seven and is successful in such action, the Company shall reimburse such person for all costs and expenses, including attorneys' fees, incurred by such person in connection with such action.

Section 8.    Length of Effectiveness.    The indemnification and advancement of expenses provided by or granted pursuant to this Article Seven shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

### ARTICLE EIGHT

### AMENDMENTS OF BYLAWS

These bylaws may be altered, amended or repealed or new bylaws may be adopted at any meeting of the board of directors at which a quorum is present, by the affirmative vote of a majority of the directors present at such meeting (provided notice of the proposed alteration, amendment or repeal is contained in the notice of the meeting), subject to repeal or change at any meeting of the stockholders at which a quorum is present, by the affirmative vote of a majority of the stockholders present at such meeting (provided notice of the proposed alteration, amendment or repeal is contained in the notice of the meeting).

15

# Exhibit F

<u>Gregory Harrison to Robert Skaff, dated March 10, 2015:</u>

Steve Gersten called me and left a message and said – he shouldn't have said this – it was Rob's idea.

Now, I don't know if that's Rob Crow or Rob Skaff.  I just don't know who it is.  Okay, that's my story and I'm sticking to it.

Rob, [laughter] Steve Gersten!—you've gotta be shittin' me.  I sent you the law in Delaware.  It says Deborah gets elected.  Nobody can be nominated at the 9th hour in *any* annual meeting.  You can't walk into the room, "I nominate Abraham Lincoln."  [laughter]

Look, you're a good man and I want you on the Board.  I want you and Sturges [unintelligible].  Assuming it's your idea, and I'll make the assumption it is, why [laughter] would you do this because we want you – Ted and I, and Benny – we want you on the Board with Sturges, so [laughter] I can't even finish.

EFiled:  Mar 16 2015 01:31PM EDT
Transaction ID 56923946
Case No. 10793-CB

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

COLLEGE HEALTH & INVESTMENT, L.P., a Delaware Limited Partnership,

        Plaintiff,

        v.

EDSON R. ARNEAULT, DEBORAH A. VITALE, GREGORY A. HARRISON, MARTIN BLOUNT and BENJAMIN J. HARRELL,

        Defendants.

C. A. No.

### AFFIDAVIT OF ROBERT F. SKAFF, JR.

STATE OF NEW HAMPSHIRE    )
                          ) s.s.
COUNTY OF ROCKINGHAM      )

    I, Robert F. Skaff, Jr., do hereby aver, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

    1.    I am a stockholder of Diamondhead Casino Corporation ("Diamondhead" or the "Company").

    2.    On or about February 19, 2015, I had a telephone conversation with Deborah Vitale ("Vitale"), a director and officer of the Company. She told me

Scanned by CamScanner

that she was happy that College Health & Investment, L.P. filed a lawsuit to compel an annual stockholders' meeting. Vitale also stated that she had discussions with another stockholder about commencing a lawsuit to compel an annual meeting.

3.      Prior to the February 19 phone call with Vitale, I spoke with Gregory Harrison ("Harrison"), a director of the Company, and he informed me that the Company was seeking a stockholder to file a lawsuit to compel an annual meeting. Harrison informed me that the Company asked stockholder Robert Crow to do so and the Company offered to pay his legal fees, but Mr. Crow refused.

4.      On March 5, 2015, I received an email from Harrison. A true and correct copy of the March 5 email is attached hereto as Exhibit A.

5.      On March 9, 2015, Harrison called me and informed me that the Company likely had a proposed charter amendment locked up in advance of the March 25, 2015 annual meeting and did not need any further stockholder support.

6.      On March 9, 2015, Steven Gersten, Robert Sturges and myself were nominated to stand for election at the 2015 annual meeting by another stockholder, Dr. F. Richard Stark.

2

Scanned by CamScanner

7. During the week of March 9, 2015 Harrison called me several times. On March 10, 2015, Harrison left me a voice mail message about my nomination. In the voice mail message, Harrison explained his view of Delaware law and said that we could not be nominated so close to the meeting date. Harrison also stated that he wanted Sturges and I on the Board. A true and correct copy of the voice mail message can be downloaded from the following web link:

https://www.dropbox.com/s/gvqwe38r00xgr51/03-10-15_VoiceMail.mp3?dl=0.

8. On March 12, 2015, I was contacted by Harrison by telephone. During the call, Harrison told me that there is a deal to acquire the Company on the horizon and that the stockholders needed to "settle down." Based on my conversation with Harrison, it is my understanding that the Chairman of the Board, Ted Arneault ("Arneault"), had told the potential acquirer that Diamondhead is not ready to be presented to it and others believe that the acquirer needs to be further along in the financing process before moving forward. I was surprised to hear from Harrison that the deal is so far along, because I had heard something different from Arneault only hours before speaking with Harrison. Harrison emphasized that the deal will happen sooner

3

Scanned by CamScanner

than Arneault is willing to admit and that Arneault asked Harrison to speak to me.

9.     It is my understanding that on or about March 10, 2015, Harrison told another stockholder that if the Company failed to pass the charter amendment increasing the authorized shares it would kill the deal.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Robert F. Skaff, Jr.

Sworn and subscribed before me this _1 6_ day of March, 2015.



Notary Public

My commission expires: _07/28/2015_

4

EFiled:  Mar 16 2015 01:31PM EDT
Transaction ID 56923946
Case No. 10793-CB

# Exhibit A



Robert F Skaff <robskaff@gmail.com>

## VOTING FOR OR WITHHOLDING VOTES IN A PUBLIC CO. ELECTION UNDER DE STATE STATUTES--Plurality Versus Uncontested elections.

**Gregory A Harrison** <gregoryaharrison@aol.com>                    Thu, Mar 5, 2015 at 7:12 PM
To: Gregoryaharrison@aol.com

I think some of you will find this very interesting as a minimum & maybe frustrating too?:

Plurality voting in the election of directors is the default standard in most state corporate statutes, including Delaware's, as well as under the Model Act.  In short, plurality voting means that a director is elected to office by virtue of having received the most votes in his or her election.  **In uncontested elections, a single vote "for" a director theoretically would be sufficient to secure his or her election.  As a result, while withholding authority to vote for the election of a director may be an effective way to communicate dissatisfaction or stockholder unrest, no amount of withheld voters can defeat a director under the plurality standard.**  Under majority voting, however, a director would be required to receive a majority of votes cast in his or her election to be elected to a board, and the failure of a nominee to receive majority support would necessitate some subsequent action by the board.  Accordingly, the rationale most frequently given behind the push for majority voting is to make boards of directors more "accountable" to stockholders.

DHCC annual mtg. involves an uncontested election per se as no other slate of Directors was provided to the Co. in the prescribed time period for Notice.
This does not mean that the Company cannot add additional Directors to the Board of Directors after the Annual Meeting is closed.   We have sufficient empty chairs to do so.

NOTE WELL THAT THE DHCC PROXY CARD CONTAINS NO MECHANISM TO VOTE "AGAINST" A DIRECTOR.  ONE COULD SAY THAT THE DHCC ANNUAL MTG ELECTION PROCESS WILL DEVOLVE INTO A POPULARITY CONTEST.   I PREDICT THAT BENNY HARRELL WILL BE THE WINNER!!  AS

HE WAS IN OTHER ELECTIONS.......MARDI GRA KING!!!