UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 7 |
| DIAMONDHEAD CASINO ) | |
| CORPORATION, ) | Case No. 15-11647 (LSS) |
| ) | |
| Alleged Debtor. ) | |
| ) | |

**MEMORANDUM OPINION[1]**

Before the Court is the *Emergency Motion of Petitioning Creditors for Entry of an Order Directing the Appointment of (I) an Interim Chapter 7 Trustee, or (II) Alternatively, a Chapter 11 Trustee Should the Involuntary Bankruptcy Case be Converted* (the "Emergency Motion")[2] and the *Answering Brief of Alleged Debtor Diamondhead Casino Corporation*[3] ("Diamondhead" or the "Company") in opposition thereto. Because I find that the Petitioning Creditors have not met their burden of proof to show that an interim trustee is necessary in the "gap period" to preserve the property of the estate or to prevent loss to the estate, I will deny the request. [4]

**Procedural Background**

On August 6, 2015, David A. Cohen, Arnold J. Sussman, and F. Richard Stark filed an involuntary chapter 7 petition against Diamondhead. On August 28, 2015, Diamondhead moved to dismiss, or in the alternative convert the case to one under chapter 11 (the "Motion to

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure Rule 7052.

[2] D.I. 11

[3] D.I. 53

[4] I am not ruling on whether the evidence to date merits the appointment of a chapter 11 Trustee. This record was made on an expedited basis, and there were complained of deficiencies in Diamondhead's production of documents. The Petitioning Creditors may submit additional evidence if they so choose with respect to a chapter 11 trustee if and when there is a chapter 11 case. Further, Diamondhead should ensure that neither the Company, nor any of its employees or directors delete or destroy any emails or other documents relevant to this case.

Dismiss").[5]  In the Motion to Dismiss, Diamondhead asserts that the involuntary petition was

filed in bad faith immediately after a contested proxy contest in which the slate advanced by

certain of the Petitioning Creditors did not prevail.  Diamondhead further asserts that the

bankruptcy filing serves no bankruptcy purpose, and that there is a *bona fide* dispute with respect

to the notes held by the Petitioning Creditors.

      While the Motion to Dismiss was pending, on September 11, 15, and 17, respectively,

Robert F. Skaff, David J. Towner, and DDM Holdings, LLC (together with Mr. Cohen, Mr.

Sussman, and Mr. Stark, the "Petitioning Creditors") joined in the involuntary petition.  Also on

September 17, the Petitioning Creditors filed the Emergency Motion seeking the appointment of

an interim trustee.  After a status conference, the parties agreed that the Emergency Motion

would be heard separately from the Motion to Dismiss.

      An evidentiary hearing on the Emergency Motion was held on October 16 and 20, 2015.

The Court heard testimony from six witnesses and admitted, without objection, the documents

that were used during the hearing.  The Court was also asked to take judicial notice of

Diamondhead's filings with the Securities and Exchange Commission, which were submitted in

exhibit binders provided to the Court.  While I will take judicial notice of certain of the SEC

filings, I do so to ascertain their contents and not for the truth of the matters asserted therein,

except where such content has not been disputed by the Petitioning Creditors.[6]

---

[5] *Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary
Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11* [D.I. 4]
[6] *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002)

**Factual Background**

Prior to August of 2000, the alleged debtor, Diamondhead, operated ship-based gambling operations primarily out of ports located in Florida.[7]  In August 2000, Diamondhead divested itself of its ship-based operations and began to focus on the development of a land-based casino resort in Diamondhead, Mississippi.[8]  Since 2000, it has had no operations.[9]  Aside from a small amount of cash, Diamondhead's only tangible asset is 404 acres of undeveloped land off of Interstate 10 in Diamondhead Mississippi (the "Property"), which is owned through a wholly owned subsidiary, Mississippi Gaming Corporation.[10]  Diamondhead acquired the Property in 1993.[11]

