UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---

In re:                                    )
                                          )
DIAMONDHEAD CASINO                        )
CORPORATION,                              )          Case No. 15-11647-LSS
                                          )
        Alleged Debtor.                   )          Involuntary Chapter  7
                                          )

---

**POST-HEARING OPENING BRIEF OF ALLEGED DEBTOR DIAMONDHEAD
CASINO CORPORATION IN SUPPORT OF ITS MOTION TO DISMISS**

David L. Finger (Delaware Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE  19801-1186
(302) 573-2525
dfinger@delawgroup.com
Counsel for Diamondhead Casino Corporation

Dated:   February 5, 2016

# **TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.     PETITIONERS HAVE NOT ESTABLISHED THAT THEIR CLAIMED DEBT IS
       BONA FIDE AND UNDISPUTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.    THE TOTALITY OF THE CIRCUMSTANCES WARRANTS A FINDING OF BAD
       FAITH AND DISMISSAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       A.     THE ORIGINAL PETITION WAS FILED IN BAD FAITH TO EFFECT A
              CHANGE IN MANAGEMENT WHICH THE STOCKHOLDERS HAD
              REJECTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       B.     THE JOINING PETITIONS WERE ALSO FILED IN BAD FAITH TO EFFECT
              A CHANGE IN MANAGEMENT WHICH THE STOCKHOLDERS HAD
              REJECTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       C.     DDM IS NOT A CREDITOR OF THE COMPANY AND ITS JOINDER WAS
              FILED IN BAD FAITH TO CIRCUMVENT THE AUTOMATIC STAY
              PROVISION IN A STATE COURT CASE. . . . . . . . . . . . . . . . . . . . . . . . 23

              1.     Circumvention of the Automatic Stay. . . . . . . . . . . . . . . . . . . . . . 23

              2.     The Alleged Assignment from College Health to DDM is Not a Valid
                     Assignment Under the Terms of the Promissory Note. . . . . . . . . . . 24

       D.     THE PETITION DOES NOT SERVE A VALID BANKRUPTCY PURPOSE
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       E.     THE BANKRUPTCY COURT IS NOT A COLLECTION AGENCY. . . . . 29

       F.     DIAMONDHEAD IS NOT INSOLVENT. . . . . . . . . . . . . . . . . . . . . . . . . 30

III.   ABSTENTION IS WARRANTED IN THIS CASE UNDER 11 U.S.C. §305(a)(1).31

IV.    IN THE EVENT THE COURT DECLINES TO DISMISS THE INVOLUNTARY CHAPTER 7 PETITION, THE CASE SHOULD BE CONVERTED TO CHAPTER 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

EXHIBIT A -  DESIGNATION OF DEPOSITION EXCERPTS

EXHIBIT B -  ANSWER FILED IN COLLEGE HEALTH & INVESTMENT, L.P. V. DIAMONDHEAD CASINO CORPORATION, DEL. SUPER., C.A. NO. N15C-01-119 WCC

EXHIBIT C - MISSISSIPPI GAMING RULE 1.4

EXHIBIT D - TRANSCRIPT OF HEARING HELD ON JANUARY 15, 2016

# TABLE OF AUTHORITIES

## Cases

*Bloom v. Toliver*, ___ F.Supp.3d ___, 2015 WL 4477321 (N.D. Okla. Sept. 22, 2015).. . . . 15

*Dhayer v. Weirton Steel Div. Of Nat'l Steel Corp.*, 571 F.Supp. 316 (N.D. W. Va. 1983).. . . 4

*Disability Advocates, Inc. v. Paterson*, 653 F.Supp.2d 184 (S.D.N.Y. 2009). . . . . . . . . . . 15

*Griffin v. Township of Clark*, 2011 WL 1546910 (D.N.J. Apr. 21, 2011).. . . . . . . . . . . . . . 12

*In re ABQ-MCB Joint Venture*, 153 B.R. 338 (Bankr. D. N.M. 1993). . . . . . . . . . . . . . . . . 34

*In re Amanat*, 321 B.R. 30 (Bankr. S.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re AMC Investors, LLC*, 406 B.R. 478 (Bankr. D. Del. 2009). . . . . . . . . . . . . . . . . . . . . 17

*In re Beacon Reef Limited Partnership*, 43 B.R. 644 (Bankr. S.D. Fla.1984).. . . . . . . . . . . 34

*In re Century Tile Marble, Inc.*, 152 B.R. 688 (Bankr. S.D. Fla. 1993). . . . . . . . . . . . . . . . 28

*In re Diamondhead Casino Corporation*, 540 B.R. 499 (Bankr. D. Del. 2015). . . . . . 1, 16, 31

*In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413 (E.D. Pa. 2013), *aff'd*, 804 F.3d 328 (3rd Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 26, 27

*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3rd Cir. 2015). . . . . . . . . . . . passim

*In re J.B. Lovell Corp.*, 876 F.2d 896 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Martin*, 167 B.R. 609 (Bankr. D. Or. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Monitor Single Lift I, Ltd.*, 381 B.R. 455 (Bankr. S.D.N.Y. 2008).. . . . . . . . . . . . . . . 31

*In re Morton*, 2015 WL 5731859 (Bankr. E.D. Tenn. Sept. 30, 2015). . . . . . . . . . . . . . . . . . 4

*In re Mountain Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007). . . . . . . . . . . . . 28, 29, 32

*In re Northshore Mainland Services, Inc.*,537 B.R. 192 (Bankr. D. Del. 2015). . . . . . . . . . . 31

*In re Oxford Royal Mushroom Products, Inc.*, 93 B.R. 390 (Bank. E.D. Pa. 1988). . . . . . . . 24

*In re RHTC Liquidating Co.*, 424 B.R. 714 (Bankr. W.D. Pa. 2010). . . . . . . . . . . . . . . . . . 31

*In re Rimell*, 946 F.2d 1363 (8th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Stroop*, 51 B.R. 210 (D. Colo. 1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re TPG Troy, LLC*, 492 B.R. 150  (Bankr. S.D.N.Y. 2015). . . . . . . . . . . . . . . . . . . . . . . 17

*In re Tri-County Fishing Equipment Co., Inc.*, 87 B.R. 667 (D. Kan. 1988). . . . . . . . . . . . 18

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Matter of Investment Corp. of North America*, 39 B.R. 758 (Bankr. S.D. Fla. 1984). . . . . . . 34

*Matter of Win-Sum Sports, Inc.*, 14 B.R. 389 (Bankr. D. Conn.1981). . . . . . . . . . . . . . . . . 34

*Phoenix Marine Enterprises, Inc. v. One (1) Hylas 46' Convertible Sportfisherman Hull No. 1*, 681 F.Supp. 1523 (S.D. Fla. 1988), *aff'd*, 846 F.2d 753 (11th Cir. 1988).. . . . . . . . . . . . . . . 4

*Reves v. Ernst & Young*, 494 U.S. 56 (1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Roemer v. Board of Public Works of Maryland*, 426 U.S. 736 (1976). . . . . . . . . . . . . . . . . 27

*Tompkins v. Cyr*, 202 F.3d 770 (5th Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Authorities

11 U.S.C. §101(32). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

11 U.S.C. §305(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 30

11 U.S.C. § 706(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

17 C.F.R. §230.501(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17 C.F.R. §§230.501(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

F.R.E. 801(d)(2)(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

F.R.E. 801(d)(2)(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

F.R.E. 804(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Bankr. P. 7030. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Bankr. P. 9014(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Civ. P.  30(b)(6).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## NATURE AND STAGE OF THE PROCEEDINGS

On August 6, 2015, F. Richard Stark ("Stark"), Arnold J. Sussman ("Sussman") and A. David Cohen ("Cohen"), filed a pro se Involuntary Petition for relief against Diamondhead Casino Corporation, the Alleged Debtor ("Diamondhead" or "the Company") under Chapter 7 of the U.S. Bankruptcy Code. The three petitioners listed combined claims in the total amount of $150,000 in principal, plus interest due on three separate promissory notes.

On August 28, 2015, the Alleged Debtor filed a Motion to Dismiss the Involuntary Petition or, in the Alternative, to Convert the Case to Chapter 11 (the "Motion to Dismiss").

On September 11, 2015, Robert F. Skaff ("Skaff") filed a Joinder. On September 15, 2015, David J. Towner ("Towner") filed a Joinder. On September 17, 2015, DDM Holdings, LLC ("DDM"), the alleged Assignee of College Health & Investment, LP ("CHI"), filed a Joinder.

