# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| DIAMONDHEAD CASINO CORPORATION, | Case No. 15-11647 (LSS) |
| Alleged Debtor. | **SEALED-SUBJECT TO PROTECTIVE ORDER DATED 10/13/15** |
|  | **Ref. Nos. 4, 10, 11, 53, 54, 70, 85** |

## PETITIONING CREDITORS' POST-HEARING ANSWERING BRIEF IN OPPOSITION OF ALLEGED DEBTOR'S MOTION TO DISMISS

OF COUNSEL:

John H. Genovese
Paul J. Battista
**GENOVESE JOBLOVE & BATTISTA P.A.**
100 Southeast Third Street, 44th Floor
Miami, Florida 33131
(305) 349-2300
jgenovese@gjb-law.com
pbattista@gjb-law.com

William E. Chipman, Jr. (No. 3818)
Joseph B. Cicero (No. 4388)
Mark D. Olivere (No. 4291)
**CHIPMAN BROWN CICERO & COLE, LLP**
Hercules Plaza
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
(302) 295-0191
chipman@chipmanbrown.com
cicero@chipmanbrown.com
olivere@chipmanbrown.com

*Counsel to Richard Stark, Arnold Sussman,
Alan D. Cohen, Robert F. Skaff, Jr., David J.
Towner, and DDM Holdings, LLC*

Dated: February 26, 2016

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ..............................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS .........................................4

STATEMENT OF FACTS .................................................................................4

    A.    Diamondhead is Hopelessly Insolvent .........................................4

    B.    Vitale and Harrison Continue to be Entrenched Despite Their
        Colossal Failure at Diamondhead ................................................5

    C.    The Company Grants an Insider Lien to Management to the
        Detriment of Creditors .................................................................9

    D.    Diamondhead's 2015 Annual Meeting .......................................11

    E.    The Petitioning Creditors File an Involuntary Petition .............12

        1.    Sussman ...........................................................................12

        2.    Stark .................................................................................14

        3.    Cohen ...............................................................................16

        4.    Skaff ................................................................................17

        5.    Towner .............................................................................19

        6.    DDM .................................................................................20

    F.    Management Continues to Entrench Itself to the Detriment of the
        Creditors .....................................................................................22

ARGUMENT ...................................................................................................23

    I.    THE MOTION SHOULD BE DENIED BECAUSE THE
        PETITIONING CREDITORS SATISFY SECTION 303 OF THE
        BANKRUPTCY CODE .................................................................23

        A.    No Bona Find Dispute Exists ........................................23

        B.    Diamondhead is not Generally Paying its Debts as they
            Come Due .....................................................................27

i

II.     DIAMONDHEAD HAS FAILED TO MEET ITS BURDEN OF
        PROVING THAT THE PETITIONING CREDITORS FILED
        THIS CASE IN BAD FAITH ...................................................................28

        A.      The *Forever Green* Factors Weight in Favor of a Finding
                that the Petitioning Creditors Filed the Petition in Good
                Faith .........................................................................................29

                1.      Factors 1 & 2: The Petitioning Creditors Satisfied
                        the Requirements Under Section 303(b) and the
                        Petition is Meritorious............................................29

                2.      Factor 3: The Petitioning Creditors were Aware that
                        the Notes Were Due and Payable..................................29

                3.      Factor 4: There is Evidence of Avoidable
                        Transactions and Dissipation of Assets ...........................30

                4.      Factor 5: The Involuntary Petition was Not Filed
                        Out of Ill Will or to Harass ................................30

                5.      Factors 6 and 7: The Involuntary Petition was Not
                        Filed for a Tactical Advantage or to Gain an
                        Advantage Over the Other Creditors ................................31

                6.      Factors 8 & 9: The Involuntary Petition was Not
                        Filed as a Substitute for Customary Debt Collection
                        and was Not Suspiciously Timed......................................34

        B.      Other Facts Demonstrating Goof Faith..........................................37

        C.      Diamondhead's Unclean Hands and Bad Faith Conduct
                Precludes a Finding that the Petitioning Creditors Filed the
                Petition in Bad Faith ...................................................................39

III.    ABSTENTION IS NOT WARRANTED ...................................................39

IV.     SHOULD THE COURT CONVERT THIS TO CHAPTER 11,
        THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE ...........41

CONCLUSION.........................................................................................................42

EXHIBIT A – COUNTER-DESIGNATION OF DEPOSITION EXCERPTS

EXHIBIT B – PETITIONING CREDITORS' SUMMARY EXHIBIT

EXHIBIT C – SUPERIOR COURT'S JULY 2, 2015 MEMORANDUM OPINION

EXHIBIT D – LETTER DATED JUNE 15, 2015 FROM K. TYLER O'CONNELL

# TABLE OF AUTHORITIES

**PAGE**

<u>Cases</u>

*In re ABQ-MCB Joint Venture,*
    153 B.R. 338 (Bankr. D.N.M. 1993) ............................................................... 35-36

*In re AMC Investors, LLC,*
    406 B.R. at 484 ....................................................................................25, 39, 40

*In re Atlas Mach. & Iron Works,*
    190 B.R. 796 (Bankr. E.D. Va. 1995).............................................................. 38-39

*Basin Elec. Power Coop. v. Midwest Processing Co.,*
    769 F.2d 483 (8th Cir. 1985) .........................................................................38

*In re Beacon Reef Limited Partnership,*
    43 B.R. 644 (Bankr. S.D. Fla.1984)....................................................................36

*B.D.W. Associates, Inc. v. Busy Beaver Building Centers, Inc.,*
    865 F.2d 65 (3d Cir. 1989).............................................................................25

*B.E. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.),*
    701 F.2d 1071 (2d Cir. 1983)...........................................................................27

*In re Busick,*
    831 F.2d 745 (7th Cir. 1987) ...........................................................................24

*In re Byrd,*
    357 F.3d 433 (4th Cir. 2004) ...........................................................................25

*CFTC v. Weintraub,*
    471 U.S. 343 (1985).......................................................................................30

*In re Corrline Int'l, LLC,*
    516 B.R. at 150 ............................................................................................23

*In re Data Synco, Inc.,*
    142 B.R. at 181 ............................................................................................24

*In re Demirco Holdings, Inc.,*
    2006 WL 1663237 (Bankr. C.D. Ill. June 9, 2006) ................................................25

*In re Dino's, Inc.,*
    183 B.R. 779 (Bankr. M.D. Fla. 2012) ................................................................38

iii

*Envirodyne Indus., Inc. v. Conn. Mut. Life Co. (In re Enfirodyne Indus., Inc.)*,
    174 B.R. 986 (Bankr. N.D. Ill. 1994) ...................................................................34

*FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*,
    517 B.R. 361 (Bankr. M.D. Ga. 2014)..................................................................34

*In re Focus Media, Inc.*,
    378 F.3d 916 (9th Cir. 2004) ..............................................................................25

*In re Forever Green Athletic Field, Inc.*,
    804 F.3d 328 (3d Cir. 2015)......................................................................... passim

*In re F.R.P. Indus., Inc.*,
    73 B.R. 309 (Bankr. M.D. Fla. 1987) ..................................................................25

*In re Garcia*,
    2011 WL 2551184 (Bankr. D.NJ. June 21, 2011) ...............................................33

*GMAM Inv. Funds Trust I v. Globo Comunicacoes E Participacoes S.A.
    (In re Globo Comunicacoes E Participacoes S.A.)*,
    317 B.R. 235, 248 (S.D.N.Y. 2004)......................................................................35

*In re: Hrobuchack*,
    2015 WL 16510742 (Bankr. M.D. Pa. Apr. 8, 2015) ...........................................35

*IBM Credit Corp. v. Compuhouse Sys.*,
    179 B.R. 474 (W.D. Pa. 1995)........................................................................ 23-25

*In the Matter of Investment Corp. of North America*,
    39 B.R. 758 (Bankr. S.D. Fla. 1984)....................................................................37

*In re Key Auto Liquidation Center, Inc.*,
    372 B.R. at 80 ................................................................................................. 38-39

*In re Knight*,
    380 B.R. 67 (Bankr. M.D. Fla. 2007) ..................................................................26

*In re LaRoche*,
    131 B.R. 253 (D.R.I. 1991)..................................................................................38

*In re Mylotte, David and Fitzpatrick*,
    2007 WL 2033812 (Bankr. E.D. Pa. July 12, 2007)......................................25, 38

*In re Olick*,
    2010 WL 4509828 (Bankr.E.D.Pa. Nov. 9, 2010).......................................... 33-34

*In re Onyx Telecommunications, Ltd.*,
    60 B.R. at 498 ......................................................................................................23

*In re Reveley*,
    148 B.R. 398 (Bankr. S.D.N.Y. 1992) ................................................................39

*In re Rimell*,
    946 F.2d 1363, 1365 (8th Cir. 1991) ............................................................24, 26

*In re R & L Engineering Co.*,
    182 F.Supp. 317 (S.D.Cal.1960) ........................................................................33

*Smith v. Allentown*,
    589 F.3d 684 (3d Cir. 2009)................................................................................31

*In re Taub*,
    439 B.R. 261 (Bankr. E.D.N.Y. 2010)................................................................26

*In re Tichy Electric Company, Inc.*,
    332 B.R. 364 (Bankr. N.D. Iowa, 2005) ............................................................28

*U.S. Fid. & Guar. Co. v. DJF Realty & Suppliers, Inc.*,
    58 B.R. 1008 (N.D.N.Y. 1986) ..........................................................................39

*Utzler v. Braca*,
    2010 WL 2106321 (Conn. Super. Ct. Apr. 19, 2010)..........................................33

*In re VitaminSpice*,
    472 B.R. 282 (Bankr. E.D. Pa. 2012) ................................................................26

*In the Matter of Win-Sum Sports, Inc.*,
    14 B.R. 389 (Bankr. D. Conn. 1981) ..................................................................36

Other Authority

11 U.S.C. § 303(b)(1) ...............................................................................................23-24

11 U.S.C. § 303(h)(1) ..............................................................................................23, 27

11 U.S.C. § 305...........................................................................................................39

Publications

*Collier on Bankruptcy*
    ¶ 303.31 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) ........................27

## <u>INTRODUCTION</u>

Petitioning Creditors filed this involuntary bankruptcy case to prevent the further dissipation of the only tangible material asset of Diamondhead Casino Corporation ("Diamondhead" or the "Company")—a 404-acre tract of undeveloped land in Diamondhead, Mississippi owned indirectly through one of its wholly-owned subsidiaries (the "Property"), and to obtain payment for all bona fide creditors. Petitioning Creditors also filed the petition to, among other things,[1] remedy avoidable and fraudulent transfers, and other misconduct of Diamondhead and its insiders.

