IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| DIAMONDHEAD CASINO CORPORATION, | ) | Case No. 15-11647(LSS) |
| Alleged Debtor. | ) | |
| _____ | ) | |

## OPINION[1]

This is the second opinion in this case, which began as an involuntary petition filed against Diamondhead Casino Corporation ("Diamondhead" or the "Company") by three stockholders/noteholders. Soon after the involuntary petition was filed, these petitioning creditors moved for the appointment of a chapter 7 trustee during the gap period. For the reasons set forth in the first opinion, that motion was denied after an evidentiary hearing.[2]

Now, the Court is faced with the alleged debtor's motion to dismiss the involuntary petition ("Motion to Dismiss").[3] After a second evidentiary hearing and post-hearing briefing, the Court grants the motion. As became evident in the first evidentiary hearing and solidified in the second, the petitioning creditors' primary purpose in filing this case was to effect a change in management, and their secondary purpose was to collect a debt. On the facts of this case, neither of these goals serves a proper bankruptcy purpose.

### Procedural Background

On August 6, 2015, David A. Cohen, Arnold J. Sussman, and F. Richard Stark (the "Original Petitioning Creditors") filed an involuntary petition against Diamondhead. On

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2] *In re Diamondhead Casino Corp.*, 540 B.R. 499 (Bankr. D. Del. 2015) ("Trustee Opinion")

[3] *Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition, or, in the Alternative, to Convert the Case to Chapter 11* [Dkt. No. 4]

September 11, 15, and 17, respectively, Robert F. Skaff, David J. Towner, and DDM Holdings, LLC (collectively, and together with the Original Petitioning Creditors, the "Petitioning Creditors") joined the involuntary petition.

On August 28, 2015, Diamondhead filed the Motion to Dismiss. While that motion was pending, the Petitioning Creditors filed an emergency motion seeking the appointment of an interim trustee ("Trustee Motion"). Following a status conference, the parties agreed that the Court should hear the Motion to Dismiss after hearing the Trustee Motion. An evidentiary hearing on the Trustee Motion was held on October 16 and 20, 2015, and the Trustee Opinion issued denying the motion.

On September 17, 2015, the Petitioning Creditors filed their opposition to the Motion to Dismiss. An evidentiary hearing was held on January 15, 2016. At the hearing on the Motion to Dismiss, the alleged debtor presented the further live testimony of Ms. Deborah Vitale, Diamondhead's Chief Executive Officer. Additionally, the parties agreed to include in their post-hearing submissions, designations and counter-designations of deposition testimony. They also incorporated into the hearing on the Motion to Dismiss all the evidence presented in connection with the Trustee Motion.[4]

On February 5, 2016, Diamondhead filed its post-hearing opening brief.[5] On February 26, 2016, the Petitioning Creditors filed their post-hearing answering brief.[6] And,

---

[4] Mot. to Dismiss Hr'g Tr. 16–17, Jan. 15, 2016 [Dkt. No. 83] ("MTD Hr'g Tr.")
[5] *Post-Hearing Opening Brief of Alleged Debtor Diamondhead Casino Corporation in Support of Its Motion to Dismiss* [Dkt. No. 85] ("Post-Hr'g Open'g Br.")
[6] *Petitioning Creditors' Post-Hearing Answering Brief in Opposition of Alleged Debtor's Motion to Dismiss* [Dkt. No. 86] ("Post-Hr'g Ans. Br.")

on March 10, 2016, Diamondhead filed its post-hearing reply brief.[7] This is the Court's
ruling.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a)
and (b)(1).  A motion to dismiss an involuntary petition is a core proceeding pursuant to 28
U.S.C. §§ 157(b)(2)(A) and (O).

## Factual Background

None of the additional evidence adduced on the Motion to Dismiss causes the Court
to question the factual conclusions reached in the Trustee Opinion.  Accordingly, except to
briefly reset the stage, the Court will elaborate upon and make further factual findings
necessary for this opinion, but will otherwise rely upon the factual findings in the Trustee
Opinion, all of which are incorporated herein.

### I.  Brief Re-cap of the Trustee Decision

Prior to August of 2000, Diamondhead operated ship-based gambling operations
primarily out of ports located in Florida.  In August 2000, Diamondhead divested itself of
its ship-based operations and began to focus on the development of a land-based casino
resort in Diamondhead, Mississippi.  Since 2000, it has had no operations.  Aside from a
small amount of cash, Diamondhead's only tangible asset is its wholly owned subsidiary,
Mississippi Gaming Corporation, which owns 404 acres of undeveloped land off of
Interstate 10 in Diamondhead Mississippi (the "Property").  Since 2000, Diamondhead has
sought to develop the Property into a destination resort centered around a casino.  However,

---

[7] *Post-Hearing Reply Brief of Alleged Debtor Diamondhead Casino Corporation in Support of Its Motion to Dismiss* [Dkt. No. 89] ("Post-Hr'g Reply Br.")

Diamondhead has never and does not currently have the financial wherewithal to develop the Property. Instead, it will need to raise funds or find a joint venture partner to attain this goal.

In 2010, pursuant to a private placement memorandum, the Company completed two rounds of financing. Diamondhead raised $475,000 in March 2010 and another $475,000 in November 2010.[8] In exchange, the Company signed promissory notes, with maturity dates two years from issuance and interest at either 9% or 12%, as applicable (collectively, the "2010 Notes," and each a "2010 Note").[9] The 2010 Notes are also convertible into equity under certain circumstances. Each of the 2010 Notes has matured and the Company has not paid them.

## II. Additional Factual Background

### A. Prepetition Events

Notwithstanding the Company's failure to develop the Property or to pay the 2010 Notes when they matured in 2012, there is no evidence that, prior to 2015, any of the Petitioning Creditors, or other investors or lenders, initiated litigation against Diamondhead. In 2014, however, several significant events occurred that were seen as troubling by one or more of the Petitioning Creditors.

First, in June 2014, the Securities and Exchange Commission temporarily suspended trading of Diamondhead stock for failure to make required filings, and in September 2014, the stock was deregistered.[10] At least some of the Petitioning Creditors were not, in the first

---

[8] Diamondhead issued one 2010 Note on June 21, 2011.
[9] Except for the interest rate and the holder of the note, the 2010 Notes appear to be identical.
[10] Interim Trustee Hr'g Tr. 31, 59, Oct. 16, 2015 [Dkt. No. 65] ("First Day Trustee Hr'g Tr.")

instance, alerted of this event by Diamondhead.[11]  The lack of communication as well as the

failure to make required filings understandably caused significant concern.

Second, the Company granted a lien on the Property (the "Executives Lien") to Ms.

Vitale and certain board members up to an aggregate amount of $2 million in order to

secure outstanding amounts owed to them for past services, as well as to secure future

obligations.[12]  Ms. Vitale, in particular, demanded the Executives Lien, threatening to leave

the Company if it was not granted.[13]  The Executives Lien was granted contemporaneously

with the Company's granting of liens on the Property in connection with its 2014 round of

financing.[14]  This was the first time the Property was encumbered.  Certain of the

Petitioning Creditors were enraged by the granting of the Executives Lien to Ms. Vitale and

other insiders as both Ms. Vitale and Mr. Harrison had previously stressed that the Property

should remain unencumbered.[15]

Third, Diamondhead's board ratified the Company's lease of a townhome owned by

Ms. Vitale that served as the Company's headquarters.[16]  Ms. Vitale first requested rent in

2012 via a letter to the board of directors.  In her letter, Ms. Vitale stated that the Company

had been using her townhome rent free since at least 2001, and that if the Company did not

want to pay rent, it could move out.[17]  As a result of her letter, the Company and Ms. Vitale

entered into a month-to-month lease for the townhome effective as of September 1, 2011.[18]

---

[11] First Day Trustee Hr'g Tr. 120
[12] *Id.* at 178–79; Petitioning Creditors' Ex. 54 ("PC Ex.")
[13] Interim Trustee Hr'g Tr. 56–57 Oct. 20, 2015 [Dkt. No. 66] ("Second Day Trustee Tr.")
[14] Trustee Opinion at 503
[15] Second Day Trustee Hr'g Tr. 55
[16] First Day Trustee Hr'g Tr. 200–01
[17] First Day Trustee Hr'g Tr. 201–02
[18] First Day Trustee Hr'g Tr. 202:9–25

As disclosed in the 2014 Private Placement Memorandum, Ms. Vitale received $100,000 from funds raised in 2014 on account of rent owed.[19]

Fourth, Diamondhead refused certain Petitioning Creditors' requests to add any new members to the board. Diamondhead twice turned down Mr. Skaff's request to sit on the board, the last request being January 2015.[20] And later in 2015, after the Company's annual meeting (see below), Diamondhead once again refused to seat any new members on the board.[21]

Fifth, the Petitioning Creditors lost faith in management. Four of the Petitioning Creditors testified that, over the years, Diamondhead, and in particular, Mr. Harrison, continually represented to them that a deal to develop the property with various significant players in the casino industry was on the horizon.[22] Mr. Harrison convinced at least one of the Petitioning Creditors to retain his investments, promising greater returns would materialize in the near future.[23] As the years passed, and Diamondhead did not reach a deal to develop the Property, frustration grew. It appears to have peaked in 2014.

In 2015, litigation began.

## B. Litigation

### (i) College Health and Investments, Ltd v. Diamondhead

On January 15, 2015, College Health and Investments, Ltd. ("College Health")[24] sued Diamondhead in the Superior Court of the State of Delaware in and for New Castle

---

[19] First Day Trustee Hr'g Tr. 251; Diamondhead Ex. I; PC Ex. 250 (Diamondhead Casino Corporation Private Placement Memorandum, dated Feb. 14, 2014) at 20
[20] First Day Trustee Hr'g Tr. 143; MTD Hr'g Tr. 36–38
[21] Skaff Dep. 147–48; Soraya Sussman Dep. 12
[22] First Day Trustee Hr'g Tr. 9–11, 74–75, 140–41; Skaff Dep. 42; Cohen Dep. 17; Stark Dep. 8–9
[23] First Day Trustee Hr'g Tr. 14
[24] College Health is not a petitioning creditor. On September 17, 2015, College Health purportedly assigned its promissory note to DDM.