The Property is carried at cost on Diamondhead's books.[12]  In 2001, it was carried on the books at $5,073,052.[13]  Currently, the Property is carried on the Company's balance sheet at $5,476,097.[14]  The Mississippi Gaming Commission recently approved 50 acres of the Property for gaming operations.[15]  In early fall 2015, CBRE performed an appraisal of the Property.[16]  It valued the undeveloped 50 acre gaming site at $30.5 million and the remaining undeveloped 350 acres (approximately) at $8.85 million.[17]  In October 2014, CBRE also provided a draft

---

[7] *Private Placement Memorandum for Diamondhead Casino Corporation*, dated February 14, 2014, Alleged Debtor's Ex. I at 2
[8] *Id.*
[9] Interim Trustee Hr'g Tr. 165:18-20, Oct. 16, 2015 ("Interim Trustee Day 1 Tr.")
[10] *Id.* at 165-66
[11] *Id.* at 166
[12] *Id.* at 170
[13] *Id.* at 173
[14] *Id.* at 170-71
[15] *Id.* at 74
[16] *Id.* at 219
[17] *Id.* at 219.  I will accept this valuation for purposes of this hearing as the initial questioning on this topic came from the Petitioning Creditors.

3

appraisal to the Company, valuing annual gaming revenue at $70 million once the Property is developed.[18]

Diamondhead has no operating revenues and expects continued losses for the foreseeable future.[19] As of June 30, 2015, the Company had $163,233 in cash and accounts payable and approximately $3.5 million in accrued expenses.[20] The Company admits that it is in default of obligations owed to the Petitioning Creditors.[21] The Company is also in default of a $1 million line of credit.[22]

Deborah A. Vitale is currently Diamondhead's chief executive officer and a member of its seven member board of directors.[23] She has been with the Company in some capacity since 1992.[24] Ms. Vitale's current base salary is $300,000 per year, but the Company has not paid her in full for many years.[25] For example, in 2010, Ms. Vitale was paid $161,538. For years 2011 through 2014, the Company paid Ms. Vitale $94,466, $0, $0, and $150,000, respectively.[26] This year, Ms. Vitale stopped taking a salary at the end of May because the Company simply did not have the money.[27] Ms. Vitale states that she is Diamondhead's largest creditor based on her accrued salary.[28] Ms. Vitale also owns the townhouse which serves as Diamondhead's corporate office.[29] The Company did not pay rent on the townhouse until April 2014, when Ms. Vitale received $100,000 which she applied to rent for 2012.[30]

---

[18] *Id.* at 208
[19] Interim Trustee Day 1 Tr. 177
[20] *Id.* at 176
[21] *Id.* at 177
[22] *Id.* at 178
[23] *Id.* at 178 166, 230
[24] *Id.* at 230
[25] *Id.* at 179
[26] *Id.* at 245
[27] *Id.* at 245
[28] *Id.* at 237-38
[29] *Id.* at 247
[30] *Id.* at 251

Diamondhead hopes to develop the Property into a destination resort centered around a casino.[31]  However, Diamondhead has never and does not currently have the financial wherewithal to develop the Property.[32]  Instead, it will need to raise funds or find a joint venture partner to attain this goal.[33]  Diamondhead's attempts over the past fifteen years to attract a joint venture partner have all failed.  In addition to the inability to obtain financing to develop the Property, Ms. Vitale testified that multiple external hurdles hampered the development of the Property, including litigation from environmental groups over permitting, waiting for the Army Corps of Engineers to perform an environmental impact survey, Hurricane Katrina, the collapse of the financial markets, and the BP oil spill.[34]

In 2010, the Company completed two rounds of financing.  Diamondhead raised $475,000 in March 2010 and another $475,000 in October 2010.[35]  In exchange, the Company signed promissory notes, with maturity dates two years from issuance and interest at 9%.  The notes are also convertible into equity under certain circumstances.[36]  Each of these notes have matured and the Company has not paid them.