On September 18, 2015, over six weeks after filing the original Petition, the petitioners filed an Emergency Motion for Entry of an Order Directing the Appointment of (I) an Interim Chapter 7 Trustee, or (ii) Alternatively, a Chapter 11 Trustee Should the Involuntary Bankruptcy Case Be Converted.  The motion was denied by Opinion and Order dated November 13, 2015. *In re Diamondhead Casino Corporation*, 540 B.R. 499 (Bankr. D. Del. 2015).

The Court held an evidentiary hearing on Diamondhead's Motion to Dismiss on September 15, 2015.  None of the original petitioners or those joining the Petition appeared in court to testify. This is Diamondhead's opening brief in support of its motion to dismiss.

1

## SUMMARY OF ARGUMENT

1.      The petitioners bear the burden of proving that their claims are not subject to a bona fide dispute. They must show that there is no genuine issue of a material fact that bears upon Diamondhead's liability and no meritorious contention as to the application of law to undisputed facts. There has been no trial and no final judgment entered in *College Health & Investment, L.P. v. Diamondhead Casino Corporation* (Delaware Superior Court, C.A. No. N15C-01-119-WCC), with respect to whether Diamondhead can pay the promissory note at issue in that case (and at issue in this case) in common stock of the Company.  Nor has there been any determination as to Diamondhead's affirmative defenses.

2.      The totality of circumstances in this case warrants a finding of bad faith and dismissal.  The petitioners, by their own admission, colluded to file the original petition and the subsequent joinders for the purpose of using this Court to effect a change in management after the stockholders voted against the petitioners at the annual meeting.  There is no legitimate bankruptcy purpose here.  Diamondhead is not insolvent.  There is no evidence of any transfer of assets, let alone a transfer favoring any creditor over any other creditor. There is no evidence of any dissipation of assets.  Bankruptcy in this particular situation would do nothing to maximize the value of the Company's only asset, its Diamondhead, Mississippi property. On the contrary, this bankruptcy could only result in a diminution of the value of that asset, a result that would not be in the best interests of both the creditors and the alleged Debtor. Moreover, the Petitioners are using this Court as a collection agency, although there is a state court available to hear this matter and the petitioners expressly agreed in their promissory notes to the exclusive jurisdiction of a Delaware state court to hear this matter.

2

3.       DDM Holdings, Inc. is not a creditor of the Company and its joinder was filed in

bad faith so as to circumvent the automatic stay in effect in *College Health & Investment, L.P.*

*v. Diamondhead Casino Corporation*. In addition, DDM is not properly joined, inasmuch as the

alleged Assignment under which it claims standing violates the express terms of the promissory

note upon which its joinder rests.

4.       In the alternative, the totality of circumstances demonstrate that this Court should

exercise its discretion to abstain under 11 U.S.C. §305(a)(1).  The petitioners, all friends working

together towards a common goal they failed to achieve at the annual meeting of stockholders,

represent a minority of the creditors and the stockholders. A bankruptcy would only impose

significant, additional, and unnecessary costs on a small, cash-strapped company.   A federal

proceeding simply is not necessary to maximize the value of the assets in this particular case or

to ensure that all creditors are treated equally.

5.       In the event the Court declines to dismiss the Involuntary Chapter 7 Petition, the

case should be converted to a Chapter 11, inasmuch as the alleged Debtor has an absolute right

to convert this case to Chapter 11.

## <u>STATEMENT OF FACTS</u>

This case is the continuation of a hotly contested proxy contest launched in March 2015

by Petitioners Stark and Skaff and others. Stark nominated a slate of eight for election to the

Board of Directors at the Annual Meeting of Stockholders of Diamondhead Casino Corporation

to be held on June 8, 2015.  Stark did not even know most of the people he was nominating.  The

slate included Stark's friend, Skaff, and another man Stark had never met, but who's curriculum

3

vitae he had read. (Tr. I at 144, 146; Stark Dep. 20-21, 28[1]).  Stark discussed the slate with Skaff

before sending a letter to the Company nominating the slate. (Stark Dep. 22). Skaff hired and

paid an organization to send out proxy solicitation materials in support of Stark's slate.  (Tr. 1

at 149-50, 1571; Skaff Dep. 54).

Stark knew Samuel Burstyn, (the General Partner of College Health & Investment, LP

("CHI")), "very well" and has been a friend of Burstyn "for many years." He considers Burstyn

"a close friend." (Stark Dep. at 27-28). He has known the Petitioner Sussman for years and

considers him "a close friend." (Stark Dep. at 47). He considers Skaff a friend. (Stark Dep. at

46).  The Original Petitioners, Stark, Sussman and Cohen Filed their Petition together after

losing the proxy contest to change management

**Stark**

At the time he was seeking to have his slate of directors elected, Stark had no intention

of putting Diamondhead into bankruptcy and did not even discuss doing so with any of his

nominees to the Board. On the contrary, "[t]he intent was to move the Company forward." (Stark

---

[1]

The transcript of the hearing held on October 16, 2015, is cited to herein as "Tr. 1 at
___." The transcript of the hearing held on October 20, 2015, is cited to herein as "Tr. 2 at ___."
The transcript of the hearing held on January 15, 2016 is cited to herein as "Tr. 3 at ___."
Diamondhead's exhibits introduced at the hearing on the motion to dismiss on January 15, 2016
are cited to herein as "DX-___."  The petitioners' exhibits from their motion for appointment of
a trustee are cited to herein as "PX-__."

The Court may take judicial notice of testimony and evidence in its prior proceedings.
*Phoenix Marine Enterprises, Inc. v. One (1) Hylas 46' Convertible Sportfisherman Hull No. 1*,
681 F.Supp. 1523, 1524 (S.D. Fla. 1988), *aff'd*, 846 F.2d 753 (11th Cir. 1988);  *Dhayer v.
Weirton Steel Div. Of Nat'l Steel Corp.*, 571 F.Supp. 316, 318 (N.D. W. Va. 1983); *In re Morton*,
2015 WL 5731859 at *1 (Bankr. E.D. Tenn. Sept. 30, 2015).

Dep. at 29-30). They formulated the idea of putting Diamondhead into bankruptcy only after they

lost the proxy contest. Stark testified as follows:

> Q.   When did you formulate the idea of putting Diamondhead into  bankruptcy?
>
> A.    Subsequent to the meeting [annual meeting] when we saw that it was
> hopeless for this company to move forward with its present leadership and board.
> Q.   Was it your idea alone?
>
> A.   No. It was collectively.
>
> Q.   Who were the members of the collective?
>
> A.   Dr. Sussman, Dr. Cohen, the people that I mentioned previously.

(Stark Dep. at 30-32).

> Q.   So, was your motive for filing the bankruptcy petition to take away control
> from the current management of Diamondhead?
>
> A.   Absolutely.

(Stark Dep. at 20).[2]

 On September 8, 2015, Mr. James Rogers, a stockholder who has no ties to any of the

parties in this case, called Deborah A. Vitale ("Vitale") to get an update on the company's

affairs. He wanted to know "why shareholders in the company would file a Chapter 7 bankruptcy

---

[2]

   Stark was unaware that a Petition for the Appointment of an Emergency Trustee had been
filed in this case on his behalf. He never saw the motion. (Stark Dep. at 37-38). Skaff informed
Stark that as a result of the trial, the Court had appointed an emergency trustee. (Stark Dep. at
38). At the time of his deposition, Stark was still under the impression that this Court had, in
fact, appointed an interim emergency trustee.

   At his deposition on December 29, 2015, Stark testified that he had still not signed a
retainer agreement and that he did not know if he was going to sign a retainer agreement. (Stark
Dep. at 48-49). Stark did not know that two law firms had entered their appearance in the case
on his behalf. (Stark Dep. at 33). Stark testified that he had not selected anyone to be his lawyer
in the case. (Stark Dep. at 34).

filing [in] a company they owned shares in, that it made no sense to him." He "was pretty upset

when he heard that." Vitale told him that "she knew why, but that she would not tell [him] and

that [he would have to call the petitioners] himself and get an answer directly from them." He

asked for and was provided with their phone numbers and he called Mr. Stark. He told Stark who

he was and how he got his number. (Rogers Dep. at 6; Tr. 3 at 41-43).

> Q.  What did you discuss with Mr. Stark about the bankruptcy?

> A. Well, my primary question was, why did you and the other shareholders file this petition for bankruptcy? And I said, I don't understand this. It makes no sense to me. I can't see why any shareholders would ever do such a thing.

> And he said it was to force a change in management.

> And ... I said, well, you know, there was a proxy contest, you know, that did not go through.

> And he said, well, we're desperate, you know, to force a change of management.

> Mr. Cicero: I want to note my objection on hearsay grounds.

> ***

> Q. Mr. Rogers, you used the phrase, force a change in management.  Do you recall whether that was Mr. Stark's exact words?

> Mr. Cicero: Objection.