Diamondhead is an insolvent corporation that has been mismanaged for over fifteen years. It has had no operations since it ended its gambling cruise ship operations in 2000, and has failed to generate any revenues since 2004. Despite concentrating its efforts on the development of the Property, its total liabilities are now in excess of $9 million, the loss to common stockholders is approximately $19 million. The Company also has an accumulated deficit in excess of $34 million. All while spending only about $400,000 on the actual development of the Property. Yet, at the same time, the Company's President, Deborah Vitale ("Vitale"), has been awarded approximately $7 million in paid and/or payable compensation that can be verified. Although Diamondhead now contends that it is not insolvent, it concedes that it will continue to lose money in the foreseeable future, and it cannot pay its debts as they become due.

---

[1] Petitioning Creditors incorporate herein by reference all of the arguments and case law set forth in their (a) Objection to Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11 ("Objection"), and (b) Emergency Motion of Petitioning Creditors for Entry of an Order Directing the Appointment of (i) an Interim Chapter 7 Trustee, or (ii) Alternatively, a Chapter 11 Trustee should the Involuntary Bankruptcy Case be Converted ("Trustee Motion").

1

Diamondhead has solicited and received significant investment from Petitioning Creditors over the years, and the promissory notes (the "Notes") received in exchange for their investments are long past their maturity dates and are in default. In the face of demands from bona fide creditors for repayment on the Notes, the Company provided management with a promissory note secured by a $2 million executive's lien (the "Lien") recorded on the Property twenty days after the Company's registration with the SEC was revoked. The Lien covers past and future compensation, thus every day the value of the Property is dissipated in favor of insiders and to the detriment of all creditors. Vitale is the primary beneficiary of the Lien, which accumulates with every paycheck she does not receive from the Company despite the fact that her services are provided to the Company, not to the subsidiary that owns the Property.

Despite the Delaware Superior Court denying Diamondhead's attempt to moot a claim on one of the Notes and holding that the Notes are not convertible into stock due to material breach by the Company, Diamondhead responded by asserting numerous baseless affirmative defenses. Such affirmative defenses are well short of being cognizable, and therefore, Petitioning Creditors' claims are not subject to bona fide dispute, which is consistent with this Court's findings of fact and conclusions of law set forth in its Memorandum Opinion, dated November 13, 2015 (the "Opinion").[2] Simply stated, Petitioning Creditors' claims, which are not subject to bona fide dispute, are in excess of the statutory amount and Diamondhead is generally not paying its debts as they become due, including Vitale's own salary and rent.

Diamondhead contends that the petition was filed in bad faith because it was filed to "oust management" as retaliation for the results of the June 8, 2015 election of directors

---

[2] The Opinion is cited to herein is as "Op. at __."

("Annual Meeting").  This is untrue.  The Company is trying to make a connection between the involuntary petition and the proxy contest leading up to the Annual Meeting that does not exist. Diamondhead focuses on this contention because it cannot escape the reality that Petitioning Creditors meet the statutory test to commence an involuntary bankruptcy case and always have acted in good faith.  Despite Delaware law requiring otherwise, the evidence demonstrates that the Annual Meeting was the first meeting in over seven years.  The proxy contest is a red herring for several reasons.  First, creditors holding promissory notes with the Company demanded payment well before the Company announced the Annual Meeting.  Second, Petitioning Creditors are not attempting to put any person on the Diamondhead board of directors (the "Board").  Quite the contrary, they are seeking to have the value of the Company's assets maximized for the benefit of all creditors and have an independent fiduciary investigate the insider transactions and the Company's files.  While it is true that Petitioning Creditors distrust management and believe they are incompetent and bad for all stakeholders of the Company, their primary concern is to protect the Property so that its value can be maximized to pay all legitimate creditors.  On the other hand, Vitale's only hope of preserving the Lien and future compensation, and to avoid an independent fiduciary investigating her prior conduct, is to dismiss this bankruptcy.

Petitioning Creditors meet all requirements of Section 303(b), because Diamondhead is an entity against whom an order for relief may be entered and it is not paying its debts as they become due.  Diamondhead concedes this and therefore is forced to manufacture an argument that the involuntary petition and the joinders were filed in bad faith.  Based upon the actual evidence presented in the proceeding, rather than inadmissible hearsay, there can be no legitimate dispute that Petitioning Creditors have acted in good faith.

## NATURE AND STAGE OF THE PROCEEDINGS

On August 6, 2015, F. Richard Stark ("Stark"), Arnold J. Sussman ("Sussman") and A. David Cohen ("Cohen") filed an involuntary chapter 7 petition against Diamondhead Casino Corporation ("Diamondhead" or the "Company"). On August 28, 2015, Diamondhead filed a motion to dismiss the petition or, in the alternative, to convert the case to one under chapter 11 (the "Motion to Dismiss").

On September 11, 15, and 17, respectively, Robert F. Skaff ("Skaff"), David J. Towner ("Towner") and DDM Holdings, LLC ("DDM") (together with Stark, Sussman, Cohen, Skaff and Towner, the "Petitioning Creditors") joined in the involuntary petition. On September 17, Petitioning Creditors filed the Trustee Motion seeking the appointment of an interim trustee, which the parties subsequently agreed would be heard prior to the Motion to Dismiss.

An evidentiary hearing on the Trustee Motion was held on October 16 and 20, 2015. On November 13, the Court issued the Opinion denying the Trustee Motion and setting forth findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure Rule 7052.

A hearing on the Motion to Dismiss was held on January 15, 2015. On February 5, Diamondhead filed a post-hearing opening brief in support of the Motion to Dismiss. This is Petitioning Creditors' post-hearing answering brief in opposition to the Motion to Dismiss.

## STATEMENT OF FACTS

A.    **Diamondhead is Hopelessly Insolvent**

In 2000, Diamondhead divested itself of a ship-based gambling operation, and began focusing on the development of the Property. (Op. at 2). Subsequent to Hurricane Katrina in 2005, it has focused on the development of a land-based casino resort on the Property. (Harrison

Dep. 26-27).   Since 2000, Diamondhead has had no operations, and aside from a very small amount of cash, its only tangible asset is the Property, which was acquired in 1993.  (Op. at 3).

The Property is carried at cost on the Company's books and currently is carried on the balance sheet at $5,476,097.   (Op. at 3; *see also* Ex. B hereto).[3]   While a document exists purportedly valuing the undeveloped 50-acre gaming site at $30.5 million and the remaining undeveloped acreage at $8.85 million, the document is inadmissible hearsay.[4]

Diamondhead has no operating revenues and conceded that it expects continued losses for the foreseeable future.   (Op. at 4).   The Company also admits that it is in default of the obligations owed to Petitioning Creditors, to Vitale, and is in default of a $1 million line of credit.  (*Id.*)

## B.    Vitale and Harrison Continue to be Entrenched Despite Their Colossal Failure at Diamondhead

Vitale made it abundantly clear that the Company is her life:

> It's my whole life. This is all I do. I have no life.  I work morning till night seven days a week. My family's mad at me.  My mother's 92.  She's, you know, Why don't you come and see me, that kind of thing.  This is all I do; okay? I have no life, everybody knows it, and that's the bottom line.

---

[3]   Attached hereto as Exhibit B is Petitioning Creditors' summary exhibit prepared from the Company's public SEC filings, which was admitted into evidence during the hearing on the Trustee Motion.

[4]   In the Opinion, the Court noted that it would accept the CBRE valuation for purposes of the hearing on the Trustee Motion because Petitioning Creditors asked a line of questions about it. The Court should not consider this document for the purposes of valuing the property in connection with the Motion to Dismiss, however, because it was not introduced at the Motion to Dismiss hearing and is inadmissible hearsay.  In addition, no valuation expert witness testified about its contents.

(Tr. 1 at 237).[5] She also likes to exaggerate how busy she is with the Company, presumably to attempt to justify her position and her claimed accrued back compensation:

> I'm busy doing legal work all day long right now. I'm working on this bankruptcy. I'm working on -- well, I'm done with FINRA. But I do legal work all day long.  I answer 3,000 shareholders, I answer 300 ESOP beneficiaries, I answer hundreds of brokers calling me. I deal with every agency you can imagine in Mississippi. I deal with the mayor, I deal with everybody. I deal with everybody and everything all day long. I'm on the phone all day long. And in between, I'm doing legal work. That's why I'm there till 3:00, 4:00, 6:00 a.m. I'm very busy. When somebody wants a mean high waterline survey, I've got to go get it. I'm busy. I have no secretary. I have no paralegal. I have no receptionist.

(Vitale Dep. 268-69).[6]  Because Diamondhead is Vitale's "life," she will stop at nothing to stay in control.

Over the years, Vitale has threatened anyone necessary to get her way and to extract personal benefits.  For example, Vitale made it clear to the Board that if they did not pay for her rent, it would be very expensive to move.  (PX-46 at 5; Tr. 1 at 200-201; Vitale Dep. 105-107). As a result, in May of 2014, Vitale convinced the board to retroactively approve a lease for her townhouse office dating back to 2011.  (Tr. 1 at 63, 68, 202-203).

Vitale and Gregory Harrison ("Harrison"), a longtime director and current Chairman of the Board, testified that they are always in discussions with business partners or potential acquirers.  (Vitale Dep. 52-64, 98-104; Harrison Dep. 58, 101-103).  Harrison testified:

---

[5]  Petitioning Creditors adopt the citation format used by Diamondhead set forth in footnote 1 of its opening brief.

[6]  There is no evidence in the record supporting the amount of hours of service to the Company Vitale claims she provides or to support her executive compensation.  As previously raised in this proceeding, the Company refused to produce documents in response to many of the categories of documents Petitioning Creditors requested prior to the hearing on the Trustee Motion.

[a]t all points in time, including right now, gentlemen, we have –
you might want to look at me on this one, I want you to look at me
– right now we have four –

MR. FINGER:  Hold on a second.  Hold on, does this need to
be highly confidential?