County.[25]  In this lawsuit, College Health sought payment of its 2010 Note in the principal

amount of $150,000.[26]  Diamondhead did not pay the promissory note at maturity.  Rather,

on January 22, 2015, seven days after the filing of the lawsuit, Diamondhead notified

College Health that it was exercising its right, pursuant to section 2.1 of the 2010 Note, to

convert the principal and interest owed to College Health into Diamondhead common

stock.[27]

Consistent therewith, on February 11, 2015, Diamondhead filed a motion to dismiss

the College Health lawsuit as moot, asserting that Diamondhead had tendered the relief

requested by College Health.[28]  On July 2, 2015, the Superior Court (William G. Carpenter,

J) issued its Memorandum Decision denying Diamondhead's motion to dismiss.  First,

Judge Carpenter found that Diamondhead had defaulted on College Health's 2010 Note

when the note matured and Diamondhead failed to pay amounts owed.[29]

Second, Judge Carpenter acknowledged Diamondhead's right of conversion under

section 2.1 of the note, but found that right limited to the time period prior to maturity.  In

particular, he found that in section 4.6 of the note, Diamondhead waived "any and all

defenses it may have in the future with respect to [its obligation to pay the principal and

interest as of the Maturity Date], except to the extent that (a) this Note has been converted

into Common Stock in accordance with [section 2] *prior to the Maturity Date . . . .*"[30]  He

further found his determination consistent with the intent of the parties as evidenced by the

---

[25] *College Health & Investment, L.P. v. Diamondhead Casino Corporation*, C.A. No. N15C-01-119WCC, 2015 WL 5138093, at *1 (Del. Super. Ct. July 2, 2015) (the "Superior Court Decision"); Post-Hr'g Open'g Br. 23

[26] Superior Court Decision at *1; PC Ex. 244

[27] *Id.*

[28] *Id.*

[29] Superior Court Decision at *2 (citing to section 3.1 of the 2010 Note)

[30] Superior Court Decision at *2–3 (emphasis in original)

private placement memorandum under which the promissory note had been issued, and which was incorporated into the note.[31] Judge Carpenter concluded that Diamondhead "does not have the right to convert the remaining principal and interest into Common Stock, and cannot now assert that its obligations have been satisfied."[32]

As College Health's lawsuit was not moot, Diamondhead's motion to dismiss was denied. Thereafter, on July 16, 2015, Diamondhead filed its Answer and Grounds of Defense.[33] Due to the involuntary petition the case has not proceeded.

### (ii)  The Chancery Court Litigation and the Annual Meeting

Prior to January, 2015, Diamondhead had not held an annual stockholder meeting for approximately 7 years.  On February 13, 2015, College Health filed a complaint pursuant to 8 Del.C. § 211(c) in the Court of Chancery of the State of Delaware seeking an order compelling Diamondhead to hold an annual meeting.[34]  A second complaint was filed seeking the same relief.  The Petitioning Creditors allege that the second complaint was the result of collusion between Diamondhead and a friendly stockholder seeking to cram down an annual meeting to thwart a proxy contest.[35]  Ultimately, the Chancery Court ordered that the annual meeting take place on June 8, 2015.

As the Court previously found, Mr. Skaff undertook a consent solicitation to remove and replace Diamondhead's incumbent board.  The group retained a proxy service firm to solicit votes for its own slate, which included Mr. Skaff.  Approximately 29.5 million votes

---

[31] The memorandum provided that, "to the extent not previously paid, the principal due under the Note shall be payable in full on the Maturity Date, unless previously converted into [Diamondhead's] Common Stock or accelerated due to the occurrence of an Event of Default." Superior Court Decision at *3.
[32] Superior Court Decision at *3
[33] Post-Hr'g Open'g Br. Ex. B
[34] PC Trust Ex. 87;  Exhibit M to Trustee Hearing – From 10/A filing with the SEC
[35] First Day Trustee Hr'g Tr. 102–03

were cast and the incumbent group prevailed. Mr. Skaff testified to concerns about the propriety of the election, but he did not challenge the results.[36]

At the annual meeting, the stockholders also voted on the Company's proposal to increase the number of shares that could be issued and outstanding. The proposal was necessitated by the Company's 2014 round of financing (the "2014 Financing"). As described in the 2014 Private Placement Memorandum, the 2014 Financing was in three tranches of $1 million each. An increase in the amount of shares that could be issued and outstanding was a condition to access the third tranche. The 2014 financing was fully subscribed, but the Company did not receive the full $3 million because (i) the conditions to access to the second tranche were not met, and not all subscribers to that tranche agreed to the amendments permitting access to the funds; and (ii) the full amount of the third tranche was unavailable (and returned) because the referendum to increase issued and outstanding shares was defeated at the annual meeting.[37] As a consequence, Diamondhead received approximately $1.8 million of the 2014 Financing.

### (iii)  The Chancery Court Litigation–Breach of Fiduciary Duty

On March 14, 2015, College Health commenced another lawsuit in the Court of Chancery, this time against Edson R. Arneault, Ms. Vitale, Mr. Harrison, Martin Blount and Benjamin Harrell. College Health alleges that the defendants, all of whom are or were on Diamondhead's board of directors, have breached their duties of disclosure, loyalty and care. Defendants deny the allegations.[38] There was no evidence regarding the status of this proceeding.

---

[36] Trustee Decision at 504
[37] First Day Trustee Hr'g Tr. 275–77; Second Day Trustee Hr'g Tr. 70–72
[38] Diamondhead Ex. M—(Diamondhead Casino Corporation Form 10/A, filed June 24, 2015) at 60

## C.  **Diamondhead's Assets and Liabilities**

As of December 31, 2015, Diamondhead's current debt was $7.65 million.  The debt includes outstanding notes in the aggregate amount of $4.8 million; $1.6 million in accrued salary (primarily owed to Ms. Vitale); $460,000 in interest due on preferred stock; $220,000 in fees owed to directors; and miscellaneous obligations of $220,000.[39]  Another $1.6 million is owed on a loan Diamondhead received in 2008 from a Mr. Merritt.  Ms. Vitale suggested that this note will be forgiven.[40]

As of December 31, 2015, Diamondhead's only asset of any consequence was its indirect ownership of the Property.  The undisputed testimony is that the Property was appraised at $39,350,000 by CB Richard Ellis.[41]  According to Ms. Vitale, the appraisal valued the undeveloped 50 acre parcel that received gaming site approval from the Mississippi Gaming Commission at $30.5 million (or $610,000 per acre) and the remaining 354 undeveloped acres at $8.85 million (or $25,000) per acre.[42]  The Property, which was bought in 1993, is carried on Diamondhead's books at $5,409,913.

---

[39] MTD Hr'g Tr. 28–29
[40] MTD Hr'g Tr. 30–31
[41] In their Answering Brief, the Petitioning Creditors argue that the Court should not consider the CB Richard Ellis appraisal because it was not admitted into evidence at the Motion to Dismiss hearing, it is hearsay, and no valuation expert testified about its contents. Post-Hr'g Ans. Br. 5 n.4. All of this is true. But, the Petitioning Creditors specifically incorporated all of the evidence introduced at the hearing on the Trustee Motion, which includes valuation testimony by Ms. Vitale, as well as the Trustee Opinion. Post-Hr'g Ans. Br. 16–17. Further, at the hearing on the Motion to Dismiss, Ms. Vitale, once again, testified regarding the CB Richard Ellis appraisal. The Petitioning Creditors did not object. Nor, did the Petitioning Creditors subsequently move to strike Ms. Vitale's testimony. The first time an objection to this testimony was raised was in the Answering Brief. This objection comes too late. The only evidentiary rulings left for post-trial briefing related to deposition testimony. MTD Hr'g Tr. 13–15, 46. The Court did not consider the deposition testimony to which objections were lodged.
[42] MTD Hr'g Tr. 27–29

### D.  The Petitioning Creditors' Motivations for Filing the Bankruptcy Petition

Each of the individual Petitioning Creditors is both a stockholder and a noteholder,[43] as follows:

| Petitioner | Principal | Date Issued | Shares of Common Stock | 1st purchased stock |
|---|---|---|---|---|
| Stark | $50,000 | March 25, 2010 | 500,000 | 2000[44] |
| Sussman | $50,000 | November 10, 2010 | 960,000 | 1998[45] |
| Cohen | $50,000 | March 25, 2010 | 400,000 | 2000[46] |
| Skaff | $62,500 | 11/29/10 ($37,500) 6/21/11 ($25,000) | 1,300,000 | 2008[47] |
| Towner | $25,000 | 11/29/10 | 218,414 (with family) | 2010[48] |
| **Total** | **$237,500** | | **3,378,414** | |

Diamondhead alleges that the aggregate amount due to the individual Petitioning Creditors on their 2010 Notes is $322,913, including interest to December 31, 2015.[49]  In addition, Petitioning Creditor DDM Holdings, LLC ("DDM") has allegedly been assigned the right to collect the 2010 Note previously held by College Health in the principal amount of $150,000.[50]  College Health also divested itself of its stock in Diamondhead, which together with any other debt totals almost $2 million.[51]

---

[43] PC Exs. 245, 246, 247, 248, 249; MTD Hr'g Diamondhead Ex. 12 ("Diamondhead MTD Ex.")
[44] Stark Dep. 6
[45] First Day Trustee Hr'g Tr. 7
[46] Cohen Dep. 7
[47] Skaff Dep. 62
[48] Towner Dep. 14
[49] Post-Hr'g Open'g Br. 16.
[50] First Day Trustee Hr'g Tr. 77–78
[51] First Day Trustee Hr'g Tr. 86, 107

### (i)  **The Original Petitioning Creditors**

#### (a)  **Mr. Stark**

Mr. Stark provided the most comprehensive explanation of why the involuntary petition was filed.  He testified that at the time of the proxy contest in June 2015, it was not his intention to put Diamondhead into bankruptcy proceedings.[52]  Had his slate been elected, he did not anticipate that he would file an involuntary petition against the Company.[53]  Rather, Mr. Stark determined to put Diamondhead into bankruptcy proceedings after the annual meeting (at which the opposition slate lost) "when we saw that it was hopeless for this company to move forward with its present leadership and board."[54] He testified that filing the involuntary petition was a collective decision as part of an ongoing discussion among himself, Mr. Sussman, Mr. Cohen and others.[55]  Specifically, Mr. Stark testified:

> Q:  Could you please tell me how it happened?  Did you all meet—for example, did you all meet somewhere over dinner and talk about it?  What were the circumstances?
>
> A:  This was an ongoing discussion subsequent to the meeting, which was very disheartening to us.  We felt that this is the only hope of getting some money out of this.  That what is happening to the company is that the shares are being diluted.  They're probably twice as many shares as when I first purchased shares in this company.  That I found out at the meeting that some millions of dollars were borrowed with no attempt to repay the note holders such as myself, yet exorbitant salaries were being paid to the leadership and the seven or $8,000 a month rent for a facility for a piece of vacant land that has no operations.