In February 2014, the Company sought to raise $3 million through a Private Placement Memorandum in three $1 million tranches.  As disclosed therein, the funds raised in the first tranche were to be used to pay: (i) closing costs of the issuance, (ii) $100,000 to Ms. Vitale as partial payment of certain amounts owed to her, and (iii) general administrative and operating expenses.  Funds were also to be used to bring the Company's SEC filings into compliance and to prepare and apply for gaming site approval with the Mississippi Gaming Commission.  The

---

[31] *Id.* at 167
[32] *Id.* at 167
[33] *Id.*
[34] *Id.* at 264-68
[35] *Id.* at 268
[36] *Id.* at 268

Private Placement Memorandum stated "[e]ven assuming the Company raised the maximum proceeds available under this Offering, inasmuch as the Company has no operations or revenue, the Company will still be required to seek additional funding in the future."[37]  The Private Placement Memorandum also describes certain "Risk Factors" that should be considered before participating in the offering, including that: (i) the Company is not in compliance with its SEC reporting obligations; (ii) the Company has not held an annual meeting of shareholders since 2007; (iii) the Company has never paid a dividend on its stock; (iv) the market price of the common stock is highly volatile; (v) a small number of existing shareholders hold significant amounts of common stock which could limit participants' ability to influence the outcome of shareholder votes; (vi) the Company is dependent on Ms. Vitale, as its sole employee, who is owed in excess of $1.5 million; (vii) the Company owes Ms. Vitale rent on the Company's office space; and (viii) if the Company does not raise funds in the future, it may be unable to continue to operate.[38]

The debentures issued by the Company pursuant to the Private Placement Memorandum are collateralized by a lien on the Property.  While the Company did raise $3 million, at least $850,000 was returned.[39]  At the same time that the Company collateralized the debentures, it granted Ms. Vitale and certain board members a lien of up to $2 million on the Property to securitize outstanding amounts that those parties allege the Company owed them.[40]  The Land Deed of Trust was recorded with Hancock County on September 26, 2014, less than one year prior to the filing of the involuntary petitions.[41]

---

[37] Alleged Debtor's Ex. I at 20
[38] *Id.* at 11-19
[39] Interim Trustee Day 1 Tr. 277
[40] *Id.* at 178-79
[41] Alleged Debtor's Ex. L

In June of 2015, Mr. Skaff (one of the Petitioning Creditors) was a participant in a group that undertook a consent solicitation to remove and replace the Company's incumbent Board of Directors.[42] The group retained a proxy service firm to solicit votes from a targeted group of 350 accounts.[43] The proposed slate of new directors included Mr. Skaff.[44] The annual meeting of shareholders was held on June 8, 2015.[45] While Mr. Skaff's group obtained 13.5 million votes, the incumbent slate obtained 16 million votes and so the incumbent group prevailed.[46] Mr. Skaff testified to concerns about the propriety of the election, but he did not challenge the results.[47]

The Company has no plans to sell or transfer the Property in the near future.[48] Ms. Vitale is currently working on a short "bridge loan" of a minimum of $1 million, to be used to pay the Company's accountants, and for architectural and engineering drawings.[49] The terms of the loan, including whether it will be secured by the Property, have not been determined.[50]

**The Petitioning Creditors**

Two of the Petitioning Creditors, Messrs. Sussman and Skaff, testified at the hearing. Mr. Sussman was first introduced to Diamondhead 17 years ago.[51] He owns approximately one million shares of Diamondhead stock and previously served on the board.[52] In 2010, he loaned Diamondhead $50,000 as evidenced by that certain Promissory Note with an issue date of November 10, 2010.[53] The note matures two years from the issue date and bears interest at 9%

---

[42] Interim Trustee Day 1 Tr. 144-50
[43] *Id.* at 150
[44] *Id.* at 146
[45] *Id.* at 144
[46] *Id.* at 147
[47] *Id.* at 157
[48] *Id.* at 255
[49] *Id.* at 217, 255-56
[50] *Id.* at 217
[51] *Id.* at 7
[52] *Id.*
[53] Petitioning Creditors' Ex. 246

per annum.[54]    Interest is paid semi-annually and can be paid in cash or common stock.[55]    Under

certain circumstances set forth in the note, either the holder of the note or the company can

convert the unpaid principal balance into common stock.[56]    The note has matured and