> A. I remember that being his words. There may be one word off here or there. But he stated this three or four times in our conversation. Because I asked the question over several times throughout the conversation. We talked about a number of other issues also.

(Rogers Dep. at 8-9).[3]

---

[3]

Rogers' testimony itself is not hearsay as he was deposed and subject to cross-examination. F.R.E. 804(b)(1).  Rogers' testimony as to what Stark told him is not hearsay as statements by Stark, an adverse party, are not hearsay. F.R.E. 801(d)(2)(a).

Rogers asked Stark the same question several times and got the same answer every time. Rogers testified that he said to Stark: "you're telling me you were filing this petition to force a change in management?  And [Stark] said, yes, it's the only option left...I asked that question three or four times during the conversation. And I got the same answer every time." (Rogers Dep. at 12).[4]

### Sussman

Sussman supported the dissident group at the annual meeting. (Tr. 1 at 14). He claimed that the "older group" had had the property for 17 years. (This would have been during Sussman's own tenure as a director from July 25, 2002 to October 31, 2005). In connection with the motion to appoint a trustee, Sussman testified that he sought a trustee because he did not approve of the way the Company was being managed. (Sussman Dep. at 20).

---

[4]

Rogers had "no doubt" that a forced liquidation would not be beneficial to the stockholders and he'd had some experience with Chapter 7 bankruptcy sales. "Forced sales of various sorts. Desperation. Well, forced sales due to financial difficulties always result in lower prices." (Rogers Dep. at 21-22). Mr. Cicero asked Rogers about sales conducted by an independent U.S. Trustee. Rogers testified: "It's just a basic principle of large, undeveloped land tracts that you cannot get a good price for the property if it's a forced sale. It's just the way that business works." (Rogers Dep. at 22-23) Finally, in response to Mr. Cicero's question implying that Rogers should be concerned "that in 15 years"..."nothing has been done," Rogers testified as follows:

> A. ..... These types of what I would call commercial or future commercial properties often take many years to come to maturity. And I've always liked to say that you make all your money on the day of the sale or the day of the consummation of whatever deal you're doing. It's not like the value gradually goes up in a straight line. Nothing may happen for 10 or 15 years and then all of a sudden someone comes along and, you know, writes you a big check. That's just the nature of that business.

(Rogers Dep. at 27-28).

The Annual Meeting of Stockholders was held on June 8, 2015.  Mrs. Sussman testified that, shortly after the annual meeting of stockholders, she emailed Ms. Vitale and that Ms. Vitale was kind enough to respond to her email and they talked. Mrs. Sussman "proposed that a couple of members of the losing slate be added to the winning slate." (Tr. 1 at 36). Mrs. Sussman told Ms. Vitale "it would be nice if she could cooperate with the other side to add some people, we think, is going to be great for the company because we looked at their background and they had a great background in gaming and if they put some of those people on the Board so we can move the company forward." (Tr. 1 at 32). "The reason I suggested these people is because of their background, but she [Vitale] didn't want to hear anything about my suggestion." (Tr. 1 at 33).

Thus, the dissident group and its supporters were still actively pressuring Vitale to put members of the dissident slate on the Board of Directors "a few weeks after the annual meeting." On August 6, 2015, just days after Vitale's conversation with Mrs. Sussman, the Petitioners filed their Petition with this Court. (D.I. 1) The Petition was filed following Vitale's refusal to "cooperate" with the dissidents and put members of the dissident slate on the Board of Directors.

## Cohen

Cohen claims he "lost faith in the company" at the annual meeting of stockholders. However, he was not present at the annual meeting because he was out of the country. Cohen discussed the Board of Directors with Stark after the annual meeting "about who was on the board, what is going on. Just general." (Cohen Dep. at 18).  Cohen is not familiar with the bankruptcy process.  Cohen did not come up with the idea to put the Company in bankruptcy.

8

He does not know who did. (Cohen Dep. at 19). He thinks Stark emailed the bankruptcy form

to him.  (Cohen Dep. at 16).[5]

Cohen believes Vitale and Harrison are inept. (Cohen Dep. at 21-22). Cohen filed the

Petition to effect a change in management as the following questions and answers confirm:

Q. Was it your intent in filing the bankruptcy to take away their ability to manage
the company?

Mr. Cicero: Objection to form.

A. I would hope so.

Q. Had they lost the proxy contest at the annual meeting of stockholders, would
you have still wanted to put the company in bankruptcy?

Mr. Cicero: Objection, calls for speculation.

A. I don't know. I don't know the answer to that.

Q. Well, would it make a difference to you?

A. Of course. Why would you want to take anything into bankruptcy if you
believed in it?

Q. ..My question is do you believe in Diamondhead?

A. I believe that the property is worth something. I believe I have invested
hundreds of thousands of dollars over the years. I believe in that. So, therefore,
I believe in what I was told, I believe.

---

[5]

     Cohen admitted he did not discuss the filing of the petition with his lawyer. He discussed it with Mr. Stark. (Cohen Dep. at 23). Cohen testified that he first spoke to Mr. Cicero for the first time the day before his deposition. He does not know how Mr. Cicero was selected as counsel. (Cohen Dep. at 25-26). At the time of his deposition, December 29, 2015, he had not signed a retainer with Mr. Cicero's firm and he did not know what the financial terms were for that firm's representation. (Cohen Dep. at 26-27). Cohen did not read any papers filed with the Bankruptcy Court in connection with the emergency motion for the appointment of a trustee. (Cohen Dep. at 27-28).

Q. Do you believe in the ability of current management to operate the company?

A. No.

Q. And is that lack of belief one of the factors that motivated you to file the bankruptcy petition?

A. Absolutely.

(Cohen Dep. at 22-23).

**Skaff**

Everything was fine between Skaff and Vitale during the lead up to the Henley deal. Skaff "helped [Vitale] put the deal together, every step of the way and then, unfortunately, the minute the money came in....he started calling [her] and pressuring [her] to hire [his] Uncle Claude. Uncle Claude produces musicals." (Tr. III at 36). Skaff was pressuring Vitale to sign a Letter of Intent ("LOI") which would have given Skaff's uncle a potentially lucrative contract granting him "exclusive negotiating authority over all entertainment on the property. This was payback." (Tr. III at 36). Vitale tried to explain that Skaff was putting the cart before the horse and the Company could not give his uncle this kind of authority and this kind of power because if somebody came into the deal, they might want control of the entertainment and "you've given it away for nothing."  Skaff "got mad at [Vitale]. He thought she owed it to him to get this through the Board." After she turned down the Uncle Claude LOI, then Skaff sent two requests to be on the Board. The last came on January 9, 2015, but the Board decided not to put him on the Board. Then, came the proxy contest in which he "went around telling people things that were false. The proxy materials were false, misleading, ridiculous and things like that." (Tr. 3 at 36-38).

10

Skaff has been described by counsel for the Petitioners as the Petitioners' "quarterback." (Tr. 3 at 24). Skaff was intimately involved in the proxy contest as a nominee to the Board, proxy solicitor and otherwise. Skaff testified that, prior to the proxy contest, he tried to get the Board to accept a proposal to change the Board to "2 plus 2 plus Ted [Arneault]" and that would be the new Board that should be seeking election", but that his proposal was "shot down." (Tr. 1 at 143). The two from his side would be Mr. Sturgis and himself.  Skaff admits that he "participate[d] in a proxy solicitation in connection with [the 2015] annual meeting; that he "participate[d] in sending out a proxy statement"; and that he "did attempt to influence stockholders to return proxy cards in favor of the proposed slate of directors that [he] was supporting." (Skaff Dep. at 24). Skaff testified that "we put up a team of eight that would have potentially displaced one or all [of the Board], depending on the election results"; that he hired Broadridge to do a targeted mailer to 350 accounts (Tr. 1 at 150); and that the dissident slate's proxy materials were posted on the Internet. (Tr. 1 at 163). He spent $25,000 between the proxy contest and having a lawyer at the annual meeting. (Tr. 1 at 157). Skaff admits he voted against or to withhold on the proposal to increase the authorized shares of common stock of the company, both of which had the same effect. (Tr. 1 at 150).  As Skaff knew, that increase was necessary to be entitled to the next tranche of funds under the Devlin deal.

Skaff admits that after losing the proxy contest, he and the losing slate were still pressuring the Company to put their nominees on the Board. They had an attorney write to the Company to place their nominee, Ronald Stone, as the 8th person on the Board "because with his background and benefits [employee benefits], and things like that, he could probably be

11

helpful in the ESOP and other things." The Company did not respond.  (Skaff Dep. 147-48; Tr. 1 at 148).