THE WITNESS:  I'm not going to give details.  They can ask
the question later and then refuse to answer it.

BY MR. CICERO:

Q.     Well, no, you can answer it and we'll make it highly
confidential.

A.  Let me just make it real clear for the record, I want it real clear,
it's a quotable quote, remember the page number.  At all points in
time for this company, we have file drawers of offers, stupid stuff,
steals, just craziness from unknown and known entities and
partners.

Right now we have offers of funding and – well, not – we
are involved with, let me restate that, we're involved with viable
individuals who have magnificent resumes and organizations that
are well capable of pushing this ball down the road, including
purchase.

*        *        *

So, at all points in time we've had, and the documents,
when push comes to shove, we have documents and files including
right the other day of people who say, and have an interest in
moving this project forward, including ████████ individually
and collectively, with others.

(Harrison Dep. 101-103).

Although Vitale testified that the stockholders are the ones to decide what deal is fair, and

despite having several over the years, she never took one to the stockholders for approval.

(Vitale Dep. 81; Tr. 1 at 212-213).  Harrison testified that he would go to his grave with no deal

as opposed to a "steal."  (Harrison Dep. 59).  For example, the Company refused to sell the

property for $100 million without taking it to the stockholders:

Q.     After the Trump deal fell through, were there any potential
suitors that were legitimate in the eyes of the company around that,
you know, shortly thereafter?

A.      Well, at some point in time, I mean, there were a lot.  Like I said before, just as we went off the record, we got three or four viable persons, entities seriously interested in talking to Deborah and doing something.

We were offered – and I'll leave his name out, you can ask Deborah, she's a lawyer, she can answer it – and we have a press release on it, I think it was my birthday, July 16.

Q.      Of what year?

A.      I'm not sure, but shortly after the Trump deal, five or six years ago, now that scares me, I don't know.  But in any event, we received on legal letterhead an offer for only $100 million all cash.  I vote yes, you know.  Right?

Q.      Right.

A.      It's not simple.  That's when I learned that a C Corp. does not have capital gains

Q.      So I think you saw this in the press?

A.      Yes.

Q.      This was the rejection of the $100 million offer and you don't know the person's name or you won't answer?

A.      I don't want to give it. He's a serious guy.

Q.      Well –

A.      I don't care. Let Deborah answer that, because it's -- you know something? When guys have a billion dollars in their checkbook and have a private jet with four gorgeous women getting off with him, I'm not getting in his gun sights.

Q.      So you're refusing to answer that?

A.      I'm refusing to answer that one, yeah, but he's a well known guy and at one point in time I believe was ███████████████
████████

Q.      Okay.

A.      In any event, he offered 100 million cash. God, did I want to take that on the face of it.

(Harrison Dep. 116-118; *see also* Tr. 2 at 46).   The Company never called a meeting of

stockholders about the $100 million cash deal and simply issued a Form 8-K about it.  (Tr. 2 at

85).

In an effort to keep control, Harrison conceded that he unilaterally decides whether or not a deal proposal is important enough to share with his fellow Board members, and he does so "to protect the board members from inadvertent disclosure." (Harrison Dep. 60). Ironically, Harrison regularly breached his fiduciary duties and divulged confidential information to non-Board members Burstyn and Skaff in the course of seeking their investments or support, including details about potential deals not shared with the full board. (*Id.* at 207; Tr. 2 at 36-37). Despite being an "email junkie" and sending "a million emails," Harrison revealed that he regularly destroys them, even in the course of litigation and did not comply with Petitioning Creditors' discovery requests. (Vitale Dep. 168; Tr. 1 at 203; Tr. 2 at 66; Harrison Dep. 147; 185-86, 271-278).

Despite all of the Company's failures and liabilities, Vitale believes the Company is "very lucky," because the Property is prime real estate, and all the Company needs is money. (Tr. 1 at 194).

## C.    The Company Grants an Insider Lien to Management to the Detriment of Creditors

Vitale has been with the Company for twenty-four years. She claims to be Diamondhead's largest creditor based on her accrued salary. Vitale owns the townhouse that serves as the Company's corporate office. She backdated a lease so that she could pay herself back rent.

In 2010, Diamondhead completed two rounds of financing. In exchange for the funding, the Company signed and issued the Notes, which matured in 2012 and have not been paid. Petitioning Creditors are noteholders pursuant to the 2010 financing and each hold a Note. Diamondhead is in default of the Notes.

In February 2014, Diamondhead sought to raise $3 million through a Private Placement Memorandum ("PPM") in three $1 million tranches. The funds raised under the PPM were to be used to pay closing costs, $100,000 to Vitale and general and administrative expenses. The funds also were to be used to bring the Company's SEC filings into compliance. When raising the money, Vitale and Harrison told investors that the money was to be used to clean up the Company's books and SEC filings. (Tr. 1 at 52-53, 57, 66, 205-206). When Vitale and Harrison were soliciting investments at the eleventh hour, they did not tell investors that cleaning up the company included paying a substantial amount of their money to Vitale:

> Q. Did you need $3 million to clean up the company?
>
> A. Oh, yeah.
>
> Q. Why?
>
> A. Because it was -- we had to get all this stuff done and maintain it while this was being negotiated. I wasn't going to work for nothing. Okay? You got to get that -- please, I don't mean to sound nasty here, but enough is enough. Okay?

(Vitale Dep. 178; Tr. 1 at 205-206; Tr. 1 at 45-51, 53, 55-57).

The debentures issued by Diamondhead pursuant to the PPM are collateralized by a lien on the Property. The Land Deed of Trust perfecting the Lien was recorded on September 26, 2014, less than one year prior to the filing of the involuntary petition. (PX-54). The Land Deed of Trust was filed just twenty days after the SEC revoked the Company's registration. (Tr. 1 at 187-189). Vitale acknowledged the importance of not encumbering the Property—a rule she disregarded for her own personal gain: "I keep the land virginous, all by itself in the Mississippi Gaming Corporation. We don't ever sign a contract so nobody can sue the landowner." (*Id.* 206-207). Vitale insisted on the Lien because outside investors were getting a lien on the Property in exchange for their investment, and threatened that if she did not get it, she was leaving the Company. (Vitale Dep. 115-119; Tr. 1 at 178-181; Harrison Dep. 193).

Harrison conceded that it was a big deal not to have debt or liens on the Property and that he "screamed like a stuck pig when it was going to be stuffed down [his] throat and that we had to put a lien on that property. He "resisted and [he] lost." (Harrison Dep. 105).

**D.     Diamondhead's 2015 Annual Meeting**

As set forth in the Objection, Diamondhead held the Annual Meeting only after being compelled to do so. The Company then tried to move forward with a quick meeting that would thwart a proxy contest, thereby causing further unnecessary litigation to enjoin the meeting. On the eve of a TRO hearing in the Court of Chancery, the Company mooted the relief requested by postponing the meeting. The Court ordered, among other things, that the Annual Meeting take place on June 8. At the conclusion of the Annual Meeting, the incumbent nominees were elected to seven of the eight Board seats.

About three to four weeks after the Annual Meeting Vitale, called Mrs. Sussman in response to an email sent by Mrs. Sussman. Mrs. Sussman inquired whether the Company would consider combining the portions of the two slates of director nominees to strengthen the composition of the Board. Vitale got angry and responded that the competing slate was full of criminals. (S. Sussman Dep. 12). When Vitale was asked to show proof, she said that she must do so in person. Mrs. Sussman asked if they could meet halfway between their house in Maryland and Vitale's residence in Alexandria, Virginia, but Vitale refused, claiming she was working twenty-four hours a day and could meet "only in Alexandria." (*Id.* at 13). Vitale then suggested that Mrs. Sussman pick any name out of the "phone book" or off the "internet" and she will put them on the board. (S. Sussman Dep. 13; Tr. 1 at 33). Vitale also suggested that Mrs. Sussman sit on the Board. Mrs. Sussman quickly rejected the suggestion because she did not believe she had any experience or expertise beneficial to the Company. (Tr. 1 at 32).

11

**E.      Petitioning Creditors File an Involuntary Petition**

Subsequent to the Superior Court's July 2, 2015 Memorandum Opinion (attached as Exhibit C hereto), Petitioning Creditors filed the petition because they now were assured that the Company was in breach of the Notes and Diamondhead could not convert the monies owed into worthless common stock, and they believed they had no other choice based on the results of the Annual Meeting.  They did so to protect the Property in order to get paid on their Notes, which have been in default for years.  After the annual meeting, Petitioning Creditors were concerned that the Company would continue to ignore demands for repayment rather than engaging in good faith discussions to resolve the debt, and to continue its pattern of misleading investors that "cure all" deals would be imminent.

**1.      Sussman**

Sussman is an eighty-year old investor in the Company, who owns shares of stock and has a $50,000 note, which was issued on November 10, 2010.  (Tr. 1 at 8; PX-246)  His note has been in default since 2012, and he only received one interest payment in stock in 2012.  (Tr. 1 at 9).  When Sussman stopped receiving interest, he made demand to Harrison numerous times about the Company paying the note.  (*Id.*)  Harrison said that the Company did not have the money to satisfy Sussman's note.

Sussman did not plan on holding his investments in the Company for seventeen years, but Harrison always said something good was about to happen that the Company was working on it, and even told Sussman that deals were signed with Trump Entertainment and Cordish Gaming.  (Tr. 1 at 23, 29).  At various times over the years, Diamondhead's stock prices were up and down, and when it had gone up to a point when the Sussmans would have liked to monetize the stock (at $2 to $3 per share), Harrison pressured them not to sell and convinced that that they

should wait until an imminent deal was consummated, because the stock would go up to $9 to

$12 per share. (*Id.* at 9-10). Harrison even said so right before the annual meeting:

> Every time I talk to [Harrison] he had a deal, somebody sitting
> there with a whole sack of money to buy this, we have a process
> within 50 acres only, $170 million went down to $50 million. I
> mean, different values. Every time he thought he has somebody,
> he gave different values for the company, so I really don't know
> what they're going to say now. It depends what deal he thought he
> has.

(Tr. 1 at 19, 29-20).