*     *     *

---

[52] Stark Dep. 30
[53] Stark Dep. 29
[54] Stark Dep. 30–32
[55] *Id.*

Q: Did [Mr. Cohen] express the desire to file bankruptcy to effect a change of management?

A: No. We felt the change of management was hopeless. We lost the proxy vote and the only way of getting out was to have the assets sold before it gets dissipated further. The company, which we were led to understand was debt-free, we found out it's not debt-free. Every day with each passing day goes deeper into debt and we would like to see the assets sold as soon as possible to get the maximum amount of money, whatever that is, so that we can move on. We're tired of this.[56]

\*       \*       \*

Q: When you said filing the bankruptcy suit—filing the bankruptcy petition was an indirect way of collecting on the note, what did you mean by that?

A: That if this Diamondhead went into bankruptcy, it would be in the hands of responsible people who would dispose of the property properly. I had no confidence this would be done under the present directorship.

Q: So, was your motive for filing the bankruptcy petition to take away control from the current management of Diamondhead?

A: Absolutely.[57]

### (b) **Mr. Cohen**

Mr. Cohen testified that he filed the involuntary petition to get his money

from the company.[58] He also wanted a change in management.[59] He testified that

---

[56] Stark Dep. 31–32
[57] Stark Dep. 20
[58] Q: Tell me why did you decide to put Diamondhead in bankruptcy?
A: I want my money. I want what was promised to me. Very, very simple. If I don't have a listening ear and I am being told it seem lies, what other choices do I have?
Q: How do you expect to get your money out of the bankruptcy?
A: I have no idea. I know I have nothing now.
Cohen Dep. 17–18.
[59] Q: Then, what did you think would happen after the bankruptcy petition was filed?
A: Not really sure. I know that it would be in court. I know that we want to have changes made to Diamondhead that are not being made before. I feel that it is being run ineptly and if forcing it into bankruptcy is a means to an end, then I'm all for it.
\*   \*   \*
Q: You say you want changes made, what changes do you want made?
A: I want Deborah Vitale out. I want Greg out. I want people put at the helm that can do something, not just make false promises and lies for 15 years to me. That's what I want.

Mr. Harrison misled him to believe that well known players in the casino industry had interest in Diamondhead.[60]  Mr. Cohen discussed the petition with Mr. Stark:

> Q:  What did you discuss with him about the petition?
>
> A:  Basically just the fact of that we are owed money, that we are not getting anywhere, it is an ongoing lie, ongoing promises.  What they say really doesn't mean anything.  You don't want to be in bed with somebody that is a liar and a thief.  No, I take that back, thief is a wrong word, that's incorrect.  You just don't want to be involved with anyone that you do not trust anymore.[61]

When asked how he came to sign the involuntary petition, Mr. Cohen stated: "Again, it was just a means to an end.  I really don't care.  All I know is when someone is kicking you in the neck, you kind of want to slap the foot away."[62]

### (c)  Mr. Sussman

Mr. Sussman testified that he filed the involuntary petition to collect on his 2010 Note.[63]  However, he also has no faith in management.[64]  Mr. Sussman and his wife clearly feel that Mr. Harrison has continuously misrepresented Diamondhead's prospects[65]—a

---

*   *   *

Q: Was it your intent in filing the bankruptcy to take away their ability to manage the company?
MR CICERO:  Object to form.
A: I would hope so.

*   *   *

Q: Do you believe in the ability of current management to operate the company?
A: No.
Q: And is that lack of belief one of the factors that motivated you to file the bankruptcy petition?
A: Absolutely.
Cohen Dep.  21–23.

[60] Cohen Dep. 17, 24

[61] Cohen Dep. 23–24

[62] Cohen Dep. 20

[63] First Day Trustee Hr'g Tr. 15, 24

[64] First Day Trustee Hr'g Tr. 14–15; Arnold Sussman Dep. 20

[65] Arnold Sussman Dep. 18–19

14

sentiment shared by all of the individual Petitioning Creditors.[66]  Mr. and Mrs. Sussman had

considered selling their Diamondhead stock, but they retained it at Mr. Harrison's urging.[67]

### (ii)  Joining Petitioning Creditors

#### (a)  Mr. Skaff

Mr. Skaff did not testify to his reasons for joining the involuntary petition, but he did

testify as to his belief that a trustee needed to be appointed.  He believes that current

management has mismanaged the company and should be replaced by a trustee.[68]  Their

mismanagement included not paying the 2010 Notes when the Company raised additional

funds in 2014, while simultaneously paying "outrageous wages" and "high rent" to

insiders.[69]  Mr. Skaff also believes that a bankruptcy filing may produce a higher price as a

buyer could be assured that "there's nothing hidden the weeds."[70]

#### (b)  Mr. Towner

Mr. Towner joined the involuntary petition because he does not see any progress in

the development of the Property.[71]  He views the Property as a "very valuable asset."[72]  His

goal in joining the involuntary petition was to get a trustee "to get in there and do

something . . . to develop the land into—to build a casino."[73]  But, Mr. Towner believed it

more likely that a trustee would sell the Property to a casino operator which would "pay off

the creditors;" the trustee "would probably have quite a bit of money left over for the

---

[66] First Day Trustee Hr'g Tr. 9–11, 74–75, 140–41; Skaff Dep. 42; Cohen Dep. 17; Stark Dep. 8–9
[67] First Day Trustee Hr'g Tr. 14
[68] Skaff Dep. 13–14
[69] *Id.*
[70] Skaff Dep. 52
[71] Towner Dep. 19
[72] *Id.* at 19
[73] *Id.* at 20

shareholders."[74] He also believed that filing an involuntary petition was the only way of getting paid on his 2010 Note.[75]

### (c) DDM

DDM is a Florida limited liability company formed on September 11, 2015,[76] about four weeks after the involuntary petition was filed. Jason Giller is the manager and registered agent.[77] DDM claims to be the assignee of the 2010 Note originally held by College Health. The general partner of College Health is Samuel Burstyn, who is the father of DDM's two members. Mr. Burstyn holds no official position with or interest in DDM. Neither College Health nor Mr. Burstyn are Petitioning Creditors.

Mr. Giller testified that DDM's primary purpose is to collect on its claim, which includes participating in a very limited capacity in the bankruptcy proceeding.[78]

### The Law

Diamondhead attacks the filing of the petition on three basis: (i) the Petitioners' claims, all of which are based upon the 2010 Notes, are subject to a *bona fide* dispute; (ii) under the Third Circuit's decision in *Forever Green*, the petition was filed in bad faith; and (iii) abstention is warranted under section 305 of the Bankruptcy Code.[79] The arguments will be discussed *seriatim*.

---

[74] *Id.* at 22
[75] *Id.* at 23
[76] Post-Hr'g Open'g Br. 15
[77] Giller Dep. 6–7, 12–13, 16–17
[78] Giller Dep. 14–15
[79] Alternatively, Diamondhead argues that if the Court declines to dismiss the involuntary petition, it should convert the case to one under chapter 11. The Court need not address this argument. Nor does the Court need to address the "bar to joinder" argument.

## I.  Five of the Petitioning Creditors' Claims are Not Subject to *Bona Fide* Dispute

Section 303(h) provides that:

> [A]fter trial, the court shall order relief against the debtor in an involuntary
> case under the chapter under which the petition was filed, only if—
>
> (1)     the debtor is generally not paying such debtor's debts as such debts
> become due unless such debts are the subject of a bona fide dispute as to
> liability or amount . . . .[80]

The Bankruptcy Code does not define a *"bona fide* dispute." The Third Circuit has held that

a *bona fide* dispute exists if "there is a genuine issue of a material fact that bears upon the

debtor's liability, or a meritorious contention as to the application of law to undisputed

facts."[81] "Under this standard, the bankruptcy court must determine whether there is an

objective basis for either a factual or a legal dispute as to the validity of debt."[82]

"The court's objective is to ascertain whether a dispute that is *bona fide* exists; the

court is not to actually resolve the dispute."[83] When determining whether a *bona fide* legal

dispute exists, however, a bankruptcy court may be required to address the merits of the

dispute "to ascertain whether an objective legal basis for the dispute exists."[84] As a result, in

certain circumstances, the court may need to conduct a more fulsome legal analysis.

For instance, in *B.D.W.* the Third Circuit determined that the alleged debtor had not

presented a *bona fide* legal dispute regarding a claim that it was liable on the debt on an alter

ego theory.[85] In order to reach this conclusion, the Third Circuit determined that the facts of

---

[80] 11 U.S.C. § 303(h)

[81] *B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66 (3d Cir. 1989) (quoting *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986))

[82] *In re AMC Investors, LLC*, 406 B.R. 478, 483–84 (Bankr. D. Del. 2009) (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987))

[83] *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir. 1991)

[84] *Id.*

[85] *B.D.W.*, 865 F.2d 65 (3d Cir. 1989)

the case satisfied every applicable criteria for determining alter ego liability, normally a highly fact intensive evaluation.  Similarly, the court in *Garland Coal* determined that the alleged debtor, a former employer, did not present a *bona fide* dispute regarding a claim that the alleged debtor illegally underfunded a pension plan.[86]  The court analyzed the legal arguments presented by the alleged debtor and determined that the alleged debtor's argument had "no legitimate basis under the [applicable] statute."[87]  Both the *B.D.W.* and *Garland* courts conducted far more than a mere cursory review of the alleged debtor's legal arguments—they decided whether the alleged debtor had any viable defenses.