Diamondhead has not paid it.[57]    Mr. Sussman testified that he initiated the involuntary

proceeding mainly to obtain a return on his notes.  He also expressed his lack of faith in current

management.[58]

Mr. Skaff first acquired a significant investment in Diamondhead stock in 2008, and

currently owns approximately 1.3 million shares of common stock.[59]    Mr. Skaff also holds two

promissory notes from Diamondhead: one in the principal amount of $37,500 with an issue date

of November 29, 2010, and one in the principal amount of $25,000 with an issue date of June 21,

2011.  These notes mature two years form the issue date, are convertible into stock and bear an

interest rate of 9%.[60]    These notes have matured and Diamondhead has not paid them.  Mr. Skaff

also purchased Diamondhead's collateralized convertible senior debentures issued in 2014; prior

to investing, Mr. Skaff read the Private Placement Memorandum.[61]

**The Law**

An involuntary petition is an "extreme remedy with serious consequences to the alleged

debtor."[62]    As such, a court should not lightly enter an order for relief.  An even more extreme

remedy—the appointment of an interim trustee—is permitted by section 303(g) of the United

---

[54] *Id.*
[55] *Id.*
[56] Petitioning Creditors' Ex. 246 at 2-3
[57] Interim Trustee Day 1 Tr. 8
[58] *Id.* at 15
[59] *Id.* at 116
[60] Petitioning Creditors' Exs. 247, 249
[61] Interim Trustee Day 1 Tr. 150
[62] *In re Forever Green Athletic Fields, Inc.*, 2015 WL 6080665, at *5 (3d Cir. Oct. 16, 2015)

States Bankruptcy Code, "if necessary to preserve the property of the estate or to prevent loss to the estate."[63] An interim trustee takes possession of property of the estate and operates the debtor's business.

There is limited case law applying section 303(g), no doubt because the request for such relief is rare. The case law that does exist counsels that a request for an interim trustee should be denied in "the absence of an exceptionally strong need for doing so"[64] or "where no facts are alleged showing a necessity for the appointment."[65] In order to appoint a trustee, a movant must show "a substantial risk of loss to the estate."[66] Further, in order to avoid the appointment of an interim trustee in an involuntary case that may be dismissed, the court must determine, as a preliminary matter, that there is a reasonable likelihood that an order for relief will be entered.[67]

A.    The Likelihood that an Order for Relief will be Issued

Section 303(b)(1) provides that an involuntary case may be commenced by "three or more entities" each of which holds a claim that "is not contingent as to liability or the subject of a bona fide dispute as to liability or to amount . . . if such claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims . . . ."[68] Further, section 303(h) provides that if a petition is timely controverted, the court shall enter an order for relief only if "the debtor is generally not paying such debtor's debt as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[69] Read

---

[63] 11 U.S.C. § 303(g).
[64] *In re Levin*, 2011 WL 1469004, at *2 (Bankr. S.D. Fla. Apr. 15, 2011) (citing *In re R.S. Grist Co.*, 16 B.R. 872, 873 (Bankr. Fla. 1982))
[65] *Id.* (citing *In re Reed*, 11 B.R. 755, 757 (Bankr. S.D.W. Va. 1981)
[66] *In re Barkats*, 2014 WL 6461884, at *2 (Bankr. D.D.C. Nov. 17, 2014)
[67] *In re The Centre for Management and Technology, Inc.*, 2007 WL 3197221, at *3 (Bankr. D. Md. Oct. 26, 2007) (citing *In re Professionals Accountants Referral Services, Inc.*, 142 B.R. 424 (Bankr. D. Colo. 1992))
[68] 11 U.S.C. § 303(b)(1)
[69] 11 U.S.C. § 303(h)

together, if an involuntary petition filed by three or more petitioning creditors is contested, the