Skaff continued his attack on the Company. He told Stark "[t]hat as a result of the trial [hearing in this matter] the court appointed a trustee, emergency trustee." (Stark Dep. at 38). Skaff told Henley, which had cut a deal with the Company to raise $3 million to sell Debentures, of his intent to "sue, sue, sue and bankrupt the company." (Tr. 3 at 36-37).   On or about January 13, 2016, just days before this Court's hearing on the alleged debtor's motion to dismiss, which was held on January 15, 2016, Skaff spoke to a major stockholder, Carl Stevens, a former director of the company.   Skaff was ranting about the lawsuits that were coming against the directors and boasting about how he had funded the proxy contest and the bankruptcy and how much money he had spent on litigation so far ($65,000) and vowed that "this is not over." (Tr. 3 at 32-36).[6]

**Towner**

David J. Towner ("Towner") is a friend of Skaff and does some bookkeeping for Skaff's company in New Hampshire. (Towner Dep. at 30).   Towner is a convicted felon who pleaded

---

[6]

Petitioners objected to this testimony as hearsay.  Vitale's testimony about what Skaff said to Mr. Stevens and Mr. Devlin said is not hearsay.  Skaff's statements are admissible non-hearsay as he is an adverse party. F.R.E. 801(d)(2)(a).  Mr. Stevens' and Mr. Devlin's statements are admissible as they were not offered for the truth of their contents but rather to show that Skaff made statements to others showing Skaff's state of mind evidencing hostility to management, which is evidence of Skaff's ill will.  *See Griffin v. Township of Clark*, 2011 WL 1546910 at *4 (D.N.J. Apr. 21, 2011) ("[w]hile, as Defendant argues, Plaintiff's statements regarding his conversations with Lt. Adamonis may not be admissible for the truth of the matter they assert, *see* Fed. R. Evid. 801(c), they would be admissible as non-hearsay evidence that such statements were in fact made").

guilty to accepting bribes as a bank official. (Towner Dep. at 30).  He has also been barred by the SEC from being an investment adviser.

Skaff solicited Towner to join the Petition. Towner knows little about these proceedings. Towner testified that he filed a joinder when he "found out that the education company had filed that petition." (Towner Dep. at 22).  Skaff asked Towner if he "wanted to join in." (Towner Dep. at 22-23).  Towner thought "it's better if you are joining in with a large organization like the health organization...College Health Investment." (Towner Dep. at 24). Towner "thought it was College Health that originally filed [the Petition to put Diamondhead in bankruptcy]." (Towner Dep. at 32).  He said he would be surprised if College Health was not one of the original petitioners. (Towner Dep. at 33).

Towner is under the impression, for some reason, that CHI is a "large...health organization." In fact, it is merely a vehicle for Mr. Burstyn to invest for his children. (Tr. 1 at 39). Towner never saw the motion to appoint a trustee before it was filed and, as of December, 29, 2015, the date of his deposition, he had no idea what the result of that motion was. (Towner Dep. at 22-23, 27-30). He testified that Skaff was his "sole source of information about the bankruptcy apart from lawyers." (Towner Dep. at 33).  Before he was approached by Skaff he had not given any thought to forcing Diamondhead into bankruptcy. (Towner Dep. at 25). When asked why he joined in the bankruptcy, Towner made it clear he wanted a change in management. The following exchange underscores the point:

Q. You joined in a petition to place Diamondhead in bankruptcy, correct?

A. Yes.

Q. Why?

13

A. I don't see any progress with the company.

Q. And what progress would you expect to see from bankruptcy?

A. I would expect that someone else could do a better job with a very valuable asset, the real estate located at Diamondhead.

Q. By better job do you mean develop --

A. Development.

Q. Was it your goal in joining in this petition for bankruptcy to effect a change of management to somebody who would do a better job?

Mr. Cicero: Objection to form.

Q. You can answer the question.

A. I'll answer the question. It wasn't necessarily management, but someone else to get in there and do something.

Q. And by "something" you mean development, correct?

A. Develop the land into -- build a casino. They had site approval.

(Towner Dep. at 19-20).

Towner admitted he didn't have experience in bankruptcy proceedings. (Towner Dep at 22). He testified that he did not hire a lawyer to assist him in filing the joinder.  (Towner Dep. at 25-26). He signed an agreement to pay a fee his lawyer based on a percentage of collection. He did not select the lawyer and thinks the lawyer represents College Health. Towner had not contacted the lawyers before receiving papers from them. (Towner Dep. at 26-28).  Towner did not review the motion for the appointment of a temporary trustee before it was filed. (Towner Dep. at 29).  He found out about the emergency motion after it was filed. (Towner Dep. at 29). He did not know the result of the motion. (Towner Dep. at 29-30).

14

**DDM Holdings, LLC**

DDM Holdings, LLC ("DDM"), is an entity which was formed on September 11, 2015,

just six days before its joinder was filed in this case. It is the alleged assignee of College Health

and Investments, Ltd. ("CHI"), whose General Partner, Samuel I. Burstyn, testified against the

Company in this case on October 16, 2015. While CHI is a creditor of the Company and has sued

in state court to collect on a promissory note, DDM is not.

Burstyn, the General Partner of CHI, and a permanently disbarred, twice convicted felon,

testified on behalf of Petitioners. However, CHI is not a Petitioner in this case. CHI loaned a

total of $252,500 to the Company over a four-year period of time on three separate occasions,

and pursuant to three separate private placements. CHI requested and received a copy of the

Company's Stockholder Lists from the Company, including the Non-Objecting Beneficial

Ownership List, which were used by Stark, Skaff and the other dissidents to solicit stockholder

votes in a proxy contest.

Burstyn repeatedly disparaged management, including Vitale, not only in her capacity as

the President and CEO of the Company, but also personally and professionally (*i.e.*, "she's a

personal injury lawyer that drafts moonlights doing securities filings..."). (Tr. 1 at 75). There

seemed to be no limit to Mr. Burstyn's animus for Ms. Vitale. ("She is a piece of crap, dishonest,

nut..."). (Tr. 1 at 80).[7]  It bordered on the extreme, but plainly fell within the ambit of ill will or

---

[7]
      Mr. Burstyn has threatened to sue Diamondhead repeatedly in the past. (Tr. 3 at 40-41).
Petitioners objected to Vitale's testimony about these threats.  However, threats are deemed
"verbal acts" which are not hearsay. *Tompkins v. Cyr*, 202 F.3d 770, 779 n. 3 (5th Cir.2000)
(stating that a threatening letter was a verbal act, and not a "statement" for purposes of the
hearsay rule); *Bloom v. Toliver*, ___ F.Supp.3d ___, 2015 WL 4477321 at *15 n.9 (N.D. Okla.
(continued...)

spite.   The same attorneys who represent the Petitioners in this case also represent CHI, which

has already filed three lawsuits in Delaware state court, including two against the Company, and

one against its Directors.

**The Creditor/Stockholders**

The following chart sets forth the number of shares of common stock owned by each of

the five Petitioners who are also stockholders of the Company. DDM owns no stock in the

Company.  The five petitioners own approximately 3,378,414 (based on their testimony[8]).  There

were 39,052,472 shares outstanding as of December 31, 2015.

| Petitioner | Principal  Due Under Note | Interest Due as of December 31,2015 | Total Due | Shares   of Common Stock Owned |
|---|---|---|---|---|
| Stark | 50,000 | 21,025 | **$ 71,025** | 500,000 |
| Sussman | 50,000 | 15,768 | **65,768** | 960,000 |
| Cohen | 50,000 | 21,025 | **71,075** | 400,000 |
| | | | | |
| Skaff | 62,500 | 19,711 | **82,211** | 1,300,000 |
| Towner | 25,000 | 7,884 | **32,884** | 218,414 (with family) |
| **Total** | **$237,500** | **$ 85,413** | **$322,913** | **3,378,414** |

---

[7](...continued)
Sept. 22, 2015); *Disability Advocates, Inc. v. Paterson*,  653 F.Supp.2d 184, 202 n. 81 (S.D.N.Y. 2009).

[8]

Stark estimates that he owns perhaps a half million shares of common stock. His son and fiancee have some, too. (Stark Dep. at 6). Sussman testified that he owns 960,000 shares of common stock and has investments with other companies, also. (Sussman Dep. at 6) Cohen had approximately 400,000 shares at the time the Petition was filed. He sold 200,000 two weeks before his deposition taken on December 29, 2015, to get a tax loss. (Cohen Dep. at 7-8). Skaff owns around 1.3 million shares. (Tr. 1 at 116). Towner owns 53,414 shares; Towner's wife owns 60,000 shares; his oldest son owns 103,000 shares; and his youngest son owns 2,000 shares of common stock in the Company, for a combined total of 218,414 shares of common stock.  Mr. Towner most recently purchased stock in 2014 to average down. (Towner Dep. at 10).