Sussman and his wife, Soraya Sussman, harbor no ill will towards management, but they

no longer trust it. (S. Sussman Dep. at 7-8, 11; A. Sussman Dep. 17). The Sussmans became

concerned and upset when Diamondhead's registration with the SEC was revoked. (S. Sussman

Dep. 9-10; A. Sussman Dep. 19). When they confronted Harrison about the deregistration of the

Company, Harrison said that the Company is working on it and Vitale has been busy and has not

had time to file papers. That is the moment when Sussman found out that the Company had

failed to file its required financial reports with the SEC for several years, which caused him to

being to lose trust in management. (Tr. 1 at 14-15). The distrust and concern came to a

crescendo when the Sussmans found out about the Lien:

> [W]e were told for the last 15 years that the company is 400 acres
> lien free, lien free and ready to be bought and being something big.
>
> Right around that time we find out there is about 3, $4
> million lien against the property. And we ask why, why didn't we
> know, and they had no answer for that.

(S. Sussman Dep. 18-19). The Sussmans were disappointed in management once the stock was

delisted and thought a change was necessary. (Tr. 1 at 31).

The Sussmans attended the Annual Meeting and voted for the competing slate that lost.

(A. Sussman Dep. 12). The Sussmans do not know Samuel Burstyn ("Burstyn"), the General

Partner of College Health & Investment, LP ("CHI"), and did not assist in the proxy solicitation conducted by Skaff and other members of the competing slate.  (A. Sussman Dep. 13, 23-24; S. Sussman Dep. 18).

Sussman filed the petition because he has no faith in current management that they will honor his note and he wants to recoup the money the Company borrowed from him in 2010.  (Tr. 1 at 15, 24).   He believes that Vitale is not a competent director because she does not communicate with the stockholders, and everything is done secretively with Harrison.  Harrison informed Sussman that Vitale fabricated a lot of the monies she claims she is owed for her services.  (A. Sussman Dep. 21-22).  A main selling point to Sussman for his investment in Diamondhead was that the Property was debt and lien free.  (*Id.* at 22).  In addition, to protecting the Property to repay his note, Sussman believes an independent fiduciary is needed to investigate the Lien and other insider transactions.  (22)

### 2.    Stark

Stark is an eighty-one year old investor who invested in Diamondhead fifteen years ago. (Stark Dep. 4-6).  He owns shares of stock and holds a $50,000 note, which he has held since March 2010.  (*Id.* at 10)  Like with Sussman, Harrison has made many promises to Stark over the years about potential deals, which never have come to fruition.  (*Id.* at 14-15).  Therefore, Stark's view of Harrison has deteriorated over the last few years.  (*Id.* at 8).  Harrison guaranteed that the Property would remain debt free and that they were going to build a casino shortly, but Stark later learned that this was untrue.  (*Id.* at 9, 32).

Stark made demands to Harrison that the Company repay his note, but Harrison—as was typical—responded that a deal was imminent and the shares of stock would become very valuable.  (*Id.* at 12-13) ("A deal is imminent and you are going to be very rich.").

Diamondhead contends that all Petitioning Creditors are friends who schemed in bad faith to file the petition in order to oust management.  The evidence does not support this contention.  Stark's friendship with all Petitioning Creditors, and its relevance to a bad faith analysis, is exaggerated.  Although Stark testified that he considers Burstyn to be a friend, he confirmed that they have not spoken in more than a year—well before CHI filed its first lawsuit against Diamondhead in the Superior Court.  (*Id.* at 52).  Stark does not know Towner and there is no evidence in the record of any friendship with Cohen.  (Stark Dep. 46-47).  Finally, Stark's "friendship" with Skaff appears to be nothing more than a business acquaintanceship:

> Q.  You mentioned Robert Skaff.  You know him, correct?
>
> A.  Yes, I met him on two occasions.
>
> Q.  Would you consider him a friend?
>
> A.  Well, we had numerous telephone conversations, so, I guess so.
>
> Q.  You mentioned earlier that you considered Mr. Burstyn a close friend?
>
> A.  Yes.
>
> Q.  Would Mr. Skaff fall into that same category?
>
> A.  No.

(Stark Dep. 46).

While Stark nominated candidates for the election of directors at the annual meeting, he had no involvement in the written proxy materials.  (*Id.* at 20-21).  The most he did was he spoke with a handful of stockholders about the candidates leading up to the election.  Stark also confirmed that Burstyn did not help with the nomination process or proxy contest.  (Stark Dep. 28-29).

Stark eventually decided that the Property needed to be disposed of responsibly so that all creditors could be paid.  (*Id.* at 20).  He formulated the idea subsequent to the annual meeting when the creditors saw that it was hopeless for the company to move forward.  (*Id.* at 30-31).  He

feared that their investments would continue to be diluted.  Stark confirmed that he did not file a

bankruptcy to change management, but that the Property needed to be sold before they were

dissipated further:

> Every day with each passing day goes deeper into debt and we
> would like to see the assets sold as soon as possible to get the
> maximum amount of money, whatever it is, so that we can move
> on.  We're tired of this.

(*Id.* at 32).

### 3.    Cohen

Cohen is a seventy-five year old stockholder and noteholder in Diamondhead.  (Cohen

Dep. 5).  Cohen made multiple demands for payment to Harrison over the years, but they were

ignored, and Harrison stopped speaking with him at some point.  (*Id.* at 15).  Cohen determined

that his investments were in extreme jeopardy.  (*Id.* at 33) ("Gee how many times do I have to be

beat on the head to know that I'm being duped.").

Cohen expected that his note would be repaid because the Company told him it would do

so.  (*Id.* at 17).  Cohen confirmed Harrison's habit of making promises of imminent transactions:

> They supposedly … had all of these people lined up to buy the
> property to build casinos.  Greg on a constant basis was telling me
> that they had a whale and they have a whale and they have two
> whales and people are coming down, they're flying their jets down,
> yada, yada, yada.

(*Id.*)

Cohen filed the bankruptcy because he wants the money owed to him under his note.  He

testified that he had no other choice, but to file the petition:  "[w]e all found ourselves in the

same pool of lies and they decided to do something about it and I said, Okay, go ahead." (Cohen

Dep. 17-18, 20).  Cohen was owed money and no progress was being made.  He also was

concerned about ongoing lies to the investors.  (*Id.* at 24).

16

4.    **Skaff**

Skaff first invested in Diamondhead in 2008, and currently is a stockholder and a noteholder.  He holds two promissory notes from Diamondhead: one in the principal amount of $37,500 with an issue date of November 29, 2010, and one in the principal amount of $25,000 with an issue date of June 21, 2011.  (Tr. 1 at 116-117; *See* PX-247 and PX-249).  Skaff's notes bear an interest rate of 9% and matured in 2012 and 2013, respectively.  Diamondhead has defaulted on Skaff's notes.

On June 19, 2015, Skaff made a written demand on the Company for immediate payment of his notes.  (PX-149.)  On June 26, Diamondhead acknowledged the debt and responded by attempting to convert the debt to common stock, just like its failed attempt with CHI—another noteholder of the Company.  As held by the Superior Court on July 2, however, the conversion right no longer exists because the Notes are in default and have been materially breached by the Company.

Over the years, Skaff was in frequent contact with Harrison and Vitale.  Over time, he became dissatisfied with management because he believed management was misleading the investors about the Company's prospects.  During that time, Harrison was providing Skaff with Company information not known to the full board of directors.  (Skaff Dep. 10).  Skaff joined the petition because the Company has been mismanaged and its management was reckless in the way it deals with its money and with the stockholders, i.e., misleading stockholders that deals are farther along than they are.  (Skaff Dep. 10, 42).

Skaff and Bob Sturges led a slate of director nominees at the Annual Meeting.  (*Id.* at 54).  Although he did not support the Company's proposal to double the authorized shares of common stock, the proxy materials took no position on that proposal.  (Skaff Dep. 30-31).  The reason

Skaff did not vote in favor of the proposal was that the Company had no plan for what it would do with any money raised.  (Tr.1 at 163-64).  After the election, Skaff made no efforts to be on the Board.  (Tr. 1 at 157).  The Company left the eighth Board seat empty after running a short slate of seven directors.  Under Delaware law, that seat should have been filled with one of the competing nominees, but the Company refused to fill the eighth seat.  During that process, Skaff requested that Ronald Stone—not himself—fill that seat.  (Tr. 1 at 147-148; *see also* Ex. D.).  This runs counter to Diamondhead's argument that Skaff continued to desire to be on the Board.

Skaff determined to join the bankruptcy because he was concerned that the current management would continue to try to cut deals out of desperation similar to the Board giving Vitale the Lien when she gave an ultimatum to do so.  (Skaff Dep. 13-14).  Skaff also was troubled that the Company failed to meet the requirements for the first tranche of the PPM by not completing all the SEC documents.  (*Id.* at 37).  Skaff did not pressure the Company to sign a proposal in connection with his uncle, Claude McNeal.  Skaff testified at his deposition—months before Vitale's testimony on this topic—that he had a vague discussion with the Company about Mr. McNeal and that he "handed it immediately over to Harrison."[7]

Skaff believes an independent fiduciary in this case has the power to look at proposals and decide which the best is for the Company.  (*Id.* at 51).  Importantly, Skaff testified that because there are suitability and affiliation issues (i.e., the lack of annual meetings for several years, the seeking of investment from felons, including Dr. Walter), running a sale or financing

---

[7]  It is noteworthy that Vitale did not testify about this in the presence of Skaff during the hearing on the Trustee Motion despite her counsel asking Skaff questions about Mr. McNeal the day before at his deposition.  Instead, she waited to do so at a hearing where no rebuttal testimony could be offered due to Diamondhead's refusal to inform Petitioning Creditors what witnesses would be testifying at the hearing on the Motion to Dismiss.

proposal through a bankruptcy court might be the cleanest and most effective way to ensure a value maximizing process.   (Skaff Dep. 52; *see also* Burstyn Dep. 47).   No testimony or documentary evidence exists that supports Diamondhead's claims that Skaff is friends with all the other Petitioning Creditors.   Of the other Petitioning Creditors, the only one Skaff knows outside the context of this proceeding is Towner.   They used to work together and Towner simply does some bookkeeping for Skaff's business.  (Towner Dep. 30).

### 5.    Towner

Towner is a seventy-eight year old investor who owns stock and holds a $25,000 note in the Company. (Towner Dep. 4, 14)  Payment has been due on the note since May 29, 2012.  (*Id.* at 8).  Towner is not willing to accept stock as payment because there is no progress towards the Company becoming a real company, such as having a business to run.  (*Id.* at 9).  Towner made written demand on Diamondhead, through Vitale, for the immediate payment of his note, but his demand was ignored.