The petitioning creditor has the initial burden to establish a *prima facie* case that no *bona fide* dispute exists.[88]  A *prima facie* case showing liability on a promissory note may exist where a creditor presents a copy of the note along with evidence showing that the debtor has defaulted on the note.[89]  If the petitioning creditor carries its initial burden, the burden then shifts to the alleged debtor to present evidence that proves that a *bona fide* dispute exists.[90]  Because the test is objective "neither the [alleged] debtor's subjective intent nor his subjective belief is sufficient to meet this burden."[91]

---

[86] *In re Garland Coal & Min. Co.*, 67 B.R. 514 (Bankr. W.D. Ark. 1986)
[87] *Id.* at 521
[88] *AMC*, 406 B.R. at 484 (Bankr. D. Del. 2009); *see also Rimell*, 946 F.2d at 1365 (8th Cir. 1991)
[89] *See VitaminSpice*, 472 B.R. at 292–93 (Bankr. E.D. Pa. 2012) (petitioning creditor established a *prima facie* case showing the absence of a *bona fide* dispute as to liability on a loan by presenting the note, documents showing that the petitioner transferred money to the alleged debtor, and the petitioner's testimony that the note was due and unsatisfied; *see also U.S. v. Davis*, 2002 WL 169603, at *1 (6th Cir. 2002) (in a non-bankruptcy case, the lender established a *prima facie* case that it was entitled to collect on a promissory note by presenting the promissory note and a certification from an agent of the lender that the defendant had defaulted on the loan)
[90] *AMC*, 406 B.R. at 484 (Bankr. D. Del. 2009)
[91] *In re Mylotte, David & Fitzpatrick*, 2007 WL 2033812, at *7 (Bankr. E.D. Pa. 2007) (citing *Rimmell*, 946 F.2d at 1365 (8th Cir. 1991)); *see also In re VitaminSpice*, 472 B.R. 282, 293 (Bankr. E.D. Pa. 2012)

A.   **The Individual Petitioning Creditors Have Carried Their Initial Burden to Show that Liability Exists on the 2010 Notes**

The Petitioning Creditors each assert that he holds a 2010 Note that has matured, and that Diamondhead is required to satisfy the balance of the notes with cash.  The Petitioning Creditors submitted copies of their notes.  They also presented a copy of the Superior Court Decision, in which the court held that Diamondhead had to pay cash pursuant to the matured, unconverted 2010 Note held by College Health/DDM.

The Petitioning Creditors argue that they have made a *prima facie* showing that no *bona fide* dispute exists because they "establish[ed] the existence of a contract obligating Diamondhead to repay the amount borrowed."[92]  With the exception of DDM, (which will be discussed separately) Diamondhead does not dispute that the promissory notes are valid and matured, and are held by a party that can enforce the rights thereunder, or the amount of due and unpaid principal and interest under each note.  On this record, the Court finds that the individual Petitioning Creditors have satisfied their initial burden of establishing a *prima facie* case.

B.   **Diamondhead Has Failed to Establish that a *Bona Fide* Dispute Exists as to the Claims of the Individual Petitioning Creditors**

As it did in the Superior Court, Diamondhead argues that it is permitted to satisfy the balance of the 2010 Notes with Diamondhead common stock.  Specifically, Diamondhead argues that, pursuant to section 2.1 of the 2010 Notes, Diamondhead is permitted, after the notes mature, to convert its obligation to pay cash to the Petitioning Creditors into an obligation to transfer stock.  The Petitioning Creditors disagree with

---

[92] Post-Hr'g Ans. Br. 24

Diamondhead's interpretation.  Diamondhead argues that this disagreement constitutes a

*bona fide* legal dispute.

In support of this argument, Diamondhead presents a limited record.  It offered no

testimony or evidence to show that the parties to the 2010 Notes intended that section 2.1 of

the notes should allow Diamondhead to convert the balance to stock after the maturity

date.  Diamondhead did, however, provide the Court with its Answer and Grounds of

Defense, which was filed in the College Health Superior Court action.  Diamondhead

argues that the answer contains several affirmative defenses that are applicable to the

Petitioning Creditors' claims.[93]  After a review of this record and the legal arguments, the

Court finds that Diamondhead has failed to carry its burden to present a *bona fide* legal

dispute.

### (i) **The Court Does Not Base its *Bona Fide* Dispute Ruling on the Superior Court Decision**

As an initial matter, the parties disagree on whether the Superior Court Decision

regarding Diamondhead's 12(b)(1) motion to dismiss should factor into this Court's *bona fide*

dispute analysis.  As previously discussed, College Health filed a complaint against

Diamondhead for the unpaid principal and interest on its 2010 Note.  Diamondhead filed a

motion to dismiss the complaint under Superior Court Rule 12(b)(1) asserting that it had

satisfied its obligations under the note by tendering Diamondhead common stock.[94]

The Superior Court denied Diamondhead's 12(b)(1) motion to dismiss.  In doing so

it disagreed with Diamondhead's legal argument and found that, pursuant to the terms of

---

[93] Post-Hr'g Open'g Br. 18
[94] Delaware Superior Court Rules of Civil Procedure, Rule 12(b)(1), which was modeled after
Federal Rule of Civil Procedure 12(b)(1), provides that a party may move to dismiss a complaint
where the court lacks subject matter jurisdiction.

the 2010 Note, after the note matured, Diamondhead had no right to convert the balance into stock.  Diamondhead now asserts the same legal argument before this Court.

The Petitioning Creditors contend that the Court can use the Superior Court Decision to conclusively resolve its *bona fide* dispute analysis.  That is, the Petitioning Creditors appear to argue that the Court should use the Superior Court Decision to either offensively preclude Diamondhead from reasserting its legal argument or to *per se* establish that the dispute is not *bona fide*.  Conversely, Diamondhead argues that the Court should not use the Superior Court Decision to conclusively resolve the *bona fide* dispute analysis because the ruling is a "preliminary, non-final ruling."[95]

The Court is not aware of any decisional law addressing this issue, and the parties cited none.  It is not clear that applicable non-bankruptcy law would allow a creditor to use a non-final 12(b)(1) ruling offensively to preclude a debtor from raising a defense in an action outside of bankruptcy.[96]  Further, even if applicable non-bankruptcy law does allow a creditor to use a non-final 12(b)(1) ruling in this way, it may be inappropriate for a bankruptcy court to apply that ruling to *per se* determine whether a *bona fide* dispute exists.[97] The Court, however, does not need to determine whether Diamondhead is precluded from asserting its legal argument on this theory because the Court ultimately finds that Diamondhead's argument does not constitute a *bona fide* legal dispute.

---

[95] Post-Hr'g Reply Br. 1

[96] *See Stuhl v. Tauro*, 476 F.2d 233 (1st Cir. 1973); *American Hawaiian Ventures, Inc. v. M.V.J. Latuharhary*, 257 F.Supp. 622 (D.N.J. 1966); *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80 (2d Cir. 1961) (each case permitting a defendant to assert a non-final, jurisdictional ruling to *defensively* preclude a legal argument)*; see also Benjamin F. Shaw Co. v. Short*, 1989 WL 89521, at *3–4 (Del. Super. Ct. 1989) (relying on a US Supreme Court case to hold that offensive collateral estoppel is not *per se* precluded, but may have less utility than defensive collateral estoppel)

[97] *See In re Marciano*, 708 F.3d 1123 (7th Cir. 2013) (analyzing the split among circuits regarding whether a final, unstayed judgment against an alleged debtor is "*per se* a 'claim against [the debtor] that is not contingent as to liability or the subject of a bona fide dispute . . . .'")

### (ii) Diamondhead's Affirmative Defenses Do Not Create a *Bona Fide* Dispute

Diamondhead attempts to support its argument by introducing the Answer and Grounds of Defense filed after the Superior Court denied its motion to dismiss.[98] Diamondhead argues in its reply brief that, "[t]he existence of affirmative defenses 'strongly suggests' the existence of a *bona fide* dispute."[99]

"[T]he existence of affirmative defenses may suggest that a *bona fide* dispute exists."[100] The mere existence of an affirmative defense, however, does not *per se* show the existence of a *bona fide* dispute. Rather, when considering whether an affirmative defense evidences a *bona fide* dispute, a bankruptcy court will review the substance of the affirmative defense to determine if it presents a meritorious argument.[101] Courts will apply the objective *bona fide* dispute analysis in the same manner as it would if the party presented the defense directly to the bankruptcy court in the first instance.[102]

Diamondhead's Answer and Grounds of Defense contains nine affirmative defenses. In its submissions to this Court, Diamondhead does not explain how any or all of its affirmative defenses support its position that a *bona fide* dispute exists. Rather, it states in its opening brief that its answer contains "material defenses (several of which are applicable to all noteholders, including those in this action)."[103] As such, the Court is left to deduce how Diamondhead thinks these defenses apply.

---

[98] Post-Hr'g Reply Br. 1
[99] Post-Hr'g Reply Br. 1
[100] *In re TPG Troy, LLC*, 492 B.R. 150, 159 (Bankr. S.D.N.Y. 2013); *see In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057, 1066 (9th Cir. 2001)
[101] *In re Tri-County Farm Equipment Co., Inc.*, 87 B.R. 667, 671 (D. Kan. 1988)
[102] *See Vortex Fishing*, 277 F.3d at 1067 (9th Cir. 2001); *Tri-County*, 87 B.R. at 669 (D. Kan. 1988)
[103] Post-Hr'g Open'g Br. 18

Initially, four of the affirmative defenses are specific to College Health and the action before the Superior Court.[104] These four are inapposite to the current dispute and thus will not be analyzed herein.