Court must determine whether: (i) the petitioning creditors' claims are not contingent as to

liability or subject to *bona fide* dispute as to liability or amount; (ii) the petitioning creditors'

claims are unsecured or undersecured by at least $15,325; and (iii) the alleged debtor is generally

not paying its debts as they come due, unless such debts are subject to a *bona fide* dispute as to

liability or amount.[70]

For purposes of the determination of whether there is a "reasonable likelihood" that an

order for relief will be entered, it appears, based on the evidence presented to date, that the

requirements of section 303(b)(1) are satisfied.  At the hearing, Diamondhead did not take issue

with the amount of debt owed to the Petitioning Creditors, which, per the involuntary petition

and joinders, aggregates to $394,872.  Even assuming, without deciding, that the portion of the

debt secured by that certain Land Deed of Trust recorded September 26, 2014[71] should not count

toward the aggregate debt owed, the unsecured dollar threshold appears to be met as Mr.

Sussman, who is owed $50,000, is not a beneficiary of the Land Deed of Trust.

I also find for purposes of the Emergency Motion that the debt held by petitioners is not

subject to a *bona fide* dispute.  A *bona fide* dispute exists "if there is a genuine issue of material

fact that bears upon the debtor's liability, or a meritorious contention as to the application of

undisputed facts."[72]  Diamondhead does not challenge the amount of the debt, that it is in default

on the notes issued in 2010, or that the notes were validly issued.  Diamondhead argues, instead,

that a lawsuit pending against it in The Superior Court of the State of Delaware, *College Health*

---

[70] *In re AMC Investors, LLC*, 406 B.R. 478, 483 (Bankr. D. Del. 2009)
[71] Alleged Debtor's Ex. L
[72] *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989) (citing *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1998)); *In re AMC Investors*, LLC, 406 B.R. at 483

& *Investment, L.P. v. Diamondhead Casino Corporation*,[73] establishes a dispute as to whether

the noteholders may be paid in stock or in cash.  While that argument has not been fully briefed

in this proceeding, I am persuaded by Judge Carpenter's Memorandum Opinion issued in

*College Health* on July 2, 2015 in which he ruled, based on the language of the notes and the

Private Placement Memorandum related thereto, that Diamondhead has the ability to convert the

notes to common stock only prior to maturity and/or prior to default.  As Diamondhead states

that the Petitioning Creditors' notes are similar to that at issue in *College Health*, I find, for

purposes of this ruling only, that the notes are not subject to a *bona fide* dispute.

For purposes of determining whether there is a "reasonable likelihood" that an order for

relief will be entered, I find that Diamondhead is generally not paying its debts as they become

due and, thus, the requirements of section 303(h)(1) have also been satisfied.  In addition to not

paying its noteholders as their notes mature, Diamondhead elicited testimony that, in general, it

is not paying Ms. Vitale's salary or the rent for Diamondhead's office space as these debts

become due because Diamondhead has insufficient cash.

The more difficult question to resolve on this preliminary record is whether the

involuntary petition was filed in bad faith.  Diamondhead argues in its motion to dismiss that an

order for relief should not be entered because the Petitioning Creditors filed the involuntary

petition in bad faith in an attempt to gain in the bankruptcy process what it lost on the proxy fight

battlefield.

The Third Circuit recently held that bad faith provides an independent basis for

dismissing an involuntary petition. As enunciated in *Forever Green*: "creditors are presumed to

have acted in good faith.  To dismiss the petition, the debtor must show by a preponderance of

---

[73] *C.A. No. N15C-01-119 WCC*

the evidence that the creditors acted in bad faith."[74]  The standard to use in determining bad faith

is the "totality of the circumstances," a fact intensive review.[75]  To aid in the analysis, the Third

Circuit provided a non-exhaustive list of factors a court may consider in conducting its review,

including whether:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary
> petition was meritorious; the creditors made a reasonable inquiry into the relevant
> facts and pertinent law before filing; there was evidence of preferential payments
> to certain creditors or of dissipation of the debtor's assets; the filing was
> motivated by ill will or a desire to harass; the petitioning creditors used the filing
> to obtain a disproportionate advantage for themselves rather than to protect
> against other creditors doing the same; the filing was used as a tactical advantage
> in pending actions; the filing was used as a substitute for customary debt-
> collection procedures; and the filing had suspicious timing.[76]