**Property Value**

CB Richard Ellis, a recognized expert in land appraisal in the casino industry, appraised the Company's Diamondhead, Mississippi casino site. They appraised the 50 acres which were site approved for a casino by the Mississippi Gaming Commission on August 21, 2014, at $30.5 million. They appraised the surrounding, approximate 350 acres at $8.850 million, for total appraised value of $39.350 million. *In re: Diamondhead Casino Corporation*, 540 B.R. at 502. (*See also* Tr. 2 at 27-28). Ms. Vitale testified that the Company's total debt, as of December 31, 2015, is approximately $7.65 million. She made it clear that this is actual debt, not the amount that would be recorded as "liabilities" on the Company's Form 10-K or Form 10-Q, which would be higher due to accounting methods. (Tr. 3 at 28-32).

## ARGUMENT

## I. PETITIONERS HAVE NOT ESTABLISHED THAT THEIR CLAIMED DEBT IS BONA FIDE AND UNDISPUTED.

In its Motion to Dismiss, Diamondhead argued that the petitioners have not established that their claimed debt is bona fide and undisputed. The petitioners bear the burden of proving that their claims are not subject to a bona fide dispute. They must show that there is no genuine issue of a material fact that bears upon Diamondhead's liability, and no meritorious contention as to the application of law to undisputed facts. Under this standard, the Court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of a debt. The Court's objective is to ascertain the existence of a dispute, not to actually resolve the dispute. *In re AMC Investors, LLC*, 406 B.R. 478, 483-84 (Bankr. D. Del. 2009); *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir.1991). The purpose of this requirement is to disqualify a creditor

whenever there is "any legitimate basis" for the debtor not paying the debt, whether that basis is factual or legal. A debtor should not be forced to pay a legitimately disputed debt or be pressured to pay that debt by the commencement of an involuntary bankruptcy case. *In re TPG Troy, LLC*, 492 B.R. 150, 159  (Bankr. S.D.N.Y. 2015).

Inasmuch as Petitioners bear the burden of proof on this issue, the Debtor will await Petitioners' brief on the matter before fully responding. The Court may take judicial notice that after its Motion to Dismiss was denied in *College Health & Investment, L.P. v. Diamondhead Casino Corporation*, the Company filed an Answer and Grounds of Defense, attached hereto as Ex. A[9], in which it raised material defenses (several of which are applicable to all note holders, including those in this action). These defenses must be considered in deciding where there is a legitimate dispute*. In re TPLG Troy, LLC*, 492 B.R. at 159; *In re Stroop*, 51 B.R. 210, 212 (D. Colo. 1985); *In re Tri-County Fishing Equipment Co., Inc*., 87 B.R. 667, 671 (D. Kan. 1988) ("colorable defenses" establish that claim is disputed).

In addition, as will be seen below, the Joining Petitioner, DDM, is not eligible to file a Petition, inasmuch as the alleged Assignment, upon which its Petition is based, is plainly subject to a bona fide dispute as to validity.

## II.    THE TOTALITY OF THE CIRCUMSTANCES WARRANTS A FINDING OF BAD FAITH AND DISMISSAL.

An involuntary bankruptcy petition filed in bad faith is subject to dismissal.  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334-35 (3rd Cir. 2015).  The burden is on the alleged debtor to prove bad faith by a preponderance of the evidence.  *Id*. at 335.

---

[9]

The Court may take judicial notice of the Answer. *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir.1998).

18

In determining bad faith, the Court looks at the totality of the circumstances. *Id*. As the

Third Circuit has said:

> In conducting this fact-intensive review, courts may consider a number of factors,
> including, but not limited to, whether: the creditors satisfied the statutory criteria
> for filing the petition; the involuntary petition was meritorious; the creditors
> made a reasonable inquiry into the relevant facts and pertinent law before filing;
> there was evidence of preferential payments to certain creditors or of dissipation
> of the debtor's assets; the filing was motivated by ill will or a desire to harass; the
> petitioning creditors used the filing to obtain a disproportionate advantage for
> themselves rather than to protect against other creditors doing the same; the filing
> was used as a tactical advantage in pending actions; the filing was used as a
> substitute for customary debt-collection procedures; and the filing had suspicious
> timing.

*Id*. at 336.

While the bankruptcy code does not define "bad faith," courts have found bad faith in

cases where a creditor hoped to shut down the debtor's business, hoped to force the debtor into

some type of negotiation, wanted to take over control of the corporation itself, or the creditor

wanted to gain settlement leverage over the debtor. The fact that a creditor may hold a bona fide

claim does not preclude that creditor from acting in bad faith. *In re Forever Green Athletic*

*Fields, Inc.*, 500 B.R. 413, 429 (E.D. Pa. 2013), *aff'd*, 804 F.3d 328, 334-35 (3rd Cir. 2015).

As demonstrated below, the totality of the circumstances warrants a finding of bad faith.

## A.    THE ORIGINAL PETITION WAS FILED IN BAD FAITH TO EFFECT A CHANGE IN MANAGEMENT WHICH THE STOCKHOLDERS HAD REJECTED.

On June 8, 2015, three thousand stockholders of Diamondhead Casino Corporation voted

in favor of the management slate and against the Petitioners' dissident slate of nominees to the

Board of Directors following a full blown proxy contest. The proxy contest should have ended

when the Inspector of Elections counted the votes. However, the Petitioners refuse to accept the decision of the stockholders of the Company and have pressured the Company since losing to put their nominees on the Board of Directors.

As late as August 1, 2015, the Sussmans were still pressuring Vitale to put their nominees on the Board. However, on August 1, 2015, Vitale made it crystal clear that she was not going to "cooperate" by putting members of the dissident slate on the Board of Directors. Five days later, on August 6, 2015, this Petition was filed. The timing of the filing, coming just days after Vitale's refusal, is telling.

The threshold question to be decided in this case is whether five stockholders of a publicly-traded company, who lost a proxy contest less than two months prior to filing an Involuntary Chapter 7 Petition to oust management, should be permitted to use the Bankruptcy Court to do so.

The testimony of the three original Petitioners, Stark, Sussman and Cohen, in and of itself, provides overwhelming evidence that the Petition was filed to remove current management. The added testimony of Mr. Rogers leaves no doubt as to the true purpose of the filing, namely, "to force a change in management." Indeed, all three original Petitioners joined in filing one hand-written document pro se without even consulting with an attorney. Therefore, the Petitioners could hardly have made a reasonable inquiry into the relevant facts and pertinent law before the filing. These accredited investors, despite their combined wealth, did not even take the time to retain a bankruptcy attorney and, instead, in their haste to punish the Company and exact revenge, they filed a hand printed Petition in this Court.

20

The Petition was filed in bad faith.  It was filed five days after the Company made it clear that it would not place the Petitioners' nominees on its Board of Directors.  It was filed in retaliation for the Petitioners' loss at the ballot box and the Company's refusal to put the Petitioners' nominees on the Board of Directors.  The timing of the Petition is such that there can be no doubt as to the Petitioners' motivation. The Petitioners knew that the filing of this Petition would have severe ramifications for the Company, which was still trying to recover from the damage caused by the false and misleading materials disseminated by Petitioners Stark, Skaff and others during the proxy contest.

The Petitioners simply want a change in management. They want this Court to oust current management and replace the current Board with a Trustee. They want the change in management that they could not get from the stockholders less than two months before filing this Petition. This is the epitome of bad faith.

> ### B.    THE JOINING PETITIONS WERE ALSO FILED IN BAD FAITH TO EFFECT A CHANGE IN MANAGEMENT WHICH THE STOCKHOLDERS HAD REJECTED.

The majority rule is that once a petition is deemed to have been filed in bad faith, such bad faith cannot be cured by the fact that, while the motion to dismiss was pending, other petitioners joined in the petition.  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 337-38 & n.7.  In that case, the Third Circuit noted that it did not have to decide whether the majority rule applies in this Circuit.  *Id.* at 339.  However, even assuming, *arguendo*, that  this  Court were to disregard the majority "bar to joinder" rule, the joining petitioners in this case also filed their Petitions in bad faith and, therefore, could not cure the prior bad faith filing. In addition,

21

DDM is not a creditor of the Company, has no standing to even file a Petition and did so knowingly and in bad faith.

There are three joining Petitioners (Skaff, Towner and DDM). However, as shown below, DDM is not a valid creditor of the Company. The factual evidence confirms that they, too, combined to join in the petition, for the purpose of changing management. The facts clearly establish that the Petitioner Skaff was intimately involved in the proxy contest to oust current management and install a new Board of Directors, including himself. The facts further establish that Skaff is the "quarterback" behind the Petitions and this bankruptcy action. Indeed, he boasts he has paid for both the proxy contest and the bankruptcy (although some Petitioners testified that they are paying the lawyers 1/3 of any recovery).

Skaff and Stark orchestrated a proxy contest to get control of the Board of Directors. When that failed, they tried to pressure the Company to put their nominees on the Board. When that failed, they orchestrated this bankruptcy filing. Of course, it is not over. Skaff has made it clear that even more lawsuits are coming. This is a man on a mission to destroy management at any cost whatsoever.

Towner works for Skaff, and is only involved in this proceeding because his friend and employer solicited his joinder. Towner had no intention of putting the Company into bankruptcy until Skaff solicited his joinder. Towner, like other Note holders, was perfectly content to accrue interest on his Note in common stock until Skaff needed him to file a Joinder in this case.

### C.   DDM IS NOT A CREDITOR OF THE COMPANY AND ITS JOINDER WAS FILED IN BAD FAITH TO CIRCUMVENT THE AUTOMATIC STAY PROVISION IN A STATE COURT CASE.

On March 25, 2010, the Company issued a promissory note to College, Health and Investments, Ltd. ("CHI") in the principle amount of $150,000 with interest payable at 12% per annum, and with a maturity date of March 25, 2012.  On January 15, 2015, CHI filed suit for breach of the promissory note. On January 22, 2015, the Company forwarded a Notice of Conversion to CHI, exercising the Borrower's right to convert the principal and any interest due on the Note into common stock. On February 11, 2015, the Company moved to dismiss the complaint as moot. CHI filed an opposition to the motion to dismiss alleging that the Note was convertible only prior to its maturity date. On July 2, 2015, the Delaware Court agreed with the Plaintiff and denied the Company's motion to dismiss. On July 16, 2015, the Company filed an Answer and Grounds of Defense. However, on August 6, 2015, before the matter could be tried, the Petitioners filed this bankruptcy action.   On August 18, 2015, the Company filed a Suggestion of Bankruptcy and Automatic Stay in the Delaware case.

#### 1.   Circumvention of the Automatic Stay.

On September 15, 2015, DDM filed a Joinder in this case. Therefore, we now have a single promissory note which is the subject of two separate court actions filed by two separate entities, both claiming the right to collect on the note. One case is pending in a Delaware State court. The other case is pending in this Court. The State court case is subject to an automatic stay. Now, in circumvention of that automatic stay, CHI, whose General Partner is Samuel Burstyn, has devised a scheme to avoid the automatic stay. CHI has attempted to assign the promissory note to a third party so that the third party can file a Joinder in this case.

23

CHI should not be permitted to circumvent a stay by simply assigning its right to sue on the promissory note to a third party. If that were permitted, a stay could be readily circumvented in numerous cases by merely assigning a right to sue to a third party. This Court should not condone such a flagrant and obvious circumvention of the automatic stay provision.

> **2.      The Alleged Assignment from College Health to DDM is Not a Valid Assignment Under the Terms of the Promissory Note.**

DDM Holdings, LLC ("DDM") is not even a promissory note holder inasmuch as the alleged assignment from College Health to DDM is invalid. Thus, DDM is not a creditor of the Company and has no standing to file a Joinder in this matter.

The Company issued a promissory note to CHI. Section 4.3 of the Note is titled "Assignability." It provides as follows:

> This Note shall be binding upon the Borrower and its successors and assigns and shall inure to the benefit of the Holder and its successors in interest.  This Note may not be assigned by the Holder without the prior written consent of the Company, except to an Affiliate of Holder that is an "accredited investor" as such term is defined in Regulation D under the Securities Act of 1933.

(DX-8 at ¶4.3, emphasis added).

The Court may take judicial notice that DDM filed its Articles of Organization with the State of Florida on September 11, 2015. The alleged Assignment from CHI to DDM is dated six days later, September 17, 2015, the same date on which the Joinder was filed in this Court. Thus, DDM was in business, at most, five days prior to the date of the Assignment and the filing of the Joinder. The sole purpose of the assignment was to enable the filing of the Joinder in this action.

For the assignment to even be valid, DDM must establish that: (i) it is "an Affiliate of [the] Holder [CHI]"; and (ii) that it is an "accredited investor" as such terms are is defined in

Regulation D under the Securities Act of 1933. 17 C.F.R. §§230.501(a), 230.501(b).[10]    DDM

bears the burden of proving that it is a bona fide assignee. *In re Oxford Royal Mushroom*

*Products, Inc.*, 93 B.R. 390, 394 (Bank. E.D. Pa. 1988); *In re Martin*, 167 B.R. 609, 616 (Bankr.

D. Or. 1994).

There is no evidence that DDM was an "affiliate" of CHI. The evidence is to the contrary.

There is no evidence that DDM's sole two members were "accredited investors" as such term

is defined in Regulation D under the Securities Act of 1933, on the date of the assignment. DDM

neither sought nor received the prior written consent of the Company to assign the promissory

note.  Thus, there is simply no evidence upon which a Court could conclude that the assignment

of the promissory note is valid.

On January 9, 2016, the Company took the deposition, pursuant to Fed. R. Civ. P.

30(b)(6), incorporated by Fed. R. Bankr. P. 7030 and 9014(d), of Jason Geller, Esquire

("Geller"), the Manager and Registered Agent for DDM. Geller has been in practice

approximately six years. He shares an office address with Mr. Burstyn and other entities at 701

Brickell Ave, 24th Floor Suite 2450, Miami, Fl 33131. He and his family have known Burstyn

and Burstyn's family for decades. Burstyn is his friend and a client. (DDM Dep. at 8). He has

also represented CHI. (DDM Dep. at 9-10).

Geller testified that he made "no effort on or about the time of signing the [assignment]

on behalf of DDM to determine whether the assignment satisfied the requirements of Section 4.3

of the promissory note. (DDM Dep. at 39). He testified that DDM did not contend it was an

---

[10]

    The promissory notes, issued by a public company trading at the time of issuance, are
subject to federal securities regulation. *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

affiliate of CHI. (DDM Dep. at 35). He testified that he "would not consider [DDM] an affiliate." (DDM Dep. at 36).  Insofar as an "accredited investor" was concerned, Geller had "no idea" of the net worth of Alana Burstyn or Ava Burstyn. (DDM Dep. at 41).  He thought that whether an investor was an accredited investor was a legal conclusion and would be something counsel would answer. He said: "[e]ven though I'm an attorney, something of that nature would be sent to an attorney and reviewed and opined on." (DDM Dep. at 42). Obviously, Geller did not know what an accredited investor was. Geller is not a securities lawyer and did not recall consulting with one before signing the Assignment. (DDM Dep. at 42). Geller had had no understanding of the securities terms involved or the serious securities issues involved with respect to the Assignment.

Geller testified that he did not know who drafted the Assignment and that he did not negotiate any terms in the Assignment. (DDM Dep. at 43-44). He testified that Ava Burstyn and Alana Burstyn, Burstyn's two daughters, were the only members of DDM. (DDM Dep. at 16-17). He was not aware of any DDM employees (DDM Dep. at 17), and was not aware of any assets of DDM, other than the alleged assignment (DDM Dep. at 18).  He was not aware of any income generated by DDM in 2015 (DDM Dep. at 19). He had no reason to believe DDM owned any stock in Diamondhead. (DDM Dep. at 50).

Geller testified that "[r]ight now, DDM's primary purpose is to collect on its claims. (DDM Dep. at 15). Thus, the very purpose of the assignment was to transfer to DDM the ability to collect on a promissory note, when that very collection action on that very note had been stayed under and pursuant to the automatic stay provision of the bankruptcy laws.

26

It is undisputed that CHI never sought or obtained Diamondhead's permission to assign the note, as required. Therefore, the assignment is invalid, the transaction was designed to circumvent the automatic stay, and the Joinder should be dismissed.

### D.   THE PETITION DOES NOT SERVE A VALID BANKRUPTCY PURPOSE.

To invoke this Court's jurisdiction, a petitioner must possess a valid bankruptcy purpose. In the context of Chapter 7 proceedings, that purpose must be to marshal a debtor's assets in order to achieve a greater pro rata distribution among a debtor's various unsecured creditors than what would be otherwise available outside of bankruptcy. A petitioner must have some plausible reason to believe that the bankruptcy system is necessary to maximize the recovery for a debtor's creditors. *In re Forever Green Athletic Fields, Inc.,* 500 B.R. at 424. Moreover,

> A further distinction must be made between voluntary and involuntary proceedings. In the context of voluntary Chapter 7 petitions, the purpose is to prevent the collection efforts of certain creditors from gaining an advantage over less diligent creditors. Whereas, involuntary Chapter 7 petitions serve to prevent a debtor from choosing to pay certain creditors over other similarly situated creditors.

*Id*.

In this action, there is no evidence that Diamondhead is favoring certain creditors over other creditors. Everyone is being treated equally - currently no one is getting paid!

A Chapter 7 bankruptcy is not a legitimate option in this case if the goal is to maximize recovery for all creditors. *In re Forever Green Athletic Fields, Inc.*, 500 B.R. at 425. The only way to maximize recovery here is to avoid a fire sale of the Company's only asset. The best interests of both the creditors and the debtor lies in the continued existence of the Company. A

27

Chapter 7 bankruptcy will result in the sale of the Company's principal asset (land) at a severely distressed price, thereby minimizing rather than maximizing value.

There is additional risk to the value of the asset in a Chapter 7 proceeding because the land is owned by Mississippi Gaming Corporation ("MGC"), a subsidiary of the Debtor. On August 21, 2014, MGC obtained Gaming Site Approval from the Mississippi Gaming Commission for a fifty- acre site on its Diamondhead, Mississippi property. That approval is revocable under regulations of the Mississippi Gaming Commission. Miss. Gaming Regulation 1.4.[11] Therefore, a Chapter 7 bankruptcy has heightened risk to the value of the Company's most valuable asset, the fifty-acre gaming site which was appraised at $30.5 million, or $610,000 per acre, following site approval. The remaining 350 acres were appraised at $25,000 per acre. Thanks to current management's ability to secure Gaming Site Approval, the Diamondhead property has greatly increased in value.  In a Chapter 7 bankruptcy, the uncertainty surrounding the transferability of site approval could further depress the value of the site in a forced sale.

The Petitioners herein should not be allowed to force the Company into a fire sale of its primary asset. The Petitioners here admittedly voted against the proposal at the annual meeting to increase the authorized shares of common stock form fifty million to one hundred million shares, a prerequisite to release of $850,000 then held in escrow. They guaranteed the lack of $850,000 in funds to the Company and now want to know why the Company has no money to pay them.  Otherwise put, they are the manufacturers of the very financial situation in which the Company now finds itself.

---

[11]

       The Court may take judicial notice of state regulations. *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 742 n.4 (1976) (taking judicial notice of state regulations).

### E.   <u>THE BANKRUPTCY COURT IS NOT A COLLECTION AGENCY</u>.

"[T]he bankruptcy court is not a collection agency." *In re Mountain Dairies, Inc*., 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007). *See also In re Century Tile Marble, Inc.*, 152 B.R. 688, 689-90 (Bankr. S.D. Fla. 1993) (creditors' attorney sanctioned and involuntary petition dismissed pursuant to section 303 for "utilizing bankruptcy court as a collection agency instead of going to state court where collection claims are properly filed"); *In re AMC Investors, LLC*, 406 B.R. at 488 (citing *In re Mountain Dairies, Inc.*).

Moreover, the promissory notes that the petitioners signed (and which DDM claims was assigned to it),  provide as follows:

> The parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of Delaware. The parties hereby agree that any dispute which may arise between them arising out of or in connection with this Agreement shall be adjudicated before a court of competent jurisdiction in the State of Delaware and they hereby submit to the exclusive jurisdiction of the courts of the State of Delaware with respect to any action or legal proceeding commenced by any party and irrevocably waive any objection they now or hereafter may have respecting the venue of any such action or proceeding brought in such a court or respecting the fact that such court is an inconvenient forum.

(DX 8-12, 14 at ¶4.7).

The "United States Bankruptcy Court for the District of Delaware" is located in the State of Delaware. However, it is not a court "of the State of Delaware." It is a court of the United States federal court system. This action should have been filed in state court in Delaware as was the action filed by CHI on its Note. (The six Petitioners are represented by the same attorneys who represent CHI). The Petitioners have one common goal at this point and that is to oust management. Otherwise, they would have gone to the same Court to which CHI went. The

29

presence of an exclusive choice of venue provision further justifies dismissing this petition. In fact, it has been found to support abstention. *See In re Mountain Dairies, Inc.*, 372 B.R. at 635 (venue provision justifies abstention).

### F.   DIAMONDHEAD IS NOT INSOLVENT.

The Company is not insolvent. An entity is insolvent when its debts total more than the aggregate value of all of its property, excluding property fraudulently transferred and exempt property. 11 U.S.C. §101(32). Diamondhead owns, through its wholly-owned subsidiary, Mississippi Gaming Corporation, an approximate 404-acre tract of land in Diamondhead, Mississippi ("the Property"). The Company owns an additional residential lot near the back entrance to the Property.

The Company used the proceeds from the PPM, in part, to perform the surveying, engineering and other work required to obtain gaming site approval for a fifty-acre gaming site on its Diamondhead, Mississippi Property.  A property owner must obtain gaming site approval from the Mississippi Gaming Commission for a casino site. On August 21, 2014, the Company obtained site approval from the Mississippi Gaming Commission for a fifty-acre site located at the east end of the Property.

 CB Richard Ellis, which is a recognized expert in appraising land in the casino industry, performed a property appraisal on the Property dated August 27, 2015. It appraised the fifty-acre site-approved gaming site at $30.5 million. It appraised the remaining 354 acres (mixed use site) at $8.850 million.  Thus, the Property is appraised for a total of $39.350 million. CB Richard Ellis also appraised the prospective value of the project once constructed (casino, casino site and 354 acre mixed use site) at $133.2 million.  CB Richard Ellis also performed a feasibility study

dated November 2014. It estimated gross gaming revenue at approximately $146.2 million for the site (not including revenue streams for entertainment and other amenities).

The Company's Property is appraised at $39.35 million.  The Company's total debt, as of December 31, 2015, is approximately $7.65 million. (This is not to be confused with "liabilities" which include contingencies and which, as Vitale testified, were reported at approximately $8.60 in the Company's Form 10-Q for the period ending September 30, 2015). (Tr. 3 at 27-32). Thus, the Company is clearly not "insolvent."

### III.    ABSTENTION IS WARRANTED IN THIS CASE UNDER 11 U.S.C. §305(a)(1).

Diamondhead respectfully requests, in the alternative, that the Court exercise its authority to dismiss this case based on the doctrine of abstention. Even where the petitioning creditors are able to prove all of the elements for the granting of an involuntary petition, and even when there is no issue as to whether the petitioning creditors have acted in good faith, a Bankruptcy Court may still dismiss an involuntary petition under the doctrine of abstention. The decision whether to abstain is within the sole discretion of the Bankruptcy Court, which may take into account "any factors it considers to be relevant to the determination of whether a dismissal of the case or a suspension of all proceedings would better serve the interests of the creditors and the debtor." 11 U.S.C. §305(a)(1).

As with the issue of bad faith, whether or not to abstain is determined by considering the totality of the circumstances.  *In re Northshore Mainland Services, Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015) (Chapter 11); *In re RHTC Liquidating Co.*, 424 B.R. 714, 720 (Bankr. W.D. Pa. 2010) (Chapter 7).

In considering abstention, the Court should keep in mind that an involuntary petition is an "extreme remedy with serious consequences to the alleged debtor...As such, a court should not lightly enter an order for relief." *In re: Diamondhead Casino Corp.*, 540 B.R. at 505. In this case, the interests of both the debtor and the creditors would be better served by a dismissal of this action. The Debtor has the burden of showing that abstention is proper under section 305(a). A consideration of the factors which courts generally consider in deciding whether or not to abstain in a case weigh in favor of abstention in the case at bar. While all factors may be considered, not all are given equal weight in every case. *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464-65 (Bankr. S.D.N.Y. 2008). The factors here support abstention.

**Five Petitioners are also stockholders of the Company.**

It is not unusual for a Company to borrow from its largest stockholders, as occurred here. In fact, in a small company, the largest stockholders are likely to be its largest creditors. The problem here is that we are dealing with a small company that now finds itself at the mercy of five stockholders, who are also creditors of the Company, but whose true motive is not to collect money owed under promissory notes that have been in default for years, but who are trying to oust current management and replace them with a Trustee. Their motive is not to get what they are owed under their Notes, but to get control of the Company.

**The economy and efficiency of administration.**

As noted at the outset of this proceeding, bringing this case into the bankruptcy court would only add an additional layer of expense to the resolution of this matter, including costs for a Trustee (if under Chapter 7) and any consultants the Trustee would need to engage. It would be inefficient and excessively costly to process this debt through this Court, as opposed to a

32

simple debt action in a state court. None of the administrative costs that will be incurred here are necessary, since there is no legitimate bankruptcy purpose to be served by this filing. Therefore, economy and efficiency favor dismissal.

**The availability of another forum, or the actual pendency of an insolvency proceeding in one.**

Another forum is available to protect the interest of all parties. One such proceeding is already pending in Delaware state court. Federal proceedings are simply not necessary inasmuch as the primary claim is based on state law and the claims here can be adequately determined in the state court. Abstention is further justified in this case because, as noted above, the parties chose the state court as their exclusive venue. *See In re Mountain Dairies, Inc.*, 372 B.R. at 635 (venue provision supports abstention).

**Whether federal proceedings are necessary to reach a just and equitable resolution.**

Federal proceedings are not necessary to reach a just and equitable resolution of this case. Diamondhead has an asset of value which greatly exceeds the amount of its debts and far exceeds the amounts claimed by creditors in this matter. Federal bankruptcy proceedings are not just unnecessary, but also improper, inasmuch as the involuntary bankruptcy case serves no legitimate bankruptcy purpose in this particular case.

**The availability of alternative means for an equitable distribution of assets and value.**

There are ample alternative means available to satisfy the creditors in this case.  These alternative means, including obtaining a property loan to retire the debt, are made more difficult by the bankruptcy filing itself. If there were no bankruptcy proceeding, the Company would be able to continue its recent forward progress, and work with lenders to obtain debt and/or equity

financing. This would allow the Company to move forward with its business plan, benefitting both creditors and stockholders. Moreover, there is no showing that proceedings outside of bankruptcy court will result in any loss of value to the land. On the contrary, anything done outside of a bankruptcy action would result in a higher valuation of the property or portions thereof and would result in a financing on more favorable terms. Negotiating terms for financing is hard enough under normal circumstances. Doing it while mired in a bankruptcy action is of no benefit to creditors, stockholders, or Diamondhead.

**Whether the debtor and creditors are able to work out a less expensive out-of-court arrangement that better serves all interests in the case.**

The Company has had good relationships with the majority of its creditors over the years. As Vitale testified, and as its SEC filings confirm, the Company has always been able to work with its creditors in the past. Indeed, Vitale testified that when she became President, the Company owed the banks, the state, the DOL, the IRS, and every vendor in Florida. She managed to pay the bank 100% on the dollar and settle with the state, the DOL and all her vendors. Vitale has enormous experience working with creditors. There is no valid reason why the debtor and the creditor/stockholders in this case cannot come to a mutually beneficial arrangement that serves the interests of the creditors in this case, in their hybrid capacity as both creditors and stockholders. It would make no sense to do otherwise given their substantial stock holdings in the Company. Any reluctance on the part of the creditors to do otherwise, would simply underscore the obvious, namely, that this action was filed in the interest of a few stockholders who want to oust management and get a Trustee in here to force a sale of the Diamondhead property so they or their allies can snap it up at a distressed price.

34

**The purpose for which bankruptcy was sought by the petitioners.**

In considering dismissal under §305, it is appropriate to consider the motivation of the parties seeking the jurisdiction of the bankruptcy court.. Although the motivation of the parties may not directly affect the consideration of whether the creditors and the debtor would be better served by the dismissal of this case, the motives of the parties can significantly influence the Court's evaluation of other factors and contribute to the Court's decision to dismiss under §305.

"[C]ourts have held that dismissal pursuant to Section 305(a)(1) is appropriate when the petitioning party is seeking to use the bankruptcy court as an alternative approach to state court procedures to resolve intra-company management and stockholder disputes.*" In re ABQ-MCB Joint Venture*, 153 B.R. 338, 341 (Bankr. D. N.M. 1993) (citing *Matter of Win-Sum Sports, Inc.*, 14 B.R. 389 (Bankr. D. Conn.1981); *In re Beacon Reef Limited Partnership*, 43 B.R. 644 (Bankr. S.D. Fla.1984)).  *See also Matter of Investment Corp. of North America*, 39 B.R. 758 (Bankr. S.D. Fla. 1984) ("[t]he fact that the petition was filed by a few disgruntled creditors without any support from additional creditors, the apparent motivation of the petitioning creditors (obtaining control of the debtor's business), the existence of pending State Court actions, the arrangements made out-of-court by the debtor and numerous creditors, and the promising prospects for the viability of the debtor's business, lead to the conclusion that it would be in the best interest of the debtor and all of the creditors to abstain in this case").

The Petitioners here are disgruntled stockholders obsessed with ousting management. All of the creditors involved here are friends and all were involved in or supporters of the dissident slate.  They should not be permitted to wage an expensive proxy battle in a small company, lose, and then reap a reward in bankruptcy court for their efforts.  A proxy contest is damaging to any

35

company, let alone a small company.   The Petitioners' motives for this bankruptcy, based on their own testimony, are pellucid.  They want this Court to oust management. This is not the role of a bankruptcy court, and this Court should nots allow itself to be used for such a purpose.

**Other Considerations.**

As noted above, CHI filed *College Health & Investment, L.P. v. Diamondhead Casino Corporation*  (Delaware Superior Court, C.A. No. N15C-01-119-WCC), to collect on the promissory note issued to it by Diamondhead. On February 11, 2015, the Company moved to dismiss that action as moot. CHI filed an opposition to the motion to dismiss alleging that the promissory note was convertible only prior to its maturity date. On July 2, 2015, the Court agreed with the Plaintiff and denied the Company's motion to dismiss. On July 16, 2015, the Company filed an Answer and Grounds of Defense. The matter was stayed due to this bankruptcy action.

Diamondhead has the right to a trial in that action. Until there is a final judgment in that action or a trial on the matter, there will remain an issue as to whether the Company can pay the Petitioners in common stock. While the Company would prefer to pay the creditors in cash and the creditors want cash at this point in time, the Company is ready, able and willing to pay the creditors in common stock. The Company intends to introduce emails from Petitioners and to call certain Petitioners as witnesses in the above-referenced action. The documentary and testimonial evidence from the Petitioners themselves will shed light on this issue when it goes to trial. It would be a terrible outcome were the Court to allow this bankruptcy action to go forward, with all its attendant consequences, only to have it ultimately decided, after trial, that the Company could pay the Notes at issue herein, in common stock. For this reason alone, the

should exercise its discretion to abstain in this matter so as to allow the state court action to run its course.

## IV.    IN THE EVENT THE COURT DECLINES TO DISMISS THE INVOLUNTARY CHAPTER 7 PETITION, THE CASE SHOULD BE CONVERTED TO CHAPTER 11.

The debtor has an absolute right to convert this case to chapter 11.  Even where an order for relief is entered on a petitioning creditor's involuntary chapter 7 petition, the debtor has an absolute right to convert the case to chapter 11. 11 U.S.C. § 706(a) ("the debtor may convert a case under this chapter to a case under chapter 11 ... at any time"); *In re J.B. Lovell Corp.*, 876 F.2d 896, 897 (11th Cir. 1989) ("[u]nder §706, the Code grants debtors a one-time absolute right to voluntarily convert a Chapter 7 proceeding against them into a Chapter 11 reorganization proceeding…"); *In re Amanat*, 321 B.R. 30, 41 (Bankr. S.D.N.Y. 2005) ("even an involuntary debtor has an absolute right to convert a case under Chapter 7 to a case under Chapter 11").  At the hearing on the motion to dismiss, counsel for the Petitioners conceded that "[the alleged debtor] can seek to be an 11. They have the absolute right to convert and do 11." (Tr. 3 at 21).

The case at bar has not been converted previously. Therefore, in the event the Court declines to dismiss the Involuntary Chapter 7 Petition, the Company respectfully requests that the Court permit the Alleged Debtor to convert this case to a Chapter 11 so that it can work with potential lenders to obtain financing and propose a plan that would be fair to all involved, rather than a Chapter 7 liquidation, which would be devastating.

37

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Diamondhead Casino Corporation respectfully requests that the Court dismiss this action either due to the petitioners' bad faith or pursuant to principles of abstention.  In the alternative, if the Court decides to grant relief, the Company respectfully requests that the case be converted to one under Chapter 11 of Title 11 of the U.S. Code.

Dated:  February 5, 2015

Respectfully submitted,

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE  19801-1186
 (302) 573-2525
dfinger@delawgroup.com
Attorney for Diamondhead Casino
Corporation

## <u>CERTIFICATE OF SERVICE</u>

I, David L. Finger, hereby certify that on this 5th day of February, 2016, I caused the

foregoing document to be sent via hand-delivery, in addition to electronic service via email and

CM/ECF to the below-listed counsel of record:


Joseph B. Cicero, Esq.
Stephanie S. Habelow, Esq.
Chipman Brown Cicero & Cole, LLP
1313 N. Market St., #5400
Wilmington, DE 19801

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE  19801-1186
(302) 573-2525
dfinger@delawgroup.com