Towner joined the bankruptcy because there has been no progress with the company.  (*Id.* at 19).   Towner testified that he believed a bankruptcy trustee could come in and see that something was done with the property to pay creditors, including cause a sale of the company to a casino operator.  (*Id.* at 20-21).

Towner knows Skaff, but does not know any of the other Petitioning Creditors or Burstyn.  (*Id.* at 24, 30).  Skaff did not solicit Towner to join in this case.  Knowing that Towner also held a note in default, Skaff simply asked Towner whether he wanted join, but did not tell him that he needed to join to recover.  (*Id.* at 22-23).

Towner testified that he "assumed" that CHI was a petitioner because it previously sued Diamondhead.  (Towner Dep. 24-25).  He never talked to anyone at CHI.  (*Id.* at 25).  It is

noteworthy that counsel for Diamondhead himself asked a confusing line of questions to Towner by wrongly claiming that Skaff was an original petitioner. (*Id.* at 32). Skaff joined as a Petitioning Creditor around the same time Towner joined.

      **6.**      **DDM**

CHI is a family limited partnership owned by irrevocable trusts created for the benefit of Burstyn's children, of which Burstyn is the General Partner. (Tr. 1 at 39; Burstyn Dep. 4). In March of 2010, CHI loaned the Company $150,000 in exchange for a two-year promissory note with a 12% annual interest rate. (Tr. 1 at 40; PX-244). CHI received a few belated payments of interest in kind as shares, but they stopped at the end of 2012, around the time Vitale was given options at a very low price. (Tr. 1 at 41).

On September 22, 2014, CHI first demanded payment of the principal amount of the CHI Note and the interest from June 30, 2012 at 12% annually. At the time, the Property was unencumbered. On October 14, 2014, Vitale responded that the Company did not have the funds to pay the note. (PX-218; PX-220).

On January 15, 2015, CHI filed a lawsuit in the Superior Court of the State of Delaware seeking payment on its note. Seven days later, on January 22, Diamondhead sent a letter acknowledging the debt and notified CHI that it would exercise a purported right to convert the unpaid principal and interest into common stock of Diamondhead. (Ex. C at 3).

On February 11, Diamondhead moved to dismiss the Superior Court action contending that it had tendered the relief requested by CHI and therefore rendering the action moot. On July 2, the Superior Court rendered a decision denying the motion and holding that the Company materially breached the CHI note by failing to pay the principal to CHI by the maturity date, and failed to pay interest after June 30, 2012. The Superior Court further held that because the

Company materially breached the note, it could not enforce the conversion provision. This Court is familiar with the Superior Court's decision, which it cites in the Memorandum Opinion issued on November 13, 2015.

At the express request of the Company's directors, CHI assigned its note, including its cause of action against the Company, to DDM. (Burstyn Dep. 76-77; PX-263, Tr. 2 at 8) (Vitale agreed that Burstyn would need to divest himself of his holdings). On August 28, 2015, CHI confirmed this divestiture by sending an email to the Company's board of directors. (*Id.*).

DDM is a Florida limited liability company with two members—Alana and Ava Burstyn. Alana and Ava are Burstyn's daughters. Jason Giller ("Giller"), a Florida lawyer, is the manager and registered agent of DDM, and he was asked to form DDM by Alana Burstyn. (Giller Dep. 6-7, 12-13, 16-17) Alana informed Giller that she wanted to organize DDM to be capitalized with an assignment from CHI. (*Id.* at 32). Prior to accepting the assignment from CHI, Giller discussed the assignment with Alana—whom, other than undersigned counsel, he communicates with exclusively in connection with DDM. (*Id.* at 24, 45).

As a result of the assignment, DDM holds the assigned cause of action and the right to collect upon the cause of action, and to the extent permitted, the note that was given by Diamondhead. (*Id.* at 18). DDM does not own any stock. (*Id.* at 50). Currently, DDM's primary purpose is to collect on its claims, but that was not the only purpose for forming it. (*Id.* at 14-15).

DDM does not recall having discussions with any other Petitioning Creditors, and there is no evidence in the record that it has done so. (Giller Dep. 48).

**F.      Management Continues to Entrench Itself to the Detriment of the Creditors**

Benjamin Harrell ("Harrell"), a stockholder of Diamondhead who has been on the Board since 2002, and the current Vice President, testified that the Board met in early 2016 to vote on a potential capital raise by ████████████████████████ (Harrell Dep. 6, 9-11).  ████████ was going to raise an initial $250,000 in cash with best efforts to raise another $1 million, in exchange for a strong stock position and Board control.  (*Id.*)  The Board rejected the proposal, despite desperately needing the cash, because it believed the transaction would be detrimental to the Company.  (*Id.* at 10-12).  Vitale and Harrison desperately do not want to lose control of the Board.  The Board then instructed Vitale to continue negotiations to improve the terms for Diamondhead.  Vitale and director Rob Crow went to New York and met with ████████ and the negotiations were not fruitful.  (*Id.* at 14-15).  Harrell and director Martin Blount ("Blount") both testified that the Company has duly considered chapter 11 as an alternative to chapter 7.  (*Id.* at 49; Blount Dep. 24).

The Board also discussed raising funds to pay off the notes.  According to Blount, "[t]he bottom line is to pay off [creditors]."  (Blount Dep. 11).  Blount clarified the Company's position on Petitioning Creditors' bad faith argument.  Blount testified that he *assumes* that Petitioning Creditors are

> [t]rying to usurp the vote of the shareholders by keeping the company tied up in litigation, which is costly, *to prohibit the company from operating* and going forward and with this operating business plan.  Eventually the goal is to – that the company doesn't have the proper funding and, you know, I guess the strategy is to keep us tied up in litigation.

(*Id.* at 25-26) (emphasis added).  Despite being on the Board, apparently Blount does not realize the Company had not been operating for over fifteen years.

## ARGUMENT

### I.  THE MOTION SHOULD BE DENIED BECAUSE PETITIONING CREDITORS SATISFY SECTION 303 OF THE BANKRUPTCY CODE

Section 303 of the Bankruptcy Code requires three things to commence an involuntary bankruptcy against a debtor with twelve or more creditors: (i) there must be three or more petitioning creditors; (ii) each holding a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute; and (iii) the claims must aggregate at least $15,325 more than the value of the liens on the debtor's property. 11 U.S.C. § 303(b)(1).  Insolvency, as argued by Diamondhead in its opening brief, is not a requirement.  The Court must find only that the debtor is generally not paying its debt as they come due. § 303(h)(1).  Here, Petitioning Creditors each hold independent, non-contingent claims against Diamondhead, which are not the subject of a bona fide dispute. *See* 11 U.S.C. § 303(b)(1). As of the petition date, Petitioning Creditors collectively are owed $387,500 without calculating the interest due and owing, which Diamondhead does not dispute.

#### A.  No Bona Fide Dispute Exists

Diamondhead argues that Petitioning Creditors' claims are the subject of a bona fide dispute because, despite the Superior Court holding otherwise, Diamondhead and its directors continue to believe that the Company can cure its defaults of the Notes by paying principal and interest in stock, rather than cash.  Diamondhead also contends that there is a bona fide dispute because it has filed affirmative defenses in that action.  Diamondhead's contention fails as a matter of law because legally deficient counterclaims and affirmative defenses do not create a bona fide dispute.  *See In re Corrline Int'l, LLC*, 516 B.R. at 150 ("[W]hile the existence of counterclaims establishes that a dispute exists, it *does not* establish that a '*bona fide*' dispute exists."); *IBM Credit Corp.*, 179 B.R. at 478-480 (district court rejected argument that a bona

23

fide dispute existed as to the creditor's claims in an involuntary petition based on a counterclaim in pending state court litigation about the debt); *In re Data Synco, Inc.*, 142 B.R. at 181 (holding no bona fide dispute existed despite the fact that debtor had asserted counterclaim in lender's state court action.); *In re Onyx Telecommunications, Ltd.*, 60 B.R. at 498 ("This court is of the opinion that the mere existence of a proceeding in another court in which the Debtor has filed an answer generally denying the allegations of the complaint and asserting assorted affirmative defenses and counterclaims, while concededly establishing the existence of a dispute, does not as a matter of law, without more, establish the existence of a 'bona fide' dispute.").

In the Third Circuit, a bona fide dispute only exists when the putative debtor raises "substantial factual and legal questions" to dispute the liability or amount of the creditor's claims, which demonstrate "a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *See B.D.W. Associates, Inc. v. Busy Beaver Building Centers, Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989) (citing *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987); *see also In re Rimell*, 946 F.2d 1363, 1365 (8th Cir. 1991) (citing favorably to *Busick* and *Busy Beaver* and the Tenth Circuit's decision in *Bartmann* for the adherence to an objective standard in deciding whether a bona fide dispute exists).

Here, to establish the *prima facie* validity of a claim, Petitioning Creditors only must establish the existence of a contract obligating Diamondhead to repay the amount borrowed. Petitioning Creditors' claims consist of obligations imposed on Diamondhead set forth in the Notes, which are *prima facie* valid and not contingent as to liability or the subject of a *bona fide* dispute as to liability or amount.  Additionally, so long as only a portion of the claim is undisputed, it is settled law that the undisputed portion of the claim is sufficient to create a debt

under section 303(b)(1) of the Bankruptcy Code.  *See In re Focus Media, Inc.*, 378 F.3d 916, 926 (9th Cir. 2004) (noting the "widely accepted proposition regarding involuntary bankruptcy petitions:  If at least a portion of the debt that is the subject of the petition is undisputed, the undisputed portion is sufficient to create a debt under section 303(b)(1) not subject to bona fide dispute"); *IBM Credit Corp. v. Compuhouse Sys.*, 179 B.R. 474, 479 (W.D. Pa. 1995), *aff'd,* 85 F.3d 612 (3d Cir 1996) (same); *In re F.R.P. Indus., Inc.*, 73 B.R. 309, 321 (Bankr. M.D. Fla. 1987) (finding that even though a portion of a claim was subject to bona fide dispute, the undisputed part was greater than the statutory floor and was sufficient to support an involuntary petition); *In re Byrd*, 357 F.3d 433, 440 (4th Cir. 2004) ("Even if Byrd had demonstrated a bona fide dispute with regard to any portion of Platinum's claim that was for finance charges, Platinum still might have had an undisputed claim for principal in excess of § 303(b)(2)'s $11,625 threshold"); *In re Demirco Holdings, Inc.*, 2006 WL 1663237, at *3 (Bankr. C.D. Ill. June 9, 2006).

This Court's objective is to ascertain whether a dispute that is bona fide exists; it need not actually resolve the dispute.  *Id.*  This does not mean, however, that the Court is prohibited from addressing the legal merits of the alleged dispute; indeed, the Court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists. *Busy Beaver*, 865 F.2d at 66-67 (the Third Circuit affirmed a determination by the Bankruptcy Court that a veil piercing claim was not subject to bona fide dispute using a summary judgment type analysis).  Because Petitioning Creditors have established a prima facie case that no bona fide dispute exists, the burden has shifted to Diamondhead to demonstrate the existence of a bona fide dispute. *In re AMC Investors, LLC*, 406 B.R. at 484.  Diamondhead has failed to meet this burden because it has not raised any substantial factual or legal contention as

to the validity of Petitioning Creditors' respective claims.  To the contrary, Diamondhead has readily admitted that it is in default under the Notes and has failed to pay debts owing to Petitioning Creditors.  (*See* PX-218).  *See In re Knight*, 380 B.R. 67, 74 (Bankr. M.D. Fla. 2007) (where a debtor conceded that he owed a debt to the creditor, the court held that "his disagreement as to the amount owed does not constitute a *bona fide* dispute").  Diamondhead has conceded that Petitioning Creditors are owed in excess of $387,500 pursuant to their Notes, an amount well in excess of the minimum amount of $15,325 required to file an involuntary petition.  *In re Mylotte, David and Fitzpatrick*, 2007 WL 2033812, at *7 (Bankr. E.D. Pa. July 12, 2007) (finding that petitioning creditor met its burden by showing that a sufficient portion of its claim was not subject to a bona fide dispute).  Claims for amounts due on demand notes constitute claims that are not contingent or subject to *bona fide* dispute.  All a petitioning creditor is required to provide is evidence of an alleged unpaid loan for standing to file an involuntary petition.  *In re VitaminSpice*, 472 B.R. 282, 291 (Bankr. E.D. Pa. 2012) (recognizing that loan documents introduced by petitioning creditors were sufficient to establish prima facie validity of claims); *In re Taub*, 439 B.R. 261, 274–75 (Bankr. E.D.N.Y. 2010) (finding that petitioning creditor lacked standing where she had presented no evidence of the underlying agreement supporting her claim); *In re Rimell*, 111 B.R. 250, 253 (Bankr. E.D. Mo. 1990) *aff'd by* 946 F.2d 1363 (8th Cir. 1991) (evaluating underlying agreements to determine whether claim was subject to a bona fide dispute).

In light of Diamondhead's own admissions and this Court's prior findings, it strains credulity for Diamondhead to appear before this Court and argue that there is a *bona fide* dispute sufficient to require this Court to dismiss the petition.  Instead, the Motion to Dismiss reflects an inexplicable and entrenched intent to avoid their undisputed obligations and avoid having an

26

independent fiduciary investigate their self-dealing actions.  The undisputed facts demonstrate that no *bona fide* dispute exists here.  From the findings by the Superior Court, it is clear that Diamondhead is not contesting liability on the Notes, only how that liability should be paid – in stock or in cash.  The Superior Court held that the Notes are in default and *must* be paid in cash.

### B.    Diamondhead Is Not Generally Paying Its Debts as They Come Due

In a last ditch effort to avoid an order for relief in this case, Diamondhead now argues that it is not insolvent because the Property has been appraised for approximately $39 million. While Petitioning Creditors contend that Diamondhead is insolvent,[8] the statutory prerequisite to the filing of an involuntary petition is not insolvency, but whether or not the alleged debtor is generally paying its debts as they come due.[9]

Section 303(h)(1) of the Bankruptcy Code requires that where a petition is timely controverted, "the court shall order relief against the debtor in an involuntary case ... [only if] the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h).  Petitioning Creditors have met the requirement.  Diamondhead admits that it is not generally paying its debts

---

[8]  The CBRE valuation relied upon by Diamondhead is inadmissible hearsay and has not been tested for its reliability via expert testimony.  Accordingly, should the Court conduct an insolvency analysis, it should rely upon the value the Company has given to the Property listed on its books for over fifteen years, which is approximately $5.5 million.  (*See* Ex. B).

[9]  The "generally not paying standard" is not synonymous with the Bankruptcy Code's definition of insolvency contained in section 101(32); it is "not a balance-sheet insolvency test based on a comparison of assets and liabilities."  *Collier on Bankruptcy* ¶ 303.31 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).  The standard also differs from the "equity insolvency" test, inasmuch as it considers whether the debtor is *actually* paying its debt when due, not whether it *can* pay its debts when due.  *Id.; see also B.E. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1076 (2d Cir. 1983) (noting Congressional compromise in which the phrase "is generally not paying" was substituted for "is generally unable to pay").

as they come due.

All one has to do is review the Company's public filings.  The Company "has incurred continued losses over the past several years and certain conditions raise substantial doubt about the Company's ability to continue as a going concern."  (*See, e.g.*, PX-41, at PC000836.)  The Company "has incurred a loss applicable to common shareholders of $3,377,375 and $1,414,526 for the years ending December 31, 2014 and 2013, respectively, and expects continued losses for the foreseeable future."  (PX-40, at PC000268.)

Furthermore, it is clear that none of the Notes are being paid and several creditors have joined the involuntary petition.  The only other debt Petitioning Creditors are aware of is the Lien, which Petitioning Creditors believe constitutes a preferential or fraudulent transfer that should be investigated and pursued by a chapter 7 trustee or other independent fiduciary, and a $1,000,000 line of credit.

Diamondhead's non-payment of their substantial undisputed debts to Petitioning Creditors is long standing and habitual.  In short, the fact that the Company has refused to and cannot pay its debts to any of Petitioning Creditors shows that it is not paying their debts as they come due.

## II.    DIAMONDHEAD HAS FAILED TO MEET ITS BURDEN OF PROVING THAT PETITIONING CREDITORS FILED THIS CASE IN BAD FAITH

In light of the fact that Petitioning Creditors meet the statutory requirements of Section 303(b), in order to dismiss the Petition, Diamondhead must show by a preponderance of the evidence that the creditors acted in bad faith under a totality of the circumstances.  *See In re Forever Green Athletic Field, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015); *In re Tichy Electric Company, Inc.*, 332 B.R. 364 (Bankr. N.D. Iowa, 2005).  Diamondhead has failed to meet this burden.

A.    **The *Forever Green* Factors Weigh in Favor of a Finding that Petitioning Creditors Filed the Petition in Good Faith**

The Third Circuit, in *Forever Green*, set forth a non-exhaustive list of factors to aid the determination of bad faith under the fact intensive "totality of the circumstances" review.  The factors are: (1) the creditors satisfied the criteria for filing the petition; (2) the petition was meritorious; (3) the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; (4) there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; (5) the filing was motivated by ill will or a desire to harass; (6) the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; (7) the filing was used as a tactical advantage in pending actions; (8) the filing was used a substitute for customary debt collection procedures; and (9) the filing had suspicious timing.  *Forever Green*, 804 F.3d at 335.  As set forth herein, the vast majority, if not all, of the *Forever Green* factors, weigh in favor of Petitioning Creditors and in favor of entering an order for relief.

1.    **Factors 1 & 2:  Petitioning Creditors Satisfied the Requirements Under Section 303(b) and the Petition is Meritorious**

As set forth above, Petitioning Creditors are qualifying creditors under section 303(b) of the Bankruptcy Code and Diamondhead is not generally paying its debts as they come due. Thus, the involuntary petition is meritorious and the first two *Forever Green* factors evidence Petitioning Creditors' good faith.  *Forever Green*, 804 F.3d at 336.

2.    **Factor 3:  Petitioning Creditors were Aware that the Notes Were Due and Payable**

As set forth above, the three original Petitioning Creditors each own an unpaid Note and meet the statutory minimum which is all they need for standing to file a valid involuntary petition.  Additionally, they did not need to make a more extensive inquiry into the facts and the

29

law before filing because of the pending Superior Court litigation and corresponding Memorandum Opinion analyzing the terms of the Notes.  Petitioning Creditors had the benefit of judicial guidance.

### 3.   Factor 4:   There is Evidence of Avoidable Transactions and Dissipation of Assets

The Lien is an avoidable transfer for which no good faith defense is available.  The Company placed the Lien on the Property twenty days after the stock was deregistered and after receiving a demand for payment from CHI.  Vitale ignored CHI and made up excuses for not responding, all while she was making sure the Lien was drafted and recorded for her personal benefit.  (Tr. 1 at 68-73; PX-215; PX-218; PX-220).  Entry of an order for relief and the subsequent appointment of an independent fiduciary is necessary to ensure that any improper transfers are recovered for the benefit of all non-insider creditors.  Moreover, as a trustee will succeed to Diamondhead's privileges, including its attorney-client privilege, *see CFTC v. Weintraub*, 471 U.S. 343 (1985), the trustee will have the opportunity to examine the true extent of what has been transpiring at Diamondhead for the past 15 years.  *See Forever Green*, 804 F.3d at 336.  With regard to dissipation of assets, this non-operating Company has burned through in excess of $18 million in shareholder value while also incurring in excess of $9 million in Debt during the past 15 years, yet the property remains undeveloped.

### 4.   Factor 5:  The Involuntary Petition was Not Filed Out of Ill Will or to Harass

Petitioning Creditors no longer trust management, but they harbor no ill will towards management. (S. Sussman Dep. 7-8, 11; A. Sussman Dep 17).  The Company's reliance on Burstyn's frustrations with the Board's misconduct, which resulted in a significant loss to his children's education and health care funds, widely misses the mark.  Burstyn is not a Petitioning

Creditor and there is no evidence in the record of any ill will or malice towards management by any of Petitioning Creditors.  Similarly, four of the six Petitioning Creditors had no involvement with the proxy solicitation in advance of the annual meeting.  (*Id.* at 13, 18).  Of the two that had involvement, Stark simply nominated the slate and spoke with a handful of potential voters prior to the meeting.  Due to the fact that no evidence exists of any Petitioning Creditor's ill will or malice, Vitale resorted to testifying about untrue statements purportedly made to her by director Carl Stevens ("Stevens") and broker James Devlin ("Devlin"), but these statements constitute inadmissible hearsay within hearsay.[10]  Petitioning Creditors did not file the involuntary out of ill will or desire to harass Diamondhead.  *See Forever Green*, 804 F.3d at 336.

### 5.    Factors 6 and 7:  The Involuntary Petition was Not Filed for a Tactical Advantage or to Gain an Advantage Over Other Creditors

One of the goals of the Petitioning Creditors was to protect the Property from any further diminution in value due to insider transactions.  Petitioning Creditors believed it was necessary to remedy the self-interested insider Lien and to stop insider payments, particularly ones made with funds earmarked to "clean up" the Company.  (Tr. 1 at 63).  Upon receipt of the earmarked funds from the investors, the Board beholden to Vitale paid her back rent and salary.  *Id.*  Only

---

[10]  Skaff's statements to Stevens and Devlin might be admissible if Stevens and Devlin had testified.  However, Stevens' and Devlin's alleged statements made to Vitale are inadmissible hearsay, because they were allegedly made by out of court declarants, and therefore, such statements are inadmissible.  Diamondhead argues that the statements are admissible because they are not being offered for the truth of the matter asserted, but to show Skaff's state of mind.  That argument is fatally flawed because of the inadmissible hearsay—*Stevens' and Devlin' statements to Vitale*—are being offered for the truth of the matter asserted, namely that those conversations occurred and Skaff in fact made the statements.  *See Smith v. Allentown*, 589 F.3d 684, 693-94 (3d Cir. 2009) (excluding repetition of an alleged statement as hearsay because the statement of the in-court-witness describing the conversation between out-of-court Person A and out-of-court Person B was offered for the truth of the matter asserted, i.e., that the conversation between Person A and Person B actually happened).

after creditors started demanding payment of their overdue Notes did Vitale have the Lien placed on the Company's sole asset primarily for her benefit.  When confronted about the payments, she angrily asked, "what would you rather [me] do for back salary?  Sue the company and get a judgment and then take over the land?"  (*Id.* at 64).  Moreover, the Lien was placed on the Property despite a continued marketing of the Property as being debt free and lien free.  (*Id.* at 65).  Rather than paying off creditors, whose notes were long in default, Vitale spent money on back rent payable to herself.  (*Id.* at 68-71; PX-54).  The Lien was provided to cover clams for past and future services—while faced with creditor demands for repayment.  (Burstyn Dep. 16). In short, every day that ticks by, the Lien expands.  (Tr. 1 at 106).

It is undisputed that Petitioning Creditors are owed money, and certainly want to have their Notes paid to the fullest extent provided by the Bankruptcy Code.  Petitioning Creditors were and remain concerned that Diamondhead will continue to dissipate the Property by providing additional liens to insiders and others.  By filing the petition, Petitioning Creditors were attempting to forestall any further dissipation of assets from the reach of bona fide existing creditors.

Petitioning Creditors neither seek to obtain a disproportionate advantage for themselves nor is the involuntary petition a litigation tactic.  Petitioning Creditors are not seeking an advantage over other lawful creditor claims, but instead are seeking to make sure the Property is protected, its value maximized and all creditors are treated fairly.  *See Forever Green*, 804 F.3d at 336.  Moreover, there is no pending litigation pursuant to which Petitioning Creditors are seeking to obtain a litigation advantage.  The three original petitioners are not engaged in any litigation, and only DDM is a potential future party to litigation against Diamondhead.  If the automatic stay were lifted, DDM might substitute in as the plaintiff in the Superior Court

litigation, however, this bankruptcy case is not an advantage to DDM's potential action. In fact, it is a detriment to it. The Superior Court already found that the Notes are not convertible, and it is reasonably foreseeable that CHI (and now DDM) would have been well on its way to obtaining a judgment against Diamondhead for the amount of its Note. This collective case allows all other creditors to participate in any recovery under the Notes without commencing six separate actions. Unlike in *Forever Green*, the involuntary filing here is not due to a desire to avoid actions pending in a related case, it actually avoids a race to the courthouse by many individual creditors.

Diamondhead incorrectly contends that CHI's assignment to DDM is ineffective. Due to the Company's material breach of the CHI note, as held by the Superior Court, Diamondhead cannot enforce any of its provisions, including any assignment restriction contained therein. (*See* Superior Court Decision, at 8) ("It is also well settled in contract law that a 'party who first commits a material breach of a contract cannot enforce the contract going forward.'"). Moreover, CHI also assigned to DDM its cause of action against Diamondhead for breach of its note. The provisions of the note do not and cannot restrict such an assignment.

Diamondhead also incorrectly contends that CHI transferred its note claim and assigned its note in violation of the automatic stay. Transfers frequently occur in bankruptcy cases despite the imposition of the automatic stay. *See In re Garcia*, 2011 WL 2551184, at 3 (Bankr. D.NJ. June 21, 2011). Moreover, it has been held that "[t]he transfer of claims in a bankruptcy case do not violate the automatic stay provision of 11 USC § 362(a)." *See Utzler v. Braca*, 2010 WL 2106321 (Conn. Super. Ct. Apr. 19, 2010), citing *In re R & L Engineering Co.*, 182 F.Supp. 317, 319 (S.D.Cal.1960). "[C]ase law firmly establishes the legal principle that the post-petition transfer of a claim from a creditor to an assignee does not violate the automatic stay." *In re*

*Olick*, 2010 WL 4509828, at *1 n. 5 (Bankr.E.D.Pa. Nov. 9, 2010) (citing cases). Finally, the Company asked CHI to divest its ownership of Diamondhead's securities, and it complied. Therefore, at a minimum, Diamondhead acquiesced to the assignment. (Burstyn Dep. 76-77; PX-263; Tr. 2 at 8).

The Lien—a large improper transfer—was made last September that likely will result in a valuable avoidable transfer action should this bankruptcy case be allowed to continue. The recipients of this potentially avoidable transfer include the Company's insiders. Any further delay in initiating a bankruptcy case would have placed the Lien outside of the applicable preference recovery period. Consequently, the value of the bankruptcy estate would have diminished had the involuntary petition not been filed when it was.

### 6. Factors 8 & 9: The Involuntary Petition was Not Filed as a Substitute for Customary Debt Collection and was Not Suspiciously Timed

Diamondhead argues that this is a substitute for customary debt collection, yet, strangely, it also argues that Petitioning Creditors' "motive is not to get what they are owed under their Notes, but to get control of the Company." (Op. Br. at 32). Diamondhead cannot have it both ways. Nevertheless, this case is anything but a customary debt collection action; nor is the timing of the involuntary suspect. The goals of Petitioning Creditors include: (i) avoiding certain transfers to insiders; (ii) maximizing the value of the Property for all parties-in-interest; (iii) reviewing and rejecting certain unfavorable executory contracts; and (iv) investigating and pursuing breach of fiduciary duty claims, most of which are only available to a trustee.

As several courts have held, filing an involuntary petition is among the remedies available to noteholders following payment defaults such as those that have occurred here. *See Envirodyne Indus., Inc. v. Conn. Mut. Life Co. (In re Enfirodyne Indus., Inc.)*, 174 B.R. 986, 997 (Bankr. N.D. Ill. 1994); *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB*

*Bancshares, Inc.)*, 517 B.R. 361, 368 (Bankr. M.D. Ga. 2014); *GMAM Inv. Funds Trust I v. Globo Comunicacoes E Participacoes S.A. (In re Globo Comunicacoes E Participacoes S.A.)*, 317 B.R. 235, 248 (S.D.N.Y. 2004).  In the case of *In re: Hrobuchack*, 2015 WL 1651074, at *2 (Bankr. M.D. Pa. Apr. 8, 2015), the Bankruptcy Court for the Middle District of Pennsylvania in applying the lower court decision in *Forever Green* denied a motion for reconsideration by a debtor seeking to dismiss an involuntary petition.   The *Hrobuchack* Court held that the petitioners did not act in bad faith by invoking the Bankruptcy Court's jurisdiction because they wanted to be paid the money owed to them:

> It is true that the petitioning creditors were owed money and, in all certainty, want to have their claim paid to the fullest extent provided by the Bankruptcy Code. The petitioning creditors believed that a fraudulent dissipation of Debtor's assets was imminent and were attempting to forestall any dissipation of assets from the reach of bona fide creditors.

*In re: Hrobuchack*, 2015 WL 1651074, at *2.

The petition was not filed because of Vitale's refusal to take Mrs. Sussman's idea into consideration of adding some of the competing nominees to the board, which the other Petitioning Creditors were not a part of.  More importantly, the petition was filed subsequent to the Superior Court's issuance of its Memorandum Opinion on July 2, 2015.  It was the Memorandum Opinion that made it clear to Petitioning Creditors that the Company could not unilaterally convert the principal and interest of their Notes.  The Memorandum Opinion just happened to be issued three and a half weeks after the annual meeting.

The cases cited by Diamondhead for the proposition that dismissal is appropriate when a petitioner "is seeking to use the bankruptcy court as an alternative approach to state court procedures to resolve intra-company management and stockholder disputes" are based upon facts inapposite to the case at hand.  *In re ABQ-MCB Joint Venture* was an involuntary case filed by

*one* of two partners to a joint venture to stop a pending state court foreclosure sale where the petitioner was using the bankruptcy court as an alternative to state court proceedings to resolve an intra-company dispute.  The bankruptcy court abstained because the case was essentially a two party dispute, where the creditor had adequate state law remedies and the debtor had no significant unencumbered assets for the bankruptcy court to administer.  *In re ABQ-MCB Joint Venture*, 153 B.R. 338, 342 (Bankr. D.N.M. 1993).

   *In the Matter of Win-Sum Sports, Inc.*, 14 B.R. 389, 394 (Bankr. D. Conn. 1981) was an involuntary case filed by three petitioning creditors at the request of a stockholder.  The bankruptcy case was dismissed because: (i) the debtor had paid or made acceptable arrangements to pay all of the debts of the petitioners; and (ii) there was indemnity agreement between the petitioning creditors and the stockholder by which the stockholder agreed to indemnify petitioning creditors from any losses resulting from dismissal of the involuntary petition and for attorney fees, without which creditors would not have brought the petition.  The evidence established that the stockholder was seeking to use the bankruptcy court as an alternate to state court proceedings to resolve intracompany management and stockholder problems.

   *In re Beacon Reef Limited Partnership*, 43 B.R. 644, 646-7 (Bankr. S.D. Fla.1984) was an involuntary petition filed by a *sole* limited partner of a partnership.   The bankruptcy court held that in light of sharply contested claims and disputed proof as to the status of the partnership's debts, access of the parties to a pending state foreclosure forum, the satisfaction of virtually all of the creditors' claims by subsequent payments, and the necessary complexities of bankruptcy process, abstention was appropriate based on findings that the involuntary petition amounted to no more than claim made by single disgruntled investor and that dispute was

36

primarily only between two general partners remaining active in partnership and single investor who was the sole limited partner.

*In the Matter of Investment Corp. of North America*, 39 B.R. 758 (Bankr. S.D. Fla. 1984) was an involuntary filed by three creditors all of which were controlled by Liss who had been active in the management of the Debtor's business and had a personal relationship with the principal of the debtor.  While the relationship existed, Liss had assumed a dominant role in the operation of the debtors business.  Upon cessation of this personal relationship, Liss filed actions in state court seeking repayment of alleged loans to the debtor.  The issues regarding debt repayment and stock issuance could be litigated in the appropriate state court forum.  However, Liss chose to allow the state court actions to lie dormant in favor of using the bankruptcy court as the vehicle to resolve these issues.  The debtor had also made arrangements, out of court, to pay many creditors.  On these facts, the bankruptcy court abstained from considering the involuntary petition without any support from additional creditors, where debtor had made apparently satisfactory arrangements, out-of-court, with many creditors, the prospects of the debtor's business seemed to be improving and the apparent motivation of petitioning creditors was to obtain control of debtor's business.

None of the facts set forth in the aforementioned cases bear any resemblance to the facts in this case, and therefore are easily distinguishable and are not applicable.

### B.    Other Facts Demonstrating Good Faith

The bad faith filing doctrine is typically invoked when a single creditor files an involuntary petition knowing that three or more creditors are required to have an effective involuntary petition, with an eye toward later seeking additional joining creditors after the would-be debtor files a list of creditors with the court as required by Bankruptcy Rule 1003(b).

In creating a doctrine, the courts recognized that "[t]he ability to force a debtor into bankruptcy *in the hands of a single creditor* is a very dangerous weapon." *In re Dino's, Inc.*, 183 B.R. 779, 783 (Bankr. M.D. Fla. 2012) (emphasis added).  Most courts that embrace the bad faith filing doctrine speak of it as only applying to an involuntary case filed by a single creditor. *See, e.g., Basin Elec. Power Coop. v. Midwest Processing Co.*, 769 F.2d 483, 486 (8th Cir. 1985) ("While an involuntary petition may be cured after filing when *a single creditor* filed in good faith believing the debtor has fewer than twelve creditors, *a single creditor* may not file an involuntary petition knowing the debtor has twelve or more creditors.") (emphasis added); *In re Mylotte,* 2007 WL 2033812, at *8. ("[T]he vast majority of courts, along with various bankruptcy commentators, have concluded that a bankruptcy court may dismiss a defective involuntary petition filed by *a single creditor* in bad faith, even if additional creditors seek to join in the petition, and even if their joinder would meet the three petitioning creditor requirement.") (collecting cases) (emphasis added). *In re Atlas Mach. & Iron Works*, 190 B.R. 796, 802 (Bankr. E.D. Va. 1995) (noting "this Court adopted the rule that a single creditor who filed an involuntary petition with knowledge that a debtor has twelve or more creditors acts in bad faith."). When the bad faith filing doctrine has been raised tried in cases with three or more initial petitioning creditors, the courts generally have not found a bad faith filing. *See, e.g., In re LaRoche*, 131 B.R. 253, 255 (D.R.I. 1991).

The motivating concern behind the bad faith filing doctrine is lessened, if not completely eliminated, when, as here, three or more creditors are responsible for the original involuntary petitions and others have joined the involuntary petitions.

Finally, the fact that one petitioning creditor seeks out others to join in the filing of an involuntary petition does not give rise to a finding of bad faith on the part of the petitioning

creditor. *See In re Key Auto Liquidation Center, Inc.*, 372 B.R. at 80; *In re Reveley*, 148 B.R. 398, 410 (Bankr. S.D.N.Y. 1992); *U.S. Fid. & Guar. Co. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1012 (N.D.N.Y. 1986) (stating, "it would be idealistic for this court to believe that three creditors would voluntarily travel to the bankruptcy court and meet on its doorstep with an identical purpose, to commence an involuntary bankruptcy proceeding against an alleged debtor").

### C.   Diamondhead's Unclean Hands and Bad Faith Conduct Precludes a Finding that Petitioning Creditors Filed the Petition in Bad Faith

The Board's own bad faith places the Company before this Court with unclean hands. The Third Circuit, in *Forever Green*, stated that bankruptcy courts have "strong roots in equity" and determinations of good and bad faith protect the "'integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands.'" *Id.* at 334.   The maxim of unclean hands is that "he who seeks equity must do equity," and Diamondhead's actions to date are the antithesis of equitable conduct.   Here, under the "totality of the circumstances," Petitioning Creditors have filed the involuntary petition in good faith.

## III.   ABSTENTION IS NOT WARRANTED

As set forth in Petitioning Creditors' objection to the Motion to Dismiss, as a general matter, abstention is only warranted if "the interests of creditors and the debtor would better be served by dismissal of the case or suspension of all proceedings in the case." 11 U.S.C. § 305. Courts that have construed section 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is extraordinary, and that dismissal is appropriate under section 305(a)(1) only in the situation where the court finds that both creditors and the debtor would be better served by a dismissal. *In re AMC Investors, LLC*, 406 B.R. at 487-488.   Diamondhead

bears the burden to demonstrate that the interests of the debtor and creditors would benefit from dismissal. *In re AMC Investors, LLC*, 406 B.R. at 488.

The totality of the circumstances does not support abstention here.  With regard to the economy and efficiency of administration, this Court is extremely capable of economically administering debtor estates, especially ones with no current operations or employees.  The only tasks to be completed by a chapter 7 trustee at this point would be to: (i) maximize the value of the Property through a full, fair and open sale process; (ii) analyze and assume or reject any executory contracts; and (iii) investigate and pursue any claims held by the estate.

Other than the Superior Court action, no other action is pending in a state court or any other forum available to protect the interests of both Diamondhead and Petitioning Creditors. Additionally, as set forth above, some of the reasons for the filing of the involuntary petition were to preserve the ability of Diamondhead's estate to pursue the Lien and analyze and assume or reject any executory contracts, something that can be accomplished only under federal bankruptcy proceedings.

A state court proceeding does not have the same ability to pursue preference actions or assume or reject executory contracts.  Furthermore, Diamondhead and the creditors have not been able to work out a less expensive out-of-court arrangement that better serves all interests in this case.  The Company's insiders are entrenched and have refused pay what is due on the Notes, all while continuing to pay themselves and run the company primarily for their own benefit at the expense of all stakeholders.  It is unlikely the parties will reach an agreement to work on an out-of-court arrangement.  In fact, all that would happen if this Court were to abstain is that individual creditors would be forced to file separate claims in state court to obtain judgments against Diamondhead—an entity that does not directly own the Property.

A bankruptcy proceeding may be the only way for Petitioning Creditors to: (i) seek the appointment of an independent fiduciary to investigate and pursue breach of fiduciary duty, preferential transfer and other claims against the Company's officers and directors; (ii) maximize the value of the Company's assets through a fair and open sale process; (iii) analyze and assume or reject any executory contracts that may exist; (iv) secure the Company's books and records; and (v) finally provide a long overdue payment on the Notes.   Indeed, without this case, Diamondhead is likely to continue to refuse to pay on the Notes, continue to place liens on the Property for the benefit of insiders and refuse to prosecute any causes of action it might have against its officers and directors.   Upon entry of an order for relief, however, a chapter 7 trustee will have the authority to sell the Property to pay creditors, assume or reject executory contracts and investigate and pursue any legitimate claims against the Company's officers and directors.

Unlike in a state court action, an independent fiduciary in this bankruptcy proceeding would be empowered to look at proposals for the sale or development of the Property and decide what is in the best interests of the Company and all stakeholders.  (Skaff Dep. 51-52).  Skaff and Burstyn testified that a bankruptcy could maximize value for bona fide creditors because it likely would provide an opportunity for an interested party who may want the property with a clean title.   (Skaff Dep. 52) ("There [are] so [many] suitability and affiliation issues, and, as Ted Arneault says, so much hair on this dog, that running it through a federal judge might be the cleanest way for a buyer to know there's nothing hidden in the weeds."); (Burstyn Dep. 47-48).

IV.     **SHOULD THE COURT CONVERT THIS TO CHAPTER 11, THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE**

For the reasons set forth in the Trustee Motion and herein, if the case is converted to a

case under Chapter 11, a Chapter 11 trustee should be appointed by the Court.[11]

## CONCLUSION

For the foregoing reasons, and as set forth in Petitioning Creditors' prior filings, the Court should deny the Motion to Dismiss, and should the Court convert the case to one under Chapter 11, the Court should appoint a Chapter 11 trustee.

Dated: February 26, 2016
   Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

   */s/ Joseph B. Cicero*
William E. Chipman, Jr. (No. 3818)
Joseph B. Cicero (No. 4388)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Telephone: (302) 295-0191
Facsimile: (302) 295-0199
Email:  chipman@chipmanbrown.com
    cicero@chipmanbrown.com
    olivere@chipmanbrown.com

  -and-

John H. Genovese
**GENOVESE JOBLOVE & BATTISTA P.A.**
100 Southeast Third Street, 44th Floor
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310
Email:  jgenovese@gjb-law.com

*Counsel to Richard Stark, Arnold Sussman, Alan D. Cohen, Robert F. Skaff, Jr., David J. Towner, and DDM Holdings, LLC*

---

[11] If this Court is not convinced a Chapter 11 Trustee is necessary based on the current record, then Petitioning Creditors respectfully request additional discovery due to the Company's failure to comply with discovery obligations during the expedited proceedings on the Trustee Motion.  (*See* Op. at 1 n.4) ("The Petitioning Creditors may submit additional evidence if they so choose with respect to a chapter 11 trustee if and when there is a chapter 11 case.")