Diamondhead's fifth affirmative defense is that the noteholders assumed the risk that their notes "would have to be converted to Common Stock."[105] Diamondhead argues that the noteholders assumed the risk of conversion based on language in a private placement memorandum incorporated into the 2010 Notes. The memorandum allegedly states that "[t]here can be no assurance that [Diamondhead] will have such cash available" to repay the principal at maturity. For two reasons, the Court finds that this is not a meritorious defense. First, Diamondhead did not present the Court with a copy of the private placement memorandum and thus failed to make an objective record to support its argument. Second, pursuant to the 2010 Notes, Diamondhead waived "any and all defenses" it may have to payment save three, none of which is assumption of risk.[106] Diamondhead has not suggested that its waiver is ineffective.

Diamondhead's remaining affirmative defenses each assert a different version of the same ultimate argument: that Diamondhead has a right under section 2.1 of the 2010 Notes to convert the balance of the notes to common stock after the notes mature.

Pursuant to the terms of the 2010 Notes, the notes are to be construed in accordance with Delaware law.[107] In Delaware, the principles of contract interpretation are well settled.

---

[104] These defenses are lack of standing, failure to join an indispensable party, accord and satisfaction of the interest due, and unclean hands. Post-Hr'g Open'g Br. Ex. B at 2, 3, 6. The parties have not disputed that, in certain circumstances, Diamondhead transferred its stock to satisfy interest payments due under the 2010 Notes. Because Diamondhead has not presented a dispute regarding these interest payments, the accord and satisfaction defense does not constitute a *bona fide* dispute.
[105] Post-Hr'g Open'g Br. Ex. B ¶ 8
[106] 2010 Note § 4.6
[107] 2010 Note § 4.7

Contracts are to be interpreted as a whole to give effect to the intention of the parties. When contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. The true test is not what the parties intended, but what a reasonable person in the same position of the parties would have thought it meant.[108] Further, a court should interpret a contract to give meaning to every word in the agreement and avoid superfluous language.[109] In addition, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[110]

The first paragraph of each 2010 Note establishes Diamondhead's obligation to repay the borrowed funds, as follows:

> For value received, Diamondhead . . . hereby promises to pay to [Holder], without demand, the principal amount of [a stated amount of cash], plus all accrued and unpaid interest thereon, on the Maturity Date, as defined below, *to the extent* the principal has not *previously* been paid or converted into Common Stock of the Company as set forth below.[111]

When the note matures, therefore, Diamondhead is obligated to pay in cash the principal and interest owing unless, *before the date of maturity*, Diamondhead has exercised its right to convert the principal and interest due on the note. Diamondhead's right to convert is limited temporally to the time prior to maturity by virtue of the obligation it created.

---

[108] *Concord Mall, LLC v. Best Buy Stores, L.P.*, 2004 WL 1588248 (Del. Super. Ct. July 12, 2004) (citing *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *Johnston v. Talley Ho, Inc.*, 303 A.2d 677, 679 (Del. Super. Ct. 1973); *ABB Flakt, Inc. v. Nat'l Union Fire Ins. Co.*, 731 A.2d 811, 816 (Del. 1999); *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d 1192, 1196 (Del. Super. Ct. 1992))
[109] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007) (citing *NAMA Holdings, LLC v. World Market Center Venture, LLC*, 2007 WL 2088851, at *6 (Del. Ch. July 20, 2007))
[110] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)
[111] 2010 Note at 4 (emphasis added)

Diamondhead argues that section 2.1 of the 2010 Notes gives it the right to convert the cash balance into stock after the note has matured.[112] Section 2.1 contains two subsections: the "Borrower's Right to Convert" and the "Holder's Right to Convert." In relevant part, the Borrower's Right to Convert states:

> The Borrower shall have the right to convert the principal and any interest due under this Note into Common Stock of the Borrower as set forth below.
>
> Upon written notice to the Holder, the Borrower may, after a minimum of one hundred and eighty (180) calendar days from the Issue Date, or alternatively, after the price of the Common Stock of the Borrower is at or above One Dollar ($1.00) per share for thirty (30) consecutive business days prior to the date of written notice of the Holder, convert the outstanding principal due under this Note into shares of fully-paid and nonassessable shares of Common Stock of the Borrower. . . . Any unpaid interest due on the Note shall, at the option of the Borrower, be payable in cash or in Common Stock of the Borrower. . . . The Holder agrees that it has no right to prevent the Borrower from effecting such conversion without the Holder's consent.[113]

Section 2.1 delineates the mechanics of Diamondhead's conversion right. It does not, however, state whether or not Diamondhead may exercise its conversion right after maturity. Diamondhead argues that if section 2.1 is read in isolation the Court might conclude that its conversion right has no temporal limitation because the section does not state such a limit. The Court, however, must consider the note holistically. As previously discussed, the 2010 Note does contain a temporal limit on Diamondhead's conversion right—it requires Diamondhead to exercise its conversion right prior to the maturity date. Because section 2.1 does not contain a provision that conflicts with or otherwise expands Diamondhead's obligation, the silence of section 2.1 on the issue does not control.

---

[112] Post-Hr'g Open'g Br. Ex. B. ¶¶ 4–7
[113] 2010 Note § 2.1

The conclusion that the Borrower's Right to Convert in subsection 2.1 does not grant Diamondhead a temporally unlimited right to convert the note is further supported by the Holder's Right to Convert, which is also contained in section 2.1. In relevant part, the Holder's Right to Convert states: "[t]he Holder shall have the right to convert the unpaid principal due under this Note into Common Stock of the Borrower *at any time*."[114] Notably, the emphasized language is absent from the Borrower's Right to Convert. The absence of the "at any time" language from the Borrower's Right to Convert subsection supports the Court's conclusion that section 2.1 does not give Diamondhead a temporally unlimited right to convert.

Diamondhead also argues that section 3.2 of the 2010 Note, a section entitled "Remedies Upon An Event of Default," demonstrates that its conversion right was not temporally limited.[115] Diamondhead argues that, under section 3.2 of the Note:

> The Holder's sole remedy upon an event of Default is to 'declare the balance of the Note, together with all interest accrued thereon, due and payable.' The Holder has no additional right to declare the balance of the Note, together with interest due thereon, due and payable in cash only. Once the Holder declares the balance of the note and all interest accrued thereon due and payable, it then falls to the Borrower to determine whether payment will be made in cash and/or stock.[116]

---

[114] 2010 Note § 2.1 (emphasis added)

[115] In relevant part, section 3.2 of the 2010 Note provides:
If an Event of Default shall have occurred and shall be continuing, the Holder of this Note may at any time at its option, (a) declare the entire unpaid principal balance of this Note, together with all interest accrued hereon, due and payable, and thereupon, the same shall be accelerated and so due and payable; provided, however, that upon the occurrence of an Event of Default described in (i) Sections 3.1(f), without presentment, demand, protest, or notice, all of which are hereby expressly unconditionally and irrevocably waived by the Borrower, the outstanding principal balance and accrued interest hereunder shall be automatically due and payable, and (ii) Sections. 3.1(a) through (e), the Holder may exercise or otherwise enforce any one or more of the Holder's rights, powers, privileges, remedies, and interests under this Note or applicable law. . . . No Remedy conferred hereby shall be exclusive or any other remedy referred to herein or now or hereafter available at law, in equity, by statute or otherwise.

[116] Post-Hr'g Open'g Br. Ex. B ¶ 7

This argument is ultimately resolved by the finding that Diamondhead does not have a right to convert the balance to stock after the 2010 Notes matured.  Section 3.2 does not change that result.

After a review of the undisputed documentary record and Diamondhead's legal arguments, the Court is satisfied that Diamondhead has presented no "potentially meritorious legal argument."  Based on this record, there is no *bona fide* dispute over whether Diamondhead owes the Petitioning Creditors cash on account of the 2010 Notes.

## II. DDM has not Carried its Initial Burden to Show that Liability Exists on its 2010 Note

Diamondhead and the Petitioning Creditors also dispute whether Petitioning Creditor DDM is in fact a creditor of Diamondhead.  DDM claims to be the assignee of a 2010 Note originally held by College Health.  As discussed above, College Health previously sued Diamondhead in Superior Court to collect on that 2010 Note.  During the pendency of the Superior Court action and after the beginning of this case, College Health allegedly assigned the 2010 Note to DDM.

Diamondhead does not dispute that the 2010 Note is valid and matured or that College Health agreed to assign the 2010 Note to DDM.  Rather, Diamondhead argues that the assignment of the note was not effective because the assignment violated both the terms of the 2010 Note and the bankruptcy automatic stay.[117]  The Petitioning Creditors disagree.  After a review of the record presented, the Court determines that the Petitioning Creditors

---

[117] As to the automatic stay, Diamondhead did not cite any law that a creditor may not assign a claim after an involuntary (or voluntary) petition is filed, and Federal Rule of Bankruptcy Procedure 3001 is directly to the contrary.  The Court, therefore, rejects this argument.

failed to present a *prima facie* case that the assignment, and, as a result, DDM's claim is not the subject of a *bona fide* dispute.

In determining whether the Petitioning Creditors presented a *prima facie* case showing that DDM's claim is not subject to a *bona fide* dispute, the Court is specifically focusing on whether the Petitioning Creditors presented evidence showing that the assignment to DDM was valid or otherwise enforceable.

The starting point of this inquiry is section 4.3 of the 2010 Note, which governs the noteholder's assignment rights. That section provides:

> This Note shall be binding upon the Borrower and its successors and assigns and shall inure to the benefit of the Holder and its successors in interest. This Note may not be assigned by the Holder without the prior written consent of the Company, except to an Affiliate of Holder that is an "accredited investor" as such term is defined in Regulation D under the Securities Act of 1933.[118]

Pursuant to the second sentence of this section, College Health may assign the note only if it obtains Diamondhead's prior written consent or if the assignee is both a College Health affiliate and an accredited investor. DDM did not present any evidence that Diamondhead had supplied prior written consent, and the only evidence regarding whether DDM is a College Health affiliate or an accredited investor is to the contrary.[119]

Having no such evidence, the Petitioning Creditors initially allege that, "[a]t the express request of the Company's directors, College Health assigned its note, including its cause of action against the Company, to DDM. . . . As a result of the assignment, DDM holds the assigned cause of action and the right to collect upon the cause of action, and to the extent permitted, the note that was given by Diamondhead."[120] Although not fully

---

[118] 2010 Note § 4.3
[119] Giller Dep. 35
[120] Post-Hr'g Ans. Br. 21

developed (or developed at all), it appears that the Petitioning Creditors are arguing that

Diamondhead's alleged oral request to College Health satisfies the 2010 Note's prior written

consent requirement, or otherwise obviates the need for prior written consent.

Initially, the Petitioning Creditors do not present any legal analysis to support such a

theory.  But, even more damning, the evidence that the Petitioning Creditors point to does

not show that Diamondhead consented to the DDM assignment.  The Petitioning Creditors

first submitted a copy of an August 28, 2015 email sent from Sam Burstyn, the general

partner of College Health, to Gregory Harrison.  The pertinent part of the email states:

> I understand that you are now Chairman of the company.  I have been
> aggressively maligned, attacked and insulted by the company. . . .   Recently,
> your attorney has publicly attacked me for not having transferred all
> investments away from my legal control.  I am now being demonized as the
> reason Vitale and Arneau couldn't conclude a deal with Henley or El Dorado
> which you and Devlin insisted was imminent last year. . . .
>
> In the next few days, I am finalizing divestment to new entities in which I
> have neither economic interest nor control.  I hope that makes it easier for
> you to monetize this fiasco, although I don't think I have been anything but a
> helpful plus.[121]

Mr. Burstyn testified that the purpose of this email was "[t]o confirm to the Chairman of the

Company that at their request . . . I was divesting from the company . . . [a]nd I began the

process."[122]

The Petitioning Creditors also point to the testimony of Ms. Vitale, which confirms

that Mr. Burstyn's involvement with Diamondhead was problematic:

> I have to fix everything with Mr. Burstyn, I have to get him, somehow, totally
> removed from this company and its stock. . . . [Mr. Burstyn] is clearly the
> very type of person the Mississippi Gaming Commission would not allow to
> hold this stock.  So, we're in a situation now where Mr. Burstyn will have to
> divest himself, or the company will be forced to exercise its rights . . . to take

---

[121] PC Ex. 263
[122] First Day Trustee Hr'g Tr. 77:10–18

down any entity or person who owns stock in the company whose presence would jeopardize a gaming license or something like that.[123]

Neither the email nor Mrs. Vitale's testimony show that Diamondhead directed Mr. Burstyn to assign or otherwise transfer the 2010 Note to DDM or any other entity.  In fact, the evidence suggests that Diamondhead was concerned with Mr. Burstyn's control over Diamondhead stock, not necessarily his ability to hold a 2010 Note.

Alternatively, the Petitioning Creditors present two more cursory arguments.  The first is that, "[d]ue to the Company's material breach of the College Health [2010 Note] . . . Diamondhead cannot enforce any of its provisions including any assignment restriction contained therein."[124]  The second is that "College Health . . . assigned to DDM its cause of action against Diamondhead for breach of its note.  The Provisions of the note do not and cannot restrict such an assignment."[125]  A review of the record reveals that both the factual assertions and the legal arguments are untenable.

Initially, and as before, the Petitioning Creditors provide no analysis and cite no relevant law to support these arguments.  The only argument presented is that by virtue of the Superior Court Decision, Diamondhead cannot, after it breached the note, enforce the 2010 Note's anti-assignment term.  The Superior Court Decision, however, is not persuasive authority because the issue before the Superior Court was materially different from the present issue.  Namely, the Superior Court examined whether, after Diamondhead breached a 2010 Note, it could affirmatively exercise a contractual option right.  The issue here is not whether Diamondhead, as the breaching party, has the contractual right to take a certain action, but whether College Health has a contractual right to take a certain action—the

---

[123] First Day Trustee Hr'g Tr. 8:5–20
[124] Post-Hr'g Ans. Br. 33
[125] Post-Hr'g Ans. Br. 33

assignment to DDM. The Petitioning Creditors appear to argue that when Diamondhead breached the 2010 Note, College Health's rights under the 2010 Note somehow improved. The Superior Court Decision does not, however, suggest that Diamondhead's breach modifies, let alone improves, the noteholder's contractual rights, and is thus inapposite here.

Further, the Petitioning Creditors also fail to support the factual assertion in their second argument—that College Health assigned to DDM its causes of action against Diamondhead (independent of the 2010 Note). While Mr. Burstyn did testify that he caused DDM to assign causes of action to College Health,[126] the Petitioning Creditors did not proffer any evidence to corroborate Mr. Burstyn's assertion. Under the Third Circuit's objective *bona fide* dispute analysis, Mr. Burstyn's uncorroborated factual assertions do not constitute competent evidence of the fact asserted.[127] More importantly, the Petitioning Creditors do not explain more fundamental questions—the legal significance of the distinction they are drawing or how the assignment of a "cause of action" without assignment of the underlying note, gives DDM a "right to payment."[128]

The Petitioning Creditors may have established a *prima facie* case that assignment occurred from College Health to DDM. The Petitioning Creditors' bald assertions and legal arguments, however, are insufficient to carry their initial burden to show that no *bona fide* dispute exists regarding that assignment.

---

[126] First Day Trustee Hr'g Tr. 78:3
[127] *See In re Taub*, 439 B.R. 261, 273–75 (Bankr. E.D.N.Y. 2010) (applying the objective bona fide dispute analysis and determining that the petitioning creditors did not meet their burden, in part, because they presented no corroborating evidence)
[128] 11 U.S.C. § 101(5)

### III.    The Involuntary Petition was Filed in Bad Faith

In *Forever Green,* the Third Circuit held that a court may dismiss an involuntary

petition for bad faith even when the petitioning creditors otherwise meet the statutory

criteria.    The Court reasoned that a bankruptcy petition—whether voluntary or involuntary,

and whether under chapter 11 or 7—commences an equitable proceeding.[129]    Quoting its

earlier decision in *In re Integrated Telecom Express, Inc.,*[130] the Court stated that "[a]t its most

fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful

balancing of interests is not undermined by petitioners whose aims are antithetical to the

basic purposes of bankruptcy."[131]    Because of the serious nature of an involuntary filing, the

bankruptcy court must ensure there is no "retributive quality" in the motivations behind the

filing.[132]

In addition to holding that an involuntary petition may be dismissed for bad faith,

the Third Circuit examined the "dizzying array" of standards employed by courts when

making this determination and settled on the "totality of the circumstances" test.    As the

Third Circuit explained: this standard "is most suitable for evaluating the myriad ways in

which creditors filing an involuntary petition could act in bad faith."[133]    It also is the same

standard the Third Circuit employs when examining a voluntary petition.[134]

The totality of the circumstances test is an amalgam of tests used by other courts,

including: (i) the "improper use" test, which reviews whether the petitioning creditors are

seeking to obtain a "disproportionate advantage" over other creditors; (ii) the "improper

---

[129] *Forever Green,* 804 F.3d at 334
[130] *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 119 (3d Cir. 2004)
[131] *Forever Green,* 804 F.3d at 335
[132] *Id.* (citations omitted)
[133] *Id.* at 335–36
[134] *Id.* at 336

purpose" test, which looks to the motivation of the petitioning creditors (*i.e.*, whether the filing "was motivated by ill will, malice or a desire to embarrass or harass the alleged debtor"); and (iii) the "objective test" which gauges what a "reasonable person" would have done in the petitioning creditors' position.[135] Given the all-encompassing nature of the standard, it is a fact intensive determination, requiring the court to look at any and all relevant factors, including, but not limited to, whether:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.[136]

The burden of persuasion is on the alleged debtor, which must prove by a preponderance of the evidence that the petition was filed in bad faith.[137]

**The Parties' Positions**

Diamondhead argues that the original Petitioning Creditors as well as the subsequent joining creditors filed the involuntary petition to oust management after they lost a proxy contest just two months earlier. It argues that the testimony shows that the Petitioning Creditors' motivation was to remove management, and that, in their haste, they did not make a reasonable inquiry into the facts and pertinent law before filing the involuntary petition. Diamondhead further argues that joining Petitioner Skaff worked with Mr. Stark to orchestrate the proxy contest, and that Mr. Towner joined the petition because he works

---

[135] *Id.* at 335–36
[136] *Id.* at 336
[137] *Id.* at 335

for Mr. Skaff. Diamondhead next argues that the involuntary petition does not serve a valid bankruptcy purpose because a bankruptcy does not maximize Diamondhead's assets. Diamondhead sees risk in the bankruptcy filing and the potential devaluation of the Property. Further, Diamondhead claims it is not preferring one creditor over others, but rather not paying anyone. Finally, Diamondhead argues that the involuntary petition was filed in bad faith because the bankruptcy court is not a substitute for a collection action; Petitioning Creditors can proceed in state court to recover their debts.

The Petitioning Creditors argue that Diamondhead has failed to meet its burden of proof to show that the involuntary petition was filed in bad faith. They argue that the vast majority, if not all, of the *Forever Green* factors weigh in favor of entering the order for relief. Specifically, they argue that they are qualifying creditors, the debtors are not generally paying their debts as they come due, and the 2010 Notes are due and payable. At various places in their brief they argue that they filed the involuntary petition to: (i) avoid the Executives Lien granted to Ms. Vitale and the board members; (ii) seek the appointment of an independent fiduciary to investigate and pursue breach of fiduciary duty claims against Diamondhead's officers and directors going back 15 years; (iii) analyze and assume or reject any executory contracts that may exist; (iv) secure the Company's books and records; and (v) maximize the value of the Company's assets through a fair and open sale process.[138] In particular, the Petitioning Creditors assert that "unlike in a state court action, an independent fiduciary in this bankruptcy proceeding would be empowered to look at

---

[138] Post-Hr'g Ans. Br. 30, 34, 41

proposals for the sale or development of the Property and decide what is in the best interests of the Company and all stakeholders."[139]

## Analysis

Having just ruled that the individual Petitioning Creditors hold *bona fide* debts that remain unpaid, the Court will discuss certain of the other *Forever Green* factors as it evaluates the totality of the circumstances. As presaged in the Trustee Decision, and as will be discussed below, certain of the *Forever Green* factors weigh in favor of dismissal and certain do not. The challenge, therefore, is to look at the totality of the circumstances and determine whether the alleged debtor has proven by a preponderance of the evidence that the filing was in bad faith. If not, the Court should enter an order for relief.

In the Trustee Decision, the Court held that Diamondhead was generally not paying its debts as they become due because it was not paying Ms. Vitale's salary or rent as it lacked the funds to do so. Diamondhead presented no new evidence on this issue at the hearing on the Motion to Dismiss and does not appear to challenge the Court's finding. Accordingly, the Court finds that the individual Petitioning Creditors satisfied the statutory criterial for filing the petition.

But, for what purpose was the bankruptcy petition filed? The situation before the Court is somewhat unique in that each individual Petitioning Creditor wears two hats—that of a noteholder and that of a stockholder. Only creditors can file an involuntary petition, not stockholders. Stockholders in a Delaware corporation have a myriad of state law rights designed to protect their equity interests. For example, stockholders can bring an action to inspect the books and records of a company for any proper purpose, to compel an annual

---

[139] Post-Hr'g Ans. Br. 41

meeting, and to determine the validity of any election at an annual meeting.[140]  And, stockholders can sue officers and directors for violating their fiduciary duties, or for corporate waste and/or self-dealing.[141]  Thus, the individual Petitioning Creditors' dual holdings add an additional inquiry—whether the individual Petitioning Creditors are motivated by their status as a creditor, a stockholder, or both.  If both, the Court's task is to determine the Petitioning Creditors' primary reason for filing the involuntary petition.[142]

While contending otherwise, the evidence is overwhelming that each individual Petitioning Creditor sought a change in management, and perceived an involuntary bankruptcy filing as the only way to accomplish that result after the failed proxy fight.  Each of the Original Petitioning Creditors has held their stock for at least fifteen years.  Each individual Petitioning Creditor expressed his frustration with the lack of development of the Property, not the non-payment of their notes.  Each individual Petitioning Creditor testified that he had been misled by Mr. Harrison regarding the possibility of a development deal, and one testified that he had retained his investment at Mr. Harrison's urging.  Each had lost faith in Ms. Vitale and/or Mr. Harrison, and each individual Petitioning Creditor no longer believed that any deal to develop a casino on the Property was imminent.  Indeed,

---

[140] 8 Del. C. §§ 211, 220, 225

[141] The Petitioning Creditors' position that an involuntary filing is necessary to investigate and pursue breach of fiduciary duty claims, "most of which are only available to a trustee" might be compelling if the Petitioning Creditors were not also stockholders. *See In re AMC*, 406 B.R. 478 (Bankr. D. Del. 2009) (court declines to abstain where petitioning creditor could not bring breach of fiduciary duty claims in state court because if such a breach occurred it most likely occurred when company was solvent).

[142] *See, e.g. General Trading Incorporated v. Yale Materials Handling Corporation*, 119 F.3d 1485 (11th Cir. 1997) (reversing dismissal of an involuntary filing, finding that the petitioning creditor was "primarily motivated" by proper purposes in filing the involuntary petition); *In re Schloss*, 262 BR 111, 116 (Bankr. M.D. Fla. 2000) (record establishing that "primary if not the sole reason" to file case was to collect a judgment); *see also AMC*, 406 B.R. at 488 (in context of abstention analysis, determining the primary reason for filing of involuntary petition)

each individual Petitioning Creditor believes that Diamondhead's current management is incapable of making a deal, hence the desire for "an independent fiduciary in this bankruptcy proceeding [] empowered to look at proposals for the sale or development of the Property and decide what is in the best interests of the Company and all stakeholders." Accepting all of these grievances as true, which the Court does, these are the grievances of a stockholder who disagrees with management's decisions. As Mr. Stark, the apparent leader of the original Petitioning Creditors, candidly testified: had the opposition slate won the proxy contest, he would not have filed the involuntary petition. This testimony was not contradicted by any of the other Petitioning Creditors.

Not surprisingly, a petitioning creditor's desire to change management because it disagrees with the direction they are taking (or not taking), is not the subject of many bankruptcy decisions. As the Petitioning Creditors note, the few cases cited by Diamondhead for the proposition that dismissal is appropriate when a petitioning creditor is seeking to resolve intra-company management and stockholder disputes are distinguishable on their facts. These cases are essentially two party disputes, or disputes among partners or equity holders in closely held companies, often when the company is paying its debts as they become due.[143] Nonetheless, the basic principle that stockholder disputes are not appropriately remedied by an involuntary petition holds true. As the *Win-Sum* court noted, the desire to replace management with a bankruptcy trustee to make business decisions as an alternative to state court proceedings to resolve stockholder problems is a factor warranting dismissal. Similarly, in *In re Petro Fill, Inc.*, the fact that a petitioning creditor

---

[143] *In re ABQ-MCB Joint Venture*, 153 B.R. 338 (Bankr. D. N.M. 1993); *Matter of Win-Sum Sports, Inc.*, 14 B.R. 389 (Bankr. D. Conn. 1981); *In re Beacon Reef Limited Partnership*, 43 B.R. 644 (Bankr. S.D. Fla. 1984); *Matter of Investment Corp. of North America*, 39 B.R. 758 (Bankr. S.D. Fla. 1984)

who was also a stockholder and director had standing to bring an action under state law for dissolution of the alleged debtor played a role in the Court dismissing that involuntary petition.[144] These cases confirm that vindicating stockholder rights is not a proper purpose for a bankruptcy proceeding.   As in *Win-Sum* and *Petro Fill*, the Petitioning Creditors have adequate stockholder remedies in state court.

In their post-hearing submission, the Petitioning Creditors insist that they filed the involuntary petition to protect the Property, preserve an avoidance action, and prevent any other liens from being placed on the Property so as to "forestall any further dissipation of assets from reaching *bona fide* existing creditors."[145] In particular, the Petitioning Creditors argue that a trustee could avoid the Executives Lien which is evidenced by a Land Deed of Trust recorded in Hancock County, Mississippi on September 26, 2014, less than one year before the involuntary petition was filed.

Diamondhead correctly argues that neither placing an Executives Lien on the Property nor payment of legitimate debts (including, Diamondhead asserts, legitimate salary and rent to Ms. Vitale) is dissipation of assets, another Petitioning Creditor complaint. And, looking beyond counsel's argument and briefing, the record contains little support for the argument that avoiding the Executives Lien, as opposed to frustration at the insider nature of the transaction, was a motivating factor for the filing of the involuntary petition. But the concern about preferential treatment, if correct, is a legitimate concern, and standing alone would be a proper purpose for the filing of an involuntary proceeding.

---

[144] *In re Petro Fill, Inc.*, 144 B.R. 26, 31 (Bankr. W.D. Pa. 1992)
[145] Post-Hr'g Ans. Br. 12, 32

The Petitioning Creditors offer no analysis of the potential avoidance of the Executives Lien, stating simply that "the Lien is an avoidable transfer for which no good faith defense is available."[146] The Petitioning Creditors' position overlooks multiple hurdles that will face a trustee pursuing such an action. First, as the Petitioning Creditors noted on the very first page of their Answering Brief, the Property is "owned indirectly through one of [Diamondhead's] wholly owned subsidiaries," not by Diamondhead. The Petitioning Creditors do not explain how placing a lien on the Property is "a transfer of an interest of the *debtor* in property"—a necessary element of a preference action.[147]

Second, it is far from certain that Diamondhead was insolvent on September 26, 2014—another requisite for a preferential transfer.[148] A corporation is insolvent when "the sum of such entity's debts is greater than all of such entity's property at fair valuation . . ."[149] A "fair valuation" is made on either a going concern or a liquidation value, as appropriate.[150] Regardless, it is appropriate to make adjustments to the balance sheet to reflect the market or liquidation value.[151] GAAP does not deal with the market value of assets or liabilities, or the determination of what are legal liabilities of a company.[152]

Neither Diamondhead nor the Petitioning Creditors adduced evidence with respect to the solvency or insolvency of Diamondhead as of September 26, 2014. But, the Petitioning Creditors did submit into evidence Friedman LLP's Report of Independent

---

[146] Post-Hr'g Ans. Br. 30
[147] 11 U.S.C. § 547(b)
[148] Because the Executives Lien was not recorded within 90 days of the filing of the involuntary petition, a trustee will not have the benefit of the presumption of insolvency. 11 U.S.C. § 547(f).
[149] 11 U.S.C. § 101(32); *In re American Classic Voyages Co.*, 367 B.R. 500, 508 (Bankr. D. Del. 2007)
[150] *Id.*
[151] *In re EBC I, Inc.*, 380 B.R. 348, 349 (Bankr. D. Del. 2008)
[152] *Id.* at 356

Registered Public Accounting Firm dated March 31, 2015.[153] The Report provides a

snapshot of Diamondhead's financial condition as of December 31, 2014, three months

after the purported preference. The Consolidated Balance Sheet reflects: (i) current assets of

$6,538,497, including the Property at book value of $5,467,097; (ii) current liabilities of

$5,281,884; and (iii) "Derivative Liability" related to the 2014 convertible debentures of

$3,754,233,[154] for total liabilities of $9,058,371. Accordingly, based on its balance sheet, as

of September 26, 2014, Diamondhead's liabilities exceeded its assets by, at most,

$2,519,874.

There was no testimony regarding market valuation of the Property as of September

26, 2014. At the Motion to Dismiss Hearing, Ms. Vitale testified that as of December 31,

2015, the value of the undeveloped Property was $39,350,000 based on the appraisal

performed by CBRE. CRBE's valuation was as of January 26, 2015 only four months after

the recording of the Land Deed of Trust.[155] While it is true that CBRE did not testify, its

valuation would have to be off by multiple orders of magnitude for Diamondhead to have

been insolvent when the Executives Lien was granted.[156]

The Petitioning Creditors assert that the Court should give no credit to Ms. Vitale's

testimony,[157] and "should the Court conduct an insolvency analysis, it should rely upon the

value the Company has given to the Property listed on its books and records for over fifteen

---

[153] PC Ex. 39

[154] As explained in the attached notes to the Report, the convertible debentures were reported in accordance with applicable Generally Accepted Accounting Principles. Ms. Vitale testified that this figure includes $1 million of "phantom liability," which would reduce the stated amount. First Day Trustee Hr'g Tr. 195.

[155] MTD Hr'g Tr. 27–29

[156] The Court observes that Diamondhead received its gaming site approval on August 21, 2014, prior to the appraisal.

[157] The Court previously rejected this argument. *See supra* n.41.

years."[158] This position is not only inconsistent with the standards for conducting a

solvency analysis, but with the Petitioning Creditors' investments in the Company. The

Court doubts that the Petitioning Creditors actually believe that Diamondhead is insolvent

today, or was insolvent on September 26, 2014, or in 2010—and none of them testified to

that belief. The only testimony from the Petitioning Creditors is that the Property is a "very

valuable asset" and that if a trustee is appointed to sell the Property, the creditors will be

paid in full, and there "would probably [be] quite a bit of money left over for the

shareholders."[159] Further, contemporaneously with the grant of the Executives Lien,

investors, including Mr. Skaff, Mr. Stark and College Health,[160] agreed to lend $3 million to

the Company albeit contingent on certain conditions. These are not the actions of persons

who believed that Diamondhead was insolvent.[161]

Finally, given the lack of operations, the lack of cash, and the auditors' doubts that

the Company could remain a going concern in 2010, no reasonable person would have

invested money in this Company if he believed that the Property was worth no more than its

book value.[162] Investments were made, or should have been made, on the development

potential of the Property. A general review of the Company's filings with the Securities and

Exchange Commission show that Diamondhead, at all times, disclosed in glorious detail,

---

[158] Post-Hr'g Ans. Br. 27, n.8
[159] Towner Dep. 22
[160] Mr. Skaff, Mr. Stark, and College Health are also beneficiaries of the liens put on the Property in connection with their respective investments in 2014.
[161] *Compare In re Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2014) (Courts further recognize that "[a] powerful indication of contemporary, informed opinion as to value" comes from private investors who "[w]ith their finances and time at stake, and with access to substantial professional expertise, [ ] concluded at the time [ ]that the business was indeed one that could be profitably pursued." *In re Longview Aluminum*, 2005 WL 3021173, at *7 (Bankr. N.D. Ill. Jul. 14, 2015).)
[162] The parties asked the Court to take judicial notice of all of Diamondhead's filing with the Securities and Exchange Commission. Second Day Trustee Hr'g Tr. 3–4; MTD Hr'g Tr. 16–17.

the cash poor position of the Company, the necessary borrowings to cover ordinary expenses, the accumulated deficits, the losses to shareholders, and the need to develop the Property in order for stockholders to obtain a return on their investment.

Thus, even if the Court were to discount Ms. Vitale's undisputed testimony, based on the totality of the evidence presented, the Court finds that a trustee would have significant hurdles in proving insolvency as of September 26, 2014.[163]

The Petitioning Creditors also deny that the involuntary petition was a substitute for customary debt collection and assert that the timing was based on the Superior Court Decision, not the failed proxy contest, and thus not "suspiciously timed."[164] In support, the Petitioning Creditors cite cases that they assert stand for the proposition that "an involuntary petition is among the remedies available to noteholders following payment defaults such as those that occurred here."[165] Those cases are inapposite. The subject of each of those cases is not whether an involuntary petition was filed in bad faith, but whether a bondholder was barred from filing an involuntary petition under the provisions of the relevant bond indenture.[166]

Here, each of the Original Petitioning Creditors testified that the filing of the bankruptcy was an attempt, directly or indirectly, to collect on their promissory notes. And,

---

[163] This analysis also brings into question the stated need to investigate claims of breach of fiduciary duty for the benefit of creditors *qua* creditors. Of course, if the Executives Lien, salary or other benefits received by Ms. Vitale constitute breaches of fiduciary duties, fraudulent conveyances, self-dealing, or other improper actions, state law remedies are available. Indeed, College Health has availed itself of state law venues to collect on its promissory note, compel an annual meeting, and seek remedies for breach of fiduciary duties.
[164] Post Hr'g Ans. Br. 34–35
[165] Post Hr'g Ans. Br. 34
[166] *Envirodyne Indus., Inc. v. Conn. Mut. Life Co. (In re Enfirodyne Indus., Inc.)*, 174 B.R. 986 (Bankr. N.D. Ill. 1994); *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*, 517 B.R. 361 (Bankr. M.D. Ga. 2014); *GMAM Inv. Funds Trust I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.)*, 317 B.R. 235, 248 (S.D.N.Y. 2004)

Mr. Towner and DDM concurred.  As this Court has previously recognized, involuntary bankruptcy proceedings are not to be used as a collection device.[167]  As to the argument that a collective involuntary bankruptcy proceeding is more cost-effective for the Petitioning Creditors, that argument is unpersuasive where there are adequate state law remedies.[168]

As to the timing of the involuntary filing, not one of the Petitioning Creditors testified that the timing of the filing was based on the issuance of the Superior Court Decision.  Rather, as Mr. Stark explained, the idea came about "subsequent to the [annual stockholder] meeting when we saw that it was hopeless for this company to move forward with its present leadership and board."[169]

The Petitioning Creditors also deny any ill-will towards Diamondhead, Ms. Vitale or Mr. Harrison.  While the Court did not have the benefit of observing the demeanor of the Petitioning Creditors other than Mr. Sussman and Mr. Skaff, the level of frustration with current management jumps off the deposition page.  Frustration, however, is not necessarily ill-will, and the Court cannot attribute to the Petitioning Creditors any ill-will toward Diamondhead, Ms. Vitale or Mr. Harrison.  On the other hand, Mr. Burstyn clearly holds ill-will towards Ms. Vitale, but he is not a Petitioning Creditor.  And, even if the Court can attribute his sentiments to DDM, the Court cannot attribute his sentiments to the other Petitioning Creditors.

---

[167] *In re AMC Investors, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (citing *In re Mountain Dairies, Inc.*, 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007))

[168] *In re Petro Fill, Inc.*, 144 B.R. 26, 31 (Bankr. W.D. Pa. 1992)

[169] If the filing of the bankruptcy proceeding was based on the issuance of the Superior Court Decision—and not the failed proxy contest—then College Health's collection action in the Superior Court laid an easy path for others to follow to obtain judgments against Diamondhead on their respective 2010 Notes.

Neither does the Court find that this case was used to obtain a tactical advantage in pending litigation. The filing certainly does not advantage College Health/DDM's case on its 2010 Note as it stayed this litigation in which College Health won an early victory. Nor does Diamondhead argue that the filing of the involuntary petition gives College Health a tactical advantage in its breach of fiduciary duty case pending in Chancery Court.

Further, the Court does not find, and Diamondhead does not argue, that the filing of the involuntary case was an attempt by the Petitioning Creditors to obtain a disproportionate advantage over other creditors. But, the Court does find that the filing was an attempt by the Petitioning Creditors to obtain a disproportionate advantage over other stockholders. On June 8, 2015, the Company held an annual meeting of stockholders at which directors were elected. At that meeting, the majority of stockholders voted to approve Diamondhead's incumbent slate of directors thereby defeating the opposition slate advanced by Mr. Skaff and/or Mr. Stark. Though Mr. Skaff expressed concerns about the propriety of the election, neither he nor any other party took advantage of Section 225 of the Delaware General Corporation Law to contest the election. In filing the involuntary petition to effect a change in management, the Petitioning Creditors sought to upend the results of the stockholder vote, which occurred just two months earlier. The Court concludes that this is analogous to an attempt by a creditor to gain an advantage over another creditor.[170]

Having reviewed the record, the Court finds that Diamondhead has met its burden to show that the involuntary petition was filed in bad faith. While some of the evidence points

---

[170] *See In re Matter of Win-Sum Sports, Inc.*, 14 B.R. 389 (Bankr. D. Conn. 1981) (concluding that attempt to resolve intra-company dispute and stockholder problems is comparable to the "recalcitrant creditor" described in the legislative history to section 305(a)(1))

in the other direction, the testimony and the Petitioning Creditors' Answering Brief were replete with stockholder concerns. Based on the totality of the circumstances, the Court finds that the Petitioning Creditors' primary concern in filing the involuntary petition was to effect a change in management to benefit their investments as stockholders. The Court finds this not to be a proper purpose for filing an involuntary bankruptcy petition. A secondary concern was to collect on their notes. While it may be proper in some circumstances for noteholders to band together to file an involuntary bankruptcy petition, it is not appropriate here, where the noteholders are looking to vindicate their equity interests and where myriad state law remedies are available. Finally, to the extent that there is any evidence to support the notion that the Petitioning Creditors' motivation in filing the involuntary was to avoid the Executives Lien, that motivation was tertiary, at best, and likely ill-conceived.[171] As such, the Court will dismiss the case.[172]

**Conclusion**

The Court understands and fully appreciates the Petitioning Creditors' frustration with the lack of progress over the last fifteen years with respect to the development of the Property. The Court also understands and fully recognizes that Diamondhead may not be successful in either resolving the disputes with the Petitioning Creditors or in raising funds to pay off the 2010 Notes. And, the Court cannot rule out the possibility of a voluntary bankruptcy in Diamondhead's future; but, that is not before the Court.

---

[171] There was no evidence regarding executory contracts that must be evaluated or a need to "secure" the Company's books and records.

[172] By dismissing this case as being filed in bad faith, the Court is not automatically inviting a motion for sanctions pursuant to section 303(g). That section vests the Court with discretion to award fees, which discretion would be judiciously administered.

For the foregoing reasons, Diamondhead's motion to dismiss or alternatively to abstain is GRANTED.[173]  An order will enter.


Dated: June **7**, 2016

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[173] Diamondhead alternatively asks the Court to dismiss the case pursuant to 11 U.S.C. § 305(a). Because the Court is dismissing the case on other grounds, the Court will not address whether it is appropriate to abstain under § 305(a).  The Court does note, however, that the facts that were identified in the Court's bad faith determination most likely warrant abstention.