The evidence adduced at the hearing on the Emergency Motion, which was not a hearing on the

Motion to Dismiss, reflects that some of the above factors likely favor the Petitioning Creditors

in this analysis and some of them likely favor the alleged debtor.  Further evidence is required to

make even a preliminary decision on the good faith/bad faith issue.  For this reason and because

the Petitioning Creditors are entitled to a presumption that the petition was filed in good faith, I

find that there is a "reasonable likelihood" that an order for relief will be entered.

### B.    The Merits of the Petitioning Creditors' Request for a Trustee

As set forth above, the appointment of an interim trustee in an involuntary case should

only be ordered if "necessary to preserve property of the estate or to prevent loss to the estate."[77]

I find that the Petitioning Creditors have not met their burden to show that the extraordinary

relief of an interim trustee during the gap period is appropriate.

---

[74] *Forever Green*, 2015 WL 6080665, at *5 (internal citations omitted)
[75] *Id.*
[76] *Id.* at *6
[77] 11 U.S.C. § 303(g)

The crux of the Petitioning Creditors' argument is that management has mismanaged the Property by not developing it in the last 15 years. Petitioning Creditors assert in the Emergency Motion that the appointment of an interim trustee is necessary because Diamondhead's management has: "(i) grossly mismanaged the Company by refusing to pay what was due on the Notes, while continuing to enrich themselves and run the Company primarily for their own benefit; (ii) repeatedly acting contrary to the interests of its creditors and shareholders; (iii) mislead investors about the status of the Company to raise additional funds; and (iv) used ESOP shares to entrench management."[78] What is missing from this list is any loss to the estate that will occur prior to the hearing on the Motion to Dismiss, or what property will not be preserved in this "gap period."

At argument, counsel for the Petitioning Creditors stressed the lack of development of the Property, the loss of shareholder value over the years, the mishandling of the ESOP, the Company's balance sheet insolvency, alleged breaches of the duty of loyalty under Delaware law, and misrepresentations made in both the solicitation of funds from investors and in connection with the proxy contest. Assuming, without deciding, the veracity of these allegations, they do not show that a trustee is necessary in the gap period to preserve property of the estate or prevent loss.

First, as the Petitioning Creditors stressed throughout the hearing on the Emergency Motion, Diamondhead is (and has been) a non-operating entity for the past 15 years, with a wholly owned subsidiary that owns real estate. There was no testimony that during the gap period anything different will occur, or that the Property will be sold; Ms. Vitale credibly

---

[78] Emergency Motion, ¶ 38

testified to the contrary.  Indeed, it is difficult on this record to imagine that the Company could negotiate, document and close on any type of deal in the next few months.

Second, as of early fall 2015, the Property was valued at $39 million on an undeveloped basis.  Currently, the Property is subject to liens that secure up to $5 million of outstanding (and future) liabilities to Ms. Vitale and certain directors, as well as liens that secure the obligations on the debentures issued under the 2014 Private Placement Memorandum.  There was no testimony that the equity of the Property will dramatically decline in value over the next few months and that, as a result, the equity cushion will be depleted during the gap period.

Third, while there is a distinct possibility that current cash, which has declined from $163,000 to $70,000 in the first six months of the year, could decline substantially, or to zero, such cash would decline under the auspices of a trustee as he, too, would need to pay any on-going expenses, including attorney fees.

Finally, lack of trust in management or frustration with the lack of progress on the development of the Property, no matter how justified, does not suffice to warrant an interim trustee on the facts of this case.  With respect to the noteholders, particularly those who lent funds under the 2014 Private Placement Memorandum, the continuance of the *status quo* pending a determination on the Motion to Dismiss is consistent with their investment.

Accordingly, the request for an interim trustee will be denied.  An order will follow.


Dated: November _13_, 2015

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE